# EXHIBIT 1

LIMITED LIABILITY COMPANY OPERATING AGREEMENT
OF FORT LEE COMMONWEALTH COMMUNITIES, LLC

BETWEEN

FORT LEE FAMILY HOUSING, LLC

FLIM, LLC

AND

THE UNITED STATES OF AMERICA
THE DEPARTMENT OF THE ARMY

## LIMITED LIABILITY COMPANY OPERATING AGREEMENT
## OF FORT LEE COMMONWEALTH COMMUNITIES, LLC

THE "LIMITED LIABILITY COMPANY INTERESTS" IN THIS LIMITED LIABILITY COMPANY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED; AND THE LIMITED LIABILITY COMPANY INTEREST(S) MAY NOT BE TRANSFERRED OR RESOLD UNLESS: (1) THE LIMITED LIABILITY COMPANY CAUSES THE LIMITED LIABILITY COMPANY INTEREST(S) TO BE REGISTERED UNDER THE SECURITIES ACT OR COUNSEL SATISFACTORY TO THE LIMITED LIABILITY COMPANY AND ITS COUNSEL HAS RENDERED TO THE LIMITED LIABILITY COMPANY AN OPINION THAT AN EXEMPTION FROM SUCH REGISTRATION IS AVAILABLE AND THAT SUCH TRANSFER WILL NOT VIOLATE FEDERAL OR STATE SECURITIES LAWS AND (2) OF THIS OPERATING AGREEMENT IS FULLY COMPLIED WITH BY THE PERSON SEEKING TRANSFER OF THE LIMITED LIABILITY COMPANY INTEREST(S).

**THIS LIMITED LIABILITY COMPANY OPERATING AGREEMENT** (this "**Agreement**") is dated for reference as of November 9, 2006, and is adopted, executed and agreed to (the "**Effective Date**") by, between and among **FORT LEE FAMILY HOUSING, LLC**, a Delaware limited liability company (the "**Managing Member**"), **FLIM, LLC**, a Delaware limited liability company (the "**Independent Member**"), and **THE UNITED STATES OF AMERICA** by the Secretary of the Army, acting by and through the Deputy Assistant Secretary of the Army (Privatizations and Partnerships) (the "**Government**"). The capitalized terms used herein shall have the respective meanings assigned to such terms in Article XI.

ARTICLE I<br>FORMATION; AMENDMENT

1.01    Formation.

On November 9, 2006, Fort Lee Commonwealth Communities, LLC (the "**Company**") was formed as a Delaware limited liability company pursuant to the provisions of the LLC Act. In connection therewith, a duly authorized representative of the Company executed the Certificate of Formation in accordance with the LLC Act and duly filed such Certificate with the Secretary of State of the State of Delaware.

1.02    Names and Addresses.

The name of the Company is currently "Fort Lee Commonwealth Communities, LLC." The registered office of the Company in the State of Virginia shall be at 4701 Cox Road, Suite 301, Glen Allen, Virginia 23060. The name of the registered agent for the Company in the State of Virginia shall be CT Corporation System. The Company shall also maintain an office in El Paso, Texas, which shall initially be at 4401 N. Mesa, El Paso, Texas 79902-1107, or such other place or places as may be determined by the Members.

1.03    Business Purposes.

The Company was formed to: (i) plan, design, develop, redevelop, finance, refinance, construct, renovate, rehabilitate, replace, own, lease, operate, maintain, and manage a residential housing development consistent with the CDMP, constituting a military housing community to consist of approximately 1,493 units of multifamily and detached housing upon completion, in order to provide affordable housing primarily for use by military personnel and their families assigned to Fort Lee, Virginia ("**Fort Lee**"); (ii) enter into a Department of the Army Ground Lease and Conveyance of Improvements for Residential Communities Initiatives Purposes (the "**Ground Lease**") of certain real estate (the "**Site**") located at Fort Lee, Prince George County, Virginia, in connection with the CDMP; (iii) acquire all of the Government's right, title and interest in and to certain buildings, improvements and fixtures with related amenities and infrastructure (the "**Existing Improvements**") currently located on the Site excluding those buildings, improvements and fixtures identified on Exhibit C appended to the Ground Lease, subject to the "**Existing Army Outgrants and Encumbrances**" set out in Exhibit B appended to the Ground Lease and the terms of Condition 18 of the Ground Lease; (iv) develop, demolish, renovate, rehabilitate, repair, maintain, replace, upgrade, lease and use the Existing Improvements, and the buildings, improvements and fixtures and related amenities and infrastructure (the "**Future Improvements**"), located on the Site after the date of the Ground Lease, pursuant to the terms of the CDMP and related agreements with the Government; (v) to perform the functions and obligations pursuant to the Project Documents; and (vi) to do all things incidental to or in furtherance of the above enumerated purposes (all of the foregoing being hereinafter referred to as the "**Project**").

1.04    Authority of the Company.

In order to carry out its purpose, the Company is empowered and authorized to do any and all acts and things necessary, appropriate, proper, advisable, incidental to or convenient for the furtherance and accomplishment of its purpose, and for the protection and benefit of the Company, including but not limited to the following:

(a)    enter into each of the Project Documents to which it is intended to be a party;

(b)    demolish any Existing Improvements and construct, operate, maintain, improve, buy, own, sell, convey, assign, mortgage, rent or lease the Project and any real estate and any personal property reasonably necessary to the development and/or operation thereof;

(c)    provide housing consistent with the requirements of the CDMP and such other housing as the Managing Member and the Government shall agree to provide;

(d)    enter into any kind of activity, and perform and carry out contracts of any kind necessary to, or in connection with, or incidental to, the accomplishment of the purposes of the Company, including non-residential operations of the project;

(e)    borrow money and issue evidences of indebtedness in furtherance of the Company business and secure any such indebtedness by mortgage, pledge, or other lien in or on any of its assets;

(f)    maintain and operate the Project and enter into any agreement for the management or construction of the Project;

(g)    rent dwelling units in the Project from time to time, collecting the rents therefrom, paying the expenses incurred in connection with the Project, and distributing the net proceeds to the Members, subject to any requirements which may be imposed by the Project Documents;

(h)    if any of the residential housing units in the Project are released by the Government from use exclusively as military housing, determine the highest and best use of such released units (not inconsistent with the remaining Project), and develop and dispose of such units for such use;

(i)    quitclaim any and all improvements constituting the Project to the Government, without further consideration, in accordance with the terms of the Ground Lease; and

(j)    do any and all other acts and things necessary or proper in furtherance of the Company's purposes.

1.05    <u>Project Financing; Restrictions.</u>

The Initial Financing of the Project will be provided pursuant to the terms of a Loan Agreement (the "**Loan Agreement**"), dated as of August 31, 2007, between the Company, as borrower, and Capmark Capital Inc., a Colorado corporation (together with its successors and assigns, the "**Senior Lender**"), having an office at 1801 California Street, Suite 3900, Denver, Colorado. Subject to the terms and conditions of the Loan Agreement, the Senior Lender has agreed to make a loan (the "**Loan**") to the Company in the original principal amount of $126,348,000 to provide for the payment of certain Project Costs. The Loan is to be evidenced by two (2) promissory notes, each of which is to be made by Company and payable to Senior Lender (such promissory notes, as they may be divided, serialized, participated, modified, amended, extended, restated or supplemented from time-to-time in accordance with its terms and the terms of the Loan Agreement, respectively, and collectively, the "**Notes**") and is to be secured by, among other things, a mortgage, assignment of rents, security agreement and fixture filing granted by the Company for the benefit of the Senior Lender (such mortgage, assignment of rents, security agreement and fixture filing, as it may be modified, amended, restated or supplemented from time-to-time in accordance with its terms and the terms of this Agreement, the "**Security Instrument**").

The Members acknowledge and agree that (in addition to those matters specifically identified in this Agreement) (i) the exercise and performance of certain rights, powers and duties of the Members and/or the Company otherwise permissible by this Agreement may be restricted and/or conditioned as and to the extent set forth in the Loan Documents, and (ii) the violation of any such restriction or condition (if not consented to in writing by the Senior Lender as may be required) may constitute a breach of or an event of default under the Loan Documents entitling the Senior Lender to exercise various rights and remedies against the Company, the Project and other Persons. The Members and the Company agree to exercise and perform any applicable rights, powers and duties under this Agreement in a manner that complies with the requirements, restrictions and conditions applicable to the Company under the Loan Documents. By executing this Agreement, the Members agree that the execution of the Loan Documents by the Company shall evidence and constitute the review and approval thereof by the Company and the Members insofar as the Loan Documents affect the Company.

1.06    <u>Fiduciary Duties.</u>

Except as expressly provided in this Agreement, no Member shall have any obligations (fiduciary or otherwise) with respect to the Company or to the other Member insofar as making investment opportunities other than the Project available to the Company or to the other Member. Except with respect to the Project, each Member may engage in whatever activities such Member may choose, whether the same are competitive with the Company or otherwise, without having or incurring any

obligation to offer any interest in such activities to the Company or to the other Member. Except as set forth in the foregoing provisions of this Section 1.08, the fiduciary duties of the Members to each other and to the Company shall be limited solely to those arising from the purposes of the Company described in Section 1.05 above.

1.07    Term of Company.

The Company commenced to operate upon formation as provided in Section 1.01 above, and shall continue in effect until September 1, 2058, unless earlier dissolved pursuant to the provisions of Article VIII or the LLC Act.

ARTICLE II
MANAGEMENT OF THE COMPANY

2.01    Management of the Company.

(a)    The Company shall be managed by the Managing Member. Except as otherwise set forth in this Agreement, the Managing Member, within the authority granted to it under this Agreement, shall have full, complete, and exclusive discretion to manage and control the business of the Company for the purposes stated in Article I, shall make all decisions affecting the business of the Company and shall manage and control the affairs of the Company and use all commercially reasonable efforts to carry out the purposes of the Company. In so doing, the Managing Member shall take all actions necessary or appropriate to protect the interests of the Members and of the Company. The Managing Member shall devote such time as is necessary to the affairs of the Company.

(b)    Except as otherwise set forth in this Agreement and subject to the applicable provisions of the Project Documents, the Managing Member (acting for and on behalf of the Company), in extension and not in limitation of the rights and powers given by law or by the other provisions of this Agreement, shall have the full and entire right, power, and authority in the management of the Company business to do any and all acts and things necessary, proper, convenient or advisable to effectuate the purposes of the Company. In furtherance and not in limitation of the foregoing provisions, the Managing Member is authorized and empowered specifically to execute and deliver, on behalf of the Company, the Project Documents, the Loan Documents, or any other document or instrument in any way related thereto or necessary or appropriate in connection therewith and to cause the Company to fully perform its obligations under the Project Documents, the Loan Documents, and all other such documents and instruments. The Managing Member shall cause any renovation work and new construction at the Project to be performed in accordance with the Plans and Specifications. All decisions made for and on behalf of the Company by the Managing Member shall be binding upon the Company. No person dealing with the Managing Member shall be required to determine its authority to make any undertaking on behalf of the Company, nor to determine any facts or circumstances bearing upon the existence of such authority.

(c)    If required under the terms of the Lockbox Agreement or any other financing obtained by the Company for the Project in accordance with the terms of this Agreement, and until the date that the Loan, or such other financing ("**Additional Permitted Debt**"), is no longer outstanding, or the date that no non-contingent monetary obligations remain outstanding under the Loan Documents or any agreement pursuant to which such Additional Permitted Debt is issued, or until such time as is set forth in the Loan Documents, and for a period of one year and one day thereafter, the Company shall appoint and (except in the case of a temporary vacancy, which shall promptly be filled) shall at all times have a member acceptable to the Senior Lender to act as the Independent Member under this Agreement. The Consent of the Senior Lender to the admission of an Independent Member shall be conclusive as to any obligation of the Company to ascertain the qualifications of such party to act as Independent Member.

The Independent Member shall the right to approve those matters set forth in subpart (b), and subpart (r), (i) through (vii) of Section 12.01, and Section 12.02 of this Agreement, but the Independent Member shall have no right to participate in, vote on, approve, or otherwise consent to any action by, or matter relating to, the Company, and shall not be included for the purposes of notice or quorum for such matters.

2.02    Actions Undertaken by the Members.

(a)    The Managing Member shall not:

(i)    perform any act in violation of any applicable law or regulation thereunder;

(ii)    perform any act in violation of the provisions of the Project Documents;

(iii)    do any act required to be approved or ratified in writing by the Members under the Act unless the right to do so is expressly otherwise given in this Agreement;

(iv)    take any action which would cause a violation of the terms of any Loan Documents or the agreements pursuant to which any Additional Permitted Debt is issued;

(v)    borrow from the Company or commingle Company funds with funds of any other Person; or

(vi)    perform any act described in Section 2.02(b) below except in accordance with the terms of Section 2.02(b).

(b)    The Managing Member shall not, without the Consent of the Government, which consent shall not be unreasonably withheld, conditioned or delayed, and subject to Sections 2.02(c) and 2.02(d):

(i)    undertake or authorize any capital expenditures in any one fiscal year in excess of $50,000 in the aggregate except (1) to the extent such capital expenditures are contemplated by the approved Annual Business Plan, (2) to the extent such capital expenditures are required to be made pursuant to the Loan Documents or Additional Permitted Debt documents, or (3) as reasonably determined by the Managing Member, capital expenditures required by law or to stabilize emergency circumstances;

(ii)    adopt or approve a Annual Business Plan except in accordance with Section 2.13 hereof or make any modification to a Annual Business Plan approved in accordance with such Section 2.13 or, except as may be required by law or to stabilize emergency circumstances, make any expenditure which is not consistent with the approved Annual Business Plan for the then current fiscal year;

(iii)    assume any obligation to make, or commit to make, any performance based incentive compensation awards;

(iv)    sell or otherwise dispose of, or approve the sale or disposition of, any material portion of the assets of the Company or the Project, or assign or enter into any lease or sublease of real property (other than tenant leases), with respect to the Project;

(v)     except for the Initial Financing and approved draws on subsequent Permitted Financings, consistent with the Annual Business Plan, borrow money and give negotiable or nonnegotiable instruments therefor; or guarantee, indemnify or act as surety with respect to payment or performance of obligations of third parties; and assign, convey, transfer, mortgage, subordinate, pledge, grant security interests in, encumber or hypothecate the Project or the Company's interest in the Project to secure any indebtedness of the Company or any other of the foregoing obligations of the Company; or approve any of the foregoing;

(vi)    institute proceedings to have the Company adjudicated bankrupt or insolvent; consent to the institution of bankruptcy or insolvency proceedings against the Company; file a petition or consent to a petition seeking reorganization or relief for the Company under any applicable federal or state law relating to bankruptcy or insolvency; consent to the appointment of a receiver, liquidator, assignee, servicer, sequestrator (or other similar official) of the Company, or a substantial part of the property of the Company, make any assignment for the benefit of creditors; except as required by law, admit in writing the inability of the Company to pay its debts generally as they become due; or consent to any lifting of the automatic stay imposed under the Bankruptcy Code; or take any action in furtherance of any of the actions listed above;

(vii)   amend, modify, alter, change or cancel, prepay, refinance (subject to clause (v) above), recast, extend or compromise any Loan Documents or refinance the Loan or any Permitted Financing, or approve any of the foregoing;

(viii)  enter into or approve any agreement on behalf of the Company for the design, construction, management or operations of the Project other than entering into or approving (i) the Development Agreement ("**Development Agreement**") in substantially the form of Exhibit "A" appended hereto; (ii) the Asset Management Agreement ("**Asset Management Agreement**") in substantially the form of Exhibit "B" appended hereto; (iii) the Property Management Agreement ("**Property Management Agreement**") in substantially the form of Exhibit "C" appended hereto, or (iv) the Construction Contract in substantially the form of Exhibit "D" appended hereto (collectively, the "**Subsidiary Agreements**");

(ix)    discontinue the operations of the Company;

(x)     except as provided, repurchase or redeem any Interests held by any Member;

(xi)    acquire any interest in real property other than the Project, including the land upon which the Project sits, in accordance with the terms of the Ground Lease;

(xii)   accept Additional Capital Contributions except as provided for in Article V and Section 2.14(c);

(xiii)  initiate or agree to settle any litigation which has a reasonable likelihood, to result in a judgment or settlement for or against the Company in an amount in excess of $50,000 per occurrence and $50,000 in the aggregate in one year, provided (a) that settlement of any litigation involving an Affiliate shall require Approval of the Members and (b) that the Managing Member shall be authorized without the need for any action by the Members to settle any litigation regardless of the amount of the judgment or settlement if such amounts are covered by the proceeds of insurance maintained by the Company ;

(xiv)   approve any material modifications to the Plans and Specifications or any change order to the scope of work described in the Construction Contract;

(xv)   decrease the amounts or types of insurance coverage maintained by the Company from those coverages contemplated in the original Annual Business Plan or as otherwise Approved by the Members;

(xvi)   designate or approve a replacement Developer, Design-Builder, Asset Manager or Property Manager, except as provided by Section 2.08 and Section 2.10(c), respectively;

(xvii)   change the limited liability company status of the Company; convert or reorganize the Company into any other form of entity; merge or consolidate the Company with or into any other entity; form any subsidiary or enter into any partnership, limited liability company or other joint venture; or acquire any equity interest in or otherwise make any equity investment in any other entity;

(xviii)   remove or approve the removal of the Developer, Design-Builder, Asset Manager or Property Manager except as provided in Section 2.08; or

(xix)   make any modification to security requirements or arrangements for the Project or expend any funds for installation force protection initiatives, except to the extent such modifications or expenditures are contemplated by the approved Annual Business Plan for the then current fiscal year;

(xx)   change any fee payable to the Developer, Design-Builder, Asset Manager or Property Manager, or approve any change in the incentive fee program metrics that are set forth in the Development Agreement, the Property Management Agreement, Asset Management Agreement or the Construction Contract;

(xxi)   approve any exceptions to the Army policy that sets rents for military families equal to the Installation BAH; or

(xxii)   use Project funds for schools or other ancillary facilities not previously described as part of the Project in the CDMP.

(c)   Notwithstanding anything to the contrary in this Agreement, until the later of the date that the Loan is no longer outstanding or the date that no non-contingent monetary obligations remain outstanding under the Loan Documents, and for a period of one year and one day thereafter:

(i)   Each Member, and the Independent Member (to the extent of its respective rights and responsibilities hereunder), shall cause the Company to, and the Company shall:

(A)   do or cause to be done all things necessary to preserve and keep in full force and effect its existence, rights (charter and statutory) and franchises, obtain and preserve its qualification to do business in each jurisdiction in which such qualification is or shall be necessary to protect the validity and enforceability of this Agreement and the Project Documents, and observe all procedures and provisions required by this Agreement and the laws of the Commonwealth of Virginia;

(B)      not amend, alter, waive, change or repeal (1) its Certificate of Formation, (2) the definitions in this Agreement of "LLC Act," "Affiliate," "Consent," "Independent Member," "Servicer," "Loan," "Loan Documents," "Person", "Project Documents" or any of the definitions of the terms that form any part thereof or (3) Section 1.05, Section 1.06, Section 2.02, Section 6.01, Section 7.01, Section 8.01, Article XII, Section 14.06 or Section 14.10 of this Agreement without the written Consent of the Senior Lender, which shall not be unreasonably withheld;

(C)      maintain its own financial records, accounts, books of account and bank accounts separate and distinct from those of any other Person (including Affiliates), not commingle its records, accounts, books of account and bank accounts with the organizational or other records, accounts, books of account or bank accounts of any other Person and cause such records, accounts, books of account and bank accounts shall reflect the separate existence of the Company;

(D)      act solely in its own name and through its Members, the Independent Member, and its duly authorized officers or agents in the conduct of its business, prepare all Company correspondence in the Company name, hold itself out as a separate entity from any other Person, conduct its business so as not to mislead others as to the identity of the entity with which they are concerned, correct any known misunderstanding regarding its separate identity, refrain from engaging in any activity that compromises the separate legal identity of the Company, and strictly comply with all organizational and statutory formalities to maintain its separate existence;

(E)      take such actions as may be necessary to authorize each of the Company's actions as may be required by law;

(F)      at any time that the Company is not treated as a disregarded entity or part of a consolidated group filing consolidated returns for federal income tax purposes, file its own tax and information returns, if any, as may be required of the Company under applicable federal, state and local law, and pay any taxes so required to be paid under applicable law from its own assets;

(G)      not commingle its assets with assets of any other Person and maintain identifiable funds and assets held in the name of the Company;

(H)      maintain annual and quarterly financial statements separate from any other Person and pay or bear the cost of preparation of its own financial statements, disclose in the annual financial statements of the Company the effects of its transactions in accordance with GAAP and cause its annual financial statements and records to be audited by an independent certified public accountant reasonably satisfactory to Members and the Senior Lender;

(I)      cause (1) the consolidated or combined financial statements, if any, which consolidate or combine the assets and earnings of any Member or the Independent Member with those of the Company to contain a footnote indicating the separate existence of the Company and stating that the assets of the Company shall not be available to creditors of any Member, the Independent Member or

any Affiliate of the Company and (2) the financial statements (if any) of the Company to disclose that the assets of the Company are not available to pay creditors of any of its Affiliates or any Member, the Independent Member or any of their respective Affiliates;

(J)      be directly responsible for the costs of its own outside legal, auditing and other similar services and pay its taxes, liabilities and operating expenses only out of its funds and not pay from its assets any obligations or indebtedness of any other Person;

(K)      maintain an arm's length relationship with its Affiliates and each Member, officer and manager of the Company, the Independent Member and their respective Affiliates, and not enter into any contract or agreement with any of its Affiliates or any Member, officer and manager of the Company, the Independent Member or their respective Affiliates unless the terms are intrinsically fair, commercially reasonable, and substantially similar to those that would be available on an arm's-length basis with third parties, and transact all business with its Affiliates and each Member, officer and manager of the Company, the Independent Member and their respective Affiliates pursuant to enforceable agreements with material terms established at the inception that will not be amendable except with the consent of each of the parties to such agreement;

(L)      to the extent that the Company leases premises from any Member, the Independent Member or their respective Affiliates, pay appropriate, fair and non-arbitrary, reasonable compensation or rental;

(M)      pay from its own funds the salaries of its own employees;

(N)      not be, become or hold itself out as being liable for the debts or other obligations of any other Person, or hold out its credit as being available to satisfy the obligation of any other Person, except to the extent required by the Loan Documents;

(O)      not act as an agent of any Member, officer or manager of the Company, the Independent Member or their respective Affiliates;

(P)      not permit any Member, the Independent Member, any managers or officers of the Company or their respective Affiliates to act as an agent for the Company, except as specifically permitted by this Agreement;

(Q)      not identify itself as a department or division of any other Person in order not (1) to mislead others as to the identity of the entity with which such other party is transacting business or (2) to suggest that the Company is responsible for the debts of any other Person;

(R)      fairly, reasonably and non-arbitrarily allocate between the Company and any other Person all expenses that are shared with such Person, including any overhead, rent, or other compensation paid for shared or leased office space;

(S)     compensate from its own funds independent contractors for performing services or incurring expenses in connection with such services for the Company in an amount no greater than the fair value of such services and expenses;

(T)     not enter into leases for office space, except as necessary to maintain a principal place of business or the conduct of its operations;

(U)     use stationery, invoices and checks separate from any other Person;

(V)     not pledge any property or assets of the Company (except as permitted by the Loan Documents), lend or advance any moneys (other than trade receivables in connection with the ordinary course of the Company's business), guarantee (directly or indirectly), endorse (other than the endorsement of negotiable instruments for collection or deposit in the ordinary course of business) or otherwise become contingently liable (directly or indirectly) for the obligations of, or acquire or assume any obligation or liability of, any other Person;

(W)     except for investments of accounts required to be maintained by this Agreement or the Lockbox Agreement, not make an investment in or for the benefit of, or own or purchase any stock, obligations or securities of or any other interest in, or make any capital contribution to, any other Person or form or acquire any subsidiary;

(X)     maintain adequate capital for the normal obligations reasonably foreseeable in a business of the Company's size and character and in light of its proposed business operations and liabilities (provided that this clause shall not be deemed a commitment by any Member or the Independent Member to make Capital Contributions except as provided in Article V of this Agreement);

(Y)     not engage, directly or indirectly, in any business other than the actions required or permitted to be performed under Sections 1.05 and 1.06 of this Agreement;

(Z)     not acquire or own any material assets other than (1) interests in the Project, (2) the Ground Lease, (3) the Site, and (4) such incidental machinery, equipment, fixtures and other personal property as may be necessary for the operation, management, maintenance and construction of the Project or otherwise necessary to comply with its obligations under the Project Documents;

(AA)     properly account in the Company's books and financial records for any transactions entered into between the Company and each Member, officer and manager of the Company, the Independent Member and their respective Affiliates;

(BB)     not enter into any contract, except such contracts as necessary to enable the Company to achieve its purposes as set forth in, or that are otherwise required or permitted by, Sections 1.05 and 1.06 of this Agreement;

(CC)    not agree to, enter into or consummate any transaction which would render it unable to confirm that (1) it is not an "employee benefit plan" as defined in Section 3(32) of ERISA, which is subject to Title I of ERISA, or a "governmental plan" within the meaning of Section 3(32) of ERISA; (2) it is not subject to state statutes regulating investments and fiduciary obligations with respect to governmental plans; and (3) less than 25% of each of its outstanding classes of equity interests are held by "benefit plan investors" within the meaning of 29 C.F.R. § 2510.3-101(f)(2);

(DD)    subject to Section 2.02(c)(iv) hereof, have at least one Independent Member at all times;

(EE)    except as expressly provided in the Loan Documents, not knowingly perform any act that would subject (1) any Member or the Independent Member to liabilities of the Company in any jurisdiction or (2) the Company to taxation as a corporation under relevant provisions of the Code;

(FF)    not combine, consolidate or merge into or with any other Person, convert into an entity that is not a limited liability company, reorganize or form the Company in a jurisdiction other than Delaware or, to the fullest extent permitted by applicable law, dissolve, liquidate or transfer substantially all of its assets; and

(GG)    not be maintained or used to abuse creditors or to perpetuate a fraud, injury or injustice to creditors.

(ii)    Except any guaranty of the Company's obligations by an Affiliate, none of the Company, any Member, officer or manager of the Company, the Independent Member, their respective Affiliates or any Person on behalf of the Company shall, and none of them shall have the authority to, enter into any agreements, written or otherwise, pursuant to which any Member, officer or manager of the Company, the Independent Member or any of their respective Affiliates agrees to extend credit, make loans or make payment or contributions to or for or assume, guaranty or otherwise be obligated for the payment or performance of the Company or hold itself out as being liable for the debts of the Company, or hold out its credit as being available to satisfy the obligations of the Company;

(iii)    Without the Consent of all of the Members and the Independent Member (which shall not be deemed to have consented unless all of the members thereof and the Independent Director thereof shall have duly authorized the Independent Member to so Consent), none of the Company, any Member, officer or manager of the Company, the Independent Member or any Person on behalf of the Company shall, or shall have the authority to:

(A)    do any act in contravention of this Agreement;

(B)    confess a judgment against the Company;

(C)    possess the property or assets of the Company, or, subject to paragraph (c)(i) above, assign rights, if any, in specific property or assets of the Company, for other than the purposes of the Company required or permitted under this Agreement; or

(D)      to the fullest extent permitted by law, (1) commence any case, proceeding or other action or file a petition or answer under any existing or future bankruptcy, insolvency or similar law that seeks (i) to adjudicate the Company a bankrupt or insolvent, (ii) to have an order for relief entered with respect to the Company, or (iii) reorganization, arrangement, adjustment, wind-up, liquidation, dissolution, composition or other relief with respect to the Company or its debts, (2) consent to the institution of bankruptcy or insolvency proceedings against the Company, (3) seek or consent to the appointment of a receiver, custodian, liquidator, assignee, servicer, sequestrator (or other similar official) of the Company or all or a substantial part of its property, (4) except as required by law, admit the Company's inability to pay its debts generally as they become due, (5) make a general assignment by the Company for the benefit of creditors, (6) file an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Company in a proceeding of the type described in subclauses (1) through (5) of this clause (D), or (7) authorize, take any action in furtherance of, consenting to or acquiesce in any of the foregoing or any similar action or other proceedings under any federal or state bankruptcy, insolvency or similar law on behalf of, or with respect to, the Company, or in connection with the Loan Documents or this Agreement;

(iv)      If required under the terms of Section 2.01(c), the Members shall cause the Company to have, and the Company shall have, an Independent Member (except in the case of a temporary vacancy, which shall promptly be filled). The Consent of the Senior Lender to the admission of an Independent Member shall be conclusive as to any obligation of the Company to ascertain the qualifications of such party to act as Independent Member. Except as otherwise set forth in this Agreement, the Independent Member shall have no right to participate in, vote on, approve, or otherwise consent to any action by, or matter relating to the Company; provided that, if the Independent Member is the sole Member, the Independent Member in its capacity as the sole Member shall hold all of the limited liability company interests in the Company, including, without limitation, the interests in the profits and losses of the Company, and shall be entitled to exercise all of the rights and shall have all of the obligations of a Member hereunder, except that the Independent Member shall not be required to make any capital contributions to the Company;

(v)      The initial Independent Member shall execute a counterpart of this Agreement. No Independent Member may resign, be removed as the Independent Member or transfer or delegate its rights or obligations as an Independent Member unless, and no appointment and admission of a successor Independent Member shall be effective, until a successor Independent Member (i) has been appointed by with the Consent the Majority Members and of the Senior Lender, (ii) has been admitted to the Company as an Independent Member by executing a counterpart to this Agreement and (ii) has accepted the appointment as the Independent Member pursuant to the terms hereof. If the Independent Member resigns, ceases to be qualified as an Independent Member, or such position is otherwise vacant, no action requiring the affirmative vote of the Independent Member shall be taken until a successor Independent Member is duly appointed as provided in this paragraph; and

(vi)      The Independent Member shall not at any time serve as a servicer in Bankruptcy for any Affiliate of the Company.

(d)      The Bankruptcy, dissolution, liquidation, termination or adjudication of incompetency of any Member or the Independent Member shall not cause the termination or dissolution of the Company and the business of the Company shall continue. Upon any such occurrence, the

Servicer, receiver, executor, administrator, committee, guardian or conservator, if any, of such Member or the Independent Member shall have all the rights of the Member or the Independent Member, as applicable for the purpose of settling or managing the Member's or the Independent Member's estate or property, subject to satisfying conditions precedent to the admission of such assignee or a substitute Member or Independent Member, as applicable. The transfer by such Servicer, receiver, executor, administrator, committee, guardian or conservator of any Interest of such Member or the interest of the Independent Member shall be subject to all of the restrictions to which such transfer would have been subject if such transfer had been made by the Bankrupt, dissolved, liquidated, terminated or incompetent Member or Independent Member. Notwithstanding any other provision of this Agreement, each of the Members and the Independent Member waives any right it might have to agree in writing to dissolve the Company upon the Bankruptcy of a Member or the Independent Member or the occurrence of an event that causes a Member to cease to be a member of the Company under the Act. This paragraph shall apply to the fullest extent permitted by applicable law.

2.03    Certain Record Keeping Obligations. The Managing Member shall be responsible for assuring that the Company maintains all records, produces all reports, and conducts all other acts necessary to ensure the Company's compliance with the federal Davis Bacon Act and Service Contract Act to the extent those acts are determined applicable to the Company activities. The Managing Member will also be responsible for gathering data and producing reports on behalf of the Company 1) for monthly, quarterly and annual financial and operational performance reports for use by Members and 2) that are necessary for compliance with the Department of the Army's Portfolio Asset Management standard operating procedures, as such procedures are furnished to the Company, and to the extent such procedures are determined to be applicable to the Company's activities. The costs of maintaining all such records, producing all such reports, gathering all such data, and taking any other actions to comply with such acts and procedures shall be operating expenses of the Company, and shall be provided for appropriately in the Annual Business Plan.

2.04    Delegation of Authority. The Managing Member may appoint, employ, contract, or otherwise deal with any Person for the transaction of the business of the Company, which Person may, under supervision of the Managing Member, perform any acts or services for the Company as the Managing Member may approve.

2.05    Managing Member or Affiliates Dealing with Company. The Managing Member and any Affiliates thereof shall have the right to contract or otherwise deal with the Company for the sale of goods or services to the Company in addition to those specifically provided for herein, if (i) the goods or services are reasonable for and necessary to the Company, (ii) the fees, terms and conditions for the provision of such goods or services are at least as favorable to the Company as would be obtainable in an arm's length transaction, and (iii) the Managing Member has provided fifteen (15) prior business days' written notice of the proposed transaction to the Government and the Government has not objected to the transaction on the basis of clauses (i) or (ii) of this sentence. If the Managing Member and the Government cannot agree as to whether the proposed transaction is reasonable and necessary to the Company and whether it constitutes the equivalent of an arm's length transaction and cannot otherwise resolve such disagreement, the parties will follow the procedures for dispute resolution described in Section 14.10. The Managing Member shall assure that any Management Agreement shall contain a provision comparable to this Section 2.05, but requiring notice and a right to object (as required by clause (iii) hereof) for the Company, rather than the Government; provided, however, that if any Management Agreement shall be with the Managing Member or any Affiliate of the Managing Member, the Government shall be given such notice and right to object. The Developer, Property Manager, Asset Manager, and Design-Builder, and the Development Agreement, Property Management Agreement, Asset Management Agreement and Construction Contract, as such parties and contracts exist on the date hereof, are all approved for the provision of appropriate goods and services to the Company.

2.06   Descriptions of Agreements. This Agreement comprehends that the Company will enter into various agreements for services, including, without limitation, the Development Agreement, the Property Management Agreement, the Asset Management Agreement and the Construction Contract. The descriptions of any such agreements herein shall be, in each and every case, subject entirely to the actual terms of said agreements, if such agreements have been executed by the Company and approved by the Government in connection with the Closing.

2.07   Liability for Acts and Omissions. No Managing Member or Affiliate thereof shall be liable, responsible or accountable in damages or otherwise to any of the Members for any act or omission performed or omitted by it, or any of them, in good faith on behalf of the Company and in a manner reasonably believed by it or any of them to be within the scope of the authority granted to it or any of them by this Agreement and in the best interest of the Company, provided that the protection afforded the Managing Member pursuant to this Section 2.07 shall not apply in the case of the gross negligence, willful misconduct, fraud, or any breach of fiduciary duty as Managing Member or its officers, directors, agents, or employees with respect to such acts or omissions. Any loss or damage incurred by any Managing Member or Affiliate thereof by reason of any act or omission performed or omitted by it or any of them in good faith on behalf of the Company and in a manner reasonably believed by it or any of them to be within the scope of the authority granted by this Agreement and in the best interests of the Company (but not, in any event, any loss or damage incurred by the Managing Member or Affiliate thereof by reason of the gross negligence, willful misconduct, or fraud by any of its officers, directors, employees, or agents of the Managing Member or any breach of fiduciary duty as Managing Member with respect to such acts or omissions) shall be paid from Company assets to the extent available. However, any such payment shall be subordinate to amounts due under the Loan Documents and any other agreements pursuant to which any Additional Permitted Debt is issued.

2.08   Removal of the Managing Member.

(a)   The Government shall have the right to remove the Managing Member and to appoint a new Managing Member (including the Government or an Affiliate) in accordance with subsection (b) hereof if one or more of the following conditions exist (each a "**Managing Member Default**"):

(i)   there has occurred and is continuing beyond any applicable notice and cure period, a default or event of default under the Project Documents by the Company as to which the Managing Member failed to take available actions to address such default during the relevant cure period, and the Servicer or the Senior Lender, exercises its remedies under the Loan Documents or the Government has initiated action to terminate the Ground Lease;

(ii)   in the case of fraud, gross negligence or willful misconduct of the Managing Member with respect to any material matter in the discharge of its duties and obligations as Managing Member, including the enforcement of the Company's rights under any Development, Property Management, Asset Management, and any Construction Contract to which the Company is a party, provided that such violation results in, or is likely to result in, a material detriment to or an substantial impairment of the Project, the Company or its asset;

(iii)   the adjudication of the Managing Member as insolvent in either bankruptcy or equity proceedings, the filing of an involuntary petition in bankruptcy against the Managing Member (that is not dismissed within ninety (90) days), the filing against the Managing Member of a petition for reorganization under the Federal Bankruptcy Code or any state statute (that is not dismissed within ninety (90) days), a general assignment by the Managing

Member for the benefit of creditors, the voluntary claim (by the Managing Member) that it is insolvent under any provisions of the Federal Bankruptcy Code (or any state insolvency statutes), or the appointment for the Managing Member of a temporary or permanent receiver, Servicer, custodian, or sequestrator and such receiver, Servicer, custodian, or sequestrator is not dismissed within ninety (90) days.

(b)     If the Government elects to remove the Managing Member in accordance with Section 2.08(a) hereof, the Government shall give Notice to all other Members, and to the Servicer and the Senior Lender of its determination that the Managing Member shall be removed or that its designee be admitted as Managing Member. If the Government has determined to remove the Managing Member in accordance with Section 2.08(a) hereof, the Managing Member shall have ninety (90) days after receipt of such Notice to cure any default or other reason for such removal if such default is curable, in which event it shall remain as Managing Member. If, at the end of ninety (90) days, the Managing Member has not cured any default or other reason for such removal, it shall cease to be Managing Member and the powers and authorities conferred on it as Managing Member under this Agreement shall cease and the Government, or a designee of the Government, shall become the Managing Member and shall be bound by all the applicable terms and conditions of this Agreement and the Project Documents. The foregoing notwithstanding, if the event giving rise to the determination that the Managing Member be removed arises under Section 2.08(a)(ii) hereof, then there shall be no requirement for Notice and no opportunity to cure any such default.   In the event that the Government has determined to cause its designee to be admitted as Managing Member, such admission shall occur on such date as is determined by the Government, which may be on the date of the Notice to the Managing Member or at any time thereafter. In the event that the Government's designee is admitted as the Managing Member pursuant to this Section 2.08, it shall not preclude the Government from exercising its right to remove the Managing Member at any time thereafter pursuant to the provisions of this Section 2.08 nor shall the Government have any liability or fiduciary obligation to any other Member because of the selection of a Managing Member or any action or any failure to act of any such Managing Member.

(c)     Upon removal as Managing Member, the former Managing Member shall retain all rights to fees earned pursuant to any contractual arrangements between the Company and the former Managing Member, and to distributions, profits, and any other proceeds of the Company (other than the return of any Capital Contributions); provided, however, that the Company shall be entitled to set off against any claims that the former Managing Member may have against the Company in respect of such fees or distributions or otherwise, any liquidated claims of the Company against the Managing Member. Managing Member shall retain its Interest and be a Member of the Company.

(d)     In the event that the Government shall determine that grounds for removal of the Managing Member exist under Section 2.08(a) and that the Company will experience immediate irreparable harm if the Managing Member shall continue to operate the Company, the Government shall be permitted to immediately remove the Managing Member, notwithstanding any requirement as to notice periods set forth in this Section 2.08 or as to dispute resolution set forth in Section 14.10.

2.09     Developer.  The Company shall approve the execution of the Development Agreement, the selection of the Developer, the establishment of milestones, the payment of the Development Fee, the taking of various actions with respect thereto, and shall take such actions as are contemplated therein.

2.10     Property Manager.   The Company shall approve the execution of the Property Management Agreement, the selection of the Property Manager, and the taking of various actions with respect thereto and shall take such actions as are contemplated therein.

2.11    Design-Builder. The Company shall approve the execution of the Construction Contract, the selection of the Design-Builder, and the taking of various actions with respect thereto and shall take such actions as are contemplated therein.

2.12    Asset Manager. The Company shall approve the execution of the Asset Management Agreement, the selection of the Asset Manager, and the taking of various actions with respect thereto and shall take such actions as are contemplated therein.

2.13    Annual Business Plan. The Managing Member cause the Asset Manager to prepare and submit to each of the Members (i) no later than thirty (30) days prior to the Closing with respect to the remainder of the Company's then-current fiscal year and (ii) not less than ninety (90) days prior to the commencement of each subsequent fiscal year, with respect to the next fiscal year, a proposed Annual Business Plan. Each such Annual Business Plan shall include, among other things, a detailed operating and capital budget for the Project and the Company. Each such Annual Business Plan shall specifically list all budgeted revenue and expense line-items and shall be organized in major categories including, but not limited to, administration, operation, repairs and maintenance, utilities, taxes, insurance, interest, debt service with respect to the Loan and capital improvements. Each Annual Business Plan shall identify all budgeted fees and expenses which are to be paid to the Managing Member, or to its Affiliates, and clearly identify, to the extent applicable, classified expenditures for "Historical/Historical Eligible Assets", "General Officer's Quarters", and such other classifications as may be directed by the Company. Each such Annual Business Plan shall be accompanied by a statement of the Managing Member as to the adequacy of the provision made for operations, maintenance, repair, capital replacement, and deposits to the accounts maintained pursuant to the Lockbox Agreement, in light of the ongoing and long-term needs of the Project. Upon receipt of the proposed Annual Business Plan, the Government shall have ninety (90) days to review, conduct discussions, and communicate any objections with respect to the proposed Annual Business Plan. No comments or communications by the Government shall signify its approval of the proposed Annual Business Plan. Until such time as the Government has approved in writing the proposed Annual Business Plan for any fiscal year, the Managing Member will continue to operate the Company and administer the Project in accordance with the approved Annual Business Plan for the immediately preceding fiscal year, provided that the operating budget incorporated within such Annual Business Plan shall be adjusted by the CPI for such preceding fiscal year. Subject to the Lockbox Agreement, the Managing Member shall be authorized to permit the Asset Manager to pay all necessary expenses for operation of the Project, even if such expenses exceed the amounts anticipated for particular items in the Annual Business Plan, if such expenditures are for (i) emergency repairs involving manifest danger to persons or property; (ii) are required to avoid suspension of any necessary service to the Project, or (iii) are needed to meet any specific requirements for Project management or maintenance that are set forth in the Ground Lease.

2.14    Accounts and Subaccounts Under the Lockbox Agreement. The Company is authorized to provide for, and shall make contributions for the establishment of, the various accounts and subaccounts to be held by the Servicer pursuant to the Lockbox Agreement, in addition to those accounts, if any, established by Company pursuant to the Loan Documents. Initial and ongoing contributions to, deposits, and disbursements from, such accounts and subaccounts shall be made as provided for in the Lockbox Agreement and the Annual Business Plan. Descriptions and requirements as to the accounts and subaccounts specifically described in this Section 2.14 shall in all respects be subject to requirements for such accounts and subaccounts set forth in the Lockbox Agreement which shall control, and the Managing Member shall be authorized to comply with the terms of the Lockbox Agreement notwithstanding any inconsistency with the terms of this Section 2.14. Among the accounts to be established under the terms of the Lockbox Agreement are the Capital Repair and Replacement Fund, the Construction Account, and the Reinvestment Account, as hereinafter described.

    (a)    Capital Repair and Replacement Fund.

Pursuant to the terms of the Lockbox Agreement, the Servicer shall establish a Capital Repair and Replacement Fund (or an equivalent account), which account shall be owned by the Company subject to a security interest and pledge given by the Company to the Senior Lender to secure the Loan. The Capital Repair and Replacement Fund shall be funded by amounts required to be deposited therein from the Revenue Account pursuant to Sections 4.04(b)(iii) and 4.07 of the Lockbox Agreement. Subject to the terms of the Lockbox Agreement, amounts in the Capital Repair and Replacement Fund shall be disbursed by the Servicer pursuant to a disbursement request or a written directive that complies with the requirements of the Lockbox Agreement. All such disbursements shall be for periodic replacement or significant repairs of the improvements and personal property of the Project as set forth in the Annual Business Plan or as otherwise agreed upon by the Managing Member and the Government. The Managing Member shall be authorized to submit such disbursement request or written directive to the Servicer under the Lockbox Agreement as to the application of funds in the Capital Repair and Replacement Fund in accordance with the authority provided in the preceding sentence. Upon termination of the Lockbox Agreement, amounts in the Capital Repair and Replacement Reserve Account shall be the property of the Company.

    (b)    Construction Account.

Pursuant to the terms of the Lockbox Agreement, the Servicer shall establish a Construction Account (or an equivalent account) and subaccounts, which account shall be owned by the Company subject to a security interest and pledge given by the Company to the Senior Lender to secure the Loan. The Construction Account shall be funded by amounts required to be deposited therein pursuant to Sections 4.02 of the Lockbox Agreement. Subject to the terms of the Lockbox Agreement, amounts in the Construction Account and subaccounts shall be disbursed by the Servicer pursuant to a disbursement request or a written directive that complies with the requirements of the Lockbox Agreement only as needed to pay Project Costs as such term is defined in the Loan Agreement.

    (c)    Reinvestment Account.

Upon the Closing, the Company shall establish a reinvestment account ("**Reinvestment Account**") which account shall be owned by the Company. The Company shall establish the Reinvestment Account at a federally insured financial institution acceptable to the Government, or, at the Government's election, in an account established under the terms of the Lockbox Agreement. So long as the Loan is outstanding, withdrawals from the Reinvestment Account for non-Project purposes shall not result in a Reinvestment Account balance that is less than an amount equal to the annual debt service due on the Loan. The Reinvestment Account shall (i) not be voluntarily subjected to any security interest to secure the payment of the Loan or any other debt of the Company, and (ii) upon the payment of the Loan, all funds in the Reinvestment Account established under the Lockbox Agreement shall be deposited in an account established by the Company at the direction of the Government. After the Completion Date all amounts allocated to the Government pursuant to Article V of this Agreement shall be deposited by the Company into the Reinvestment Account. Amounts in the Reinvestment Account shall, with the consent of the Government, be applied by the Managing Member to rehabilitate, reconstruct, or replace units of, or to make any other improvements or long-term repair and maintenance to the Project (including the addition of units thereto), and any other military housing privatization projects jointly owned by the Managing Member and the Government as agreed upon by the Managing Member and the Government. Any amounts deposited in the Reinvestment Account shall be treated as Additional Capital Contributions by the Government. Amounts held in a Reinvestment Account established under the Lockbox Agreement shall be invested as specified in the Lockbox Agreement and earnings thereon shall be the property of the

Company and shall be held in the Reinvestment Account for application by the Managing Member as specified above.

      (d)    <u>Investments</u>.

      Amounts held in the accounts provided for in this <u>Section 2.14</u> shall be invested as provided in the Lockbox Agreement. If the Reinvestment Account is not established under the terms of the Lockbox Agreement, amounts held in such Reinvestment Account shall be invested by the Managing Member in Permitted Investments as such term is defined in the Lockbox Agreement. Earnings on such accounts shall be applied as provided therein, and to the extent not so provided, such earnings shall be treated as revenues of the Project, except that earnings on the Reinvestment Account shall, as provided in <u>Section 2.14(c)</u>, remain in and be a part of such account.

ARTICLE III
CERTAIN MEMBER RESPONSIBILITIES, COMMITMENTS AND RIGHTS

3.01    <u>Management of the Company</u>.

      No Member other than the Managing Member shall take part in the management or control of the business of the Company nor transact any business in the name of the Company. No Member other than the Managing Member shall have the power or authority to bind the Company or to sign any agreement or document in the name of the Company, except as otherwise expressly provided in this Agreement. No Member other than the Managing Member shall have any power or authority with respect to the Company except insofar as the Consent of a Member shall be expressly required or except as otherwise expressly provided in this Agreement. Except as expressly provided in this Agreement, the Independent Member may not bind the Company.

3.02    <u>Liability and Indemnity</u>.

      The liability of a Member shall be limited to its Capital Contribution as and when payable under the provisions of this Agreement, and as provided under the Act. No Member shall have any other liability to contribute money to, or in respect of the liabilities or obligations of, the Company, nor shall any Member be personally liable for any obligations of the Company, except as and to the extent provided in the LLC Act.

3.03    <u>Other Activities</u>. Any Member and any Affiliate thereof may engage in or possess interests in other business ventures of every kind and description for its own account, including without limitation, serving as general or limited partner of other partnerships or as a member or Managing Member of other limited liability companies which own, either directly or through interests in other partnerships, limited liability companies, or other entities, government-assisted housing projects similar to the Project. Neither the Company nor any of the Members shall have any right by virtue of this Agreement in or to such other business ventures to the income or profits derived therefrom.

3.04    <u>Anti-Deficiency Act</u>. Nothing in this Agreement shall obligate the Government to obligate appropriated funds in violation of the Anti-Deficiency Act, 31 U.S.C. §§ 1341-1351.

ARTICLE IV
CAPITAL ACCOUNTS; MEMBERS' CONTRIBUTIONS TO COMPANY

4.01    Capital Contribution of Managing Member.

The Managing Member, its principal office and place of business, its Capital Contribution, and its Percentage Interest are as follows:

| Principal Office: | Capital Contribution: | Percentage Interest: |
|---|---|---|
| Fort Lee Family Housing, LLC<br>4401 N. Mesa<br>El Paso, Texas 79902-1107 | $4,000,000 | 51% |

The principal office and place of business, Capital Contribution, and Percentage Interest of each other Member is as follows:

| Principal Office: | Capital Contribution: | Percentage Interest: |
|---|---|---|
| Secretary of the Army<br>U. S. Army Corps of Engineers<br>Norfolk District<br>Attn: CENAO-TS-R (RCI)<br>Fort Norfolk, 803 Front Street<br>Norfolk, Virginia 23510-1096 | $32,769,000 | 49% |

| Principal Office: | Capital Contribution: | Percentage Interest: |
|---|---|---|
| FLIM, LLC<br>7500 Viscount, Suite 106<br>El Paso, Texas 79925 | $   0 | 0% |

(b)    Except as provided in this Agreement, no additional Persons may be admitted as additional or substitute Members, and Capital Contributions may be accepted only as and to the extent expressly provided for in this Article IV and in Section 2.14.

(c)    Except as may otherwise be provided under applicable law, no Member shall be bound by, or personally liable for, the expenses, liabilities, or obligations of the Company.

(d)    No Member shall be required to make Additional Capital Contributions.

(e)    The Independent Member shall be admitted as a member of the Company within the meaning of the Act upon execution and delivery of this Agreement or a counterpart signature page to this Agreement. The Independent Member shall not be required to make any capital contribution to the Company. Unless the Independent Member is the sole member of the Company, the Independent Member shall have no interest in the profits, losses and capital of the Company and shall have no right to receive any distributions of Company assets.

(f)    The Managing Member shall contribute its Capital Contribution of $4,000,000 when and as necessary during the IDP to pay for the cost of performing the renovation work and new construction described in the Plans and Specifications but not later than the last day of the last month of

the IDP. The Managing Member's obligation to contribute its Capital Contribution shall be secured by its unconditional guaranty agreement in favor of the Government in substantially the form of Exhibit "E" appended hereto, and otherwise in form and substance reasonably acceptable to the Government and the Senior Lender.

(g)     The Government shall contribute its Capital Contribution within one hundred twenty (120) days following the Financial Closing.

(h)     Net Cash Flow shall be applied to pay construction costs of the Project, as required by the Annual Business Plan and the Loan Documents, and shall be credited to the Capital Accounts of the Members in accordance with the application of Net Operating Profit of the Company pursuant to Section 5.03.

4.02     Member Loans. Subject to the prior approval of the Managing Member, any Member may make a Member Loan to the Company for the purpose of providing working capital to the Company. A Member Loan shall bear annual interest at a rate equal to the lesser of (i) the prevailing Chase Manhattan Bank commercial reference (prime) rate plus four (4) percentage points, adjusted and compounded on the first day of each month during the term of such Member Loan, or (ii) the maximum, nonusurious rate then permitted by law for such loans. Any Member Loan made prior to the date of the Financial Closing shall be payable in full on the date of the Financial Closing. Any Member Loan made after the date of the Financial Closing shall be due and payable on or before the expiration of six months from the date thereof. In the event that there are insufficient funds under the Lockbox Agreement to pay such Member Loan at maturity, the Member making such Member Loan agrees to extend the maturity of such Member Loan for an additional six (6) months.

4.03     Return of Capital Contribution. No Member shall be entitled to withdraw any part of his or her Capital Contribution or Capital Account, or to receive any distribution from the Company, except as specifically provided in this Agreement. Members shall be entitled to return of their Capital Contribution (including Additional Capital Contributions, if any) upon the earlier to occur of (i) end of the final term of the Ground Lease, or (ii) dissolution or liquidation of the Company in accordance with the terms of this Agreement. Upon dissolution or liquidation of the Company, all reserves, except for the Reinvestment Account, maintained by or on behalf of the Company under the Ground Lease, the Operating Agreement, and applicable Loan Documents, shall be deemed to be assets of the Company to be applied in accordance with the priorities set forth in Article V. The Reinvestment Account shall be disbursed to the Government in accordance with Article V.

ARTICLE V
DISTRIBUTIONS AND ALLOCATIONS

5.01     Distributions from Operations. On each Payment Date, the Company shall distribute Net Cash Flow as follows:

(a)     Prior to Completion Date. All Net Cash Flow disbursed by or for the benefit the Company prior to the Completion Date shall be deposited, within two (2) Business Days after its receipt thereof, into the Revenue Account pursuant to Section 4.04 of the Lockbox Agreement. Amounts in the Revenue Account shall thereafter be transferred or disbursed by the Servicer in accordance with the terms of the Lockbox Agreement.

(b)     After Completion Date. All Net Cash Flow received by or for the benefit the Company in cash or other consideration of any source whatsoever, including rental loss or business interruption insurance, if any, following the Completion Date shall be deposited into the Revenue Fund

described in Section 4.04 of the Lockbox Agreement within two (2) Business Days after its receipt by the Company or the Property Manager. Amounts in the Revenue Fund shall thereafter be transferred or disbursed by the Servicer in the manner and in the order of priority set forth in Section 4.04 of the Lockbox Agreement.

5.02    Distributions of Extraordinary Items.  Net distributable proceeds from the sale, exchange, other disposition or refinancing of all or substantially all of the property owned by the Company (including upon its liquidation and winding up under Article VIII) or from any damages, awards, or payments received in connection with the termination of the Ground Lease (collectively, the "**Extraordinary Items**") shall be distributed in the following manner:

(a)    first, to the repayment of Member Loans;

(b)    next, to the Managing Member to the extent of its then cumulative, unpaid Investment Return for the current and all previous periods (taking into account all previous distributions under Section 5.01(a) and this Section 5.02(a));

(c)    next, to the Government, the balance of the Reinvestment Account;

(d)    next, to the Managing Member to the extent of its unreturned Capital Contribution (taking into account all previous distributions under Section 5.02(c);

(e)    next, to the Government to the extent of its unreturned Capital Contribution (taking into account all previous distributions under this Section 5.02(c));

(f)    thereafter, to the Members in accordance with their Percentage Interests.

5.03    Allocations.

(a)    Net Operating Profit.  After taking into account allocations made pursuant to Section 5.03(d), Net Operating Profit of the Company for each fiscal year or other period of the Company shall be allocated to the Members as follows:

(i)    first, to the extent Net Operating Losses were allocated to any Member pursuant to Section 5.03(b) for any prior period, Net Operating Profit will be allocated to Members to the extent of such previously allocated Net Operating Losses (among such Members in proportion to their respective shares of Net Operating Losses being offset);

(ii)    second, if (i) the cumulative aggregate amount of distributions made to any Member, in the current and all prior periods, under Section 5.01 exceeds (ii) the cumulative amount allocated in prior periods to such Member under this Section 5.03(a)(ii), then to each such Member in proportion to and to the extent of the excess; and

(iii)    thereafter, to the Government.

(b)    Net Operating Loss.  After taking into account allocations made pursuant to this Agreement, Net Operating Loss of the Company for each fiscal year or other period of the Company shall be allocated to the Members as follows:

(i)    first, to the Managing Member until its Capital Account balance is reduced to zero (0);

        (ii)     second, to the Government until its Capital Account balance is reduced to zero (0); and

        (iii)    thereafter, to the Members in accordance with their Percentage Interests.

    (c)    Allocations from Extraordinary Items.  After taking into account allocations made pursuant to Section 5.03(d), Company income, gain, loss, deduction, and credit attributable to an Extraordinary Items for any allocation period shall be allocated to the Members as follows:

        (i)    Gains.  Income and gain from Extraordinary Items shall be allocated to the Members as follows:

            (A)    first, to all Members with negative Capital Account balances in proportion to and to the extent of such negative balances; and

            (B)    second, if (i) the cumulative aggregate amount of distributions made to any Member, in the current and all prior periods, under Section 5.02 exceeds (ii) the cumulative amount allocated in prior periods to such Member under this Section 5.03(c)(i)(B), then to each such Member in proportion to and to the extent of the excess; and

            (C)    thereafter, to the Members in accordance with their Percentage Interests.

        (ii)    Losses.  Losses and deductions from Extraordinary Items shall be allocated to the Members as follows:

            (A)    first, to those Members with positive balances in their respective Capital Accounts in proportion to and to the extent of such positive balances; and

            (B)    thereafter, to the Members in proportion to their respective Percentage Interests.

Notwithstanding the forgoing provisions of this Section 5.03(c), but subject to Section 5.03(d), it is the intent of the Members that the allocations set forth in this Section 5.03(c) will cause the positive balance of the capital account of each of Member to equal the distribution made to it on liquidation and winding up of the Company.  Accordingly, if after giving hypothetical effect to the allocations set forth in this Section 5.03(c) and all adjustments attributable to contributions and distributions of money and property effected prior to the final distributions under Section 5.02 upon liquidation and winding up of the Company the positive capital account of each Member is not equal to the distribution to be made to that Partner under Section 5.02, then income (or items thereof), gain (or items thereof), loss (or items thereof), and deduction (or items thereof) will be allocated among the Members so that the positive balance in each Member's capital account, prior to the distributions under Section 5.02, equals the amount of distributions to be received by the Member under Section 5.02.

    (d)    Regulatory Allocations.  Prior to making any allocations under this Agreement, the following allocations shall be made for each fiscal year or other period:

        (i)    Certain Allocations of Losses.  No allocations of Net Operating Losses shall be charged to the Capital Account of any Member if such allocation would cause such Member to have a Deficit Capital Account or would increase a Deficit Capital Account.  The

amount of the Net Operating Losses which would have caused a Member to have a Deficit Capital Account shall instead be charged to the Capital Accounts of any Members which would not have Deficit Capital Accounts as a result of the allocation, in proportion to the positive balances in their respective Capital Accounts as determined immediately prior to such allocations and taking into account all adjustments thereto deemed by the Managing Member to be appropriate and consistent with Section 704(b) of the Code and the Regulations. If no such Members exist, then the Net Operating Losses shall be allocated to the Members in accordance with their Percentage Interests.

(ii)     Qualified Income Offset.   In the event any Member unexpectedly receives any adjustments, allocations or distributions described in Sections 1.704-1(b)(2)(ii)(d)(4), (5) or (6) of the Regulations, which create or increase a Deficit Capital Account for such Member, then items of Company income and gain (consisting of a pro rata portion of each item of Company income, including gross income, and gain for such year and, if necessary, for subsequent years) shall be specially credited to the Capital Account of such Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Deficit Capital Account so created as quickly as possible. It is the intent that this Section 5.03(d)(ii) qualify and be construed as a "qualified income offset" within the meaning of Section 1.704-1(b)(2)(ii)(d) of the Regulations, which shall be controlling in the event of a conflict between such Regulations and this Section 5.03(d)(ii).

(iii)     Certain Allocations of Income.   In the event any Member has a Deficit Capital Account at the end of any fiscal year of the Company, the Capital Account of such Member shall be specially credited with items of Company income (including gross income) and gain in proportion to its Deficit Capital Account relative to the Deficit Capital Accounts of all Members until such Deficit Capital Account is eliminated.

(iv)     Minimum Gain Chargebacks.    Except as otherwise provided in Regulations Section 1.704-2(f), if there is a net decrease in Company Minimum Gain during any fiscal year of the Company, each Member shall be specially allocated items of Company income and gain for such fiscal year (and, if necessary, subsequent years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, as determined under Regulations Section 1.704-2(g). This Section 5.03(d)(iv) is intended to qualify as a "minimum gain chargeback" within the meaning of Regulations Section 1.704-2(f) which shall be controlling in the event of a conflict between such Regulation and this Section 5.03(d)(iv).

(v)     Member Minimum Gain Chargebacks. Except as otherwise provided in Regulations Section 1.704-2(i)(4), if there is a net decrease in Member Minimum Gain attributable to a Member Nonrecourse Debt during any fiscal year of the Company, each Member who has a share of the Member Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Regulations Section 1.704-2(i)(5), shall be specially allocated items of Company income and gain for such fiscal year (and, if necessary, subsequent years) in an amount equal to such Member's share of the net decrease in Member Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Regulations Section 1.704-2(i)(4). This Section 5.03(d)(v) is intended to qualify as a "chargeback of Member nonrecourse debt minimum gain" within the meaning of Regulations Section 1.704-2(i) which shall be controlling in the event of a conflict between such Regulation and this Section 5.03(d)(v).

(vi)     Nonrecourse Deductions.  Any Nonrecourse Deductions for any fiscal year of the Company shall be specially allocated to the Members in accordance with their Percentage Interests. Any Member Nonrecourse Deductions for any fiscal year of the Company

shall be specially allocated to the Member(s) who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable, in accordance with Regulations Section 1.704-2(i).

(vii)     Excess Nonrecourse Liabilities.   For purposes of determining a Member's proportional share of the "excess nonrecourse liabilities" of the Company within the meaning of Regulations Section 1.752-3(a)(3), each Member's interest in Company profits shall be such Member's Percentage Interest.

(viii)     Special Allocation of Equipment and Building Depreciation.  Subject to Sections 5.03(d)(ii) and 5.03(d)(vi), an amount equal to the Managing Member's Percentage Interest of all depreciation, amortization, and similar deductions ("Depreciation") relating to any and all Project "section 1245 property" (as defined in Code Section 1245(a)(3)) and any and all Project "section 1250 property" (as defined in Code Section 1250(c)) shall be specially allocated to the Managing Member; provided, however, the Managing Member's distributive share of such Depreciation will be allowed only to the extent that such allocation does not cause the Managing Member to have a Deficit Capital Account or would increase its Deficit Capital Account.  The Managing Member's share of Depreciation that would cause the Managing Member to have a Deficit Capital Account or would increase its Deficit Capital Account will not be allowed for that year.  However, any Depreciation so disallowed shall be allowed as a deduction at the end of the first succeeding taxable year, and subsequent taxable years, to the extent that the Managing Member's does not have a Deficit Capital Account.

(e)     Net Operating Profit and Net Operating Loss.  For purposes of this Agreement, **"Net Operating Profit"** and **"Net Operating Loss"** shall mean the net income or loss of the Company (including for this purpose all items of income, gain, deduction and loss, but excluding Depreciation which will be specially allocated under Section 5.03(d)(viii) and excluding Extraordinary Items) for each fiscal year or other period, determined under Section 703(a) of the Code and Regulations Section 1.703-1 (and for this purpose all items of income, gain, loss, or deduction required to be stated separately under Section 703(a)(1) of the Code will be included in net income or loss, except to the extent required under Section 5.03(d)), with the following adjustments:

(i)     Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Net Operating Profit or Net Operating Loss shall be added to such taxable income or loss;

(ii)     Any expenditures of the Company described in Section 705(a)(2)(B) of the Code or treated as Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Net Operating Profit or Net Operating Loss shall be subtracted from such taxable income or added to such taxable loss;

(iii)     In the event the Gross Asset Value of any Company asset is adjusted pursuant to the definition thereof, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Net Operating Profit or Net Operating Loss;

(iv)     Gain or loss resulting from any disposition of property in the ordinary course of business with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value;

(v)     In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, the Company shall compute such deductions based on the Gross Asset Value of a property; and

(vi)     Any income items specially allocated pursuant to Section 5.03(d) shall not be taken into account.

(f)     Gross Asset Value. "Gross Asset Value" means, with respect to any asset, such asset's book value determined in accordance with the principles of Regulations Section 1.704-1(b). Consequently, each asset's Gross Asset Value is equal to the asset's adjusted basis for federal income tax purposes, except as follows:

(i)     The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as determined by the contributing Member and the Company.

(ii)     The Gross Asset Value of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Managing Member with the consent of the other Member (which consent shall not unreasonably be withheld or delayed), as of the following times:

(a)     The acquisition of any additional interest in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution.

(b)     The distribution by the Company to the Member of more than the de minimis amount of property as consideration for an interest in the Company, and

(c)     The liquidation of the Company within the meaning of Regulation Section 1.704-1(b)(2)(ii)(g); provided, however, that the adjustments pursuant to clauses (a) and (b) above shall be made only if the Managing Member reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company.

(g)     Allocation of Certain Tax Items. As stated in Regulations Section 1.704-1(b)(4)(i), when any property of the Company is reflected in the Capital Accounts of the Members and on the books of the Company at a book value that differs from the adjusted tax basis of such property, then certain book items with respect to such property will differ from certain tax items with respect to that property. Since the Capital Accounts of the Members are required to be adjusted solely for allocation of the book items, the Members' shares of the corresponding tax items are not independently reflected by adjustments to the Capital Accounts. These tax items shall be shared among the Members under the Remedial Method as set forth in the Regulations or such other method as the Managing Member shall select.

5.04     Determination of Profits and Losses. Profits and losses for all purposes of this Agreement shall be determined in accordance with the accrual accounting method, except that any adjustments made pursuant to Section 754 of the Code shall not be taken into account. Every item of income, gain, loss, deduction, credit or tax preference entering into the computation of such profits or losses, or applicable to the period during which such profits and losses were realized, shall be considered allocated to each Member in the same proportion as profits and losses are allocated to such Member.

5.05    Capital Accounts.

There shall be established on the books of the Company a capital account ("**Capital Account**") for each Member. Each such Member's Capital Account shall be increased by (1) the amount of money contributed by it to the Company, (2) the fair market value of the property contributed by it to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take under Code Section 752), and (3) allocations to it of items of book income and gain, and shall be decreased by (A) the amount of money distributed from it by the Company, (B) the fair market value of the property distributed to it by the Company (net of liabilities secured by such contributed property that the Member is considered to assume or take under Code Section 752) and (C) allocations to it of items of book loss and deduction, and shall otherwise be adjusted in accordance with the additional rules set forth in Regulations Section 1.704-1(b)(2)(iv). If any assets of the Company are to be distributed in kind, the Members' Capital Accounts shall be adjusted to reflect the manner in which any unrealized income, gain, loss and deductions with respect to such assets would be allocated among the Members under this Agreement if there were a taxable disposition of the assets for their fair market value. It is the intent of the Company that the Capital Accounts of all Members be determined and maintained in accordance with the principles of Regulations Section 1.704-1(b)(2)(iv) at all times throughout the full term of the Company.

5.06    Tax Matters.

(a)    The "**Tax Matters Partner**" of the Company for purposes of Code Section 6231(a)(7) shall have the power to manage and control, on behalf of the Company, any administrative proceeding at the Company level with the Internal Revenue Service or any other taxing authority relating to the determination of any item of Company income, gain, loss, deduction or credit for U.S. federal, state, local or foreign income or franchise tax purposes. The Tax Matters Partner shall take such action as may be reasonably necessary to constitute each other Member a "notice partner" within the meaning of Code Section 6231(a)(8). The Tax Matters Partner shall cause to be prepared for each taxable year of the Company the federal, state and local tax returns and information returns, if any, which the Company is required to file, copies of which returns shall be made available by the Company at least thirty (30) days prior to filing for inspection, examination, and approval by any Member or any of its representatives during reasonable business hours, and all of such persons shall be entitled to make copies or extracts thereof. The Members shall provide any comments on such returns to the Tax Matters Partner within 15 days after their being made available to the Members. Where the Members are required to file federal, state or local income tax returns by reason of their interest in the Company, the Tax Matters Partner shall cause them to be furnished with the relevant returns filed by the Company. The Tax Matters Partner shall notify each other Member of all material matters that come to its attention in its capacity as Tax Matters Partner. The Tax Matters Partner shall not have the authority to bind any of the Members, including with respect to any extension of any statute of limitations. The Tax Matters Partner shall be the Managing Member.

(b)    The Company shall, within ten (10) days of the receipt of any notice from the Internal Revenue Service or any state, local or foreign tax authority in any administrative proceeding at the Company level relating to the determination of any Company item of income, gain, loss, deduction or credit, mail a copy of such notice to each Member.

5.07    Cost Savings.

To the extent that the Company shall receive any Cost Savings (as defined in the Construction Contract) following the substantial completion of the Project, all such Cost Savings shall, at the direction

of the Government exercised in its sole discretion, be used by the Company to (i) enhance the scope of the Project; (ii) pay down Project indebtedness, or (iii) fund the Reinvestment Account.

ARTICLE VI
RESTRICTIONS ON TRANSFERS OF
COMPANY INTERESTS

6.01    Limitations on Transfer of Members Interest

No Member shall be entitled to sell, exchange, assign, or transfer, directly or indirectly, all or any part of its Interest in the Company without the prior written consent of the other Members. Any attempted sale, exchange, assignment or transfer in violation of the restrictions set forth in this Section 6.01 shall be null and void ab initio and of no force or effect. The foregoing restriction shall not apply to a pledge, hypothecation, encumbrance or otherwise granting a security interest (i) in all or any part of an Interest in the Company to a non-affiliated third party for financing for the Project; (ii) any distributions to any Member; (iii) any rights to receive distributions to be made to any Member, or (iv) any transfer by the Government Member to another federal, state, or local governmental agency or instrumentality.

6.02    Admission of Substituted Members.

If any Member transfers such Member's Interest to a transferee in accordance with this Article VI, then such transferee shall be entitled to be admitted into the Company as a substituted member and this Agreement shall be amended in accordance with the LLC Act to reflect such admission, provided that: (i) the non-transferring Member shall reasonably approve the form and content of the instrument of transfer; (ii) the transferor and transferee named therein execute and acknowledge such other instruments as the non-transferring Member may deem reasonably necessary to effectuate such admission; (iii) the transferee in writing accepts and adopts all of the terms and conditions of this Agreement, as the same may have been amended; and (iv) the transferor pays, as the non-transferring Member may reasonably determine, all reasonable expenses incurred in connection with such admission, including, without limitation, legal fees and costs. An assignee of an Interest who does not become a substituted member shall have no right to require any information or account of the Company's transactions, to inspect the Company books, or to vote on any of the matters as to which a Member would be entitled to vote under this Agreement. An assignee shall only be entitled to share in such Net Operating Profits and Net Operating Losses, to receive such distributions, and to receive such allocations of income, gain, loss, deduction or credit or similar items to which the assignor was entitled, to the extent assigned.

6.03    Election; Allocations Between Transferor and Transferee.

Upon the transfer of the Interest of any Member or the distribution of any property of the Company to a Member, the Company may file, in the reasonable discretion of the Managing Member, an election in accordance with applicable Treasury Regulations, to cause the basis of the Company property to be adjusted for federal income tax purposes as provided by Sections 734 and 743 of the Code. Notwithstanding the foregoing, upon the Government's request, the Managing Member shall make such election in connection with the transfer of all or any part of the Government's Interest. Upon the transfer of all or any part of the Interest of a Member as herein above provided, Net Operating Profits and Net Operating Losses shall be allocated between the transferor and transferee on the basis of the computation method which in the reasonable discretion of the Managing Member, is in the best interests of the Company, provided such method is in conformity with the methods prescribed by Section 706 of the Code and Treasury Regulation Section 1.706-1(c)(2)(ii). Notwithstanding the foregoing, upon the transfer of all or any part of the Government's Interest, Net Operating Profits and Net Operating Losses shall be allocated between the Government and its transferee based upon any reasonable method

determined by the Government, provided such method is in conformity with Section 706 of the Code and related Treasury Regulations and the Company is notified of the method of allocation.

6.04    Partition.

To the fullest extent permitted by law, each Member hereby irrevocably waives any right or power that such Member might have to cause the Company or any of its assets to be partitioned, to cause the appointment of a receiver for all or any portion of the assets of the Company, to compel any sale of all or any portion of the assets of the Company pursuant to any applicable law or to file a complaint or to institute any proceeding at law or in equity to cause the dissolution, liquidation, winding up or termination of the Company.  No Member shall have any interest in any specific assets of the Company, and no Member shall have the status of a creditor with respect to any distribution pursuant to Section 14.12 hereof.  The interest of the Members in the Company is personal property.

6.05    Withdrawal Rights.

Each Member hereby waives any and all rights it may have to voluntarily withdraw or resign from the Company.

ARTICLE VII
AMENDMENTS

7.01    Proposal and Adoption of Amendments.

Subject to the provisions of Section 2.02, this Agreement may be amended by the Managing Member with the Consent of the Government, provided that such Consent shall not be unreasonably withheld as to any proposed amendment which does not affect the obligations of the Managing Member or the rights of any of the Members under this Agreement.

ARTICLE VIII
DISSOLUTION AND WINDING UP OF THE COMPANY

8.01    Dissolution.

In the event of any Member's bankruptcy, retirement, resignation, expulsion or other cessation to serve or the admission of any new Member into the Company, the Company shall not dissolve, but the business of the Company shall continue without interruption and without any break in continuity.  The Company shall be dissolved upon the first to occur of:  (i) the expiration of the term of the Company, unless such term has been extended by the unanimous agreement of the Members; (ii) the completion of all work, terms and responsibilities of the parties under the CDMP and all Government Agreements, and the sale, transfer or other disposition by the Company of all or substantially all of its assets and the collection by the Company of any and all cash flow derived therefrom; (iii) the affirmative election of all of the Members to dissolve the Company; or (iv) the entry of a decree of judicial dissolution pursuant to the LLC Act.

8.02    Winding Up of the Company.

Upon the dissolution of the Company hereunder or under the LLC Act (other than the termination of the Company under Section 708(b)(1)(b) of the Code, in which case the Company shall remain in existence in accordance with the provisions of such Section of the Code), the Members shall as soon as

practical proceed to wind up the affairs of the Company and the assets shall be liquidated as promptly as consistent with obtaining a fair value therefor. During such winding up process, the Net Operating Profits and Net Operating Losses shall continue to be shared by the Members in accordance with this Agreement. Subject to Section 8.01, any proceeds remaining following the liquidation of the assets of the Company shall be applied and distributed by the Company on or before the end of the taxable year of such liquidation or, if later, within ninety (90) days after such liquidation, in the following order:

(a)     Creditors.  First, to creditors of the Company, including, without limitation, the Senior Lender and any Members that are creditors, all in the order of priority as provided by law;

(b)     Reserves.  Second, to establishing any reserves which the Members deem necessary, in its reasonable discretion, for any contingent, conditional or unmatured liabilities or obligations of the Company; and

(c)     Members.  Thereafter, to the Members in accordance with Section 5.02.  Any reserve withheld pursuant to Section 8.02(b) shall be distributed as soon as practicable, as determined in the reasonable discretion of the Members, to the Members in accordance with Section 5.02.

8.03    Negative Capital Account Restoration.

No Member shall have any obligation whatsoever upon the Liquidation of such Member's Interest, the Liquidation of the Company or in any other event, to contribute all or any portion of any negative balance standing in such Member's Capital Account to the Company, to the other Member or to any other person or entity.

ARTICLE IX
BOOKS AND RECORDS

9.01    Books and Records.  The books and records of the Company shall be maintained on an accrual basis in accordance with GAAP.  These and all other records of the Company, including (a) information relating to the status of the Project and all other assets of the Company, including appraisal, title, marketing and other information as required, (b) all items of revenue and expense attributable to the Project, (c) information with respect to the sale by the Managing Member or any Affiliate of goods or services to the Company, and (d) records and information with respect to the administration of incentive fee plans for Developer, Design-Builder, Asset Manager, and Property Manager, shall be kept at the principal office of the Company and shall be available for examination and audit there by any Member, or his duly authorized representative, at any and all reasonable times.  Any Member, or his duly authorized representative, upon paying the costs of collection, duplication and mailing, shall be entitled to a copy of the Company books and records.

9.02    Bank Accounts.  All funds of the Company not otherwise invested shall be deposited in one or more accounts maintained in such banking institutions as the Managing Member shall determine, and withdrawals shall be made only in the regular course of Company business on such signature or signatures as the Managing Member may, from time to time, determine.  No funds of the Company shall be deposited in any financial institution in which any Member is an officer, director, or holder of any proprietary interest.

9.03    Accountants.  The Accountants shall annually prepare for execution by the Managing Member all tax returns of the Company and be responsible for the preparation of all reports, statements, audits and accountings required by this Article IX in accordance with GAAP and with the requirements set forth in Section 9.04(c).

9.04    Reports to Members.

(a)    The Managing Member shall cause to be prepared and distributed to all persons who were Members at any time during a fiscal year of the Company:

(i)    within thirty (30) days after the close of each fiscal year of the company, unaudited financial statements including a detailed line-item budget variance report, and within one hundred twenty (120) days after the close of each fiscal year of the Company, audited financial statements, with notes thereto and with financial statement supplementary information, prepared by the Accountants;

(ii)    within one hundred twenty (120) days after the close of each fiscal year of the Company, such financial information with respect to each fiscal year of the Company as shall be reportable for federal and state income tax purposes (including Schedules K-1);

(iii)    within thirty (30) days after the end of each fiscal quarter, a report of operations for such quarter containing:

(A)    a balance sheet, which may be unaudited;

(B)    statements of collections, disbursements, cash and balances of operating and reserve accounts for the quarter then ended, which may be unaudited;

(C)    projected revenues, separately stated, for the current and upcoming quarters and projected expenses, separately stated, for the current and upcoming quarters;

(D)    a quarterly payroll distribution ledger identifying all compensation payments to reimbursable project staff for the quarter;

(E)    other pertinent information regarding the Company and its activities during the period covered by the report; and

(iv)    within thirty (30) days after the end of each month, monthly operating statements with respect to the Project, including, but not limited to, a detailed line-item budget variance report identifying current month and year-to-date variance of actual results against the approved Annual Business Plan and an occupancy analysis by neighborhood and rank.

(b)    Within ninety (90) days after the end of each fiscal year of the Company the Managing Member shall provide to the Members:

(i)    a certification by the Managing Member that (A) no amounts are then due and owing with respect to the Loan and taxes and insurance payments with respect to the Project are current as of the date of the year-end report, (B) there is no material default under the Project Documents or this Agreement, or if there is any material default, a description thereof, and (C) it has not received notice of any building, health or fire code violation or similar violation of a law, ordinance or regulation against the Project or, if any such notice of any violation has been received, a description thereof;

        (ii)     a descriptive statement of all transactions during the fiscal year between the Company and the Managing Member and/or any Affiliate, including the nature of the transaction and the payments involved (including accrued cash or other payments);

        (iii)     the occupancy levels of the Project by month, separately identifying the level of occupancy by Army personnel and by other tenants, during the preceding fiscal year;

        (iv)     if there are any Operating Deficits or anticipated Operating Deficits, the manner in which such deficits will be funded; and

        (v)     such other information as may reasonably be required by the Members concerning the operation, management, maintenance, physical condition, compliance with the Project Documents, or financial status of the Project.

        (c)     In addition to the information required by subsections (a) and (b) of this Section 9.04, the Managing Member shall make available to the Members annual financial information including the auditor's management letter, the auditor's engagement letter, the client's letter to the auditor concerning related parties and related party transactions, the local property tax return for the project, and the Federal income tax return for the project. The auditor's management letter, the auditor's report or the financial statements must disclose any illegal act noted by the auditor regardless of materiality. The supplemental schedules must include the beginning and ending balances and activity within each cash and reserve account, and the amount of local property taxes paid or due.

        (d)     Upon the written request of the Members for further information with respect to any matter covered in subsections (a), (b) or (c) above, the Managing Member shall furnish such information within 30 days of receipt of such request.

        (e)     Prior to December 31st of each year, the Managing Member, on behalf of the Company, shall send to the Members an estimate of the applicable Member's share of the profits and losses of the Company for federal income tax purposes for the current fiscal year.

        (f)     Within fifteen (15) days after the end of any calendar quarter during which any of the following events shall have occurred:

        (i)     there is a material default by the Company under the Project Documents or in payment of any mortgage, taxes, interest or other obligation on secured or unsecured debt;

        (ii)     any reserve has been reduced or terminated by application of funds therein for purposes materially different from those for which such reserve was established;

        (iii)     the Managing Member has received any notice of a material fact which may substantially affect further distributions; or

        (iv)     any Member has pledged or collateralized his Interest in the Company;

the Managing Member shall send the Government a detailed report of such event.

        (g)     Any operating information previously prepared or otherwise acquired by the Property Manager, the Design-Builder, or the Managing Member shall be available to the Government upon request.

(h)     In the event that the reporting requirements set forth in any of the above provisions of this Section 9.04 are not met, the Government, in its reasonable discretion, may direct the Managing Member to dismiss the Accountants, and to designate successor Accountants, subject to the approval of Government; provided, however, that if the Managing Member and Government cannot agree on the designation of successor Accountants, the successor Accountants shall be designated by Government in its sole reasonable discretion, and the fees of such successor Accountants shall be paid by the Company.

(i)     Upon written request of Government, the Managing Member shall provide any of the reports or information required by this Section 9.04 in electronic format.

9.05    Section 754 Elections.

In the event of a transfer of all or part of the Interest of a Member, at the request of the transferee or if in the best interests of the Company (as determined by the Managing Member), the Company shall elect pursuant to Section 754 of the Code to adjust the basis of the Company's assets as provided by Sections 734 and 743 of the Code, and any cost of such election or cost of administering or accounting for such election shall be at the sole cost and expense of the requesting transferee.

9.06    Fiscal Year.  The fiscal year of the Company shall end at December 31st.

ARTICLE X
MISCELLANEOUS

10.01   Effect of Bankruptcy, Death, Withdrawal or Dissolution of a Member.

(a)     In the event of the Bankruptcy of a Member or the withdrawal, resignation or dissolution of a Member (or a Member ceases to be a Member for any other reason), the Company shall continue.

(b)     The Members, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, agrees that in the event a Member should make application for or seek protection or relief under any of the provisions of the United States Bankruptcy Code (the "**Bankruptcy Code**"), or in the event that any involuntary petition is filed against a Member, then, in such event, the other Members shall thereupon be entitled to (i) immediate relief from any automatic stay imposed by Section 362 of the Bankruptcy Code, or otherwise, on or against the exercise of the rights and remedies available to such Members pursuant to this Agreement, or otherwise and (ii) an order prohibiting the Member's use of any "cash collateral" as defined under Section 363 of the Bankruptcy Code.

(c)     The Members acknowledge and agree that this Agreement is a contract under which each other Member is excused from accepting performance from a Member, its assignee or Servicer, in the event that the Member makes application for or seeks protection under any of the provisions of the Bankruptcy Code, or an involuntary petition under the Bankruptcy Code is filed against the Member.  The effects of this paragraph shall be that this Agreement hereby is deemed to be subject to the exceptions to assumption and assignment of contracts set forth in Sections 365(c)(1) and 365 (e)(2)(A) of the Bankruptcy Code and that the other Members, by their refusal to consent to an assumption or assignment of this Agreement by the Member, shall be able to prevent such assumption or assignment.

(d)     In the event that a Member makes application for or seeks relief or protection under any of the provisions of the Bankruptcy Code, or in the event that any involuntary petition under

the Bankruptcy Code is filed against a Member, then, in such event, any Member may apply or move to the bankruptcy court in which such petition is filed for a change of venue to the bankruptcy court where the Company has its principal place of business, and the Member hereby agrees not to oppose or object to such application or motion in any way.

10.02   Notices.

All notices or other communications required or permitted hereunder shall be in writing, and shall be delivered or sent, as the case may be, by any of the following methods: (i) personal delivery, (ii) overnight commercial carrier, (iii) registered or certified mail, postage prepaid, return receipt requested, or (iv) facsimile. Any such notice or other communication shall be deemed received and effective upon the earlier of (a) if personally delivered, the date of delivery to the address of the person to receive such notice; (b) if delivered by overnight commercial carrier, one (1) day following the receipt of such communication by such carrier from the sender, as shown on the sender's delivery invoice from such carrier; (c) if mailed, upon the expiration of three (3) business days following the deposit in any post office or mail depository regularly maintained by the U.S. Postal Service; (d) if given by telecopy, when sent, provided that such telecopy is mechanically confirmed as received and is confirmed within forty-eight (48) hours by letter mailed or delivered in accordance with the foregoing. Any reference herein to the date of receipt, delivery, or giving, or effective date, as the case may be, of any notice or communication shall refer to the date such communication becomes effective under the terms of this Section 10.02. Any such notice or other communication so delivered shall be addressed to the party to be served at the address for such party set forth in Section 4.01 of this Agreement. Such addresses may be changed by giving written notice to the other parties in the manner set forth in this Section 10.02. Rejection or other refusal to accept or the inability to deliver because of changed address of which no notice was given shall be deemed to constitute receipt of notice or other communication sent.

10.03   Construction of Agreement.

The Article and Section headings of this Agreement are used herein for reference purposes only and shall not govern, limit, or be used in construing this Agreement or any provision hereof. Time is of the essence of this Agreement. The provisions of this Agreement shall be construed and enforced in accordance with the laws of the State of Delaware, and all rights, duties, obligations and remedies shall be governed by the LLC Act without regard to principles of conflict of laws. If any proceeding is brought by any Member against any other Member that arises out of or is connected with this Agreement, then the prevailing Member in such proceeding shall be entitled to recover reasonable attorneys' fees and costs. Each Member agrees to perform any further acts, and to execute and deliver (with acknowledgment, verification, and/or affidavit, if required) any further documents and instruments, as may be reasonably necessary or desirable to implement and/or accomplish the provisions of this Agreement and the transactions contemplated herein. Subject to the restrictions set forth in Article VII, this Agreement shall inure to the benefit of and shall bind the parties hereto and their respective personal representatives, successors, and assigns. Any agreement to pay any amount and any assumption of liability herein contained, express or implied, shall be only for the benefit of the Members and their respective successors and assigns, and such agreements and assumptions shall not inure to the benefit of the obligees of any indebtedness or any other party, whomsoever, deemed to be a third-party beneficiary of this Agreement. Where the context so requires, the use of the neuter gender shall include the masculine and feminine genders, the masculine gender shall include the feminine and neuter genders, and the singular number shall include the plural and vice versa. Every provision of this Agreement is intended to be severable. This Agreement amends and completely supersedes all previous operating agreements of the Company. No alteration, modification or interpretation hereof shall be binding unless in writing signed by all of the Members. This Agreement may be executed in multiple counterparts, all of which, taken together, shall constitute one (1) and the same Agreement binding upon the parties hereto. Each Member acknowledges

that (i) each Member is of equal bargaining strength; (ii) each Member has actively participated in the drafting, preparation and negotiation of this Agreement; and (iii) any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not apply in the interpretation of this Agreement, any portion hereof or any amendments hereto.

10.04   Representations and Warranties of the Managing Member.

The Managing Member hereby represents and warrants to the other Members that, on the date of this Agreement:

(a)   the execution and delivery of this Agreement by Managing Member and the performance by Managing Member of the transactions contemplated hereby have been duly authorized by all requisite actions or proceedings;

(b)   Managing Member is duly organized, validly existing and in good standing under the laws of the state of Delaware with power to enter into this Agreement and to consummate the transactions contemplated hereby;

(c)   there is no default under any agreement, contract, lease, or other commitment, or of any claim, demand, litigation, proceedings, or governmental investigation pending or threatened against Managing Member or the Company, or related to the business or assets of the Company, which claim, demand, litigation, proceeding, or governmental investigation could result in any judgment, order, decree, or settlement which would materially affect the business or assets of the Company;

(d)   the execution of this Agreement, the incurring of the obligations set forth in this Agreement, and the consummation of the transactions contemplated by this Agreement, do not violate any provision of law, any order, judgment or decree of any court binding on the Company or Managing Member, any provision of any Lockbox Agreement, agreement, or other instrument to which the Company or Managing Member is a party or by which the Company is bound, and is not in conflict with, and will not result in a breach of or constitute a default under any such Lockbox Agreement, agreement, or other instrument or result in creating or imposing any lien, charge, or encumbrance of any nature whatsoever upon the Project other than in favor of Servicer; and

(e)   the Company is a limited liability company, duly organized, validly existing, and in good standing under the laws of the State of Delaware, and has the power to lease the Site and to develop, construct, operate and maintain the Project in accordance with the terms of this Agreement and the other Project Documents, and has taken all action under the laws of the State of Virginia and any other applicable jurisdiction that is necessary to protect the limited liability of the Members and to enable the Company to engage in its business.

10.05   Representations of the Government.

The Government hereby represents to the Company and to the other Members that, on the date of this Agreement:

(a)   the execution and delivery of this Agreement by the Government and the performance by the Government of the transactions contemplated hereby have been duly authorized by all requisite actions or proceedings; and

(b)   there is no default under any agreement, contract, lease, or other commitment, or of any claim, demand, litigation, proceedings, or governmental investigation pending or threatened

against the Government which claim, demand, litigation, proceeding, or governmental investigation could result in any judgment, order, decree, or settlement which would materially affect the business or assets of the Company.

10.06   Investment Representations.

Each Member agrees as follows with respect to investment representations:

(a)   General Securities Representations.  Each Member understands:

(i)   That the interests in the Company evidenced by this Agreement have not been registered under the Securities Act of 1933, 15 U.S.C. § 15b et seq., under the any state securities act or any other state securities laws (the "**Securities Acts**") because the Company is issuing interests in the Company in reliance upon the exemptions from the registration requirements of the Securities Acts providing for issuance of securities not involving a public offering;

(ii)   That the Company has relied upon the representation made by each Member that such Member's Interest in the Company is to be held by such Member for investment; and

(iii)   That exemption from registration under the Securities Acts would not be available if any Interest in the Company was acquired by a Member with a view to distribution.  Each Member agrees that the Company is under no obligation to register the Interests in the Company or to assist the Members in complying with any exemption from registration under the Securities Acts if the Member should at a later date wish to dispose of such Member's Interest in the Company.

(b)   Acquisition for Own Account.  Each Member hereby represents to the Company that such Member is acquiring such Member's Interest in the Company for such Member's own account, for investment and not with a view to or for resale in connection with, any distribution thereof.  No other person or entity has any interest in or right with respect to the Interest issued to such Member, nor has such Member agreed to give any person or entity any such interest or right in the future.

(c)   No Public Market.  Each Member recognizes that no public market exists with respect to the Interests and no representation has been made that such a public market will exist at a future date.

(d)   No Solicitation.  Each Member hereby represents that such Member has not received any advertisement or general solicitation with respect to the sale of the Interests.

(e)   Due Investigation.  Before acquiring any Interest in the Company, each Member has investigated the Company and its business and the Company has made available to each Member all information necessary for the Member to make an informed decision to acquire an Interest in the Company.  Each Member considers itself to be a person or entity possessing experience and sophistication as an investor adequate for the evaluation of the merits and risks of the Member's investment in the Company.

(f)   Survival of Representations.  Each Member understands the meaning and consequences of the representations, warranties and covenants made by such Member set forth herein and that the Company has relied upon such representations, warranties and covenants.  Except as otherwise provided in separate agreements between the parties hereto, each Member hereby indemnifies, defends, protects and holds wholly free and harmless the Company (and the other Member) from and against any and all losses, damages, expenses or liabilities arising out of the breach and/or inaccuracy of any such

representation, warranty and/or covenant. All representations, warranties and covenants contained herein and the indemnification contained in this Section 10.06 shall survive the execution of this Agreement, the formation of the Company, and the liquidation of the Company.

(g)     Rescission. If the Company discovers any breach and/or inaccuracy of any of the representations, warranties and/or covenants contained herein by any Member, the Company may, at the Company's election, rescind the issuance of the Interest in the Company issued to such Member. Upon any such rescission by the Company, any such Member shall be conclusively presumed to have immediately transferred such Member's Interest in the Company to the Company and to have withdrawn from the Company.

10.07   Ratification of CDMP.

Notwithstanding anything to the contrary in this Agreement, the Members ratify and approve the Company's execution of the CDMP and any delegations of authority by the Company set forth in the CDMP.

ARTICLE XI
DEFINITIONS

11.01   Additional Capital Contributions.

"**Additional Capital Contributions**" means Capital Contributions made in addition to those required under Section 4.01(a).

11.02   Additional Permitted Debt.

The term "**Additional Permitted Debt**" is defined in Section 2.01.

11.03   Affiliate.

The term "**Affiliate**" means any person or entity which, directly or indirectly through one (1) or more intermediaries, controls or is controlled by or is under common control with another person or entity. The term "control" as used herein (including the terms "controlling," "controlled by," and "under common control with") means the possession, direct or indirect, of the power to (i) vote fifty-one percent (51%) or more of the outstanding voting securities of such person or entity, or (ii) otherwise direct management policies of such person by contract or otherwise.

11.04   Agreement.

The term "**Agreement**" means this Limited Liability Company Operating Agreement of Fort Lee Commonwealth Communities, LLC.

11.05   Annual Business Plan.

The term "**Annual Business Plan**" means the annual business plan for the operation of the Project that is required under the terms of the CDMP, prepared by the Asset Manager, and which among other things, shall have at least the following components:

(a)     a market assessment of regional and local housing impacts on Project leasing, occupancy, rental rates and marketing inducements for the upcoming fiscal year;

(b)     an assessment of occupancy by military personnel and a leasing projection related to such personnel;

(c)     an assessment of Project utilities and the Soldier Direct Pay Program to the extent applicable to the Project;

(d)     an assessment of completed capital projects in the prior year, and a three (3) year rolling projection of such projects and associated spending of capital repair and replacement reserves and reinvestment reserves.  The first year of the three (3) year plan shall be detailed by project with outline specifications and trades estimates, and the remaining two (2) years may be classified into reasonable categories and estimated costs;

(e)     an assessment of the Project's financial condition with a variance analysis against the Closing pro forma, if any, of Project financial performance or the prior year's Annual Business Plan,

(f)     an annual operating budget detailing planned expenses in a format consistent with guidance, if any, from the Government's Portfolio and Asset Management group and the definition of "Operating Budget" in the Loan Agreement; and

(g)     any recommendations for changes or revisions to Project Documents, including, but not limited to, the CDMP, and operating/resident policies and procedures.

11.06   BAH.

The term "**BAH**" shall have the meaning assigned to such term in the Government Agreements.

11.07   Bankruptcy Code.

The term "**Bankruptcy Code**" is defined in Section 10.01(b).

11.08   Borrower.

The term "**Borrower**" means the Company as the borrower under the Loan Agreement.

11.09   Capital Account.

The term "**Capital Account**" means with respect to each Member such capital account determined and maintained pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv).  Without limiting the generality of the foregoing, each Member's capital account shall be increased by the amount of money contributed by such Member to the capital of the Company, increased by the aggregate fair market value at the time of contribution (as determined by the Members) of all property contributed by such Member to the capital of the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under Section 752 of the Code), the aggregate amount of all Net Operating Profits allocated to such Member, and any and all items of gross income or gain specially allocated to such Member pursuant to Article V, and decreased by the amount of money distributed to such Member by the Company (exclusive of any guaranteed payment within the meaning of Section 707(c) of the Code paid to such Member), the aggregate fair market value at the time of distribution (as determined by the Members) of all property distributed to such Member by the Company (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to under Section 752 of the Code), the amount of any Net Operating Losses charged to such

Member, and any and all partnership and/or partner "nonrecourse deductions" specially allocated to such Member pursuant to Article V.

    11.10   Capital Contribution.

The term **"Capital Contribution"** means any Capital Contribution made to the capital of the Company pursuant to Section 4.01(a).

    11.11   Cash Flow Available for Distribution.

The term **"Cash Flow Available for Distribution"** means the excess, if any, of all cash receipts of the Company as of any applicable determination date in excess of the sum of (i) all cash disbursements of the Company prior to that date, plus (ii) amounts due and payable under any financing or debt of the Company; amounts deposited or required to be deposited in any tax reserve account (the **"Tax Reserve Account"**) established by the Members for the payment of taxes, plus (iii) any other reserve established at the reasonable discretion of the Members for anticipated cash disbursements that will have to be made before additional cash receipts of the Company from third parties will provide the funds therefor, which reserves shall be established and maintained in accordance with GAAP and to be confirmed in the audited financial statements of the Company. Cash Flow shall be determined and distributed on a monthly basis or at such other times as the Members determine that funds are available therefor, taking into account the reasonable business needs of the Company.

    11.12   CDMP.

The term **"CDMP"** means the Community Development and Management Plan by and between the Company and the Government for a "Residential Communities Initiative" military family housing development to be located at Fort Lee.

    11.13   Closing

The term **"Closing"** means the date upon which the later of (i) the execution of the Ground Lease or (ii) the closing of the Loan occurs.

    11.14   Code.

The term **"Code"** means the Internal Revenue Code of 1986, as heretofore and hereafter amended from time to time (and/or any corresponding provision of any superseding revenue law).

    11.15   Company.

The term **"Company"** means the limited liability company governed pursuant to this Agreement.

    11.16   Company Accountants.

The **"Company Accountants"** shall mean a nationally or regionally recognized certified public accounting firm selected by the Managing Member to audit the Company's books and records, issue opinions with respect to the Company's financial statements and records, and to perform other auditing or specialized accounting functions for the Company.

11.17   Company Minimum Gain.

**"Company Minimum Gain"** shall have the meaning of partnership minimum gain that is set forth in Regulations Section 1.704-2(b)(2), and the amount of Company Minimum Gain, as well as any net increase or decrease in Company Minimum Gain, for any fiscal year of the Company determined in accordance with the provisions of Regulations Section 1.704-2(d).

11.18   Completion Date.

The term **"Completion Date"** shall have the meaning given in the Lockbox Agreement.

11.19   Consent.

The term **"Consent"** means the prior written consent or approval of a Member, the Independent Member, the Senior Lender and/or the Servicer, as the context may require, to do the act or thing for which the consent is solicited.

11.20   Construction Consultant.

The term **"Construction Consultant"** shall have the meaning given in the Lockbox Agreement.

11.21   Construction Contract.

The term **"Construction Contract"** means that certain Standard Form of Agreement Between Owner and Design-Builder-Lump Sum (Guaranteed Maximum Price), and Amendment to Design-Build Agreement, each dated as of August 31, 2007, by and between the Company and the Design-Builder.

11.22   CPI.

The term **"CPI"** means the United States Department of Labor, Bureau of Labor Statistics, Consumer Price Index – US City Average, All Items (1982-84 = 100). The Consumer Price Index for any year shall be that published in December of that year.  If the manner in which the Consumer Price Index is determined by the Bureau of Labor Statistics is materially revised, the Managing Member shall make an adjustment in the revised index that will produce a result equivalent, as nearly as possible, to that which would have been obtained if the Consumer Price Index has not been so revised.  If the Consumer Price Index becomes unavailable to the public, or if the equivalent data is not readily available to enable it to make the calculations referred to herein, then there shall be substituted therefore a comparable index, reasonably acceptable to both parties, based on changes in the cost of living or purchasing power of the consumer dollar, published by an agency of the federal government, or in the absence thereof by a nationally recognized financial reporting service.

11.23   Deficit Capital Account.

The term **"Deficit Capital Account"** means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of any fiscal year or other period, after giving effect to the following adjustments:

(i)      Credit to such Capital Account any amount which such Member is obligated to restore under Regulations Section 1.704-1(b)(2)(ii)(c), as well as any addition thereto pursuant to the next

to last sentence of Regulations Sections 1.704-2(g)(1) and (i)(5), after taking into account thereunder any changes during such fiscal year in any Company Minimum Gain and any Member Minimum Gain; and

(ii)   Debit to such Capital Account the items described in Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

This definition of Deficit Capital Account is intended to comply with the provisions of Regulations Sections 1.704-1(b)(2)(ii)(d) and 1.704-2, and is intended to be interpreted consistently with those provisions.

11.24   Design-Builder.

The term "**Design-Builder**" means Hunt Building Company, Ltd., a Texas limited partnership, its successors and assigns, as Design-Builder under the terms of the Construction Contract.

11.25   Effective Date.

The "**Effective Date**" is defined in the first paragraph of this Agreement.

11.26   Financial Closing.

The term "**Financial Closing**" means the closing and funding of the Initial Financing.

11.27   Fiscal Year.

The term "**Fiscal Year**" shall mean the Company's fiscal year, which shall be the calendar year ending December 31 unless changed by the unanimous vote of the Members.

11.28   GAAP.

"**GAAP**" shall mean Generally Accepted Accounting Principles.

11.29   Government.

The term "**Government**" means The United States of America by the Secretary of the Army, acting by and through the Deputy Assistant Secretary of the Army (Privatizations and Partnerships).

11.30   Government Agreements.

The term "**Government Agreements**" means collectively the Ground Lease, and all other contracts to be entered into between the Company and the Army in connection with the Ground Lease and the CDMP.

11.31   IDP.

The term "**IDP**" means the initial development period within which it is contemplated that all residential units and related facilities, infrastructure, roads and grounds constituting the Project will be first rehabilitated or constructed and made ready for occupancy in accordance with the CDMP, as such period may be extended or shortened by (i) the agreement of the Managing Member and the Government or (ii) force majeure as provided in the Construction Contract

11.32   Independent Member.

The term "**Independent Member**" means initially FLIM, LLC or any other limited liability company, formed and duly admitted as the Independent Member of the Company, which is a bankruptcy remote, special purpose entity the operating agreement of which is similar to that of FLIM, LLC in all material respects and which at any time during the preceding five (5) years:  (A) has not and does not own beneficially, directly or indirectly any of the outstanding equity interest in the Company or in either the Managing Member or the Government or any Affiliate; (B) has not been and is not (and has not and is not affiliated with) a creditor, customer, supplier, employee, officer, director (except as an Independent Member (or similar capacity) of a limited or special purpose, bankruptcy remote entity), family member of an equity interest holder, manager, contractor, member of, or other Person who derives any of its purchases or revenues from its activities with (except as an Independent Member (or similar capacity) of a limited or special purpose, bankruptcy remote entity), the Company or either the Managing Member or the Government or any Affiliate; (C) has not and does not control (whether directly, indirectly, or otherwise) the Company or either of the Managing Member or the Government or any Affiliate, or any of their creditors, suppliers, customers, employees, officers, other directors, managers, or contractors; and (D) is not and has not been affiliated with a tax-exempt entity that receives significant contributions from the Company, either the Managing Member or the Government or any Affiliate, and the Articles of Organization of which are in form and substance acceptable to the Senior Lender.

11.33   Initial Financing.

The term "**Initial Financing**" means the financing provided by the Loan made to the Company pursuant to the terms of the Loan Agreement.

11.34   Interest.

The term "**Interest**" means a Member's entire right, title and interest in the Company and the profits, losses, capital and distributions of the Company, the right to vote on or participate in management and the right to receive information concerning the business and affairs of the Company.

11.35   Investment Return.

The term "**Investment Return**" means a return of up to fifteen percent (15%), per annum, on the Managing Member's initial Capital Contribution of Four Million and 00/100 Dollars ($4,000,000), which shall commence on the later of (i) the date the Design-Builder gives written notice to the Company that all of the work to be performed under the Construction Contract is substantially complete in accordance with the Construction Contract and the Loan Documents or (ii) the date such initial Capital Contribution is made.

11.36   Liquidation.

The term "**Liquidation**" shall mean any voluntary or involuntary liquidation, dissolution or winding up of the Company.

11.37   LLC Act.

The term "**LLC Act**" means the Delaware Limited Liability Company Act, as amended from time to time.

11.38   Loan.

The term "**Loan**" is defined in Section 1.05 of this Agreement.

11.39   Loan Documents.

The term "**Loan Documents**" means the Loan Agreement, the Notes, the Security Instrument, the Lockbox Agreement, the Environmental Indemnity and all other guaranties, all other indemnity agreements, all account control and similar agreements, instruments and security documents now or in the future executed by the Company, as the Borrower, or by any indemnitor, guarantor or any other Person evidencing or securing the Loan, as the same may be modified, amended, restated or supplemented from time-to-time in accordance therewith.

11.40   Lockbox Agreement.

The term "**Lockbox Agreement**" means the Servicing and Lockbox Agreement, dated as of September 1, 2007, by and among the Company, as the Borrower, the Senior Lender and the Servicer, as such agreement may be amended, supplemented or otherwise modified from time to time pursuant to the terms thereof.

11.41   Managing Member.

The Managing Member of the Company, which shall initially be Fort Lee Family Housing, LLC, is subject to replacement by the Members in accordance with Section 2.09 above.

11.42   Material Action.

The term "**Material Action**" means to consolidate or merge the Company with or into any Person, or sell all or substantially all of the assets of the Company, or to institute proceedings to have the Company be adjudicated bankrupt or insolvent, or consent to the institution of bankruptcy or insolvency proceedings against the Company or file a petition seeking, or consent to, reorganization or relief with respect to the Company under any applicable federal or state law relating to bankruptcy, or consent to the appointment of a receiver, liquidator, assignee, Servicer, sequestrator (or other similar official) of the Company or a substantial part of its property, or make any assignment for the benefit of creditors of the Company, or admit in writing the Company's inability to pay its debts generally as they become due, or take action in furtherance of any such action, or, to the fullest extent permitted by law, dissolve or liquidate the Company.

11.43   Member(s).

The term "**Members**" means, collectively, the Managing Member, the Independent Member and the Government; the term "**Member**" means any one (1) of the Members.

11.44   Member Loan.

The term "Member Loan" means cash advance to the Company made by a Member in an amount approved by the Managing Member.

11.45    Net Cash Flow.

The term **"Net Cash Flow"** means the sum of (i) all cash received by the Company, but excluding (A) tenant security or other deposits, (B) Capital Contributions and interest thereon, (C) proceeds from Extraordinary Items, and (D) interest on reserves not available for distribution; (ii) the net proceeds of any insurance (including rental interruption insurance), other than fire and extended coverage and title insurance, to the extent not used to repair or replace damaged property or otherwise reinvested in the Project, and (iii) any other funds deemed available for distribution by the Managing Member, less the sum of (i) all cash expenditures, and all fees and expenses unpaid but properly accrued, which have been incurred in the operation of the Company's business and are payable, including (a) fees (including incentive fees) and expenses (including reimbursable expenses) due under the terms of any Development Agreement, Asset Management Agreement, and any Property Management Agreement, that the Company has entered into with respect to the Project, but excluding expenditures paid from any Company reserve account (whether or not such expenditure is deducted, amortized or capitalized for tax purposes); (ii) all payments on account of any loans (including unpaid principal and accrued interest) made to the Company, and (iii) any deposits to the Capital Repair and Replacement Reserve Account and any other reserves or escrows for working capital, capital expenditures, repairs, replacements and/or anticipated expenditures, in such amounts as may be required by this Agreement, or as may be determined from time to time by the Managing Member to be advisable for the operation of the Company. Net Cash Flow of the Project shall be determined separately for each calendar year or portion thereof and shall not be cumulative.

11.46    Net Operating Loss.

The term **"Net Operating Loss"** is defined in Section 5.03(e).

11.47    Net Operating Profit.

The term **"Net Operating Profit"** is defined in Section 5.03(e).

11.48    Net Rental Revenue.

The term **"Net Rental Revenue"** shall have the meaning assigned to such term in the Property Management Agreement.

11.49    Notes.

The term **"Notes"** is defined in Section 1.05 of this Agreement.

11.50    Operating Deficit.

The term **"Operating Deficit"** means the amount by which the Net Rental Revenues and all other payments received by Lessee with respect to the Company from all sources, including the net proceeds of any insurance, other than fire and extended coverage and title insurance, to the extent not used to repair or replace damaged property or otherwise reinvested in the Project for a particular period of time, but excluding (A) tenant security or other deposits, (B) Capital Contributions and interest thereon, (C) the Loan, Additional Permitted Debt, and indebtedness of any sort, (D) proceeds from Extraordinary Items and (E) interest on reserves not available for distribution or payment to the Company, is exceeded by the sum of all the operating expenses, including all required debt service, operating and maintenance expenses, required deposits into the accounts maintained pursuant to the Lockbox Agreement, any fees to the Servicer and/or any applicable mortgage insurance premium payments and all other Project

obligations or expenditures, excluding payments for construction of the Project and fees and other expenses and obligations of the Company to be paid from the sources identified in clauses (B) through (E) of this sentence during the same period of time.

11.51   Outstanding.

The term "**Outstanding**" shall have the meaning given in the Lockbox Agreement.

11.52   Payment Date.

The term "**Payment Date**" means, in respect of each calendar year, the later of (i) the date which is ninety (90) days after the end of such calendar year or (ii) the date on which the Managing Member has delivered to all Members the financial statements and information required to be delivered under Section 9.04(a)(i) and (ii).

11.53   Percentage Interest.

The term "**Percentage Interest**" means with respect to each Member, the percentage set forth in Section 4.01 of this Agreement.

11.54   Permitted Financing.

The term "**Permitted Financing**" means the Initial Financing, Additional Permitted Debt, and any other financing that is undertaken or approved by the Company in accordance with the provisions of this Agreement.

11.55   Person.

The term "**Person**" means any individual, partnership, corporation, association, trust, limited liability company, or other legal entity(s), including the Government, whether foreign or domestic, and their respective heirs, executors, administrators, legal representatives, successors, and assigns where the context requires.

11.56   Plans and Specifications.

The term "**Plans and Specifications**" means the plans and specifications for all renovation work, new construction and other work for the Project that are prepared pursuant to and consistent with the CDMP and the Construction Contract and approved by the Company and the Government.

11.57   Project.

The term "**Project**" is defined in Section 1.05.

11.58   Project Documents.

The term "**Project Documents**" means and includes the CDMP, each Loan Document, the Ground Lease, the Construction Contract, the Development Agreement, the Asset Management Agreement and the Property Management Agreement.

11.59   Rate of Return.

The term "**Rate of Return**" means a percentage, calculated like interest and compounded annually, on the Unreturned Capital Contribution of a Member, as such Unreturned Capital Contribution may change from time to time based upon additional Contributions of such Member and distributions by the Company to such Member hereunder.

11.60   Regulation.

"**Regulation**" means the income tax regulations, including any temporary regulations, promulgated under the Code from time to time.

11.61   Related Party.

The term "**Related Party**" means any person or entity that has a relationship to the relevant Member described in Section 267(b) of the Code and any Affiliate of a Member.

11.62   Securities Acts.

The term "**Securities Acts**" is defined in Section 10.06(a)(i).

11.63   Security Instrument.

The term "**Security Instrument**" is defined in Section 1.05 of this Agreement.

11.64   Senior Lender.

The term "**Senior Lender**" is defined in Section 1.05 of this Agreement.

11.65   Servicer.

The term "**Servicer**" means Capmark Finance Inc., a California corporation, and any successor servicer designated pursuant to Article IX of the Lockbox Agreement.

11.66   Tax Reserve Account.

The term "**Tax Reserve Account**" is defined in Section 11.11.

11.67   Treasury Regulation.

The term "**Treasury Regulation**" means any proposed, temporary, and/or final federal income tax regulation promulgated by the United States Department of the Treasury as heretofore and hereafter amended from time to time (and/or any corresponding provisions of any superseding revenue law and/or regulation).

ARTICLE XII
SINGLE PURPOSE ENTITY

12.01   Company.   Until 366 days after the date that (x) the Ground Lease has been terminated and all obligations of the Company thereunder have been fully performed and (y) the Loan is no longer Outstanding, the Company shall:

a.   do or cause to be done all things necessary to preserve and keep in full force and effect its existence, rights (charter and statutory) and franchises, observe all customary organizational and operational formalities, including the taking and maintaining of complete minutes of all member or board meetings, and obtain and preserve its qualification to do business in each jurisdiction in which such qualification is or shall be necessary to protect the validity and enforceability of the this Agreement, the Ground Lease, and the Loan Documents and observe all procedures and provisions required by the Ground Lease, the Loan Documents and the laws of the State of Virginia;

b.   not amend, alter, change or repeal its Certificate of Formation or (i) the definitions of "Senior Lender," "Consent", "Independent Member", or "Material Action"; (ii) this Article XII or (iii) any definitions of defined terms used herein, in any manner that could reasonably be expected to adversely affect the Company's status as a special purpose entity, without the written consent of the Independent Member and the Senior Lender;

c.   maintain its own full and complete records, accounts, books of account and bank accounts separate from those of any other Person and not commingle its records, accounts, books of account and bank accounts with the organizational or other records, accounts, books of account or bank accounts of any other Person and such records, accounts, books of account and bank accounts shall reflect the separate existence of the Company;

d.   act solely in its own name independently and through its duly authorized officers or agents in the conduct of its business; prepare all of its correspondence in the Company's name, hold itself out as a separate entity from any other Person and not identify itself as a division of any other Person; correct any known misunderstanding regarding its separate identity; conduct its business so as not to mislead others as to the identity of the entity with which they are concerned, correct any known misunderstanding regarding its separate identity; refrain from engaging in any activity that compromises the separate legal identity of the Company, and strictly comply with all organizational formalities to maintain its separate existence;

e.   file its own tax returns, if any, as may be required under applicable law, to the extent: (i) not part of a consolidated group filing a consolidated return or returns; or (ii) not treated as a disregarded entity for federal income tax purposes, and pay any taxes so required to be paid under applicable law;

f.   not commingle its assets with assets of any other Person, hold all of its assets in its own name, and maintain its assets in such a manner that it is not costly or difficult to segregate, identify, or ascertain such assets;

g.   prepare and maintain separate full and complete tax returns and financial statements complying with GAAP, showing its assets and liabilities separate and apart from those of any other Person or if part of a consolidated group, then include an appropriate notation on the financial statements of such consolidated group indicating the separate existence of the Issuer and its assets and liabilities.   The consolidated financial statements, if any, which consolidate the assets and

earnings of any Member with those of the Company shall contain a footnote stating that the assets of the Company shall not be available to creditors of the Member. The financial statements (if any) of the Company shall disclose that the assets of the Company are not available to pay creditors of any Affiliate or any Member or its Affiliates;

h.  pay its liabilities and operating expenses only out of its funds and not pay from its assets any obligations or indebtedness of any other Person;

i.  maintain an arm's length relationship with its Affiliates and any Member or its Affiliates, not enter into any contract or agreement with any of its Affiliates or any Member or its Affiliates except on terms that are intrinsically fair, commercially reasonable, and substantially similar to those that would be available on an arm's-length basis with third parties, and transact all business with its Affiliates and each Member or its Affiliate pursuant to written, enforceable agreements;

j.  pay the salaries of its own employees, if any, and maintain a sufficient number of employees in light of its contemplated business operations;

k.  not be, become or hold itself out as being liable for the debts of any other Person, or hold out its credit as being available to satisfy the obligation of any other Person and not make loans or advances to any Person or buy or hold evidence of indebtedness issued by any other Person except for Permitted Investments as provided in the Lockbox Agreement. The Company will not act as the agent of its Affiliates or any Member or its Affiliates. The Company will not permit any Member to act as the agent for the Company;

l.  allocate, charge and reimburse fairly and reasonably on a current basis with any other Person expenses that are shared with such Person including, without limitation, any common employee or overhead costs shared with Affiliates, rent, or other compensation paid for shared or leased office space. The Company shall require that independent contractors performing services or incurring expenses in connection with such services for the Company shall receive compensation for such services rendered or expenses incurred in an amount equal to the fair value of such services and expenses;

m.  use stationery, invoices and checks bearing its own name and separate from any other Person; maintain a separate office that, if leased from an Affiliate, is on an arm's-length commercially reasonable basis and that is conspicuously identified as the Company's office so it can easily be identified by other Persons

n.  except pursuant to the Subsidiary Agreements, not assume, guarantee, or pay the debts or obligations of any other Person; not pledge its assets for the benefit of any Person (other than as contemplated by the Lockbox Agreement); not lend or advance any moneys to (other than trade receivables in connection with the ordinary course of the Company's business) or make an investment in or for the benefit of, guarantee (directly or indirectly), endorse or otherwise become contingently liable (directly or indirectly) or hold its credit as being available to satisfy the obligations of any other Person, or own or purchase any stock, obligations or securities of any of its Affiliates or members, or any other interest in, or make any capital contribution to, any other Person;

o.  maintain adequate capital for the normal obligations reasonably foreseeable in a business of the Company's size and character and in light of its proposed business operations and liabilities, and pay its own obligations, including employee salaries, only out of its own funds and not permit any

Affiliate to guarantee or pay the Company's obligations except for the Letter of Credit described in Section 4.24 of the Lockbox Agreement;

p.   conduct business limited solely to (i) developing, designing, financing, constructing, renovating, demolishing, selling, owning, managing, acquiring, leasing, operating and maintaining the Project in accordance with the Transaction Documents as defined in the Lockbox Agreement; (ii) entering into and performing its obligations under the Transaction Documents; or (iii) that which is incident, necessary, and appropriate to accomplish the foregoing;

q.   cause the managers, officers, agents and other representatives of the Company, if any, to act at all times with respect to the Company consistently and in furtherance of the foregoing and in the best interests of the Company; and

r.   not take any of the following actions nor permit any Member or any other Person on behalf of the Company to take any of the following actions without the consent of the Independent Member:

(i)   do any act in contravention of this Agreement or the Ground Lease;

(ii)   do any act which would make it impossible to carry on the ordinary business of the Company;

(iii)   confess a judgment against the Company;

(iv)   possess the property of the Company, or assign rights, if any, in specific property of the Company, for other than purposes of the Company;

(v)   knowingly perform any act that would subject: (A) any Member to liabilities of the Company in any jurisdiction; or (B) the Company to taxation as a corporation under relevant provisions of the Internal Revenue Code of 1986 (as amended);

(vi)   except as permitted by this Agreement or the Loan Documents, sell, pledge, transfer, assign, lease or otherwise convey property or assets of the Company or interests in the Company; not dissolve or liquidate; not change its limited liability company status; convert or reorganize into any other form of entity; or merge or consolidate with any other entity;

(vii)   not change its limited liability company status; convert or reorganize into any other form of entity; or merge or consolidate with any other entity;

(viii)   except as permitted by this Agreement, enter into any agreements, written or otherwise, between any Member and the Company or any other Person pursuant to which the Member agrees to extend credit or make payment or contributions to or for or assume, guaranty or otherwise be obligated for the payment or performance of the obligations of either the Company or the Managing Member; provided, however, that any Member may make any capital contributions to the Company that such Member determines to be in the Member's own best interest;

(ix)   not, without the approval by the Independent Member, (i) commence any case, proceeding, or other action or file a voluntary petition or otherwise initiate proceedings to have the Company adjudicated bankrupt or insolvent, or (ii) consent to the institution of bankruptcy or insolvency proceedings against the Issuer, or (iii) file a petition seeking or consenting to reorganization or relief of the Company as debtor under any applicable federal or state law

relating to bankruptcy, insolvency, or other relief for debtors with respect to the Company, or (iv) seek or consent to the appointment of any Servicer, receiver, conservator, assignee, sequestrator, custodian, liquidator (or other similar official) of the Company or of all or any substantial part of the Company's property, or (v) make any general assignment for the benefit of creditors of the Company, or (vi) except as required by law, admit in writing the inability of the Issuer to pay its debts generally as they become due, or declare or effect a moratorium on the Company's indebtedness, or (vii) take any action in furtherance of any of the foregoing; and

(x)     cause to be appointed and maintained as a member of the Company an "Independent Member" who shall have the right to vote on those matters specifically requiring the vote of the Independent Member pursuant to this Agreement.

12.02   Managing Member.   Until 366 days after the date that (x) the Ground Lease has been terminated and all obligations of the Company thereunder have been fully performed and (y) the Loan is no longer Outstanding, the Managing Member shall:

a.   do or cause to be done all things necessary to preserve and keep in full force and effect its existence, rights (charter and statutory) and franchises, and obtain and preserve its qualification to do business in each jurisdiction in which such qualification is or shall be necessary to protect the validity and enforceability of any agreement to which the Managing Member is a party and observe all procedures and provisions required by the Company under the CDMP, the Ground Lease and the laws of the State of Virginia;

b.   maintain its own records, accounts, books of account and bank accounts separate from those of any other Person and shall not commingle its records, accounts, books of account and bank accounts with the organizational or other records, accounts, books of account or bank accounts of any other Person and such records, accounts, books of account and bank accounts shall reflect the separate existence of the Managing Member;

c.   act solely in its own name and through its duly authorized officers or agents in the conduct of its business, prepare all of its correspondence in the Managing Member's name, hold itself out as a separate entity from any other Person, conduct its business so as not to mislead others as to the identity of the entity with which they are concerned, correct any known misunderstanding regarding its separate identity, refrain from engaging in any activity that compromises the separate legal identity of the Managing Member, and strictly comply with all organizational formalities to maintain its separate existence;

d.   file its own tax returns, if any, as may be required under applicable law, to the extent:  (i) not part of a consolidated group filing a consolidated return or returns; or (ii) not treated as a disregarded entity for federal income tax purposes, and pay any taxes so required to be paid under applicable law;

e.   not commingle its assets with assets of any other Person;

f.   maintain financial statements separate from any other Person. The annual financial statements of the Managing Member shall disclose the effects of its transactions in accordance with GAAP. The consolidated financial statements, if any, which consolidate the assets and earnings of any Member with those of the Managing Member shall contain a footnote stating that the assets of the Managing Member shall not be available to creditors of the Member. The financial statements (if any) of the Managing Member shall disclose that the assets of the Managing Member are not available to pay creditors of any Affiliate or any Member or its Affiliates;

g.  pay its liabilities and operating expenses only out of its funds and not pay from its assets any obligations or indebtedness of any other Person;

h.  maintain an arm's length relationship with its Affiliates and any Member or its Affiliates, not enter into any contract or agreement with any of its Affiliates or any Member or its Affiliates except on terms that are intrinsically fair, commercially reasonable, and substantially similar to those that would be available on an arm's-length basis with third parties, and transact all business with its Affiliates and each Member or its Affiliate pursuant to written, enforceable agreements;

i.  pay the salaries of its own employees, if any, and maintain a sufficient number of employees in light of its contemplated business operations;

j.  not be, become or hold itself out as being liable for the debts of any other Person, or hold out its credit as being available to satisfy the obligation of any other Person.  The Managing Member will not act as the agent of its Affiliates or any Member or its Affiliates.  Managing Member will not permit any Member to act as the agent for the Managing Member;

k.  allocate fairly and reasonably with any other Person expenses that are shared with such Person including, without limitation, any overhead, rent, or other compensation paid for shared or leased office space.  Managing Member shall require that independent contractors performing services or incurring expenses in connection with such services for the Managing Member shall receive compensation for such services rendered or expenses incurred in an amount equal to the fair value of such services and expenses;

l.  use stationery, invoices and checks separate from any other Person;

m.  not make an investment in or for the benefit of, guarantee (directly or indirectly), endorse or otherwise become contingently liable (directly or indirectly) for the obligations of, or own or purchase any stock, obligations or securities of or any other interest in, or make any capital contribution to, any other Person;

n.  maintain adequate capital for the normal obligations reasonably foreseeable in a business of the Managing Member's size and character and in light of its proposed business operations and liabilities;

o.  not engage, directly or indirectly, in any business other than the actions required or permitted to be performed by the Managing Member under this Agreement;

p.  cause the managers, officers, agents and other representatives of the Managing Member, if any, to act at all times with respect to the Managing Member consistently and in furtherance of the foregoing and in the best interests of the Managing Member; and

q.  not take any of the following actions nor permit any Member or any other Person on behalf of the Managing Member to take any of the following actions without the consent of the Independent Member and the Government:

    (i)  do any act in contravention of the Ground Lease;

    (ii)  do any act which would make it impossible to carry on the ordinary business of the Managing Member;

(iii)     confess a judgment against the Managing Member;

(iv)     possess the property of the Managing Member, or assign rights, if any, in specific property of the Managing Member, for other than purposes of the Managing Member;

(v)     knowingly perform any act that would subject: (A) any Member to liabilities of the Managing Member in any jurisdiction; or (B) the Managing Member to taxation as a corporation under relevant provisions of the Internal Revenue Code of 1986 (as amended);

(vi)     sell, pledge, transfer, assign or otherwise convey property or assets of the Managing Member; or

(vii)     except as otherwise provided for in this Agreement, enter into any agreements, written or otherwise, between any Member and the Managing Member or any other Person pursuant to which the Member agrees to extend credit or make payment or contributions to or for or assume, guaranty or otherwise be obligated for the payment or performance of the obligations of either the Managing Member or the managing member of the Managing Member; provided, however, that any Member may make any capital contributions to the Managing Member that such Member determines to be in the Member's own best interest.

ARTICLE XIII
CONSENTS, VOTING, AND MEETINGS

13.01   Method of Giving Consent.  Any Consent required by this Agreement may be given by a written Consent given by the consenting Member and received by the Managing Member at or prior to the doing of the act or thing for which the Consent is solicited.

13.02   Submissions to Members.  The Managing Member shall give each Member Notice of any proposal or other matter required by any provision of this Agreement or by law to be submitted for consideration and approval of such Member.  Each Notice shall include any information required by the relevant provision or by law.

13.03   Meetings; Submission of Matter for Voting.  Subject to the provisions of Section 3.01, the Government shall have the authority to convene meetings of the Company and to submit matters to a vote of the Members.

ARTICLE XIV
GENERAL PROVISIONS

14.01   Burden and Benefit.  The covenants and agreements contained herein shall be binding upon and inure to the benefit of the successors and assigns of the respective parties hereto.

14.02   Applicable Law.  This Agreement shall be construed, and the rights and obligations of the Members under this Agreement shall be determined, in accordance with the law of the State of Delaware.

14.03   Counterparts.  This Agreement may be executed in several counterparts, each of which shall be deemed to be an original copy and all of which together shall constitute one agreement binding on all parties hereto, notwithstanding that all the parties shall not have signed the same counterpart.

14.04   Severability of Provisions.  Each provision of this Agreement shall be considered separable and if for any reason any provision which is not essential to the effectuation of the basic

purposes of this Agreement is determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or affect those provisions of this Agreement which are valid.

14.05    Entire Agreement.  This Agreement sets forth all (and is intended by all parties to be an integration of all) of the representations, promises, agreements and understandings among the parties hereto with respect to the Company, the Company business and the property of the Company, and there are no representations, promises, agreements or understandings, oral or written, express or implied, among them other than as set forth or incorporated herein.

14.06    Liability of Each Member.  Except as set forth in this Section and, to the fullest extent permitted by applicable law, no Member nor any of its partners, general or limited, employees, officers, directors, representatives, or agents shall have any personal liability to any of the parties to this Agreement with regard to the representations and covenants extended, or the obligations undertaken, by the Member under this Agreement, or on account of such Member's good faith reliance on the provisions of this Agreement.  Neither the Company nor any Member shall have any claim for breach of fiduciary duty or otherwise against any Member for failing to take any Material Action.  In the event that a Member shall be in default under any of the terms of this Agreement, the sole recourse of any party hereto for any indebtedness due hereunder, or for any damages resulting from any such default by such Member, shall be against the Interest of the Member; provided however, that under no circumstances shall the liability of the Member for any such default be in excess of the amount of Capital Contribution payable by the Member to the Company, under the terms of this Agreement, at the time of such default.  This Section 14.06 shall survive any termination of the Company or this Agreement.

14.07    Power of Attorney.  The Government is hereby granted an irrevocable power of attorney, coupled with an interest, to execute any and all documents on behalf of the other Members and the Company as shall be legally necessary and sufficient to effect all of the provisions of Section 2.09; provided, however, that the Government shall not exercise such Power of Attorney unless the documents necessary to effect such provisions of Section 2.09 have been submitted to the Managing Member.

14.08    Interpretation.   Whenever in this Agreement and Exhibits hereto, any Member is provided the right or authority to Consent, approve, determine, exercise discretion or withhold such Consent or approval or to take or not take similar action, such action shall, unless specifically provided otherwise in this Agreement, be taken or withheld in such Member's sole and absolute discretion.

14.09    Interpretation of Project Documents.  The Company is bound by the Project Documents in accordance with their terms.  Each Member agrees and acknowledges that the fact that this Agreement may contain terms or address matters similar to terms or matters addressed in the Project Documents does not govern the interpretation of such terms or the disposition of such matters for purposes of the Project Documents, notwithstanding that the Government may be a party to such Project Documents.

14.10    Dispute Resolution.

(a)    In the event that either Member demands dispute resolution in accordance with the provisions of this Agreement, arbitration proceedings shall be held at Fort Lee in accordance with the provisions of this Section and with the Arbitration Rules for the Real Estate Industry then obtaining of the American Arbitration Association.  In the event of a conflict between such rules and the provisions of this Section, the provisions of this Section shall govern.  The dispute shall be resolved by an arbitrator (such Person, the "**Arbitrator**") mutually agreed to by the Members.  If the Members are unable to agree on the selection of an arbitrator within ten (10) days of the demand for arbitration, each Member shall select an arbitrator within ten (10) days of such determination.  The arbitrators selected by the Members shall in

turn within ten (10) days of their selection select a third arbitrator who shall be designated the Arbitrator to resolve the dispute pursuant to this Section.

(b)     To the extent permitted by law, the decision of the Arbitrator shall be conclusive and binding on the Members. To the extent the Arbitrator's decision is not binding on all Members, all Members expressly reserve their rights to resolve the dispute by whatever means available under applicable law.

(c)     The Arbitrator shall be appointed in accordance with the applicable provisions of the Arbitration Rules for the Real Estate Industry of the American Arbitration Association as effective at the time of appointment. The Arbitrator shall be a member of the American Arbitration Association National Panel of Real Estate Industry Arbitrators and must either (i) possess not less than ten (10) years of experience in the ownership or operation of joint venture real estate projects within the United States, or (ii) be an attorney-at-law admitted to practice and actively engaged in a real estate practice within the United States for not less than ten (10) years.

(d)     In the event that the American Arbitration Association or its successors is not then in existence, the Member demanding arbitration shall appoint a disinterested Person as an arbitrator on its behalf and give notice thereof to the other Members. Each such other Member shall, within 10 days of the receipt of such notice, appoint an additional disinterested Person as an arbitrator on its behalf and give notice thereof to the other Members (all such disinterested Persons appointed pursuant to this clause (d) of Section 14.10 are referred to herein collectively as the "**Designated Arbitrator**"). Each such designated arbitrator shall possess the qualifications set forth in clause (c) of this Section 14.10. If either Member fails to appoint an arbitrator within the designated 10 day period, then the arbitrator(s) selected pursuant to this clause (d) of Section 14.10 shall resolve the pending dispute. Any arbitration undertaken pursuant to the provisions of this subsection (d) of Section 14.10 shall be governed under the Arbitration Rules for the Real Estate Industry obtaining of the American Arbitration Association immediately prior to the cessation of operations by the American Arbitration Association, except as otherwise provided in this Section.

(e)     Except as agreed to in writing by the Members, each Member shall submit to the Arbitrator, or, if applicable, the Designated Arbitrator, and each other Member its final written position as to the resolution of the pending dispute that is the subject of the arbitration (with respect to each Member, its "**Final Position**") within 10 days after notice of appointment of the Arbitrator from the American Arbitration Association, or if applicable, the Designated Arbitrator, within  ten (10) days after the expiration of the 10 day period specified in such subsection. If only one Member so submits its Final Position, then such Final Position shall be deemed the decision of the Arbitrator, or if applicable, the Designated Arbitrator.

(f)     The Arbitrator or, if applicable, the Designated Arbitrator shall render his or her decision relative to the disputed matter within 30 days after receiving from the Members their respective Final Positions. The Arbitrator or, if applicable, the Designated Arbitrator shall be required to render a decision relative to the disputed matter as proposed exactly as set forth in the Final Positions and may not render or resolve the disputed matter in any other matter. The final decision of the Arbitrator or, if applicable, the Designated Arbitrator, shall be in writing and counterpart copies thereof shall be delivered to each Member. In making its decision, the Arbitrator or, if applicable, the Designated Arbitrator, shall have no power to modify in any manner the provisions of this Agreement.

(g)     Prior to the commencement of any arbitration and the receipt of any Final Positions, the Arbitrator or, if applicable, the Designated Arbitrator shall subscribe and swear an oath to resolve the pending dispute fairly and impartially in accordance with the provisions of this Section.

(h)     The expenses of arbitration shall be paid for by the Company but each Member shall pay and be separately responsible for the fees and costs of its own counsel and any other Persons engaged in connection with the arbitration proceedings.

(i)     The Arbitrator or, if applicable, the Designated Arbitrator, shall have the right to retain and consult experts and competent authorities skilled in the matters that are the subject of the arbitration; provided, however, that any such consultation shall be made in the presence of all Members who shall have the right to cross-examine such experts and authorities.

(j)     At any time during the pendency of the arbitration proceedings, the Members may agree in writing as to the resolution of the pending dispute, in which event the pending arbitration proceedings shall thereupon terminate.

**EXECUTED** the day and year first above written.

**FORT LEE FAMILY HOUSING, LLC**, a
Delaware limited liability company

By:    **FALCON PROPERTIES MH LLC**, a
Pennsylvania limited liability company

By: _____
     Sinclair S. Cooper, Member

By:    **PINNACLE FORT LEE LLC**,
a Washington limited liability company

By: _____
     M. Scott Orrantia, Managing Director

By:    **HUNT ELP, Ltd.**, a Texas limited partnership

By:    **HB GP, LLC**, a Nevada limited liability
company, Managing General Partner

By: _____
     Robin Vaughn, Senior
     Vice President

**[Signatures Continue of Next Page]**

*Signature Page to Operating Agreement of Fort
Lee Commonwealth Communities, LLC*

**FLIM, LLC**, a Nevada limited liability company, Independent Member

By: _____
    **William R. Caparis, Member**


**[Signatures Continue of Next Page]**


*Signature Page to Operating Agreement of Fort Lee Commonwealth Communities, LLC*

THE UNITED STATES OF AMERICA, BY
THE SECRETARY OF THE ARMY


By: _____
Geoffrey O. Prosch
Principal Deputy Assistant Secretary
of the Army (Installations and Environment)

EXHIBIT "A"

FORM OF DEVELOPMENT AGREEMENT