# EXHIBIT 3

# LOAN AGREEMENT

between

## CAPMARK CAPITAL INC.,
as Lender

and

## FORT LEE COMMONWEALTH COMMUNITIES, LLC,
as Borrower

Dated as of August 31, 2007

Premises:   Military Housing Privatization Project for Fort Lee, Prince George County, Virginia

4852-0716-2625 7
Capmark Fort Lee Loan Agreement

TABLE OF CONTENTS

Page

### ARTICLE I

### DEFINITIONS; ASSIGNMENT TO GRANTOR TRUST

Section 1.01.   Definitions .......................................................................................... 2

### ARTICLE II

### THE LOAN

Section 2.01.   Making the Loan ................................................................................. 15
Section 2.02.   Funding and Disbursement of Loan Proceeds and Other Amounts ........... 15
Section 2.03.   Repayment of the Loan ...................................................................... 16

### ARTICLE III

### CONDITIONS PRECEDENT TO DISBURSEMENTS FROM THE CONSTRUCTION ACCOUNT AND CERTAIN OTHER ACCOUNTS

Section 3.01.   Closing Documents .............................................................................. 16
Section 3.02.   Conditions Precedent to Disbursements from the Construction Account .... 19
Section 3.03    Disbursements from Capital Repair/Replacement Account, the Operating Reserve Account and the Utility Cost Reserve Account ............................ 21
Section 3.04.   Procedures for, and Determination of Amounts of, Disbursements From the Construction Account, the Capital Repair/Replacement Account, the Operating Reserve Account and the Utility Cost Reserve Account ............ 22
Section 3.05    Deposit of Loan Proceeds to the Construction Account, the Series A Reserve Account, the Series B Reserve Account, the Capitalized Interest Account, the Operating Reserve Account and the Utility Cost Reserve Account ........... 22
Section 3.06    Lender's Rights to Stop Disbursements from the Construction Account and the Capital Repair/Replacement Account .............................................. 23
Section 3.07.   Excess Loan Proceeds Subaccount ...................................................... 23
Section 3.08.   Extraordinary Borrower Repayment Right ........................................... 24
Section 3.09.   Use of Proceeds ................................................................................ 25
Section 3.10.   Conditions to Obligations of Lender To Make Disbursements ................. 25

### ARTICLE IV

### CONSTRUCTION CONSULTANT

Section 4.01.   Construction Consultant ..................................................................... 25
Section 4.02.   Construction Consultant Reports ......................................................... 25

4852-0716-2625.7
Capmark Fort Lee Loan Agreement

## ARTICLE V

### COMPLETION

| | | |
|---|---|---|
| Section 5.01. | Completion | 27 |
| Section 5.02. | Completion of Punch-List Items | 29 |
| Section 5.03. | Release of Remaining Funds in Construction Account | 29 |

## ARTICLE VI

### REPRESENTATIONS AND WARRANTIES

| | | |
|---|---|---|
| Section 6.01. | Representations and Warranties in Security Instrument | 30 |
| Section 6.02. | Construction Documents | 30 |
| Section 6.03. | No Illegal Activity as Source of Funds | 30 |
| Section 6.04. | Compliance With Anti-Terrorism, Embargo, Sanctions and Anti-Money Laundering Laws | 30 |

## ARTICLE VII

### AFFIRMATIVE COVENANTS

| | | |
|---|---|---|
| Section 7.01. | Construction | 31 |
| Section 7.02. | Correction of Work | 31 |
| Section 7.03. | No Encroachments | 31 |
| Section 7.04. | Plan Changes | 31 |
| Section 7.05. | Brokerage | 32 |
| Section 7.06. | No Liens | 32 |
| Section 7.07. | Shop Drawings | 32 |
| Section 7.08. | Loan Reserve Accounts | 32 |
| Section 7.09. | Single Purpose Entity | 32 |
| Section 7.10. | Construction Inspections | 33 |
| Section 7.11. | Construction Documents, Development Agreement, Asset Management Agreement, Management Agreement and Government Agreements | 33 |
| Section 7.12. | Progress Certification | 33 |
| Section 7.13. | Construction Budget Evaluation | 36 |
| Section 7.14. | Borrower's Covenants Regarding Government Agreements | 36 |
| Section 7.15. | Bankruptcy | 38 |
| Section 7.16. | Further Assurances | 38 |
| Section 7.17. | Compliance With Anti-Terrorism, Embargo, Sanctions and Anti-Money Laundering Laws | 39 |

## ARTICLE VIII

### NEGATIVE COVENANTS

| | | |
|---|---|---|
| Section 8.01. | Changes to Plans and Adjustment of Construction Schedule and Budget | 39 |

Section 8.02.   Permits ........................................................................................... 40
Section 8.03.   Disposition of Assets ..................................................................... 40
Section 8.04.   Changes in Accounting .................................................................. 40
Section 8.05.   Transfer of Ownership Interests. ................................................... 40
Section 8.06.   Change of Use ................................................................................ 41
Section 8.07.   Characterization for Income Tax Purposes ................................... 41

## ARTICLE IX

## EVENTS OF DEFAULT

Section 9.01.   Events of Default ........................................................................... 41
Section 9.02.   Remedies Generally ....................................................................... 47

## ARTICLE X

## GENERAL CONDITIONS

Section 10.01.   Effect of Disbursements................................................................. 49
Section 10.02.   Assignment by the Lender ............................................................. 50
Section 10.03.   Notices ........................................................................................... 52
Section 10.04.   Modifications ................................................................................. 53
Section 10.05.   Rights Cumulative: No Waiver ...................................................... 53
Section 10.06.   Schedules ....................................................................................... 53
Section 10.07.   Captions ......................................................................................... 53
Section 10.08.   Assignment by the Borrower ......................................................... 53
Section 10.09.   Consents ......................................................................................... 53
Section 10.10.   Severability .................................................................................... 54
Section 10.11.   Consent of Government ................................................................. 54
Section 10.12.   Costs and Expenses ....................................................................... 54
Section 10.13.   Performance by Lender.................................................................. 55
Section 10.14.   Indemnification .............................................................................. 55
Section 10.15.   Survival of Covenants ................................................................... 56
Section 10.16.   Benefits .......................................................................................... 57
Section 10.17.   Supersedes Prior Agreements; Counterparts ................................ 57
Section 10.18.   Rules of Construction .................................................................... 57
Section 10.19.   Controlling Law ............................................................................. 58
Section 10.20.   Nonrecourse ................................................................................... 58
Section 10.21.   Intentionally Omitted .................................................................... 59
Section 10.22.   Servicing ........................................................................................ 59
Section 10.23.   Waiver of Automatic Stay ............................................................. 60
Section 10.24.   Waiver of Jury Trial....................................................................... 60
Section 10.25.   Additional Financing ..................................................................... 61
Section 10.26.   Deemed Approval, Consent and Acceptance................................. 64

SCHEDULE 1     LEGAL DESCRIPTION OF LAND AND PARCELS
SCHEDULE 2     CONSTRUCTION BUDGET

SCHEDULE 3      MEMBERS IN THE BORROWER
SCHEDULE 4      CONSTRUCTION SCHEDULE
EXHIBIT A        DISBURSEMENT REQUEST

# LOAN AGREEMENT

**THIS LOAN AGREEMENT** (as it may be modified, amended, restated and supplemented from time-to-time in accordance herewith, this "Agreement") is made as of this 31ˢᵗ day of August, 2007 between **CAPMARK CAPITAL INC.**, a Colorado corporation, having an office at 1801 California Street, Suite 3900, Denver, Colorado 80202, as lender, and **FORT LEE COMMONWEALTH COMMUNITIES, LLC**, a Delaware limited liability company, having an office at 4401 North Mesa, El Paso, Texas 79902-1107, as borrower.

## R E C I T A L S :

WHEREAS, capitalized terms used, and not defined in, these Recitals are used with the meanings set forth in Article I hereof; and

WHEREAS, the Borrower has acquired a leasehold interest in the Land and an ownership interest in certain improvements located on the Land, including, as of the date hereof, 1,206 units of multifamily housing and detached housing, together with related amenities and infrastructure (the "Existing Improvements"), and the Borrower estimates that 364 units of multifamily housing and detached housing, together with related amenities and infrastructure comprising part of the Existing Improvements, are to be demolished as and when required pursuant to the Government Agreements (the units and related amenities and infrastructure which are to be demolished are sometimes hereinafter referred to as the "Demolished Units" (the Land, together with all Existing Improvements and all New Improvements (defined below), are sometimes hereinafter collectively referred to as the "Premises"); and

WHEREAS, pursuant to the Ground Lease, the Borrower is required to (a) perform certain site preparation work, (b) demolish the Demolished Units and (c) construct 651 new units of multifamily housing and detached housing, together with related amenities and infrastructure, the "New Improvements") on the Land, all in accordance with the terms of this Agreement and the other Loan Documents, the Government Agreements and substantially in accordance with the Plans; and

WHEREAS, the Project shall be completed in phases substantially in accordance with the Plans and the Construction Schedule (each a "Phase"); and

WHEREAS, subject to the terms and conditions of this Agreement and the other Loan Documents, the Lender has agreed to make a loan to the Borrower in the original principal amount of $126,348,000 (the "Loan") to provide for the payment of certain Project Costs. The Loan is evidenced by (i) the Series A promissory note of even date herewith in the original principal amount of $121,131,000 and (ii) the Series B promissory note of even date herewith in the original principal amount of $5,217,000, each of which is made by Borrower and payable to Lender (such promissory notes, as they may be divided, serialized, participated, modified, amended, extended, restated or supplemented from time-to-time in accordance with its terms and the terms of this Agreement, the "Series A Note" and the "Series B Note," respectively and collectively, the "Notes") and is secured by, among other things, a mortgage, assignment of rents, security agreement and fixture filing of even date herewith granted by the Borrower for the benefit of the Lender (such mortgage, assignment of rents, security agreement and fixture filing,

as it may be modified, amended, restated or supplemented from time-to-time in accordance with its terms and the terms of this Agreement, the "Security Instrument"); and

WHEREAS, the proceeds of the Loan will be fully funded at the Closing and the proceeds of the Loan will be deposited with the Servicer and thereafter disbursed to the Borrower from time-to-time subject to and in accordance with the Loan Documents and the Servicing Agreement to pay Project Costs.

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I

## DEFINITIONS; ASSIGNMENT TO GRANTOR TRUST

**Section 1.01. Definitions.** For the purposes of this Agreement, each of the following terms shall have the meaning specified below.

"*Accounts*" is defined in the Servicing Agreement.

"*Additional Permitted Indebtedness*" is defined in Section 10.25 hereof.

"*Affiliate*" or "*affiliate*" means, as to any Person, any other Person that, directly or indirectly, controls, is controlled by or is under common control with such Person. The term "control" (including the terms "controlled by" or "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person, whether through the ability to exercise voting power, by contract or otherwise.

"*Approved Construction Agreement Supplement*" is defined in Section 7.17 hereof.

"*Asset Manager*" means HBC Property Managers Limited Partnership, a Texas limited partnership, together with its successors and assigns, in each case as permitted in accordance with this Agreement.

"*Asset Management Agreement*" means the Asset Management Agreement of even date herewith between the Borrower and the Asset Manager, as it may be modified, amended, restated or supplemented from time-to-time in accordance herewith and therewith.

"*Assignment of Contracts*" means the Assignment of Agreement, Permits and Contracts of even date herewith, made by Borrower in favor of Lender, as it may be modified, amended, restated or supplemented from time-to-time in accordance herewith and therewith.

"*Assignment of Leases*" means the Absolute Assignment of Leases and Rents of even date herewith, made by the Borrower in favor of the Lender with respect to, among other things, Leases of the Improvements, as it may be modified, amended, restated or supplemented from time-to-time in accordance herewith and therewith.

"*Borrower*" means Fort Lee Commonwealth Communities, LLC, a Delaware limited liability company, and its successors and assigns.

"*Borrower Equity Subaccount*" means the subaccount of that name established within the Construction Account pursuant to the Servicing Agreement.

"*Borrower's Operating Agreement*" means the Operating Agreement of Borrower, dated as of November 7, 2006.

"*Budget Line*" means a line item in the Construction Budget.

"*Builder*" means Hunt Building Company, Ltd., a Texas limited partnership and any other party who may hereafter act as the builder under the Construction Agreement in accordance with this Agreement.

"*Business Day*" means any day on which banks located in the City of New York, New York, banks located in the City of Chicago, Illinois, banks located in the City of Philadelphia, Pennsylvania and banks located in the City and County of Denver, Colorado are not required or authorized by law to remain closed and on which The New York Stock Exchange is not closed.

"*Capitalized Interest Account*" means the Account by that name established pursuant to the Servicing Agreement.

"*Capital Repair/Replacement Account*" means the Account by that name established pursuant to the Servicing Agreement.

"*Capmark Capital*" means Capmark Capital Inc., a Colorado corporation, in its individual capacity, as opposed to its capacity as Lender, together with its successors and assigns.

"*Closing*" means the funding of the Loan as described in Section 2.02 hereof.

"*Closing Date*" means the date of this Agreement.

"*Code*" means the Internal Revenue Code of 1986, as amended, including effective date and transition rules (whether or not codified), and any successor thereto.

"*Collateral Agreement*" means any separate agreement between the Borrower or any other Person in favor of the Lender pursuant to which the Borrower or such Person guarantees, or encumbers any Mortgaged Property as security for, the Obligations, as any such agreement may be amended, modified, restated or supplemented from time-to-time in accordance herewith, including, without limitation, the Security Instrument, the Assignment of Leases and collateral assignments of the Management Agreement, the Construction Agreement and the Development Agreement made by the Borrower in favor of the Lender.

"*Completion*" with respect to the Project, is defined in Section 5.01(a) hereof, and with respect to any Phase, is defined in Section 5.01(b) hereof.

"*Completion Date Certificate*" means a certificate issued by the Servicer pursuant to Section 5.03 hereof.

"*Construction Account*" means the Account by that name established pursuant to the Servicing Agreement.

"*Construction Agreement*" means the Construction Agreement, of even date herewith between the Borrower and Builder, and other similar agreements entered into from time-to-time between the Borrower and another general contractor with respect to the Project in accordance with this Agreement, as each may be modified, amended, restated or supplemented from time-to-time in accordance herewith and therewith.

"*Construction Budget*" means the Construction Budget with respect to the Project attached hereto as Schedule 2, as it may be amended in writing from time-to-time in accordance with this Agreement.

"*Construction Consultant*" means Government Services Integrated Process Team, LLC, a Maryland limited liability company, or such other architectural or engineering consultant as the Lender may engage, subject to the terms of the Construction Consulting Agreement and Article IV of this Agreement

"*Construction Consulting Agreement*" means the agreement between Construction Consultant, the Borrower, the Government and the Lender dated as of the date hereof, as it may be modified, amended, restated or supplemented from time-to-time in accordance herewith.

"*Construction Documents*" means, collectively, the Construction Agreement, the Development Agreement, the Trade Contracts, the payment and performance bonds relating to such agreements, if any, the Plans and the Permits.

"*Construction Schedule*" means a construction schedule showing the anticipated schedule for the Project, as it may be amended in accordance with Section 8.01 hereof from time-to-time. The initial Construction Schedule is attached hereto as part of Schedule 4.

"*Consumer Price Index*" means the index number for the last day for which computation has been made in the column for "All Items" in the table entitled "Consumer's Price Index, (1982-84=100) all items" as presently published in the "Monthly Labor Review" of the Bureau of Labor Statistics of the United States Department of Labor applicable to the Prince George County, Virginia area.

"*Default*" means any event which with the giving of any applicable notice or the passage of time, or both, would constitute an Event of Default.

"*Default Rate*" is defined in the Notes.

"*Development Agreement*" means the Development Agreement of even date herewith between the Borrower and the Developer, as it may be modified, amended, restated or supplemented from time-to-time in accordance herewith and therewith.

"*Developer*" means East Army Properties, LLC, a Delaware limited liability company, together with its successors and assigns, in each case as permitted in accordance with this Agreement.

"*Disbursement Date*" means any day on which any disbursement of amounts in the Construction Account or any other Account or the proceeds of the Loan shall be made, including without limitation, each Revenue Account Monthly Disbursement Date (as such term is defined in the Servicing Agreement)

"*Disbursement Request*" means a written request for a disbursement of money from an Account that is executed and delivered to the Servicer and the Lender by a Responsible Officer on behalf of the Borrower substantially in the form of Exhibit A attached hereto or such other form as the Lender and the Borrower may approve (such approval not to be unreasonably withheld) in writing from time-to-time.

"*DSC Approval Period*" means any period of determination during which the DSC Ratio is less than 1.15:1.00.

"*DSC Ratio*" means, for any period of determination, the quotient obtained by dividing (a) Operating Income (including any earnings on any proceeds of the Loan or on any other moneys held in any Account) for such specified period minus the sum (without duplication) of (i) all deposits to the Tax and Insurance Account and the Capital Repair/Replacement Account (to the extent made before deposits to the Lender Account under Section 4.04 of the Servicing Agreement), and (ii) actual or projected, as applicable, Operating Expenses for such period (excluding amounts to be paid from deposits to the Tax and Insurance Account and the Capital Repair/Replacement Account), by (b) the actual or projected, as applicable, sum of the aggregate regularly scheduled payments of interest and principal, if any, due during such specified period under (A) the Loan, (B) any Additional Permitted Indebtedness, and (C) all other Indebtedness of the Borrower (without implying Lender's consent to any such other Indebtedness).

"*Eligible Funds*" means, as of any time of determination,

(i)      that portion of the original $621,000 balance of the Excess Loan Proceeds Subaccount that has previously been determined to be Eligible Funds pursuant to Section 3.07 hereof (whether remaining in the Excess Loan Proceeds Subaccount) regardless of whether such funds would constitute Eligible Funds under a current determination, plus

(ii) the largest portion of all funds then on deposit in the Excess Loan Proceeds Subaccount that do not already constitute Eligible Funds that can be added to the then existing Hypothetical Principal Amount and still result in DSC Ratio of 1.15:1.00 or higher during the nine (9) full calendar month period preceding the date of such determination using the following assumptions for such DSC Ratio calculation:

(A)      Operating Income for each month of such nine (9) month period shall be deemed equal to (1) the average monthly Operating Income (excluding earnings on the Accounts during such nine (9) month period), (2) divided by the average monthly number of units actually occupied by Tenants under enforceable Leases during such nine (9) month period and (3) multiplied by the lesser of

(a) 95% of the End State Unit Count and (b) the product of the End State Unit Count multiplied by a fraction, the numerator of which is the average monthly number of units actually occupied by Tenants under enforceable Leases during such nine (9) month period, and the denominator of which is the average monthly number of units Occupied or Available for Occupancy during such nine (9) month period;

(B)   Operating Expenses for each month of such nine (9) month period shall be deemed to be equal to (1) the average monthly Operating Expenses during the twelve (12) month period ending contemporaneously with such nine (9) month period, (2) divided by the average number of units Occupied or Available for Immediate Occupancy during such twelve (12) month period, and (3) multiplied by the End State Unit Count;

(C)   the debt service payments on the Loan during such nine (9) month period shall be deemed equal to the first nine (9) payments of a schedule of equal monthly payments of principal and interest fully amortizing the principal amount described in clause (ii) over a 489-month period, using an interest rate equal to 6.184%; and

(D)   for purposes of this Section, Lender reserves the right to adjust the End State Unit Count in the above calculation of the DSC Ratio so as to balance the per unit construction cost at time of determination with the amount of Eligible Funds targeted for release from the Excess Loan Proceeds Subaccount; provided that such adjustment by Lender is based on (a) Lender's reasonable assessment of the actual end state unit count the Borrower can reasonably be expected to achieve given the remaining time in the Construction Schedule, the Borrower's historical construction costs, the estimated amount of funds available to pay Project Costs; and (b) such other factors reasonably related to the Borrower's ability to complete the Project, as Lender may reasonably determine.

"*End State Unit Count*" means 1493 housing units occupied or available for immediate occupancy (which number may be adjusted as provided in the definition of Eligible Funds).

"*Environmental Indemnity*" means the Environmental Indemnification Agreement of even date herewith by the Borrower in favor of the Lender in connection with the Loan, as it may be modified, amended, restated or supplemented from time-to-time in accordance herewith and therewith.

"*Equity Guaranty*" means the Guaranty of even date herewith given by Indemnitor in favor of the Borrower and the Lender with respect to the equity contribution obligations of Fort Lee Family Housing, LLC under the Borrower's Operating Agreement, as it may be modified, amended, restated or supplemented from time-to-time in accordance herewith and therewith.

"*Event of Default*" means any of the events described in Section 9.01 hereof.

"*Event of Default Notice and Direction*" is defined in Section 8.03 of the Servicing Agreement.

*"Excess Loan Proceeds Account"* means the Account by that name established pursuant to the Servicing Agreement.

*"Existing Improvements"* is defined in the Recitals of this Agreement and includes all of the improvements as and when conveyed to the Borrower by the Government as contemplated by the Ground Lease.

*"First Tier Trade Contractor"* means any Trade Contractor that is in direct contractual privity with the Borrower or the Builder.

*"Force Majeure Delay"* means any delay caused by any condition beyond the reasonable control of the Borrower. *Force Majeure* Delay may include any of the following to the extent beyond the control of the Borrower: act of God, fire, earthquake, flood, explosion, or other casualty, any unanticipated governmental restriction, regulation, control or other delay caused by any Governmental Authority unrelated to any act or failure to act by the Borrower or the Lender, any strike, lockout or other general unanticipated unavailability of labor, equipment, utilities or materials, a military invasion by an enemy of the United States, war, insurrection, terrorism, mob violence, sabotage, a civil riot, unanticipated materially adverse weather conditions, failure of transportation, reasonable delays for adjustments of insurance, or any Trade Contractor bankruptcy (not including the insolvency or financial condition of the Borrower, Indemnitor or Developer or any Affiliate thereof), provided that no delay shall be considered a "Force Majeure Delay" unless the Borrower has notified the Lender of the existence of such delay within 15 days after the Borrower has, or through reasonable diligence should have had, knowledge of the occurrence of the event causing the delay.

*"Government"* means the United States of America, acting through the Department of the Army (or by and through the Secretary of the Army).

*"Government Agreements"* is defined in the Security Instrument.

*"Government Funds Subaccount"* means the subaccount of that name established within the Construction Account pursuant to the Servicing Agreement.

*"Governmental Authority"* means any nation or government, any state or other political subdivision thereof, any other entity exercising executive, judicial, regulatory or administrative functions of or pertaining to government and any corporation or other entity owned or controlled (through stock or capital ownership or otherwise) by any of the foregoing, including, without limitation, the Government, whose consent or approval is required as a prerequisite to the commencement of the Project or to the operation and occupancy of the Premises, or to the performance of any act or obligation or the observance of any agreement, provision or condition of whatsoever nature herein contained.

*"Ground Lease"* is defined in the Security Instrument.

*"Hard Costs"* means those Project Costs specified as "Hard Costs" on the Construction Budget.

"*Hypothetical Principal Amount*" means, as of any date of determination, an amount equal to the actual outstanding aggregate principal amount of the Loan as of the date of such determination (i) less $621,000, and (ii) plus the sum of all funds previously determined to be Eligible Funds pursuant to Section 3.07 hereof (whether or not such funds have been released from or remain in the Excess Loan Proceeds Account).

"*Improvements*" means the Existing Improvements and the New Improvements.

"*Indebtedness*" of any Person means (i) all indebtedness of such Person for borrowed money, (ii) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, (iii) all obligations of such Person to pay the deferred purchase price of property or services, (iv) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (v) all obligations of such Person as lessee under leases which shall have been or should be, in accordance with generally accepted accounting principles, recorded as capital leases, (vi) all obligations, contingent or otherwise, of such Person under acceptance, letter of credit or similar facilities, (vii) all obligations for production payments from property operated by or on behalf of such Person and other similar arrangements with respect to natural resources, (viii) all Indebtedness guaranteed by such Person, and (ix) all Indebtedness of the type referred to in clauses (i) through (viii) above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property (including, without limitation, accounts and contracts rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness.

"*Indemnitor*" means (i) collectively, Hunt ELP, Ltd., a Texas limited partnership, Falcon Properties MH LLC, a Pennsylvania limited liability company and Pinnacle Fort Lee LLC, a Washington limited liability company, together with their respective successors and assigns and any other party who may hereafter act as a Indemnitor under the Equity Guaranty or any other guaranty(ies) or indemnities given in favor of the Lender (other than by the Borrower), from time to time, in connection with the Loan and (ii) collectively, Hunt ELP, Ltd., a Texas limited partnership, SSC Capital Corp., a Pennsylvania corporation and Pinnacle AMS Development Company, LLC, a Washington limited liability company, together with their respective successors and assigns and any other party who may hereafter act as a Indemnitor under the Performance Guaranty or any other guaranty(ies) or indemnities given in favor of the Lender (other than by the Borrower), from time to time, in connection with the Loan.

"*Land*" means the real property legally described on Schedule 1 attached hereto and any other real property (or leasehold or other interest therein) that is encumbered by the Security Instrument from time-to-time.

"*Leases*" means all residential and commercial leases by the Borrower, as lessor, and a third party, as lessee, of any portion of the Premises, whether now existing or hereafter executed.

"*Legal Requirement*" means, as to any Person, the certificate of incorporation, articles of organization, bylaws, operating agreement, partnership agreement or limited partnership

agreement, certificate of limited partnership or other organizational or governing documents of such Person, the International Building Code, as amended (until superceded by a subsequent applicable building code), and any law, statute, order, decree, treaty, rule or regulation, or determination of an arbitrator or a court or other Governmental Authority, including, without limitation, any applicable environmental, zoning, and/or land use laws, statutes, orders, decrees, ordinances, rules or regulations of any Governmental Authority, and all covenants, agreements, restrictions and encumbrances, including, without limitation, the Loan Documents, the Ground Lease, the other Government Agreements and the Borrower's Operating Agreement in each case, to the extent applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"*Lender*" means Capmark Capital Inc., a Colorado corporation, in its capacity as Lender hereunder and not in any other capacity, and any successor and assign thereof that is identified as "Lender" in a written notice from Capmark Capital (or the then current Lender) to Borrower and the Government in accordance with Section 10.02 hereof.

"*Lender Assignee*" is defined in Section 10.02 hereof.

"*Lender Rights*" is defined in Section 10.02 hereof.

"*Lien*" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), priority or other security agreement or arrangement of a similar nature (including, without limitation, any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction).

"*Liquidity Facility*" means a surety bond, insurance policy, letter of credit, investment agreement or similar instrument that provides for payments when and as required for purposes of the Series A Reserve Account or the Series B Reserve Account, as applicable.

"*Liquidity Facility Agreement*" means collectively, the Series A Liquidity Facility Agreement and the Series B Liquidity Facility Agreement.

"*Liquidity Facility Provider*" means the issuer of the Liquidity Facility, its successors and assigns, pursuant to the Liquidity Facility Agreement. The initial Liquidity Facility Provider is Capmark Finance Inc.

"*Liquidity Facility Reimbursement Agreement*" means the Liquidity Facility Reimbursement Agreement relating to the Series A Liquidity Facility Agreement and the Series B Liquidity Facility Agreement dated as of the date hereof and made by the Borrower to the Liquidity Facility Provider.

"*Loan*" means the loan in the original principal amount of $126,348,000 made to the Borrower by the Lender pursuant to the Loan Documents.

"*Loan Closing Statement*" is defined in the Servicing Agreement.

"*Loan Documents*" means this Agreement, the Notes, the Security Instrument, the Servicing Agreement, the Equity Guaranty, the Performance Guaranty, the Environmental Indemnity and all other guaranties, all other indemnity agreements, all account control and similar agreements, Collateral Agreements, O&M Programs and any other agreements, documents and instruments now or in the future executed by the Borrower, any Indemnitor or any other Person evidencing or securing the Loan, as the same may be modified, amended, restated or supplemented from time-to-time in accordance herewith.

"*Loan Proceeds Subaccount*" means the Subaccount of that name established within the Construction Account pursuant to the Servicing Agreement.

"*Management Agreement*" means the Property Management Agreement of even date herewith between the Borrower and the Manager, as it may be modified, amended, restated or supplemented from time-to-time in accordance herewith and therewith.

"*Manager*" means American Management Services, LLC, a Washington limited liability company, together with its successors and assigns, in each case as permitted in accordance with this Agreement.

"*Member*" means any Person who is a member in the Borrower. A list of all the Members as of the date hereof is attached hereto as Schedule 3.

"*Moody's*" is defined in the Servicing Agreement.

"*Mortgaged Property*" means the "*Mortgaged Property*" as defined in the Security Instrument.

"*Net Operating Income*" means Operating Income less Operating Expenses.

"*Net Operating Income Subaccount*" means the subaccount of that name established within the Construction Account pursuant to the Servicing Agreement.

"*New Improvements*" is defined in the Recitals hereof and includes all new improvements that have been or are to be constructed or have been or are to be rehabilitated on the Premises pursuant to the Plans and the Construction Documents.

"*Notes*" and "*Note*" are defined in the Recitals hereof.

"*O&M Program*" is defined in the Security Instrument.

"*Obligations*" means all obligations of the Borrower to the Lender now or hereafter existing under any of the Loan Documents or with respect to the Loan (whether for principal, interest, prepayment premiums, fees, expenses or otherwise).

"*Occupied or available for immediate occupancy*" means with respect to any residential unit in the Mortgaged Property as of any date of determination that it is as of such date either (i) occupied by an individual or individuals pursuant to a Lease representing an arms-length transaction, or (ii) is, or within 14 days of such date will be available to be immediately occupied

in accordance with clause (i), in each case in compliance in all material respects with all Legal Requirements.

"*OFAC List*" means the list of specially designated nationals and blocked persons subject to financial sanctions that is maintained by the U.S. Treasury Department, Office of Foreign Assets Control and any other similar list maintained by the U.S. Treasury Department, Office of Foreign Assets Control pursuant to any Requirements of Law, including, without limitation, trade embargo, economic sanctions, or other prohibitions imposed by Executive Order of the President of the United States. The OFAC List currently is accessible through the internet website www.treas.gov/ofac/t11sdn.pdf.

"*Operating Budget*" means for each calendar year, or remaining portion thereof, a budget prepared by the Borrower delivered by the Borrower to the Lender and the Servicer at Closing (for 2007) and not later than the last Business Day of the first calendar month of each fiscal year for subsequent years, provided that until a subsequent year's budget is so delivered, the prior year's Operating Budget shall apply, adjusted (a) consistent with the then current change in the Consumer Price Index, and (b) to reflect actual increases (known to the Borrower) in insurance premiums, utilities expenses, real estate property taxes, and other Operating Expenses, if any. The Operating Budget shall be certified by a Responsible Officer of the Borrower as setting forth the Borrower's best estimate of all Operating Income, Operating Expenses, DSC Ratio, reserves and costs for capital improvements that are projected by the Borrower for the forthcoming year in connection with the Premises. If (i) an Event of Default shall have occurred and be continuing, or (ii) a DSC Approval Period shall be continuing, or (iii) the Operating Expenses shown on a proposed Operating Budget would cause the DSC Ratio to be less than 1.15:1.00 at any time during the period covered by such proposed Operating Budget based on the projected Operating Income for such period, then the proposed Operating Budget shall be subject to the approval of the Lender (which approval shall not be unreasonably withheld). For purposes of calculating the DSC Ratio for the preceding sentence, Operating Income shall be determined without including earnings on amounts held in the Construction Account or the Capitalized Interest Account.

"*Operating Expenses*" means all expenses determined in accordance with generally accepted accounting principles (excluding for purposes of determining the DSC Ratio, the effect of depreciation) paid or incurred on or to be incurred by Borrower in the operation or maintenance of the Mortgaged Property determined on an accrual basis (including for payroll (salary, taxes and benefits), administrative expenses, marketing and resident services, property management fees, repairs and maintenance and utilities) in accordance with the Operating Budget.

"*Operating Income*" means the total of all revenues derived by the Borrower from the Mortgaged Property determined in accordance with generally accepted accounting principles, including, without limitation, all receipts, revenues, income, rents, investment earnings on funds which are deposited in the Accounts and other money received by or on behalf of the Borrower in respect of the ownership or operation of the Mortgaged Property, including, but without limiting the generality of the foregoing, all amounts paid in respect of the use by third parties of any portion of the Mortgaged Property, including, without limitation, all Rents and other lease payments for the use by third parties of real, personal or intangible property constituting a part of the Mortgaged Property, and all rights to receive the same, whether in the form of accounts,

accounts receivable, chattel paper, contract rights or other rights, and the proceeds of such rights, and whether now owned or held or hereafter coming into existence, but excluding for purposes of determining the DSC Ratio (i) proceeds of Indebtedness (including proceeds of the Loan), (ii) insurance (other than rental interruption insurance) and condemnation proceeds, damage awards and other amounts required under the Loan Documents to be applied toward maintenance and repair of the Mortgaged Property, (iii) gains on sale or disposition of fixed or capital assets not in the ordinary course, and (iv) gains resulting from reappraisal, revaluation or write-up of assets.

"*Operating Reserve Account*" means the Account by that name established pursuant to the Servicing Agreement.

"*Parcel*" means any of the separate parcels of real property which are legally described in Schedule 1 attached hereto and which together constitute the Land.

"*Performance Guaranty*" means, collectively and individually, each Performance Guaranty, dated the date hereof, given by the applicable Indemnitors in favor of Lender.

"*Permits*" means all authorizations, consents, licenses, approvals and permits required for the site preparation, demolition, renovation, rehabilitation, construction, operation and occupancy of the Project and the Mortgaged Property, in accordance with all Legal Requirements.

"*Permitted Exceptions*" is defined in the Security Instrument.

"*Permitted Investments*" is defined in the Servicing Agreement.

"*Person*" means an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Governmental Authority or other entity or organization of whatever nature.

"*Phase*" is defined in the Recitals of this Agreement and each Phase shall be more particularly described in the Construction Agreement as contemplated under Section 7.17.

"*Plans*" means the complete plans and specifications for the Project, prepared or to be prepared by or on behalf of the Borrower and approved by the Lender, the Construction Consultant and the Government, including such amendments thereto as may from time-to-time be made by the Borrower and, to the extent required by the terms of this Agreement and the Government Agreements, approved by the Lender, the Construction Consultant and the Government. A copy of the Plans when they are delivered pursuant to Section 3.01 hereof shall be attached hereto as part of Schedule 2.

"*Premises*" means the Land and the Improvements, collectively.

"*Progress Certificate*" is defined in Section 7.12 hereof.

"*Project*" means the demolition of the Demolished Units and the construction of the New Improvements and all amenities and infrastructure relating thereto as required by the Government Agreements, including, without limitation, site work, streets, sidewalks, gutters,

landscaping, utility connections (whether on or off the Premises), and the acquisition and installation of all Tangible Personal Property, and all site preparation, demolition, renovation, rehabilitation and construction related thereto, in each case substantially in accordance with the Plans

"*Project Costs*" means the costs of the Project, as set forth on the Construction Budget.

"*Qualification*" is defined in Section 4.02 hereof.

"*Relevant Information*" is defined in Section 10.02 hereof.

"*Rents*" is defined in the Security Instrument.

"*Resolution Plan*" is defined in Section 4.02 hereof.

"*Responsible Officer*" means such individual as may be designated by the Borrower from time-to-time in a written notice from the Borrower delivered to the Lender in accordance with Section 10.03 hereof.

"*Retainage*" means, with respect to Hard Costs only, the total amount actually held back from a Trade Contractor with respect to the value of its work in place, which shall not at any time be less than 5% of the aggregate amounts paid and then payable by the Borrower with respect to such Trade Contractor for the work in place performed by such Trade Contractor under the related Trade Contract, as verified from time-to-time by the Borrower and the Construction Consultant; provided, that there shall be no minimum Retainage requirement for that portion of Trade Contracts relating to the supply of materials to the extent such materials are stored on site and insured in accordance with the terms of this Agreement (including, without limitation, Section 7.12(d) hereof).

"*Revenue Account*" means the Account by that name established pursuant to the Servicing Agreement.

"*Scheduled Completion Date*" means (a) with respect to any Phase, the date for such Phase set forth in the Construction Schedule, by which date the Completion of such Phase is scheduled to occur; and (b) with respect to the entire Project, the date set forth in the Construction Schedule attached hereto, by which the Completion of the entire Project is scheduled to occur, in each case as extended for Force Majeure Delay and subject to changes in the Construction Schedule made in accordance with the terms of this Agreement.

"*Security Instrument*" is defined in the Recitals of this Agreement.

"*Series A Liquidity Facility Agreement*" means the Liquidity Facility Forward Funding Agreement relating to the portion of the Loan evidenced by the Series A Note, dated as of the date hereof issued by the Liquidity Facility Provider to the Servicer for the benefit of the Lender pursuant to which the Liquidity Facility Provider has agreed, subject to the terms thereof, to make payments into the Series A Reserve Account in an amount equal to the Series A Maximum Annual Debt Service, and any Liquidity Facility issued or provided by any other Person in substitution or replacement thereof that shall be accepted by the Servicer on behalf of the Lender.

*"Series A Maximum Annual Debt Service"* is defined in the Servicing Agreement.

*"Series A Note"* is defined in the Recitals of this Agreement.

*"Series A Reserve Account"* means the Account by that name established pursuant to the Servicing Agreement.

*"Series B Liquidity Facility Agreement"* means the Liquidity Facility Forward Funding Agreement relating to the portion of the Loan evidenced by the Series B Note, dated as of the date hereof issued by the Liquidity Facility Provider to the Servicer for the benefit of the Lender pursuant to which the Liquidity Facility Provider has agreed, subject to the terms thereof, to make payments into the Series B Reserve Account in an amount equal to the Series B Maximum Annual Debt Service, and any Liquidity Facility issued or provided by any other Person in substitution or replacement thereof that shall be accepted by the Servicer on behalf of the Lender.

*"Series B Maximum Annual Debt Service"* is defined in the Servicing Agreement.

*"Series B Note"* is defined in the Recitals of this Agreement.

*"Series B Reserve Account"* means the Account by that name established pursuant to the Servicing Agreement.

*"Servicer"* means Capmark Finance Inc., or any other Person selected by the Lender pursuant to the Servicing Agreement, so long as no Event of Default or DSC Approval Period exists, approved by the Borrower (such approval not to be unreasonably withheld), to service the Loan on behalf of the Lender pursuant to the Servicing Agreement.

*"Servicing Agreement"* means the Servicing and Lockbox Agreement of even date herewith among the Borrower, the Lender and the Servicer, as it may be modified, amended, restated or supplemented from time-to-time in accordance herewith and therewith or any similar agreement among the Borrower, the Lender and another Servicer.

*"Soft Costs"* means Project Costs other than Hard Costs, including without limitation, for financing and commitment fees, loan fees, interest, architectural and/or engineering fees, other fees, taxes and insurance, payment or performance bond premiums

*"S&P"* is defined in the Servicing Agreement.

*"Tangible Personal Property"* means all equipment, furniture, furnishings and other tangible personal property acquired or to be acquired by the Borrower which is part of the Mortgaged Property.

*"Tax and Insurance Account"* means the Account by that name established pursuant to the Servicing Agreement.

*"Title Company"* means Chicago Title Insurance Company, and its successors and assigns.

"*Title Policy*" means a mortgagee's policy (or policies) of title insurance dated as of the Closing Date with respect to the Loan, which policy shall (a) be in the amount of the Loan; (b) insure the Lender that the Security Instrument creates a valid first Lien on the Mortgaged Property, and that such interest is free and clear of all defects and encumbrances, except for Permitted Exceptions; (c) be in the form of the 2006 or 1992 ALTA Loan Policy with "New York Form" of creditor's rights exception; and (d) contain such endorsements and affirmative coverage as the Lender may require, including, without limitation, affirmative coverage over mechanics and materialman's liens.

"*Trade Contract*" means any material agreement (other than the Construction Agreement, the Construction Oversight Agreement, the Management Agreement or the Development Agreement), pertaining to construction, reconstruction, demolition or equipping of the Mortgaged Property providing for the provision by the contractor or vendor thereunder of labor and/or materials in connection with construction, reconstruction, demolition or equipping of the Mortgaged Property, as any of the same may be modified, amended, restated or supplemented from time-to-time in accordance herewith.

"*Trade Contractor*" means the contractor or vendor under any Trade Contract.

"*UCC*" means the Uniform Commercial Code as adopted in the Commonwealth of Virginia.

"*UCC Financing Statements*" means the UCC Financing Statements in favor of the Lender as secured party in respect of certain of the tangible and intangible personal property comprising part of the Mortgaged Property.

"*Utility Cost Reserve Account*" means the Account by that name established pursuant to the Servicing Agreement

## ARTICLE II

## THE LOAN

**Section 2.01.  Making the Loan.**  The Borrower has agreed to borrow the proceeds of the Loan from the Lender, and the Lender has agreed to make the Loan to the Borrower, subject to the Borrower's compliance with and observance of the terms, conditions, covenants, and provisions of this Agreement and the other Loan Documents, and the Borrower has made the covenants, representations, and warranties herein and therein as a material inducement to the Lender to make the Loan.

**Section 2.02.  Funding and Disbursement of Loan Proceeds and Other Amounts.**  Subject to the conditions and upon the terms provided herein and in the Servicing Agreement and the other Loan Documents, (i) the Lender shall on the Closing Date fund the full amount of the Loan (a portion of which proceeds from each loan will be applied toward payment of the Closing Costs shown on the Loan Closing Statement) and deposit the net loan proceeds (after payment of such closing costs shown on the Loan Closing Statement) with the Servicer in accordance with the Servicing Agreement and the Loan Closing Statement, and (ii) thereafter, subject to the terms of the Loan Documents, the Servicer shall disburse to the Borrower from

time-to-time amounts then held in the Construction Account and other Accounts to pay for Project Costs, Operating Expenses and other amounts included in the Construction Budget and the Operating Budget and for the other purposes described herein and in the Servicing Agreement. All disbursements for Project Costs from the Construction Account shall be made from the subaccounts of the Construction Account in the following order (to the extent of then available funds): first, from the Net Operating Income Subaccount, second, from the Government Equity Subaccount, third, from the Borrower Equity Subaccount, and fourth, from the Loan proceeds.

**Section 2.03.  Repayment of the Loan.**

(a)     The Loan will be evidenced by the Notes. The Borrower shall repay the outstanding principal amount of the Loan together with interest thereon in the manner and in accordance with the terms and conditions of the Notes and the other Loan Documents. The Loan may be prepaid only in accordance with the Notes. The Loan shall be deemed fully funded as of the date hereof and the Loan proceeds shall be disbursed to or for the benefit of the Borrower by the Servicer pursuant and subject to the terms and conditions of this Agreement and the Servicing Agreement.

(b)     Any prepayment of the Loan pursuant to Section 3.07 hereof shall be applied first to the Series B Note and second to the Series A Note. Any prepayment of the Loan pursuant to Section 3.08 hereof shall be applied (x) first, to the Series B Note, the lesser of the amount of such payment or $621,000, and (y) second, to the Series A Note, the balance, if any, of such payment. Any prepayment of the Loan by reason of the application of casualty or condemnation proceeds shall be allocated between the Notes pro rata on the basis of their respective principal amounts as of such date.

(c)     Any prepayment of the Loan not described in Sections 2.03(b) shall be allocated between the Notes pro rata on the basis of their respective principal amounts as of such date.

**ARTICLE III**

**CONDITIONS PRECEDENT TO DISBURSEMENTS FROM THE CONSTRUCTION ACCOUNT AND CERTAIN OTHER ACCOUNTS**

**Section 3.01.  Closing Documents.**  The obligation of the Lender to fund the Loan shall be subject to the Lender's receipt, in each case in form and substance reasonably satisfactory to the Lender, of the following (and, subject to written notice from the Lender, the Lender's funding of the Loan on the Closing Date shall evidence the satisfaction or waiver of all such conditions):

(a)     *Taxes.*  Evidence that no ad valorem taxes and assessments or payments in lieu thereof are or will be due and payable by Borrower with respect to its interest in the Premises.

(b)     *Title Insurance.*  The Title Policy and satisfactory evidence that all premiums then due and payable in respect of the Title Policy have been paid.

(c)     *Survey.*  A survey of the Premises certified to the Lender and dated within 90 days of the date hereof.

(d)     *Ground Lease and Other Government Agreements.*  Fully executed copies of the Ground Lease and every other Government Agreement and evidence of the recordation of the Ground Lease or a memorandum thereof (or the submission of a duplicate original thereof to the Title Company with instructions to record same) in the official real estate records of Prince George County, Virginia.

(e)     *Authority to do Business.*  Evidence of (i) the Borrower's and the Manager's authority to do business in the Commonwealth of Virginia, and (ii) all Permits applicable to such entities with respect to their obligations under the Construction Documents and the Management Agreement.

(f)     *Insurance.*  Certificates of insurance required by the Security Instrument and the Ground Lease, accompanied by evidence of the payment of the premiums then due and payable therefor.

(g)     *Flood Insurance.*  Evidence that the Borrower has obtained flood insurance, if the Land or any portion thereof is located in a flood hazard area.

(h)     *Permits.*  Copies of all Permits obtained to date.

(i)     *Utilities.*  Copies of documents, if any, providing for the availability of utilities to the Land, including the Municipal Services Agreement by and between the Borrower and the Government.

(j)     *Opinions of Counsel for the Borrower, the Indemnitor and the Government.*  Opinions of counsel for the Borrower, the Indemnitor and the Government, covering enforceability of the Loan Documents, and the Government Agreements, formation, authority, execution, substantive non-consolidation, characterization of the Borrower as a partnership for purposes of federal income tax, creation, perfection and validity of Liens on the Mortgaged Property, absence of any litigation or proceeding pending or threatened in writing, which is reasonably expected to have a material adverse impact, and such other matters as the Lender reasonably shall require.

(k)     *Plans.*  A copy of the Plans to the extent then existing.

(l)     *Loan Documents.*  Duly executed copies of all of the Loan Documents.

(m)     *Organizational Documents.*  Certified copies of all organizational documents of the Borrower, the Indemnitor and each Member of the Borrower (other than the Government), good standing certificates from the state of formation and the Commonwealth of Virginia with respect to the Borrower, the Builder and the Manager and, if different, from the state of formation of the Borrower, the Developer, and each Member (other than the Government); and appropriate resolutions and/or consents with respect to the Borrower and each Member (other than the Government), as applicable

(n)   *Construction Documents.*  Copies of the Construction Documents, other than the agreement with the architect for the Project.

(o)   *Construction Schedule and Budget.*  The Construction Schedule and the Construction Budget and an accounting of all expenditures for costs shown on the Construction Budget incurred by Borrower prior to the first Disbursement Date.

(p)   *Phase I Report, Baseline Survey and O&M Program.*  A Phase I Report, a baseline environmental survey and the O&M Program with respect to any asbestos, mold and lead-based paint located on the Premises.

(q)   *Construction Budget Evaluation.*  An evaluation of the adequacy of the Construction Budget and such other matters by the Construction Consultant as the Lender reasonably may require

(r)   *Searches.*  Such UCC, bankruptcy, judgment and litigation searches as the Lender reasonably may require.

(s)   *Equity.*  The Government shall have delivered a letter confirming that the Government's equity contribution to the Borrower in the amount of $32,769,000 will be deposited to the "Government Funds Subaccount" established under the Servicing Agreement within 120 days of the date hereof.  Indemnitor shall have delivered to the Government and the Lender the Equity Guaranty.

(t)   *Representations and Warranties.*  Each of the representations and warranties set forth (either expressly or incorporated by reference) in Article VI hereof are true and correct in all material respects.

(u)   *Certified Rent Roll.*  A rent roll for the Premises, certified to be true and correct in all material respects, to its knowledge, by the Borrower

(v)   *Operating Budget.*  An Operating Budget for calendar year 2007 and an accounting of all expenditures for costs shown on the Operating Budget prior to the first Disbursement Date

(w)   *Trade Contracts.*  A list of all Trade Contractors and Trade Contracts (and the maximum contract amount of each such Trade Contract) existing as of such date.

(x)   *Subcontractor Consents.*  If required by the Lender, written consent from each subcontractor to the assignment of the Builder's interest in the subcontracts to the Lender upon an Event of Default and subcontractor's receipt of written notice from the Lender that the assignment is effective.

(y)   *Payment and Performance Bond.*  Either (i) a copy of the payment and performance bond for each Builder, which bond (or replacements thereof satisfying the requirements of this Section 3.01(y)) shall be maintained during the full term of the applicable Construction Agreement, shall each be (x) for an amount equal to not less than $34,601,000, (y) together with such bonds in place for any other Builders, cover all work

relating to units under construction or rehabilitation (including, without limitation, any such work self performed by any Builder or performed by any Affiliate of any Builder), and (z) cover all work relating to units under construction or rehabilitation (including, without limitation, any of such work self performed by any Builder or performed by any Affiliate of any Builder), shall cover all indemnification obligations of the Contractor under the Construction Agreement and shall be issued by a surety rated not less than "A" by S&P or A+:XIV by AM Best & Company (or equivalent) (the Lender, as their respective interests may appear, shall be named as a co-obligees on all such bonds), or (ii) a subcontractor's default insurance policy in form and substance, issued by an insurer and having premium and deductible amounts acceptable to Lender in their sole discretion, providing coverage for the Project in an amount not less than $34,601,000, and covering all work relating to units under construction or rehabilitation (including, without limitation, any of such work self performed by any Builder or performed by any Affiliate of any Builder), together with an endorsement thereto, in form and substance acceptable to the Lender in its sole discretion, authorizing Lender to pursue claims under such policy in the event the Borrower fails to do so.

(z) ***Additional Documents***. Such other documents, certificates and instruments as Lender reasonably may require.

**Section 3.02. Conditions Precedent to Disbursements from the Construction Account**. Disbursement Requests from the Construction Account shall be approved by the Lender subject to the Lender's receipt of the following materials (in form and substance reasonably satisfactory to the Lender) and the Lender's reasonable determination that each of the following conditions, as well as all other applicable conditions of this Agreement, have been satisfied for such disbursement:

(a) The Lender shall have received a Disbursement Request executed by the Borrower, bearing a satisfactory date with appropriate insertions and attachments executed by a Responsible Officer.

(b) The Hard Costs covered by such Disbursement Request shall have been incurred only with respect to a Phase or Phases for which Plans have been previously approved by Lender.

(c) The Borrower shall have satisfied at Closing all of the conditions set forth in Section 3.01 hereof to the extent not previously satisfied.

(d) The Loan Documents shall constitute valid Liens on the Mortgaged Property for the full amount of the Loan then outstanding, free and clear of all Liens except for Permitted Exceptions and such other Liens as may be waived in writing by the Lender.

(e) Subject to the security interests created by the Security Instrument and other Permitted Exceptions, all Tangible Personal Property acquired to date shall have been purchased so that title thereto shall have vested in the Borrower immediately upon delivery thereof to the Premises and payment therefor.

(f)     All representations and warranties of the Borrower made herein, in any other Loan Document and in any Disbursement Request shall be true and correct in all material respects on and as of the Disbursement Date for such disbursement as if made on such Disbursement Date (except those that refer to a specific, other date).

(g)     No Event of Default shall have occurred and be continuing on the applicable Disbursement Date before or after giving effect to the disbursement to be made on such Disbursement Date.

(h)     Moneys available in the Construction Account are adequate to fund such disbursement.

(i)     Neither the Improvements nor the Mortgaged Property shall have been damaged or destroyed in any material respect (exclusive of any Demolished Units or then undergoing construction or rehabilitation or otherwise as contemplated by the Plans) or condemned nor has Borrower received written notice of the institution of a condemnation action in any material respect, unless the Borrower or the Lender has received or will receive (on terms and a schedule reasonably acceptable to the Lender) insurance proceeds or the proceeds of condemnation in an amount equal to the full replacement value of the Improvements so damaged, destroyed or condemned and such amounts are available or will be available (on terms and a schedule reasonably acceptable to the Lender) to the Borrower pursuant to Section 21 of the Security Instrument to repair or replace such damaged, destroyed or condemned Improvements and such proceeds have been deposited or will be deposited (on terms and a schedule reasonably acceptable to the Lender) in the Capital Repair/Replacement Account in accordance with the Servicing Agreement.

(j)     The Borrower shall have delivered the Progress Certificate relating to such Disbursement Request in accordance with Section 7.11 and the Servicer shall have received the report of the Construction Consultant relating to such Disbursement Request and Progress Certificate in accordance with Section 4.02.

(k)     The Borrower shall have furnished to the Servicer and the Title Company current unconditional Lien waivers from the Builder, and all First Tier Trade Contractors to whom proceeds of the immediately preceding disbursement of amounts in any subaccount of the Construction Account were paid, evidencing that they have been paid in full for all work performed to the date shown on the Disbursement Request for such preceding disbursement, except for Retainage or other amounts permitted to be withheld for any Trade Contractor.

(l)     The Borrower shall have delivered to the Servicer such additional documents, certificates and assurances, if any, as the Servicer may reasonably require with respect to such disbursement, including, without limitation, a certificate of the Borrower's architect responsible for the work covered by such Disbursement Request as to the status of such work (on AIA standard forms or such other form as the Lender may reasonably require).

(m)     A certificate of Borrower's code compliance consultant (as described in subparagraph (n) below) as to the compliance of the work covered by such request (on such form as Lender may reasonably require)

(n)     All Hard Costs and Soft Costs covered by such Disbursement Request and the Improvements and/or work to which they relate are part of the Construction Agreement or an Approved Construction Agreement Supplement

(o)     The Borrower shall have delivered to Lender a fully executed copy of a code compliance agreement in form and substance and with a consultant reasonably satisfactory to Lender

(p)     Disbursement Requests for funds in the Excess Loan Proceeds Account shall be approved by the Lender subject to the satisfaction of the following conditions to the Lender's reasonable satisfaction:

(i)     satisfaction of each of the conditions in Sections 3 02(a) through (f) and, to the extent applicable, (j) through (m);

(ii)     delivery to the Lender of evidence that the funds shall be used to pay only (A) the cost of services, materials or equipment principally benefiting and to be incorporated into the Mortgaged Property; or (B) other costs approved in writing by Capmark Capital in its sole discretion; and

(iii)     the disbursement and the proposed use of such funds shall not violate any Government Agreement

**Section 3.03. Disbursements from Capital Repair/Replacement Account, the Operating Reserve Account and the Utility Cost Reserve Account.** Amounts on deposit in the Capital Repair/Replacement Account, the Operating Reserve Account and the Utility Cost Reserve Account shall be disbursed in accordance with the procedures described in Section 3 04 from time-to-time upon satisfaction of the following conditions:

(a)     satisfaction of each of the conditions in Sections 3 02(a) through (g), (j) (with respect to disbursements from the Capital Repair/Replacement Account only), (l) and (m) (except that certificates of Borrower's architect and Borrower's code compliance consultant shall only be required for disbursements from the Capital Repair/Replacement Account) hereof;

(b)     moneys available in the applicable Account are adequate to fund such disbursement;

(c)     with respect to disbursements from the Capital Repair/Replacement Account, receipt by the Lender of a certificate by a Responsible Officer of the Borrower, and if an Event of Default or DSC Approval Period exists, the Servicer has independently confirmed, (i) that the Borrower has incurred the capital expense, extraordinary Operating Expense, extraordinary utility cost or environmental remediation cost, as

applicable, described in the applicable Disbursement Request, and (ii) describing the costs for which disbursement is requested; and

(d)     if the disbursement is requested from the Capital Repair/Replacement Account and relates to expenses for the repair or restoration of the effects of a casualty or condemnation and the funds from which the disbursement is requested represent the proceeds of insurance or a condemnation award, satisfaction of the provisions of the Security Instrument regarding disbursement of such proceeds of insurance and condemnation awards.

**Section 3.04. Procedures for, and Determination of Amounts of, Disbursements From the Construction Account, the Capital Repair/Replacement Account, the Operating Reserve Account and the Utility Cost Reserve Account.**

(a)     Not less than eight Business Days prior to the date upon which a disbursement is requested and not more than once in any calendar month and the Borrower may submit to the Lender and the Servicer a Disbursement Request for a disbursement from the applicable Account (which Disbursement Request in the case of a disbursement from the Capital Repair/Replacement Account or the Construction Account shall include the related Progress Certificate).

(b)     Subject to satisfaction of the applicable requirements of this Article III and subject to any delays incurred by the Servicer in liquidating Permitted Investments, not later than 10:00 a.m. Central time on a Business Day which is the eighth Business Day after the Business Day on which any Disbursement Request shall have been received in accordance with this Section 3.04, the Lender shall authorize the Servicer to disburse in immediately available funds an amount equal to the Disbursement Request from amounts available in the applicable Account in accordance with the Borrower's instructions.

(c)     Approved disbursements from the Construction Account in accordance with this Agreement for Soft Costs shall be on the basis of 100% of Borrower's Disbursement Request therefore and approved disbursements from the Construction Account in accordance with this Agreement for Hard Costs shall be made net of any applicable Retainage.

(d)     Disbursements shall be made from the Operating Reserve Account and the Utility Cost Reserve Account at the times and upon the conditions provided in the Servicing Agreement.

**Section 3.05. Deposit of Loan Proceeds to the Construction Account, the Series A Reserve Account, the Series B Reserve Account, the Capitalized Interest Account, the Operating Reserve Account and the Utility Cost Reserve Account.** Subject to the satisfaction of the conditions set forth in Section 3.01 hereof, on the Closing Date the Lender shall disburse to the Servicer for deposit into the Construction Account, the Series A Reserve Account, the Series B Reserve Account, the Capitalized Interest Account, the Operating Reserve Account, and the Utility Cost Reserve Account, the amounts specified for each such Account on the Loan

Closing Statement, if any, for future disbursement from such Accounts pursuant to the terms of this Agreement and the Servicing Agreement.

**Section 3.06. Lender's Rights to Stop Disbursements from the Construction Account and the Capital Repair/Replacement Account.** Anything contained in this Agreement or any other Loan Documents to the contrary notwithstanding, the Lender shall have the option, upon written notice to the Borrower and the Servicer, to direct the Servicer to reject Disbursement Requests for (and order cessation of disbursements from) the Construction Account or the Capital Repair/Replacement Account at any time during the continuance of a monetary or material non-monetary Event of Default.

**Section 3.07. Excess Loan Proceeds Subaccount.**

(a)     Commencing on September 1, 2009 and on the last day of each calendar quarter thereafter, the Lender shall make a determination of (i) the aggregate amount of Eligible Funds and (ii) the portion of such Eligible Funds then in the Excess Loan Proceeds Subaccount, and shall notify the Borrower in writing of such determinations. No such quarterly determination may reduce the aggregate amount of Eligible Funds. No amounts shall be disbursed to the Borrower under Section 4.02(a)(ii)(B) of the Servicing Agreement from the Excess Loan Proceeds Subaccount unless the same constitute Eligible Funds.

(b)     Anything contained in any Loan Documents to the contrary notwithstanding and without the need to declare an Event of Default or accelerate the Obligations or any portion thereof, if as of the Debt Service Payment Date (as defined in the Servicing Agreement) of December 10, 2011, the projected DSC Ratio for the forthcoming 12-month period is less than 1.15:1.00, then Lender, at its sole election, may, within 60 days following such date, instruct the Servicer in writing (with a copy to Borrower) (the "Repayment Notice") to, and the Servicer upon receipt of the Repayment Notice shall, deposit to the Series A Lender Account and/or the Series B Lender Account (as defined in the Servicing Agreement), as applicable, moneys to the extent needed from the Capitalized Interest Account, the Loan Proceeds Subaccount, the Borrower Equity Subaccount and the Excess Loan Proceeds Account, in that order (but not from any other Account or source), and to apply the moneys so transferred to pay the amount of the outstanding principal balance of the applicable Note, equal to the lesser of (A) $621,000 less the sum of all Eligible Funds previously disbursed or available for disbursement as of December 10, 2011 and (B) the amount necessary to cause the DSC Ratio for the forthcoming 12-month period to be not less than 1.15:1.00. In the event that the Lender has the right under this Section 3.07(b) to give the Servicer the Repayment Notice but does not do so within such 60-day period, then within 30 days following the expiration of such 60-day period, Borrower, at its sole election, may deliver the Repayment Notice to Servicer with the same effect as if the Repayment Notice had been delivered by Lender within such 60-day period. Any payment of principal made pursuant to this Section 3.07 shall be applied (x) first, to the Series B Note, in an amount equal to the lesser of (1) the amount of such payment or (2) $621,000 less the amount of any payment previously applied to the Series B Note pursuant to Section 3.08, and (y) second, to the Series A Note, the balance, if any, of such payment.

For purposes of determining the DSC Ratio for this Section 3.07: (a) monthly Operating Income for each month during the forthcoming 12-month period shall be determined using the calculation set forth in paragraph (ii)(A) of the definition of "Eligible Funds" herein; and (b) debt service on the Loan shall be determined by using the debt service payments due during the first 12 month period after commencement of principal amortization on the Notes. For purposes of this Section, Lender reserves the right, to be exercised in its sole discretion, to adjust the End State Unit Count in the above calculation of the DSC Ratio so as to balance the per unit construction cost at time of determination with the amount of Eligible Funds targeted for release from the Excess Loan Proceeds Subaccount; provided that such adjustment by Lender is based on (a) Lender's reasonable assessment of the actual end state count the Borrower can reasonably be expected to achieve given the remaining time in the Construction Schedule, the Borrower's historical actual construction costs, the estimated amount of funds available in the applicable Accounts to pay Project Costs and (b) such other factors reasonably related to the Borrower's ability to complete the Project, as Lender may reasonably determine. Any payment of the principal amount of the Loan pursuant to this Section shall require the payment of a Prepayment Amount (as defined in the Series A Note or the Series B Note, as applicable) determined pursuant to Section 10(c) of the applicable Note.

**Section 3.08. Extraordinary Borrower Repayment Right.** Provided no Event of Default has occurred and is continuing, if at any time during the period commencing on January 11, 2011 to and including December 9, 2011, the projected DSC Ratio (as calculated below in this section) is less than 1.15:1.00, then Borrower, at its sole election, may on a one time only basis, upon fifteen (15) days' prior written notice, prepay, on any Debt Service Payment Date during such period, the outstanding principal balance of the Loan by an amount up to but not in excess of an amount equal to (A) the amount that if applied to the Series A Note principal balance would cause the DSC Ratio (as calculated below in this Section) for the forthcoming 12-month period to be not greater than 1.15:1.00, less (B) the amount then on deposit in the Excess Loan Proceeds Subaccount.

For purposes of determining the DSC Ratio for this Section 3.08: (a) monthly Operating Income for each month during the forthcoming 12-month period shall be determined using the calculation set forth in paragraph (ii)(A) of the definition of "Eligible Funds" herein; and (b) debt service on the Loan shall be determined by using the debt service payments due on the Series A Note during the first 12-month period after commencement of principal amortization on the Series A Note only. For purposes of this Section, Lender reserves the right to adjust the End State Unit Count in the above calculation of the DSC Ratio so as to balance the per unit construction cost at time of determination with the amount of Eligible Funds targeted for release from the Excess Loan Proceeds Subaccount; provided that such adjustment by Lender is based on (a) Lender's reasonable assessment of the actual end state count the Borrower can reasonably be expected to achieve given the remaining time in the Construction Schedule, the Borrower's historical construction costs, the estimated amount of funds available to pay Project Costs and (b) such other factors reasonably related to the Borrower's ability to complete the Project, as Lender may reasonably determine. Any payment of principal made pursuant to this Section 3.08 shall be applied (x) first, to the Series B Note, the lesser of the amount of such payment or $621,000, and (y) second, to the Series A Note, the balance, if any, of such payment. Any payment of the principal amount of the Loan pursuant to this Section shall require the payment

of a Prepayment Amount (as defined in the Series A Note or the Series B Note, as applicable) determined pursuant to Section 10(c) of the applicable Note.

**Section 3.09. Use of Proceeds.** All amounts disbursed to or for the benefit of the Borrower from any Account pursuant to a Disbursement Request or any Borrower Standing Instructions (as defined in the Servicing Agreement) shall be used by the Borrower solely for the purpose or purposes identified in such Disbursement Request or Borrower Standing Instructions.

**Section 3.10. Conditions to Obligations of Lender To Make Disbursements.** All conditions to the obligations of the Lender to make disbursements hereunder are imposed solely and exclusively for the benefit of the Lender and the Servicer and their respective successors and assigns, and no other Person shall have standing to require satisfaction of such conditions in accordance with their terms or be entitled to assume that the Lender or the Servicer will refuse to make advances or disbursements in the absence of strict compliance with any or all thereof, and no other Person shall, under any circumstances, be deemed to be a beneficiary of such conditions, any or all of which may be freely waived in whole or in part by the Lender at any time if the Lender deems it advisable to do so.

**ARTICLE IV**

**CONSTRUCTION CONSULTANT**

**Section 4.01. Construction Consultant.** The Borrower acknowledges that (i) the Construction Consultant has been retained pursuant to the Construction Consulting Agreement to act as a consultant to the Lender and not as a consultant to the Borrower in connection with the Project; (ii) the Construction Consultant shall in no event or under any circumstance have any power or authority to make any decision, or to give any approval or consent, or to do any other act or thing that is binding upon the Lender and any such purported decision, approval, consent, act or thing by the Construction Consultant on behalf of the Lender shall be void and of no force or effect; (iii) the Lender reserves the right to make any and all decisions required to be made by the Lender under the Loan Documents and to give or refrain from giving any and all consents or approvals required to be given by the Lender under the Loan Documents and to accept or not accept any matter or thing required to be accepted by the Lender under the Loan Documents without in any instance being bound or limited in any manner or under any circumstance whatsoever by any opinion expressed or not expressed, or advice given or not given, or information, certificate or report provided or not provided, by the Construction Consultant to the Lender or any other Person with respect thereto; (iv) the Lender reserves the right in its sole discretion to disregard or disagree, in whole or in part, with any opinion expressed, advice given, or information, certificate or report furnished or provided by the Construction Consultant to the Lender or any other Person or party; (v) the Lender reserves the right to replace the Construction Consultant with another Construction Consultant at any time and without approval by or prior (but with subsequent) notice to the Borrower; and (vi) notwithstanding the foregoing, the Lender reserves the right to withhold disbursement of all funds until the Construction Consulting Agreement is mutually executed by the Construction Consultant and the Lender.

**Section 4.02. Construction Consultant Reports.** The Construction Consulting Agreement shall provide that not less frequently (and, so long as no Event of Default or DSC

Approval Period shall exist, no more frequently) than within eight Business Days after the delivery of each Progress Certificate by the Borrower pursuant to Sections 3.02 and 7.12 hereof, the Construction Consultant shall deliver a report of the Construction Consultant to the Servicer and the Borrower based upon the Construction Consultant's review of such Progress Certificate and the Disbursement Request covered by such Progress Certificate and a site observation of the Improvements made by the Construction Consultant, sufficient to cover the period covered by the applicable Progress Certificate, in which report the Construction Consultant shall, except as qualified in such report (each a "Qualification"), as to any Phase of the Project for which Completion has not occurred (i) verify that the portions of the New Improvements completed as of the date of such site observation have been completed in a good and workmanlike manner consistent with residential projects of similar quality to the Project and substantially in accordance with the Plans; (ii) confirm that such Progress Certificate and related Disbursement Request, if any, are accurate and complete in all material respects; and (iii) state the Construction Consultant's estimate of (A) the percentage of the Project completed as of the date of such site observation on the basis of work in place as part of the New Improvements and the Construction Budget; (B) the Hard Costs actually incurred for work in place as part of the New Improvements as of the date of such site observation; (C) the sum necessary to complete the overall Project and each Phase in accordance with the Plans; and (D) the amount of time from the date of such inspection that will be required to achieve Completion of the Project and each Phase, and (iv) state that the money in the Construction Budget allocated to each Budget Line (plus any additional funds identified by the Borrower pursuant to Section 8.01(b)(iii) hereof) will be sufficient to pay all then unpaid Project Costs relating to such Budget Line and any costs identified by the Construction Consultant in such report to resolve any Qualification which relate to such Budget Line. With respect to any Qualification in any such report, the Construction Consultant shall specifically describe the basis for such Qualification and shall provide the Construction Consultant's estimate of the time and cost necessary to resolve such Qualification. In the event that based on any report of the Construction Consultant or otherwise, the Lender notifies the Borrower that the Lender has reasonably determined that a material Qualification has been made by the Construction Consultant, then the Borrower shall promptly (and in no event later than 15 Business Days after such notice) deliver to the Lender, the Borrower's proposal (each a "Resolution Plan") for resolving such Qualification, including a schedule of milestone dates to accomplish such resolution, a budget for such resolution and a description of the source of funds for such resolution (if a source other than the Construction Account). Each Resolution Plan shall include a certificate of a Responsible Officer of the Borrower (as to items (i), (ii) and (iii) below) and the Construction Consultant (as to items (i) and (ii) below) to the Lender and the Servicer that such Resolution Plan (i) is in substantial compliance with the Plans and Legal Requirements in all material respects, (ii) is a commercially reasonable method for resolving the applicable Qualification, and (iii) does not require more moneys than remain in the affected Budget Lines (assuming payment from such Budget Lines of all work for the Project remaining to be performed under such Budget Lines), or, if requiring more money, will be funded from a source identified by the Borrower in such Resolution Plan and in accordance with Section 8.01(b)(iii). The Lender may withhold from the amount requested in a Disbursement Request the amount reasonably estimated by the Construction Consultant necessary to resolve all Qualifications relating to such Disbursement Request and related Progress Certificate and fund the balance of the Disbursement Request.

# ARTICLE V

# COMPLETION

**Section 5.01. Completion.**

(a) "Completion" of the Project shall be deemed to have occurred for purposes of this Agreement when:

(i) the Borrower shall have certified to the Lender that all of the following conditions shall have been satisfied (and the Construction Consultant shall have confirmed such certification and the Lender and the Servicer shall have received such additional evidence of such satisfaction as the Lender or the Servicer may reasonably require):

(A) the demolition of the Demolished Units has been completed (exclusive of the seasonal, punch list and other items described in clause (E) of this Section 5.01(a)(i)) lien-free, in a good and workmanlike manner substantially in accordance with the Plans and in compliance with all Legal Requirements in all material respects;

(B) the New Improvements have been completed (exclusive of the seasonal, punch list and other items described in clause (E) of this Section 5.01(a)(i)) lien-free, in a good and workmanlike manner substantially in accordance with the Plans and in compliance with all Legal Requirements in all material respects;

(C) the Improvements shall contain all Tangible Personal Property required by the Contract Documents, or that are required by any Governmental Authority or Legal Requirement;

(D) all approvals necessary for the occupancy, use and operation of the Improvements in compliance in all material respects with all Legal Requirements shall have been obtained by the Borrower, which approvals shall include meeting the occupancy standards of the Virginia Building Statewide Code 2;

(E) all Project Costs shall have been paid in full (other than construction costs and other costs and expenses that will be incurred in completing punch list work, landscaping and other minor work with respect to the Improvements, which, in the aggregate, do not exceed $2,000,000.00, and which amount, to the extent relating to Hard Costs, is equal to or less than the remaining amount in the Construction Account identified as Retainage or other permissible withholdings yet to be paid under Trade Contracts relating to such work (and an amount equal to 100% of such remaining costs shall be withheld from such Retainage otherwise eligible for disbursement); and

(ii)    the Borrower shall have received final Lien waivers from the Builder and all First Tier Trade Contractors to whom proceeds of the disbursement from the Construction Account covered by the immediately preceding Progress Certificate were paid and Lien waivers conditioned upon payment only from the Builder, to the extent they are to be paid from the current Disbursement Request (to the extent permitted by applicable law), in each case evidencing that they have been paid in full, excluding Retainage and other permissible withholdings under the respective contracts, for all work performed to date (subject to any contest described in Section 7.12(f));

(iii)    the Government has issued any approval or acceptance of the Project required by the Borrower's Operating Agreement or the Ground Lease; and

(iv)    an as-built survey of the Project shall have been provided to and shall be reasonably acceptable to the Lender.

(b)    "Completion" of a Phase of the Project shall be deemed to have occurred for purposes of this Agreement when

(i)    the Borrower shall have certified to the Lender that all of the following conditions shall have been satisfied (and the Construction Consultant shall have confirmed such certification and the Lender shall have received such additional evidence of such satisfaction as the Lender may reasonably require):

(A)    all of the work on the Improvements required in such Phase has been completed (exclusive of the seasonal, punch list and other items described in clause (D) of this Section 5.01(b)(i)) lien-free, in a good and workmanlike manner, substantially in accordance with the Plans and in compliance with all Legal Requirements in all material respects;

(B)    the Improvements in such Phase contain all Tangible Personal Property then required by the Contract Documents for such Phase, or that then are required by any Governmental Authority or Legal Requirement;

(C)    all approvals necessary for the occupancy, use and operation of the Improvements in compliance in all material respects with all Legal Requirements shall have been obtained by the Borrower, which approvals shall include meeting the occupancy standards of Virginia Building Statewide Code 3; and

(D)    all Project Costs incurred in connection with such Phase of the Project shall have been paid in full (other than construction costs and other costs and expenses that will be incurred in completing punch list work, landscaping and other minor work with respect to the Improvements in such Phase, which, in the aggregate, shall not exceed $500,000.00, and which amount, to the extent related to Hard Costs, is equal to or less than

the remaining amount of Retainage or other permissible withholdings yet to be paid under Trade Contracts relating to such work) (and an amount equal to 100% of such remaining costs shall be withheld from such Retainage otherwise eligible for disbursement);

(ii)    the Borrower shall have received unconditional Lien waivers with respect to such Phase from the Builder and all First Tier Trade Contractors to whom proceeds of the disbursement from the Construction Account covered by the immediately preceding Progress Certificate were paid and Lien waivers conditioned upon payment only from the Builder, to the extent they are to be paid from the current Disbursement Request (to the extent permitted by applicable law), in each case evidencing that they have been paid in full, excluding Retainage and other permissible withholdings under the respective contracts, for all work performed to date (subject to any contest described in Section 7.12(f));

(iii)    the Government has issued any approval or acceptance of the Project required by the Borrower's Operating Agreement or the Ground Lease; and

(iv)    an as-built survey of such Phase shall have been provided to and shall be reasonably acceptable to the Lender.

**Section 5.02. Completion of Punch-List Items**. After the Completion of any Phase of the Project, the Borrower shall, as soon as practicable, complete any and all punch-list items, landscaping, seasonal work and other remaining work described under Section 5.01(b)(i)(D) hereof for such Phase, all of which shall be performed in a good and workmanlike manner, substantially in accordance with the Plans and in compliance with all Legal Requirements in all material respects. After the Completion of the Project, the Borrower shall, as soon as practicable, complete any and all punch-list items, landscaping, seasonal work and other remaining work described under Section 5.01(a)(i)(E) hereof, all of which shall be performed in a good and workmanlike manner, substantially in accordance with the Plans and in compliance with all Legal Requirements in all material respects.

**Section 5.03. Release of Remaining Funds in Construction Account**. Upon Completion of the Project and receipt by Lender of a certificate from the Borrower (which certification shall have been confirmed in writing by the Construction Consultant) that the Borrower has satisfied in full its obligations under Section 5.02 (and the Lender shall have received such additional evidence of such satisfaction as the Lender may reasonably require), and provided no Event of Default or DSC Approval Period exists, the Lender shall deliver a certificate (the "Completion Date Certificate") to the Servicer and the Borrower and upon receipt thereof the Servicer shall withdraw from the Construction Account and deposit into the Revenue Account all amounts then on deposit in the Construction Account and each subaccount thereof.

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES

In order to induce the Lender to enter into this Agreement and to make the Loan, the Borrower hereby represents and warrants to the Lender that as of the Closing and as of each Disbursement Date the following statements are true, complete and accurate in all material respects:

**Section 6.01. Representations and Warranties in Security Instrument.**  All of the representations and warranties set forth in Section 8 of the Security Instrument are true and correct in all material respects and are deemed incorporated herein by reference as if such representations and warranties were set forth fully herein.

**Section 6.02. Construction Documents.**  True and complete copies of the Construction Documents have been delivered to the Lender and the Servicer.  (i) The Borrower and, to the Borrower's knowledge, each of the Builder and the Developer, has duly executed and delivered each of the Construction Documents to which it is a party; (ii) each Construction Document to which the Borrower is a party constitutes the legal, valid and binding obligation of the Borrower; (iii) to the Borrower's knowledge, each Construction Document to which the Builder is a party constitutes the legal, valid and binding obligation of the Builder; and (iv) to the Borrower's knowledge, each Construction Document to which the Developer is a party constitutes the legal, valid and binding obligation of the Developer; in each case subject to applicable bankruptcy, insolvency and similar laws affecting rights of creditors generally and subject as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).  None of the Construction Documents has been amended, supplemented or otherwise modified or terminated, except as permitted hereby, and all of the Construction Documents are in full force and effect.  All Trade Contracts entered after the date hereof by the Borrower or the Builder will be duly executed and delivered by or on behalf of the Borrower and, to Borrower's knowledge, the Builder and constitute the legal, valid and binding obligations of the Borrower and, to Borrower's knowledge, the Builder as applicable.

**Section 6.03. No Illegal Activity as Source of Funds.**  No portion of the Property has been or will be purchased, improved, equipped or furnished with proceeds of any illegal activity.

**Section 6.04. Compliance With Anti-Terrorism, Embargo, Sanctions and Anti-Money Laundering Laws.**  The Borrower, and to the best of the Borrower's knowledge (a) each Person owning an interest in the Borrower and in the Independent Member, (b) Indemnitor, (c) the Manager, and (d) each tenant at the Property: (i) is not currently identified on OFAC List, and (ii) is not a Person with whom a citizen of the United States is prohibited to engage in transactions by any trade embargo, economic sanction, or other prohibition of United States law, regulation, or Executive Order of the President of the United States.  The Borrower has implemented procedures, and will consistently apply those procedures throughout the term of the Loan, to ensure the foregoing representations and warranties remain true and correct during the term of the Loan.

## ARTICLE VII

## AFFIRMATIVE COVENANTS

The Borrower hereby agrees and covenants unto Lender that until all Obligations have been paid and performed in full the Borrower shall keep and perform fully each and all of the following covenants:

**Section 7.01. Construction.** The Borrower shall proceed with and complete the Project substantially in accordance with the Construction Documents and Construction Schedule (subject to *Force Majeure* Delay and changes thereto permitted hereunder). The Borrower shall timely obtain all required Permits, and the Improvements shall be demolished, rehabilitated, constructed, performed and/or equipped, as applicable, in a good and workmanlike manner, and in compliance in all material respects with all Legal Requirements, all requirements of the appropriate Board of Fire Underwriters or other similar body acting in and for the locality in which the Premises is situated and substantially in accordance with the Plans. The Borrower shall timely pay all costs associated with the Improvements and the Completion of each Phase and the Project regardless of the amount or availability of the proceeds of the Loan and/or amounts in the Construction Account or any other Account; provided, however, that, subject to Section 7.06 and Section 7.11 hereof, the Borrower shall have the right during the course of the Project to withhold payment from Trade Contractors (but shall not request disbursement from the Construction Account or the Capital Repair/Replacement Account for any such amounts the Borrower intends to withhold). At such time as the Borrower enters into any Trade Contract, the Borrower shall furnish a copy of such Trade Contract to the Lender, the Servicer and the Construction Consultant. If an Event of Default or DSC Approval Period shall exist, the Borrower shall not enter into any Trade Contract without the prior written approval of such Trade Contract by Lender, which approval shall not be unreasonably withheld, conditioned or delayed.

**Section 7.02. Correction of Work.** The Borrower shall, at its expense, correct any material structural defect in the New Improvements or Qualification identified by the Lender, the Servicer or the Construction Consultant, or any material departure from the Plans not permitted hereby, in each case in a good and workmanlike manner, as described in the Plans, and in compliance with all then applicable Legal Requirements, the Plans and applicable Resolution Plans in all material respects.

**Section 7.03. No Encroachments.** The Borrower shall cause the rehabilitation and construction of the New Improvements and demolition of the Demolished Units to occur entirely on the Premises so as not to encroach upon or overhang any easement or right-of-way or the land of others (except to the extent permitted or not prohibited by such easement or right-of-way or the beneficiaries thereof), and when erected the New Improvements shall be wholly within any building restriction lines, however established.

**Section 7.04. Plan Changes.** The Borrower shall promptly provide the Lender, the Servicer and the Construction Consultant with copies of all material change orders, change bulletins and other revisions of the Plans and other Construction Documents.

**Section 7.05. Brokerage.** The Borrower shall indemnify the Lender, the Servicer and their respective Affiliates against any claims for brokerage fees or commissions in connection with the financing of the Project contemplated hereby by Persons claiming to have dealt with the Borrower or on the Borrower's behalf, and shall pay all reasonable out-of-pocket expenses incurred by the Lender or its Affiliates in connection with the defense of any action or proceeding brought to collect any such brokerage fees or commissions.

**Section 7.06. No Liens.** The Borrower shall keep the Improvements free and clear of all mechanics' Liens, notices of intention to file mechanic's Lien, notices of pendency, stop orders or comparable Liens or filings and all other Liens of any nature whatsoever (other than Permitted Exceptions) by arranging for the same to be bonded over or discharged in a manner reasonably acceptable to Lender within 30 days after the Borrower receives notice thereof, subject, however, to the Borrower's rights to contest such Liens in accordance with the terms of any Loan Document permitting such a contest.

**Section 7.07. Shop Drawings.** The Borrower shall make available to the Lender, the Servicer and the Construction Consultant, upon prior request and during normal business hours, all shop and related drawings used in connection with the Plans and the Project, at the office and location where the same are kept.

**Section 7.08. Loan Reserve Accounts.**

(a)     The Borrower shall establish and maintain (i) a balance in the Series A Reserve Account in an amount equal to the Series A Maximum Annual Debt Service and (ii) a balance in the Series B Reserve Account in an amount equal to the Series B Maximum Annual Debt Service  This obligation of the Borrower may be satisfied by the deposit of cash, Permitted Investment or a Liquidity Facility, or any combination thereof. Lender hereby approves Capmark Finance Inc. as the Liquidity Facility Provider and approves the terms of the Series A Liquidity Facility Agreement  Any payment made to or on behalf of Lender of principal or interest on the Loan made with funds drawn on the Series A Liquidity Facility Agreement shall be deemed to be a payment by the Borrower.

(b)     If the Borrower's obligation under Section 7.08(a)(i) is satisfied all or in part by the Liquidity Facility, the Borrower shall pay to the Liquidity Facility Provider on or before the date when due under the Liquidity Facility Reimbursement Agreement all reimbursement amounts and other amounts payable by the Borrower pursuant to the Liquidity Facility Reimbursement Agreement.

**Section 7.09. Single Purpose Entity.** Notwithstanding anything to the contrary in the Loan Documents, the Operating Agreement or the Government Agreements, until 91 days after the date that the Obligations are no longer outstanding and no non-contingent monetary obligations remain outstanding under the Loan Documents:

(a)     The Borrower and its Members and managers shall comply with each condition, covenant, representation and warranty set forth in Section 12.01 of the Operating Agreement, as in effect as of the date hereof or as amended with the Lender's consent.

(b)    The separate existence of the Borrower has not been and will not be maintained or used to abuse creditors or to perpetuate a fraud, injury or injustice to creditors.

(c)    The Borrower is not entering into this Agreement or the documents contemplated hereby with any intent to hinder, delay or defraud creditors of the Borrower

**Section 7.10. Construction Inspections.**  The Lender and the Construction Consultant and their representatives, shall have the right upon reasonable notice at all reasonable times during regular business hours to enter upon the Premises and inspect the work of construction to determine that the same is in conformity in all material respects with the Plans and the requirements hereof.   The Borrower shall make its own inspections of the construction to determine that the quality of the New Improvements and all other requirements of the work of construction financed by the Loan are being performed in a manner satisfactory to the Borrower, and the Borrower agrees to immediately notify the Lender and the Construction Consultant in writing should the same show any work to be unsatisfactory in any material manner.  Without limiting the foregoing, the Borrower shall permit the Lender and the Servicer and the Construction Consultant to examine and copy all books and account records and other papers of the Borrower relating to the Project, the Premises and the construction of the New Improvements; and the Borrower will use commercially reasonable efforts to cause Builder and all Trade Contractors to cooperate with the Lender and the Construction Consultant to enable the forgoing.

**Section 7.11. Construction   Documents,   Development   Agreement,   Asset Management Agreement, Management Agreement and Government Agreements.**  The Borrower shall maintain each of the Construction Documents, the Development Agreement, the Asset Management Agreement, the Management Agreement and each Government Agreement in full force and effect and timely perform all of the Borrower's obligations thereunder and enforce performance of all material obligations of each other party thereunder and not permit the termination, amendment in any material respect or assignment of any such agreement without the prior written consent of the Lender.  The Borrower will cause each of the Builder, the Developer, the Asset Manager and the Manager to enter into a Collateral Agreement relating to the Construction Documents, the Development Agreement, the Asset Management Agreement and the Management Agreement, as applicable, in form and content reasonably acceptable to the Lender.  Except in accordance with the terms of this Agreement, the Borrower will not enter into any other construction documents, development agreement, asset management agreement or management agreement without the Lender's prior written consent.

**Section 7.12. Progress Certification.**    Concurrently with the delivery of each Disbursement Request for disbursement of funds from the Construction Account (or, if no Disbursement Request is made during a calendar month, on or before the last day of each calendar month), the Borrower shall deliver to the Lender and the Construction Consultant a certificate executed by a Responsible Officer of the Borrower (each a "Progress Certificate") dated the date of such Disbursement Request, or last day of such month, as applicable:

(a)     setting forth a list of all Trade Contracts entered into by the Borrower since the date of the last Progress Certificate together with the names, addresses and amounts due or to become due, as well as the amounts previously paid, to any Trade Contractor and the Builder;

(b)     setting forth a list of all material Permits required through the then current stage of the Project;

(c)     (i) identifying in reasonable detail all changes to the Construction Budget and the Construction Schedule since the date of the last Progress Certificate, and confirming that all such changes have been made in compliance with Section 8.01 hereof; (ii) certifying that it has available all utilities then necessary for the construction, use, occupancy and operation of the Improvements; (iii) certifying that it has complied in all material respects with all Legal Requirements; (iv) describing any change to the Plans since the date of the last Progress Certificate and confirming that with respect to any such change that it has been made in accordance with Section 8.01; (v) certifying that no order or notice to the Borrower's knowledge has been made to or by the Borrower, by or to any Governmental Authority having jurisdiction stating that the work of construction at the Project is or will be in violation of any Legal Requirement in any material respect; (vi) confirming that the amount described in the most recent Disbursement Request fairly reflects the work and materials incorporated into the Improvements to be paid for with such disbursement and that the work being paid for has been satisfactorily completed substantially in accordance with the Plans and in a good and workmanlike manner; (vii) setting forth the Borrower's projection of the anticipated cost and time to complete the Project and the Phase(s) then under progress; (viii) identifying the Budget Line or Budget Lines and the Approved Construction Agreement Supplement(s) to which the most recent Disbursement Request applied; (ix) confirming that the Borrower has obtained unconditional Lien waivers from the Builder, the First Tier Trade Contractors and subcontractors to whom proceeds of the disbursement from the Construction Account covered by the immediately preceding Progress Certificate were paid and Lien waivers conditioned upon payment only from all such parties to the extent to be paid from the current Disbursement Request, in each case evidencing that they have been paid in full, excluding Retainage and other permissible withholdings, for all work performed to date (subject to any contest described in Section 7.11(f) hereof); and (x) with respect to any portion of such disbursement covering Retainage that (A) the applicable Trade Contractor has completed 100% of all work and has supplied 100% of all materials in compliance with such Trade Contractor's Trade Contract and in substantial conformance with the Plans; (B) such Trade Contractor will be paid in full for all work and materials supplied by such Trade Contractor in connection with such Phase upon the release of such portion of the Retainage, and (C) such Trade Contractor has executed and delivered full Lien waivers (conditioned only upon receipt of payment of such Retainage) for all work and materials supplied by such Trade Contractor in connection with such Phase;

(d)     if such Progress Certificate was delivered in connection with a Disbursement Request and if any portion of such Disbursement Request was for the cost of materials not yet incorporated in the Improvements but stored on-site or off-site, confirming that (i) such materials are substantially in accordance with the Plans; (ii) such

materials are securely stored on-site or in another safe and secure location, and, if stored off-site, properly inventoried and marked to indicate that they are the property of the Borrower to the extent reasonably necessary; (iii) such materials are insured against casualty, loss and theft in accordance with the applicable terms of the Security Instrument; (iv) the Borrower owns (or, after payment therefor, will own) such materials free and clear of all Liens (other than Permitted Exceptions); (v) the aggregate amount of such disbursements for such materials does not exceed the actual Hard Costs incurred by the Borrower for such materials; (vi) including such disbursement, the aggregate amount of disbursements for such materials stored on site or off site that is outstanding at such time does not exceed $1,000,000.00, and (vii) such materials are in good condition and suitable for use in connection with the Project;

(e)    describing any cessation of the work on the Project not contemplated by the Construction Schedule that has continued in excess of 30 consecutive days and for each such cessation (i) a description of the cause therefor; (ii) what provision has been made by the Borrower for the protection of materials stored on site and for the protection of the New Improvements and the Tangible Personal Property, to the extent then constructed or installed, against deterioration and against other loss or damage and theft; (iii) confirmation that such cessation of the work on the Project will not (A) materially adversely affect or jeopardize the rights of the Borrower under the Ground Lease, any other Government Agreement, any Construction Document or any other material agreements relating to the ownership, control, rehabilitation or construction of the Improvements; or (B) increase the total Project Costs, unless the Borrower has sufficient funds, other than amounts in the Construction Account, available to it to pay such increased costs;

(f)    identifying any amounts (exclusive of Retainage) that the Borrower is withholding from any Trade Contractor as the result of a contest of such amounts and confirming for any such amount (i) the basis for such contest, (ii) that the Borrower is withholding such payments in good faith, (iii) that the Borrower has paid if due all other uncontested costs and expenses from time-to-time incurred in connection with the Project, and (iv) that the withholding of such payments by the Borrower will not materially adversely affect the Borrower's ability to timely complete the Project and each Phase in accordance with the provisions of this Agreement;

(g)    certifying as to the total residential units in the Mortgaged Property that are occupied or available for immediate occupancy as of the date of such Progress Certificate;

(h)    confirming that the Borrower is in compliance in all material respects with all then uncompleted Resolution Plans;

(i)    certifying that the Borrower is in compliance with Section 8.07 hereof; and

(j)    confirming that the Borrower has required and the Builder has in force and effect, payment and performance bonds and subguard insurance in the minimum amount described in Section 5 of Addendum No. 1 to the Construction Agreement.

**Section 7.13. Construction Budget Evaluation.**  With respect to any particular Budget Line, if after giving effect to any allocation of excess amounts (and the allocation of any additional amounts) to such Budget Line made in accordance with Section 8.01 hereof, the Lender determines at any time prior to the Completion of the Project that the money in the Construction Budget allocated to such Budget Line will not be sufficient to pay all Project Costs relating to such Budget Line, then the Lender shall have the right, before it authorizes the Servicer to advance any additional amounts from the Construction Account, to require the Borrower to invest the amount of such deficiency (the "Deficiency") in the following manner: within 10 days after being notified in writing by the Lender that there is or will be a Deficiency, the Borrower shall deposit with the Lender for delivery to the Servicer for deposit into the Borrower Equity Subaccount an amount equal to the Deficiency. Any amounts deposited by the Borrower with the Lender pursuant to the preceding sentence shall be disbursed to the Borrower by the Servicer at the authorization of the Lender at the Lender's discretion and shall be applied by the Borrower to the payment of costs related to the deficient Budget Line, and until so disbursed shall be held by the Servicer in the Borrower Equity Subaccount and invested in accordance with the requirements of the Servicing Agreement and shall be subject to the terms of the Servicing Agreement.   Any undisbursed balance representing funds deposited by the Borrower in respect of such Deficiencies shall be returned to the Borrower upon the earlier to occur of (i) the elimination of such Deficiency as determined by the Lender, in its sole discretion or (ii) Completion of the Project.   If a Default or an Event of Default shall occur and be continuing, the Lender may, in addition to all other rights that it may have, apply or cause the Servicer to apply the undisbursed balance of any Deficiency deposit, and any other amounts held by or on behalf of Lender pursuant to the Loan Documents (including without limitation amounts drawn pursuant to any letter of credit, guaranty or indemnity, or otherwise) for any reason, together with interest earned thereon, in whole or in part to the payment of the Obligations, in such order as Lender shall determine in its sole discretion.

**Section 7.14. Borrower's Covenants Regarding Government Agreements.**

(a)    Borrower will at all times fully and promptly perform and comply with all of its obligations under the Government Agreements to which it is a party in all material respects, and if Borrower shall fail to do so, Lender may (but shall not be obligated to) after notice to the Borrower take any such action as Lender deems necessary to prevent or to cure any default by Borrower thereunder; upon receipt by Lender from the Government or other party of any written notice of default thereunder by Borrower, Lender may rely thereon and take any such action even though the existence of such default or the nature be questioned or denied by or on behalf of the Borrower; Borrower shall pay to Lender immediately and without deduction, demand, offset or counterclaim, all sums paid by Lender pursuant to this section, with interest thereon from the date of each such payment at the Default Rate (as defined in the Notes); and, without limitation to any other provision hereof, all sums so paid and expended by Lender, and the interest, shall be added to and be secured by the lien of this Instrument   Borrower agrees to use

diligent efforts not to suffer or knowingly incur, or knowingly permit to be suffered or incurred, any default on its part under the Government Agreements to which it is a party.

(b)    Borrower agrees not to amend or modify in any material respect, or terminate or surrender, such Government Agreements to which it is a party without the prior written consent of Lender being first had and obtained, which consent shall not be unreasonably withheld, conditioned or delayed.

(c)    Borrower agrees to furnish to Lender copies of any and all written notices of default served on Borrower under any Government Agreements to which it is a party and such other written notices as the Government may serve on Borrower relating to such Government Agreements or the terms and provisions or operations by Borrower thereunder.

(d)    Notwithstanding any advances made by Lender of any monetary amounts required to be made by Borrower under such Government Agreements, thus curing default thereunder, non-payment by Borrower to Lender of such amount or amounts so advanced shall, subject to the terms of the Loan Documents, be and remain a default by Borrower hereunder, unless and until such amounts are paid to Lender.

(e)    Borrower shall from time to time as may be reasonably requested by Lender furnish to Lender evidence of Borrower's performance under such Government Agreements to which it is a party and substantiating that the terms and provisions to be kept and performed by Borrower thereunder have been duly performed.

(f)    Borrower shall not, without Lender's prior written consent, elect to treat such Government Agreements to which it is a party as terminated under Section 365(h)(i) (or any other applicable section) of the Bankruptcy Code.  Any such election made without Lender's prior written consent shall be void.

(g)    If pursuant to § 365(h)(2) of the Bankruptcy Code, Borrower seeks to offset against any amounts due under such Government Agreements to which it is a party the amount of any damages caused by the non-performance by the Government or any successor or assign thereof (herein the "**Counterparty**") of any of the Counterparty's obligations under the Government Agreements to which it is a party after the rejection by the Counterparty of such Government Agreements under the Bankruptcy Code, Borrower shall, prior to effecting such offset, notify Lender of its intention to do so, setting forth the amounts proposed to be so offset and the basis therefor.  Lender shall have the right to object to all or any part of such offset, and, in the event of such objection, Borrower shall not effect any offset of the amounts so objected to by Lender.  If Lender has failed to object as aforesaid within ten (10) Business Days after notice from Borrower in accordance with the first sentence of this clause (g), Borrower may proceed to effect such offset in the amounts set forth in Borrower's notice.  Neither the failure of Lender to object as aforesaid nor any objection or other communication between Lender and Borrower relating to such offset shall constitute an approval of any such offset by Lender.  Borrower shall indemnify and save Lender harmless from and against any and all claims, demands, actions, suits, proceedings, damages, losses, costs and expenses of every nature

whatsoever (including, without limitation, attorney's fees and disbursements) arising from or relating to any such offset by Borrower against the amounts due under such Government Agreements to which it is a party, provided that Borrower shall not indemnify against or have any liability for any of such matters arising as the result of the gross negligence or willful misconduct of Lender.

(h)   Borrower shall promptly after obtaining knowledge notify Lender orally of any filing by or against the Counterparty of a petition under the Bankruptcy Code. Borrower shall thereafter forthwith give written notice of such filing to Lender, setting forth any information available to Borrower as to the date of such filing, the court in which such petition was filed, and the relief sought therein. Borrower shall promptly deliver to Lender following receipt any and all notices, summonses, pleadings, applications and other documents received by Borrower in connection with any such petition and any proceedings relating thereto.

(i)   If there shall be filed by or against Borrower a petition under the Bankruptcy Code, and Borrower, as a party to such Government Agreements, shall determine to reject any Government Agreements to which it is a party pursuant to Section 365(a) of the Bankruptcy Code, then Borrower shall give Lender not less than ten (10) Business Days' prior notice of the date on which the Borrower shall apply to the bankruptcy court for authority to reject such Government Agreements. Lender shall have the right, but not the obligation, to serve upon Borrower within such 10 Business Day period a notice stating that (x) Lender demands that Borrower assume and assign such Government Agreements to Lender pursuant to Section 365 of the Bankruptcy Code and (y) Lender covenants to cure all existing defaults by Borrower thereunder and to provide adequate assurance of future performance under such Government Agreements to which it is a party.   If Lender serves upon Borrower the notice described in the preceding sentence, Borrower shall not seek to reject such Government Agreements to which it is a party and, subject to applicable proceedings in the bankruptcy case, shall comply with the demand provided for in clause (x) of the preceding sentence.

**Section 7.15. Bankruptcy**   Effective upon the entry of an order for relief in respect of Borrower under the Bankruptcy Code, Borrower hereby assigns and transfers to Lender a non-exclusive right to apply to the Bankruptcy Court under § 365(d)(4) of the Bankruptcy Code for an order extending the period during which such Government Agreements may be rejected or assumed

**Section 7.16. Further Assurances.**   The Borrower from time to time shall make, do, execute, adopt, acknowledge and deliver, and take all and every such further acts, deeds, conveyances, assignments, resolutions, transfers and assurances, to the extent reasonably requested by the Lender (but exclusive of title reports, title commitments, title policies and surveys) as may be reasonably necessary or desirable for the better assuring, conveying, granting, assigning and confirming all and singular the rights and interests of the Lender, if any, in the Mortgaged Property including any agreements entered into by or assigned to the Borrower after the execution and delivery hereof.

**Section 7.17. Compliance With Anti-Terrorism, Embargo, Sanctions and Anti-Money Laundering Laws.** The Borrower shall comply with all Legal Requirements relating to money laundering, anti-terrorism, trade embargos and economic sanctions, now or hereafter in effect. Upon the Lender's request from time to time during the term of the Loan, the Borrower shall certify in writing to the Lender that the Borrower's representations, warranties and obligations under Section 6.10 and this Section 7.18 remain true and correct and have not been breached. The Borrower shall immediately notify the Lender in writing if any of such representations, warranties or covenants are no longer true or have been breached or if the Borrower has a reasonable basis to believe that they may no longer be true or have been breached. In connection with such an event, the Borrower shall comply with all Legal Requirements and directives of Governmental Authorities and, at the Lender's request, provide to the Lender copies of all notices, reports and other communications exchanged with, or received from, Governmental Authorities relating to such an event. The Borrower shall also reimburse the Lender any expense incurred by the Lender in evaluating the effect of such an event on the Loan and the Lender's interest in the collateral for the Loan in obtaining any necessary license from Governmental Authorities as may be necessary for the Lender to enforce its rights under the Loan Documents, and in complying with all Legal Requirements applicable to the Lender as the result of the existence of such an event and for any penalties or fines imposed upon the Lender as a result thereof.

## ARTICLE VIII

## NEGATIVE COVENANTS

Until all Obligations have been paid and performed in full:

**Section 8.01. Changes to Plans and Adjustment of Construction Schedule and Budget.**

(a)     Except as permitted in Sections 7.17 and 8.01(b) hereof, the Borrower shall not, directly or indirectly modify or supplement the Plans, the Construction Schedule, or the Construction Budget in any material respect or direct or permit the performance of any work pursuant to any material revision (of whatever nature or form) of the Plans, or any change order or change bulletin or other instrument or understanding relating to the Construction Documents.

(b)     The Borrower may modify or supplement the Plans and the Construction Schedule (including the scope of a particular Phase) so long as such modification or change order (i) has been approved by all Governmental Authorities, to the extent such approval is required by applicable law or contract, and does not cause a default under the Ground Lease or any other Government Agreements, and has been approved by the Lender to the extent required by this Agreement; (ii) will not reduce the total number of residential units occupied or available for immediate occupancy to be contained in the Improvements (on a current or projected basis) to an amount that would constitute a Default under Section 9.01(v) (on a current or projected basis), or involve the use of Tangible Personal Property that will not be at least equal in quality in all material respects to the Tangible Personal Property originally specified in or required by the

Plans; (iii) does not result in an increase in the Project Costs unless the Borrower has certified to the Servicer and the Lender a commercially reasonable source of funds to pay such increase which will be available to the Borrower on or before the date on which such increased costs are reasonably expected to become due and payable; (iv) complies with all Legal Requirements in all material respects; (v) will not increase remaining Project Costs payable from any Budget Line above the amount allocated to such Budget Line remaining in the Construction Account or to be funded from the source identified in clause (iii); and (vi) will not (on a current basis after the scheduled date for Completion of the Project) in the reasonable determination of the Lender, cause the DSC Ratio to be less than 1.17:1.00 or cause the Borrower to be unable to satisfy its Obligations (which shall be determined without including earnings from the Construction Account or the Capitalized Interest Account in the calculation of Operating Income).

(c)     Consistent with, and without limiting, the foregoing, Borrower may revise the Construction Budget from time-to-time to move amounts available under (i) the Budget Line denominated "Contingency" to other Hard Cost Budget Lines and (ii) the Budget Line denominated "Contingency for Soft Costs" to other Soft Cost Budget Lines. If Borrower obtains a savings in any Hard Costs or Soft Costs in a particular Budget Line, based upon signed contracts, signed purchase orders and/or otherwise, the Borrower shall allow the Borrower to reallocate such savings to another Budget Line with respect to which additional costs have been or may be incurred

**Section 8.02.  Permits.**  The Borrower shall not commence any work on any portion or Phase of the Project unless all Permits required for such portion shall have been issued by the appropriate Governmental Authorities and shall remain in full force and effect.  The Borrower shall provide copies of all Permits received by the Borrower to the Lender and the Construction Consultant as and when such Permits are received.

**Section 8.03.  Disposition of Assets.**  Except as otherwise permitted under the Security Instrument, the Servicing Agreement or the Assignment of Leases, the Borrower shall not sell, lease (other than by residential leases of the Premises and commercial leases of an immaterial portion of the Premises, in the ordinary course of business), transfer or otherwise dispose of any material portion of its assets, without the prior written consent of the Lender, which consent shall not be unreasonably withheld.

**Section 8.04.  Changes in Accounting.**  The Borrower shall not change its methods of accounting, unless such change is permitted by generally accepted accounting principles consistently applied, and provided such changes do not have the effect of curing or preventing what would otherwise be an Event of Default or Default had such change not taken place.

**Section 8.05.  Transfer of Ownership Interests.**  The Borrower shall not, except as otherwise permitted under the Security Instrument or any other Loan Document, permit a change in the ownership interests of the Members unless the written consent of the Lender is first obtained, which consent shall not be unreasonably withheld, delayed or conditioned.

**Section 8.06.  Change of Use.**  The Borrower shall not alter or change in any material respect the use of the Premises, unless the Borrower first notifies the Lender and obtains the Lender's written consent thereto, which consent may be withheld in the Lender's sole discretion.

**Section 8.07.  Characterization for Income Tax Purposes.**  The Borrower shall not take any action that, for purposes of the Code, would cause (i) the Borrower to be characterized as an association or publicly traded partnership or the Notes to not be treated as debt.

**ARTICLE IX**

**EVENTS OF DEFAULT**

**Section 9.01.  Events of Default.**  The occurrence of any of the following shall be deemed an "Event of Default" for purposes of this Agreement and the other Loan Documents:

(a)   (i)   the failure by Borrower to pay any installment of principal or interest on the Loan when the same becomes due and payable under the Loan Documents (payment of any such amounts from proceeds of any insurance policy or other credit enhancement insuring any portion of the Obligations or any interest therein (other than the Liquidity Facility Agreement), shall not constitute payment by the Borrower); or

(ii)   the failure by the Borrower to pay any other amounts required to be paid by Borrower under the Loan Documents within 10 days after the Lender gives Borrower written notice of such failure.

(iii)   the failure of the Borrower to pay the Liquidity Facility Provider any amount payable to the Liquidity Facility Provider by the Borrower on or before the date such payment is due pursuant to Section 2.01(a) of the Liquidity Facility Reimbursement Agreement.

(b)   Either the validity, priority or perfection of Lender's Lien on any part of the Mortgaged Property becomes unsatisfactory in any material respect to the Lender by reason of any Lien or other defect (even though the same may have existed at the time of any prior advance), other than any of the Permitted Exceptions, and such Lien or other defect is not eliminated (by bonding or other means reasonably acceptable to the Lender), or satisfactorily insured against by the Title Company in a manner reasonably acceptable to the Lender, within 30 days after the Borrower receives notice thereof.  The Lender acknowledges that to the extent that Borrower has the right to contest any such Lien under the terms of the Loan Documents, an Event of Default shall not be deemed to exist under this subsection for so long as Borrower is diligently contesting such Lien in accordance with the applicable terms of the Loan Documents.

(c)   The Borrower purports or attempts to assign any interest in this Agreement, any other Loan Document, or any disbursement to be made hereunder in violation of the terms and conditions of this Agreement, or any other Loan Document; or any Loan Document becomes or is claimed by the Borrower or Indemnitor or any other party thereto that is an Affiliate of the Borrower to be unenforceable against such party.

(d)     Any required Permit is not in effect for any reason, including, without limitation, that such Permit is not issued, is revoked or otherwise ceases to be in full force and effect and such Permit is not issued or reinstated within 30 days after notice thereof to the Borrower from the Lender or the applicable Governmental Authority, provided, however, that in the event (i) the reinstatement or issuance of such Permit cannot be effectuated using all due diligence within said 30 day period; and (ii) the absence of such Permit does not, in the reasonable judgment of the Lender, materially delay the progress of work on the Project, the Borrower shall have 90 additional days (or such longer period as may be approved in writing by the Lender, which approval shall not be unreasonably withheld), to obtain the issuance or reinstatement of such Permit so long as the Borrower commences obtaining such Permit within the initial 30 day period and thereafter diligently seeks and obtains the reinstatement or issuance thereof.

(e)     The Borrower fails to deliver any Progress Certificate or Resolution Plan on or before the date when due; or the Borrower fails to diligently and continuously prosecute any Resolution Plan to completion; or the Borrower otherwise Defaults in the performance or observance of any Obligation under Section 4.02, Section 7.09 or Section 7.11 and in any case such failure or Default continues for 10 days after notice shall have been given to the Borrower specifying such Default and requiring such Default to be remedied.

(f)     The Borrower defaults in the performance or observance of any other Obligation of the Borrower contained in this Agreement or any other Loan Document not specifically addressed by this Section 9.01 and such Default continues for 30 days after notice shall have been given to the Borrower by the Lender specifying such Default and requiring such Default to be remedied; provided that if such Default is not reasonably susceptible of cure within such 30 day period, the Borrower shall have an additional 90 days (or such longer period as may be approved in writing by the Lender, which approval shall not be unreasonably withheld) to cure such Default so long as the Borrower commences curing such Default within the initial 30 day period and thereafter diligently prosecutes such cure to completion, provided, however, that in no event will any such cure period be deemed to extend any shorter cure period expressly provided for herein or in any other Loan Document with respect to a particular Default.

(g)     The occurrence and continuance of any "breach", "default" or "event of default" by the Borrower or any Member of the Borrower (other than the Government), after the giving of any required notice thereof and the expiration of any applicable cure period available to the Borrower or any such Member of the Borrower, as applicable, under the Ground Lease or any other Government Agreement.

(h)     The Borrower is enjoined by any court or other Governmental Authority from entering into Leases generally or performing any material Obligations and such injunction continues unreleased and unstayed for 90 days.

(i)     All or a substantial or material portion of the Mortgaged Property is damaged or destroyed by fire or other casualty and a material loss of Operating Income from the Mortgaged Property has been or reasonably is expected to be incurred as a result

(net of the proceeds of any business interruption insurance) and the requirements set forth in the Security Instrument for making such proceeds available for restoration have not been satisfied; or all or a substantial or material portion of the Mortgaged Property is condemned, seized or appropriated by any Governmental Authority and a material loss (as reasonably determined by the Lender) of Operating Income from the Mortgaged Property has been or reasonably is expected to be incurred as a result (net of the proceeds of any business interruption insurance), taking into account any reduction in the outstanding Obligations by reason of the application of any condemnation award and the requirements set forth in the Security Instrument for making such proceeds available for restoration have not been satisfied.

(j)     Unless otherwise permitted under this Agreement or any other Loan Document, the Borrower, any Member of the Borrower (exclusive of the Government and exclusive of changes in the control of the Independent Member permitted by the terms of the Borrower's Operating Agreement), or the Indemnitor ceases to be controlled by the Person or Persons who control such party as of the date of this Agreement, unless, in any case, the new control Person is reasonably acceptable to Lender (the parties agreeing that acceptance of such party by the Government is a condition precedent to their acceptance by the Lender).

(k)     The filing as debtor by the Borrower or the Indemnitor of a voluntary petition, or the adjudication of either of the aforesaid Persons, or the filing by either of the aforesaid Persons of any petition or answer seeking or acquiescing, in any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief for itself under any present or future federal, state or other statute, law or regulation relating to bankruptcy, insolvency or other relief for debtors, or if either of the aforesaid Persons should seek or consent to or acquiesce in the appointment of any trustee, receiver or liquidator for itself or of all or any substantial part of its property or of any or all of the rents, revenues, issues, earnings, profits or income thereof, or the mailing of any general assignment for the benefit of its creditors or the admission in writing by either of the aforesaid Persons of its inability to pay its debts generally as they become due.

(l)     The entry by a court of competent jurisdiction of an order, judgment or decree approving a petition filed against the Borrower or the Indemnitor which petition seeks any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any present or future federal, state or other statute, law or regulation relating to bankruptcy, insolvency or other relief for debtors, which order, judgment or decree remains unvacated and unstayed for 120 days (whether or not consecutive) from the date of entry thereof, or the appointment of any trustee, receiver or liquidator of either of the aforesaid Persons or of all or any substantial part of its properties or of any or all of the rents, revenues, issues, earnings, profits or income thereof which appointment shall remain unvacated and unstayed for 120 days (whether or not consecutive).

(m)     Any transfer occurs in violation of Section 23 of the Security Instrument.

(n)   Any written certificate, statement, representation, warranty or audit heretofore or hereafter furnished by or on behalf of the Borrower or the Indemnitor pursuant to or in connection with this Agreement (including, without limitation, representations and warranties contained herein or in any Loan Documents), any other Loan Document or as an inducement to Lender to make the Loan to Borrower or authorize or permit the disbursement moneys from any Account proves to have been false in any material respect at the time when the facts therein set forth were stated or certified, or proves to have omitted any substantial contingent or unliquidated liability or claim against the Borrower or Indemnitor

(o)   Any final judgment for an amount in excess of $10,000,000 shall be rendered by a court of law or equity or any administrative tribunal against the Borrower or the Indemnitor, and the same shall remain undischarged for a period of 30 days, unless such judgment is either (i) fully covered by collectible insurance and such insurer has not within such period disputed such coverage in writing; or (ii) although not fully covered by insurance, enforcement of such judgment has been effectively stayed, such judgment is being contested or appealed by appropriate proceedings and the Borrower or the Indemnitor as the case may be, has established reserves adequate for payment in the event such Person is ultimately unsuccessful in such contest or appeal.

(p)   There is any fraud with respect to, material misrepresentation in or material omission from any written certificate, statement, representation, warranty or audit heretofore or hereafter furnished by or on behalf of the Borrower or the Design/Builder or any of their respective officers, directors, trustees, general partners, members, agents or managers pursuant to or in connection with (A) this Agreement (including, without limitation, representations and warranties contained herein, in any application for or creation of the Loan or in any other Loan Documents), (B) any other Loan Document or (C) any request for the Lender's or the Servicer's consent to any proposed action, including a request for disbursement of funds from any Account or any such certificate, statement, representation, warranty or audit proves to have omitted any substantial contingent or unliquidated liability or claim against the Borrower.

(q)   The knowing expenditure by the Borrower of any moneys from the Construction Account or the Capital Repair/Replacement Account on any item other than the items for which such moneys were disbursed pursuant to the Loan Closing Statement or the applicable Disbursement Request.

(r)   The Borrower's or its Members' failure to comply with Section 7.09 hereof in any respect that the Lender reasonably determines has a material adverse affect on any interest of the Lender and, with respect only to any such failure which reasonably is susceptible to cure (as determined by the Lender), such failure has continued for thirty (30) days after written notice of such failure from the Lender to the Borrower.

(s)   Any payment and performance bond required by the terms of Section 21(a)(1)(G) of the Security Instrument hereof is revoked, terminated, cancelled, suspended, or altered in any material respect and Borrower does not promptly commence and diligently pursue enforcement of the Builder's obligation to cause such payment and

performance bond to be replaced by a payment and performance bond satisfying the requirements of Section 21(a)(1)(G) of the Security Instrument.

(t)     The Borrower or the Indemnitor modifies, amends, or terminates the Ground Lease or any other Government Agreement, any Construction Document, the Management Agreement, or the Equity Guaranty, as applicable, unless otherwise expressly permitted under the terms of this Agreement, the Security Instrument, the Assignment of Leases or a Collateral Agreement.

(u)     During any of the periods specified below (unless otherwise agreed to in writing by the Lender, which agreement shall not be unreasonably withheld), the Improvements shall include fewer residential units occupied or available for immediate occupancy than the minimum number specified below for such period (as the applicable amount may be adjusted from time-to-time pursuant to this Section 9.01(v), "Minimum Units Online"):

| PERIOD | MINIMUM NUMBER |
|---|---|
| Closing—December 11, 2011 | 1125 |
| December 11, 2011 and thereafter | 1493 |

provided that the applicable Minimum Units Online amount shall be reduced for each housing unit that is not occupied or available for immediate occupancy because

(i)     of casualty or damage, vandalism or the act of a third party, provided that the Borrower either (A) is proceeding with due diligence to repair or replace such housing units in accordance with the Security Instrument or (B) applies 100% of the insurance proceeds applicable to such housing unit to the repayment of the Loan;

(ii)     of condemnation, provided that the Borrower applies the condemnation proceeds to the repayment of the Loan;

(iii)     of an event for which business interruption insurance payments are due, provided that the Borrower deposits the proceeds of the business interruption insurance in the Revenue Account; and

(iv)     the Borrower is renovating such housing unit, provided that (A) this reduction will only be available for a housing unit for the three month period commencing on the date renovation work commences on such housing unit, and (B) at no time may the Borrower receive a reduction for more than 100 housing units pursuant to this clause.

(v)     There is any cessation of the work on the Project, not contemplated by the Construction Schedule that continues for in excess of 30 consecutive days, unless each of the following conditions shall have been satisfied:

(i)     the cessation of the rehabilitation or construction shall have been caused by *Force Majeure* Delay;

(ii)     the Borrower shall have made adequate provision, acceptable to the Lender for the protection of materials stored on site and for the protection of the Improvements and the Tangible Personal Property, to the extent then constructed or installed, against deterioration and against other loss or damage and theft;

(iii)     the Borrower shall have furnished to the Lender evidence satisfactory to the Lender that such cessation of the work on the Project will not (A) materially adversely affect or jeopardize the rights of the Borrower or the Borrower under material agreements relating to the ownership, control, rehabilitation or construction of the Improvements; or (B) increase the cost of the rehabilitation or construction of the Improvements unless the Borrower shall have simultaneously furnished evidence satisfactory to the Lender that sufficient funds from other sources (including amounts in the Net Operating Income Subaccount) are available to pay such increased costs and such funds are (or, prior to the time such costs are to become payable, will be) deposited in the appropriate Account under the Servicing Agreement; and

(iv)     from time to time upon the request from Lender therefor during any such cessation of the work on the Project, the Borrower shall furnish to Lender, evidence satisfactory to the Lender, as applicable, to the effect that (notwithstanding such cessation of rehabilitation or construction) the Completion of the Project can be accomplished on or before the Scheduled Completion Date for the Project and the Completion of each Phase of the Project can be accomplished on or before the Scheduled Completion Date for such Phase, in each case with amounts remaining available in the Construction Account.

(w)     The Borrower shall fail to deposit with the Lender or give the Lender satisfactory evidence of availability from another source of sufficient additional funds to satisfy any Deficiency identified by the Lender, all as provided in Section 7.13 hereof within 30 days after written demand by the Lender therefor.

(x)     The Completion of any Phase of the Project does not occur on or before Scheduled Completion Date for such Phase of the Project or the Completion of the Project does not occur on or before the Scheduled Completion Date for the Project or the Lender determines during the course of rehabilitation and/or construction of the Improvements, upon advice of the Construction Consultant or otherwise, that the Completion of any Phase of the Project has no reasonable likelihood of occurring by the Scheduled Completion Date for such Phase or that the Completion of the Project has no reasonable likelihood of occurring by the Scheduled Completion Date for the Project unless (i) the Borrower shall be in compliance with Section 8.01 hereof, (ii) no Event of Default has occurred or is reasonably expected by the Construction Consultant or the Servicer to occur under Section 9.01(v) hereof by reason of such delay, (iii) no DSC Approval Period exists and no DSC Approval Period is projected by the Lender to occur

throughout the period prior to any such revised Scheduled Completion Date, and (iv) the existence of such delay shall not, in the reasonable determination of the Lender, impair the ability of the Borrower fully and timely to pay the Obligations.

Notwithstanding anything in this Section, all requirements of notice shall be deemed eliminated if Lender reasonably determines that the Lender is prevented from declaring an Event of Default by bankruptcy or other applicable law. The cure period, if any, shall then run from the occurrence of the event or condition of Default rather than from the date of notice.

**Section 9.02. Remedies Generally.** Notwithstanding anything in this Agreement to the contrary, so long as the Series A Note remains unpaid, upon the occurrence of an Event of Default under Section 9.01(a) with respect to the Series B Note, without the prior written consent of the holders of more than 50% of the unpaid principal balance of the Series A Note (i) neither the unpaid principal balance of the Loan evidenced by the Series A Note, or the interest accrued thereon, nor the unpaid principal balance of the Loan evidenced by the Series B Note, or the interest accrued thereon, may be accelerated, (ii) the lien and security interest of the Mortgage or other Security Documents may not be foreclosed, and (iii) funds may not be transferred from any account of the Servicing and Lockbox Agreement for payment of principal of or interest on the Series B Note (or for payment of amounts owing with respect to the Series B Liquidity Facility Agreement), except as otherwise specifically provided herein or in the Servicing Agreement. It is understood and agreed, however, (A) except as expressly provided in the preceding sentence, the existence of an Event of Default under Section 9.01(a) with respect to the Series B Note, shall not limit or impair Lender's right to waive any default or Event of Default or to exercise any remedy hereunder; and (B) that the Borrower shall have no responsibility or obligation to determine whether the provisions of this Section shall have been complied with and shall not be liable for any non-compliance herewith. Upon the occurrence of any one or more of the foregoing Events of Default, and so long as the same is or are continuing, the Lender may, at its option:

    (a)    Immediately terminate any further disbursement of funds from any Account

    (b)    Declare the entire unpaid Obligations to be, and the same shall thereupon become, immediately due and payable, without presentment, protest or further demand or notice of any kind, all of which are hereby expressly waived

    (c)    Enter upon the Premises and demolish, rehabilitate, construct, equip and complete the Improvements in accordance with the Plans with such commercially reasonable changes therein as the Lender may from time-to-time deem appropriate, all at the cost and expense of the Borrower. The Lender shall endeavor to provide not less than 24 hours prior notice of any such entering, provided, the Lender's failure to deliver any such notice shall not impair, modify or limit any right, power or remedy of the Lender In exercising such rights, the Lender shall have the right at any and all times to discontinue any work commenced by it in respect of the Improvements or to change any course of action undertaken by it and shall not be bound by any limitations or requirements of time whether set forth herein or otherwise. In exercising such rights, the Lender shall have the right and power (but shall not be obligated) to assume any

Construction Document or any other agreement or contract made by or on behalf of the Borrower in any way relating to the Improvements and to take over and use all or any part or parts of the labor, materials, supplies and equipment contracted for by or on behalf of the Borrower, whether or not previously incorporated into the Improvements, all in the sole and absolute discretion of the Lender.   In connection with any demolition, rehabilitation, construction, completion or equipping of the Improvements undertaken by the Lender pursuant to the provisions of this subsection, the Lender may (i) engage builders, contractors, architects, engineers and others for the purpose of furnishing labor, materials and equipment in connection with any rehabilitation or construction of the Improvements; (ii) pay, settle or compromise all bills or claims that have or may become Liens against the Mortgaged Property, or any portion thereof, or that have been or may be incurred in any manner in connection with the demolition, rehabilitation, construction, completion and equipping of the Improvements or for the discharge of Liens or other defects in title to the Mortgaged Property arising therefrom; and (iii) take such other action (including the employment of watchmen to protect the Improvements) or refrain from acting under this Agreement as the Lender may from time-to-time determine.  The Borrower shall be liable to the Lender for all sums paid or incurred by the Lender for the demolition, rehabilitation, construction, completion and equipping of the Improvements, whether the same shall be paid or incurred pursuant to the provisions of this Section 9.02(c) or otherwise, and all payments made or liabilities incurred by the Lender under this Agreement or any of the Loan Documents of any kind whatsoever, including, without limitation, all reasonable out-of-pocket fees, costs and expenses incurred by the Lender in accordance with this Agreement or any other Loan Document, shall be paid by the Borrower to the Lender, upon demand with interest at the Default Rate from the date such payment or liability was incurred to the date of payment to the Lender, and all of the foregoing, including interest, shall be deemed and shall constitute advances under this Agreement and be secured by the Loan Documents.  Upon the occurrence of any Event of Default, the rights, powers and privileges provided in this Section 9.02(c) and all other remedies available to the Lender under this Agreement may be exercised by the Lender at any time and from time-to-time whether or not the indebtedness evidenced by the Notes and secured by the Security Instrument shall be declared by the Lender to be due and payable, and whether or not the Lender shall have instituted any foreclosure or other action for the enforcement of the Security Instrument.  For the purpose of carrying out the provisions and exercising the rights, powers and privileges granted by this Section 9.02(c), after the occurrence and during the continuance of an Event of Default, the Borrower hereby irrevocably constitutes and appoints the Lender its true and lawful attorney-in-fact to execute, acknowledge and deliver any instruments and to do and perform any acts such as are referred to in this Section 9.02(c) in the name and on behalf of the Borrower; provided that with respect to the power of attorney granted in this Section and each power of attorney granted to the Lender under any other Loan Document, the Lender shall provide the Borrower with written notice within 10 days after executing any such instrument or taking any such act.  This power of attorney is a power coupled with an interest and cannot be revoked.

(d)     Where defective or unworkmanlike labor or materials are being used in the construction of the New Improvements in violation of the terms of this Agreement, the Lender shall have the right immediately to order stoppage of the construction and

further disbursements from the Construction Account and the Capital Repair/Replacement Account, and demand that such conditions be corrected in all material respects.

      (e)     Proceed to protect and enforce its rights by action at law (including, without limitation, bringing suit to reduce any claim to judgment), suit in equity and other appropriate proceedings including, without limitation, for specific performance of any Obligation.

      (f)     Exercise any and all rights and remedies afforded by the laws of the United States, the Commonwealth of Virginia or any other appropriate jurisdiction as may be available for enforcement of the Obligations.

      (g)     Exercise any and all other rights, powers and remedies under this Agreement and the other Loan Documents.

## ARTICLE X

### GENERAL CONDITIONS

The following conditions shall be applicable throughout the term of this Agreement:

**Section 10.01. Effect of Disbursements.** Any disbursement of moneys from the Construction Account or any other Account and any sums expended by the Lender pursuant to the Loan Documents shall be deemed to have been made pursuant to this Agreement, and not in contravention hereof, notwithstanding the existence of any uncured Default or Event of Default or failure of any condition. No disbursement of any proceeds or any other amount from the Construction Account or any other Account shall constitute a waiver of the right of the Lender to require compliance with the Obligations. No disbursement of any proceeds or any other amount from the Construction Account or any other Account at a time when any Default or Event of Default exists shall constitute a waiver of any right or remedy of the Lender existing by reason of such Default or Event of Default, including, without limitation, the right to accelerate the maturity of the indebtedness evidenced by the Notes or to foreclose the Security Instrument or, subject to the terms of this Agreement and the other Loan Documents, to refuse to make or authorize further disbursements of the proceeds or from the Construction Account or any other Account. Anything in this Agreement or any other Loan Document to the contrary notwithstanding, any approval or authorization by the Lender of the disbursement of proceeds or other moneys from the Construction Account or any other Account or approval, acceptance of any or delivery of any Disbursement Request given by the Lender or the Construction Consultant, whether or not before or after a site observation of the Improvements by the Construction Consultant or otherwise, shall not, by itself, be deemed to be an approval or acceptance by the Lender or the Construction Consultant of any work performed thereon, or an approval or acceptance by the Lender or the Construction Consultant of any work or materials done or furnished with respect thereto, or a representation or warranty by the Lender or the Construction Consultant as to the fitness of such work or materials or as to any other matter.

**Section 10.02.  Assignment by the Lender.**

(a)     The Lender may assign all or any of the Lender's rights or interest in the Loan, the Loan Documents or the Government Agreements, the Lender's rights in any other agreement, document or instrument relating to the Loan, the Loan Documents, the Government Agreements, the Project, the Borrower or other participants in the transactions contemplated by the Loan Documents and the Government Agreements, or the Lender's rights in the revenues from or security for any of the foregoing (the "Lender's Rights") at any time and upon and subject to any terms and conditions as the Lender may determine in its sole discretion without (subject to the requirements of Section 10 02(e) below), notice to or consent of the Borrower or any other party, to any Person, including a Person acting as trustee, nominee or agent for any other Person, (i) to whom all or any portion of the Lender's Rights are assigned or into which all or any portion of the Lender's Rights are deposited, including, but not limited to, the trustee of a grantor trust or trustee or custodian of any trust or similar vehicle to which the Lender assigns or into which the Lender deposits all or any portion of the Lender's Rights (ii) who purchases an interest in the Lender's Rights or any bonds, trust, certificates or other instruments or obligations payable from or secured by an interest in the Lender's Rights; (iii) who makes a loan secured by an interest in the Lender's Rights or any such bonds, trust, certificates or other instruments or obligations; or (iv) who provides credit or liquidity, credit enhancement, insurance, a surety bond or other security for or in connection with all or any portion of the Lender's Rights, any such bonds, trust certificates or other instruments or obligations or any such loan (each such Person and any immediate or remote assignee of any of the Lender's Rights assigned to each such Person is referred to as a "Lender Assignee"). The Borrower hereby (A) consents to any such assignment to any Lender Assignee; (B) acknowledges and agrees that each Lender Assignee shall be deemed to be the "Lender" with respect to the Lender's Rights assigned to such Lender Assignee and is explicitly recognized as an intended third-party beneficiary under this Agreement and that all representations and warranties made by the Borrower to Lender under the Loan Documents and the Government Agreements are made for the benefit of each Lender Assignee; and (C) agrees that all documentation, financial statements, appraisals, data or information, or copies thereof, relating to (1) the Borrower, the Government, any other participant in the transactions contemplated by the Loan Documents and the Government Agreements or any Affiliate of the Borrower or (2) the Loan, the Loan Documents, the Government Agreements or the Project, in each case prepared by the Borrower or its Affiliates and provided to Lender (the "Relevant Information") may be disclosed and delivered to and retained by any potential Lender Assignee, any rating agency or any other Person who has a legitimate commercial reason to review the same in connection with any assignment to a Lender Assignee in accordance with this Section, notwithstanding any previous confidentiality agreement or other arrangement between the Lender or any Affiliate of the Lender and the Borrower or any Affiliate of the Borrower (and any such agreement or arrangement to the contrary is hereby waived solely to the extent inconsistent with this clause).

(b)     The Borrower shall cooperate with the Lender with respect to all reasonable requests and due diligence procedures and use reasonable efforts to facilitate any assignment proposed by the Lender to any Lender Assignee, including without

limitation, providing Relevant Information to the Lender or any proposed or actual Lender Assignee or for inclusion in any prospectus or other offering material which would typically be provided to a Lender Assignee, any rating agency or any other Person who has a reason to review the same in connection with any such assignment, and the Borrower shall indemnify and hold harmless the Lender for any and all liabilities, losses and reasonable out-of-pocket expenses imposed upon or incurred by the Lender arising under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended, as a result of any misstatement of material fact by the Borrower (or alleged misstatement of material fact by the Borrower) contained in any such information provided by or at the direction of the Borrower or any Affiliate of the Borrower or any omission (or alleged omission) of a material fact by the Borrower, the inclusion of which was necessary to make any such written information not misleading, unless such misstatement of material fact or alleged misstatement of material fact or omission or alleged omission is caused by the Lender or its agents

(c)     The Borrower shall deliver to the Lender, each Lender Assignee and any Person designated by the Lender (i) such statements and audit letters of reputable, certified public accountants pertaining to the written information provided by the Borrower pursuant to this Section as shall reasonably be requested by the Lender and (ii) such opinions of counsel as are customarily delivered by debtors in connection with similar assignments or as may be reasonably required by any rating agency in connection with any such assignments

(d)     Notwithstanding the foregoing or Section 10.12 hereof, all reasonable out-of-pocket costs incurred by the Borrower in providing Relevant Information, opinions and accounting material pursuant to subsections (b) and (c) of this Section after the Closing shall be paid or, if applicable, reimbursed to the Borrower by the Person requesting the same (it being recognized and agreed that all costs incurred by the Borrower in providing such Relevant Information, opinions and accounting material prior to or at the Closing shall be the responsibility of Borrower).

(e)     In connection with any assignment of Lender's Rights to any Lender Assignee which makes such Lender Assignee a "Lender" under the Government Agreements, Capmark Capital (and any subsequent "Lender") shall notify the Borrower and the Army that such Lender Assignee, from and after the effectiveness of such assignment, shall be the "Lender" for purposes of the Government Agreements as and to the extent set forth in such notice   Upon receipt by the Borrower of such notice from Capmark Capital (or any subsequently identified "Lender") identifying a new Person as "Lender," the Person identified in such notice shall be, as and to the extent set forth in such notice, (A) the "Lender" for the purposes of the Government Agreements and (B) the Person to which, along with Capmark Capital, the notices, filings and communications that are to be delivered to the Lender pursuant to the Government Agreements shall be delivered. In accordance with the foregoing provisions, and for the avoidance of doubt, the Borrower shall not treat any Person as the "Lender" for purposes of receiving principal and interest on the Loan unless and until the Borrower has received a written notice of the type referenced in the foregoing provisions specifying that such Person is the "Lender" for such purpose   Any transfer by the Lender of the right to

receive principal and interest on the Loan directly from the Borrower (or any agent thereof) shall be reflected on the books of the Borrower. Subject to the requirements of Section 10.03, the Borrower and the Lender shall coordinate all communication with one another through the Servicer.

(f)     The Borrower acknowledges and agrees that, in addition to the Liquidity Facility (the premium for which was paid in full by Borrower at Closing), the Lender shall have the right (i) at its expense, to obtain credit enhancement for the Indebtedness or any interest therein, in whatever form, from whatever issuer and upon whatever terms Lender may determine in its sole discretion, and (ii) in connection therewith, to assign any or all of the Lender Rights to the issuer of such credit enhancement.

**Section 10.03. Notices.**   All notices, consents, approvals and requests required or permitted hereunder shall be given in writing and shall be effective for all purposes (a) if hand delivered, upon receipt; (b) if sent by (i) certified or registered United States mail, postage prepaid, return receipt requested, upon receipt or refusal of delivery or (ii) expedited prepaid reputable overnight delivery service, either commercial or United States Postal Service, the next Business Day after delivery to such service, or (c) sent by telecopier, upon telephoning the recipient that a telecopy notice is forthcoming and receipt of a machine-generated confirmation of successful transmission (provided, notices of Event of Default shall not be effectively delivered by telecopier), addressed as follows (or at such other address and Person as shall be designated from time to time by any party hereto, as the case may be, in a written notice to the other parties hereto in the manner provided for in this Section):

| | |
|---|---|
| If intended for the Lender: | Capmark Capital Inc.<br>1801 California Street, Suite 3900<br>Denver, CO 80202<br>Attention: Dan Ray<br>Facsimile: (303) 296-6804 |
| with copies to: | Servicer |
| If intended for Capmark Capital: | Capmark Capital Inc.<br>1801 California Street, Suite 3900<br>Denver, CO 80202<br>Attention: Dan Ray<br>Facsimile: (303) 296-6804 |
| If to Servicer: | Capmark Finance Inc.<br>100 South Wacker Drive, Suite 400<br>Chicago, IL 60606<br>Attention: Construction Lending<br>Facsimile: (312) 845-8623 |

| If intended for the Borrower: | Fort Lee Commonwealth Communities, LLC |
| | P.O. Box 12220 |
| | 4401 North Mesa |
| | El Paso, TX  79902-1107 |
| | Attention:  James C. Hunt |
| | Facsimile:  (915) 533-1172 |

| with a copy to: | Pinnacle Fort Lee LLC |
| | 18500 Von Karman |
| | Suite 540 |
| | Irvine, CA  92612 |
| | Attention:  M. Scott Orrantia |
| | Facsimile:  (949) 224-2943 |

| With a copy to: | Falcon Properties MH, LLC |
| | 506 Mockingbird Way |
| | Warrington, PA  18976 |
| | Attention:  Sinclair Cooper |
| | Facsimile:  (215) 491-4750 |

**Section 10.04. Modifications.** Neither this Agreement nor any provision hereof may be changed, waived or terminated orally, but only by an instrument in writing signed by the party against which enforcement of the change, waiver or termination is sought.

**Section 10.05. Rights Cumulative: No Waiver.** All rights, powers and remedies herein given to the parties hereunder are cumulative and not alternative, and are in addition to all statutes or rules of law. Any forbearance or delay by a party hereto in exercising the same shall not be deemed to be a waiver thereof, and the exercise of any right or partial exercise thereof shall not preclude the further exercise thereof, and the same shall continue in full force and effect until specifically waived by an instrument in writing executed by such party. All representations and covenants by the parties hereto shall survive the funding of the Loan and disbursements and other advances hereunder and under the Servicing Agreement.

**Section 10.06. Schedules.** The Schedules and Exhibits attached to this Agreement are an integral part hereof and are hereby made a part of this Agreement.

**Section 10.07. Captions.** The captions in this Agreement are for convenience of reference only, and are not intended to limit or amplify the provisions hereof.

**Section 10.08. Assignment by the Borrower.** Except as expressly permitted by the Loan Documents, the Borrower may not assign or otherwise transfer any of its rights or obligations under this Agreement or any other Loan Document without the prior written consent of the Lender

**Section 10.09. Consents.** All consents required to be given by the Lender hereunder shall be in writing and shall not be deemed received unless received in writing.

**Section 10.10. Severability.** The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision, and all other provisions shall remain in full force and effect.

**Section 10.11. Consent of Government.** In addition to the consent or approval of Lender or any other parties required by the terms of this Agreement, the Borrower shall obtain in a timely manner the approval or consent of the Government, whether in its capacity as Ground Lessor or otherwise, whenever such approval or consent is required by applicable law or contract.

**Section 10.12. Costs and Expenses.** The Borrower will bear all applicable taxes, reasonable out-of-pocket fees and expenses incurred by the Lender, the Lender Assignees or the Servicer (including, but not limited to, reasonable attorneys' fees and expenses of counsel for the Lender, the Lender Assignees and the Servicer) in connection with (i) the Loan, (ii) the preparation, administration and enforcement of the Loan Documents, (iii) the Government Agreements, or (iv) any applicable grantor trust agreement or related document to which a Lender Assignee may be a party or by which it may be bound in connection with an assignment or deposit of the Loan into a grantor trust or similar vehicle in connection with any modifications of the foregoing and the recording of any of the Loan Documents and the Government Agreements. If, at any time, an Event of Default occurs or the Lender, any Lender Assignee or the Servicer becomes a party to any suit or proceeding in order to protect its interests or priority in any collateral for any of the Obligations or its rights under this Agreement or any of the Loan Documents, or if the Lender, any Lender Assignee or the Servicer is made a party to any suit or proceeding by virtue of the Loan, any of the Loan Documents or Government Agreements or any Mortgaged Property and as a result of any of the foregoing, the Lender, any Lender Assignee or the Servicer employs counsel to advise or provide other representation with respect to thereto, or to collect the balance of the Obligations, or to take any action in or with respect to any suit or proceeding relating to the Obligations, any of the Loan Documents or Government Agreements or any Mortgaged Property, the Borrower or the Indemnitor or to protect, collect or liquidate any of the security for the Obligations or the obligations of such parties, or attempt to enforce any security interest or Lien granted to the Lender by any of the Loan Documents, then in any such events, all reasonable out-of-pocket attorney's fees actually incurred arising from such services, including attorneys' fees for preparation of litigation and in any appellate or bankruptcy proceedings, and any reasonable out-of-pocket expenses, costs and charges relating thereto shall constitute additional Obligations of the Borrower (subordinate to principal of and interest on the Notes) payable on demand of the Person who incurred the same. Without limiting the foregoing, the Borrower has undertaken the obligation for payment of, and shall pay, all recording and filing fees, revenue or documentary stamps or taxes (other than Lender's, Servicer's or any Lender Assignee's income taxes), intangibles taxes, and other taxes, reasonable out-of-pocket expenses and charges payable in connection with the Loan Documents, the Government Agreements, the Obligations, or the filing of any financing statements or other instruments required to effectuate the purposes of this Agreement, and should the Borrower fail to do so, the Borrower agrees to reimburse the Lender, any Lender Assignee and Servicer for the amounts paid by any of them in connection therewith, together with penalties or interest, if any, incurred by any of them as a result of such underpayment or nonpayment. Such amounts shall constitute a portion of the Obligations (subordinate to payment of principal and interest on the Notes), shall be secured by the Security Instrument. The Person requesting payment shall submit to the

Borrower a reasonably detailed statement of all such expenses for which payment or reimbursement by the Borrower is sought under the Loan Documents and payment by the Borrower shall be due within 10 days after the Borrower's receipt of such statement after which it shall bear interest at the Default Rate from the date advanced until repaid

**Section 10.13. Performance by Lender.** At its option, upon the Borrower's failure to do so, the Lender may make any payment or do any act on the Borrower's behalf that the Borrower is required to do to remain in compliance with this Agreement or any of the other Loan Documents, and the Borrower agrees to reimburse the Lender on demand, for any payment made or reasonable out-of-pocket expense incurred by the Lender, pursuant to the foregoing authorization, including, without limitation, reasonable out-of-pocket attorneys' fees, and until so repaid any sums advanced by the Lender shall constitute a portion of the Obligations (subordinate to payment of principal and interest on the Notes), shall be secured by the Security Instrument and shall bear interest at the Default Rate from the date advanced until repaid. The Lender shall submit to the Borrower a reasonably detailed statement of all such expenses for which payment or reimbursement by the Borrower is sought.

**Section 10.14. Indemnification.** The Borrower (but not any Member of the Borrower, including, without limitation, the Government, or Affiliate of any Member) shall, at its sole cost and expense, protect, defend, indemnify and hold harmless the Indemnified Parties from and against any and all claims, suits, liabilities (including, without limitation, strict liabilities), actions, proceedings, obligations, debts, damages, losses, reasonable out-of-pocket costs, fees and expenses, fines, penalties, charges, judgments, awards, amounts paid in settlement, punitive damages, foreseeable and unforeseeable consequential damages, of whatever kind or nature (including but not limited to reasonable out-of-pocket attorneys' fees and other costs of defense) (collectively, "Indemnified Matters"), imposed upon or incurred by or asserted against the Indemnified Parties (as defined below) by reason of (a) ownership of the Notes, the Security Instrument, the Mortgaged Property, any other Loan Document or any interest therein or receipt of any Operating Income; (b) any amendment to, or restructuring of, or the invalidity or unenforceability of, the Obligations, any of the Loan Documents, the Ground Lease, any Construction Document, the Management Agreement or any other Government Agreement; (c) any and all lawful action that may be taken by the Lender in connection with the enforcement of the provisions of the Security Instrument or the Notes or any of the other Loan Documents, the Ground Lease, any Construction Document or any other Government Agreement, whether or not suit is filed in connection with same, or in connection with Borrower or the Indemnitor and/or any partner, joint venturer, Member or shareholder thereof becoming a party as debtor to a voluntary or involuntary federal or state bankruptcy, insolvency or similar proceeding; (d) any accident, injury to or death of Persons or loss of or damage to property occurring in, on or about the Mortgaged Property, the Improvements or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (e) any use, nonuse or condition in, on or about the Mortgaged Property, the Improvements or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (f) any failure on the part of the Borrower or the Indemnitor to perform or comply with any of the terms imposed on the Borrower or the Indemnitor of this Agreement or any of the other Loan Document; (g) any claims by any broker, person or entity claiming to have participated on behalf of the Borrower in arranging the making of the Loan or otherwise in connection with the financing of the Project; (h) any failure of the Mortgaged Property to be in compliance with all

Legal Requirements; (i) performance of any labor or services or the furnishing of any materials or other property with respect to the Mortgaged Property, the Improvements or any part thereof; (j) the failure of any person to file timely with the Internal Revenue Service an accurate Form 1099-b, statement for recipients of proceeds from real estate, broker and barter exchange transactions, which may be required in connection with the Security Instrument, or to supply a copy thereof in a timely fashion to the recipient of the proceeds of the transaction in connection with which the Loan is made; (k) any material misrepresentation made by or on behalf of the Borrower or the Indemnitor to the Lender in this Agreement or any other Loan Document or in any certificate from the Borrower or the Indemnitor in connection with this Agreement or in any of the other Loan Documents; (l) any recording tax on the making and/or recording of the Security Instrument, the Notes or any of the other Loan Documents; (m) the Borrower's violation of any requirements of the Employee Retirement Income Security Act of 1974, as amended, (n) any fines or penalties assessed or any corrective costs incurred by the Lender if the Project or any part of the Mortgaged Property is determined to be in violation of any covenants, restrictions of record or any Legal Requirements; or (o) the enforcement by any of the Indemnified Parties of the provisions of this Section. Any amounts payable to the Lender by reason of the application of this Section shall become immediately due and payable, and shall constitute a portion of the Obligations, shall be secured by the Security Instrument and shall accrue interest at the Default Rate if not paid within 10 days after demand thereof. The Obligations of the Borrower under this Section shall survive any termination, satisfaction, assignment, entry of a judgment of foreclosure or exercise of a power of sale or delivery of a deed in lieu of foreclosure of the Security Instrument. For purposes of this Section, the term "Indemnified Parties" means the Lender, Capmark Capital, the Servicer, their respective Affiliates, the Lender Assignees, and any Person who is or will have been involved in the origination of the Loan, any Person who is or will have been involved in the servicing of the Loan, any Person in whose name the encumbrance created by the Security Instrument is or will have been recorded, any Person who may hold or acquire or will have held a full or partial interest in the Loan or any right or interest under this Agreement or any other Loan Document as well as the respective directors, officers, shareholders, partners, members, employees, agents, servants, representatives, contractors, subcontractors, affiliates, subsidiaries, participants, successors and assigns of any and all of the foregoing acting within the scope of employment (including, without limitation, any other Person who holds or acquires or will have held a participation or other full or partial interest in the Loan or the Mortgaged Property or any right or interest under this Agreement or any other Loan Document, whether during the term of the Loan or as a part of or following a foreclosure of the Security Instrument and including, without limitation, any successors by merger, consolidation or acquisition of all or a substantial portion of the Lender's assets and business). Notwithstanding the foregoing, the Borrower shall not protect, defend, indemnify, hold harmless or have any liability for Indemnified Matters (x) arising solely as the result of the gross negligence or willful misconduct of any Indemnified Party or (y) as to matters relating to Hazardous Materials first introduced on the Land after the date Borrower ceases to own the lessee's interest under the Ground Lease.

**Section 10.15. Survival of Covenants.** All covenants, agreements, representations and warranties of the Borrower made herein and in certificates or reports of or on behalf of the Borrower, any Member or Indemnitor delivered pursuant hereto shall be deemed to have been material and relied on by the Lender, notwithstanding any investigation made by or on behalf of

the Lender, and shall survive the execution and delivery to the Lender of the Notes, this Agreement and the other Loan Documents.

**Section 10.16. Benefits.** All of the terms and provisions of this Agreement shall bind and inure to the benefit of the parties hereto, Capmark Capital, all Lender Assignees and their respective successors and assigns. Except as expressly set forth in this Agreement, no Person other than the Borrower, Capmark Capital, all Lender Assignees, the Servicer and the Lender shall be entitled to rely upon this Agreement or be entitled to the benefits of this Agreement.

**Section 10.17. Supersedes Prior Agreements; Counterparts.** This Agreement and the instruments referred to herein supersede and incorporate all representations, promises, and statements, oral or written, made by the parties in connection with the Loan. This Agreement may be executed in any number of counterparts, each of which, when executed and delivered, shall be an original, but such counterparts shall together constitute one and the same instrument.

**Section 10.18. Rules of Construction.**

(a)     For purposes of this Agreement and the other Loan Documents:

(i)     any reference to "days" or "months" shall mean calendar days or months;

(ii)     the word "including" shall mean "including without limitation";

(iii)     any reference in any of the Loan Documents to any Loan Document or other document or exhibit shall mean such Loan Document or other document or exhibit as it may from time-to-time be supplemented, modified, amended and extended in accordance with the terms of this Agreement;

(iv)     defined terms shall be equally applicable to the singular and plural forms;

(v)     all existing and future exhibits to this Agreement are incorporated in this Agreement by this reference;

(vi)     the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and all section, subsection, schedule and exhibit references are to this Agreement unless otherwise specified;

(vii)     any reference herein to the consent, approval or judgment of the Lender, or any similar term or condition, shall, unless expressly provided otherwise herein, mean the consent, approval or judgment of the Lender in its sole and absolute discretion; and

(viii)     terms contained in this Agreement shall, unless otherwise defined herein or unless the context otherwise indicates, have the meanings, if any, assigned to them by the UCC in effect in the Commonwealth of Virginia.

(b)     Time is of the essence of the Loan Documents, and the provisions of the Loan Documents are declared to be severable.

(c)     All accounting terms used and not otherwise defined in any Loan Document shall be construed in conformity with, and all financial information maintained or submitted by the Borrower, the Indemnitor or any other Person under any Loan Document shall be prepared in accordance with generally accepted accounting principles consistently applied.

(d)     The Loan is governed by the terms and provisions set forth in this Agreement and the other Loan Documents and in the event of any irreconcilable conflict between the terms of the other Loan Documents and the terms of this Agreement, the terms of this Agreement shall control.

**Section 10.19. Controlling Law**   THE PARTIES HERETO AGREE THAT THE VALIDITY, INTERPRETATION, ENFORCEMENT AND EFFECT OF THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE COMMONWEALTH OF VIRGINIA; PROVIDED, HOWEVER, THAT WITH RESPECT TO THE CREATION, PERFECTION, PRIORITY, ENFORCEMENT AND FORECLOSURE OF THE LIEN OF THE SECURITY INSTRUMENT, AND THE DETERMINATION OF DEFICIENCY JUDGMENTS, THE LAWS OF THE STATE WHERE THE PREMISES IS LOCATED SHALL APPLY, AND THE PARTIES HERETO SUBMIT (AND WAIVE ALL RIGHTS TO OBJECT) TO NON-EXCLUSIVE PERSONAL JURISDICTION IN THE COMMONWEALTH OF VIRGINIA, FOR THE ENFORCEMENT OF ANY AND ALL OBLIGATIONS UNDER THE LOAN DOCUMENTS EXCEPT THAT IF ANY SUCH ACTION OR PROCEEDING ARISES UNDER THE CONSTITUTION, LAWS OR TREATIES OF THE UNITED STATES OF AMERICA, OR IF THERE IS A DIVERSITY OF CITIZENSHIP BETWEEN THE PARTIES THERETO, SO THAT SUBJECT TO APPLICABLE LEGAL REQUIREMENTS IT MAY BE BROUGHT IN A UNITED STATES DISTRICT COURT, IT MAY BE BROUGHT IN THE UNITED STATES DISTRICT COURT FOR THE COMMONWEALTH OF VIRGINIA OR ANY SUCCESSOR FEDERAL COURT HAVING ORIGINAL JURISDICTION.

**Section 10.20. Nonrecourse**

(a)     Except as otherwise provided in this Section 10.20, the Lender shall not enforce the liability and obligation of the Borrower to perform and observe the Obligations by any action or proceeding wherein a money judgment shall be sought against the Borrower or any Member of the Borrower or any Affiliate of any such Member.

(b)     The provisions of subsection (a) above shall not (i) constitute a waiver, release or impairment of any Obligation evidenced or secured by this Agreement, the Notes, the Security Instrument or the other Loan Documents; (ii) impair the right of the Lender to name the Borrower (but not any Member or Affiliate of the Borrower) as a party defendant in any action or suit for judicial foreclosure and sale under the Security Instrument; (iii) affect the validity or enforceability of any indemnity, guaranty, master

lease or similar instrument made in connection with this Agreement, the Notes, the Security Instrument or the other Loan Documents; (iv) impair the right of the Lender to obtain the appointment of a receiver; (v) impair the right of the Lender to obtain a deficiency judgment or judgment on the Notes against the Borrower (but not any Member or Affiliate of the Borrower) if necessary to obtain any insurance proceeds or condemnation awards to which the Lender would be otherwise entitled under the Security Instrument; or (vi) impair the right of the Lender to enforce, subject to the terms thereof, the provisions of the Environmental Indemnity Agreement.

(c)     Notwithstanding the provisions of subsection (a) above to the contrary, the Borrower (but not any Member or Affiliate of the Borrower) shall be personally liable to the Lender for any and all claims, suits, liabilities (including, without limitation, strict liabilities), actions, proceedings, obligations, debts, damages, losses, reasonable out-of-pocket costs, fees and expenses, fines, penalties, charges, judgments, awards, amounts paid in settlement, foreseeable and unforeseeable consequential damages, of whatever kind or nature (collectively, "Losses") actually imposed upon, asserted against or incurred by Lender due to: (i) knowing application of any Operating Income, insurance proceeds, condemnation awards or any other revenues or proceeds from the Mortgaged Property in a manner in violation of or inconsistent with the requirements of the Loan Documents, (ii) failure of the Borrower, any Member (other than the Army), Manager or Indemnitor to provide any financial information or financial reports as and when required under the Loan Documents, (iii) fraud or intentional misrepresentation by the Borrower, any Member (other than the Army), Manager or Indemnitor, (iv) damage to the Mortgaged Property caused by or arising out of the gross negligence or willful misconduct of the Borrower, any Member (other than the Army), Manager or Indemnitor or their respective directors, officers, managers, members, employees, contractors or agents (to the extent the Lender is not compensated for such loss from insurance proceeds), (v) an Event of Default under Section 9.01(v) hereof, or (vi) violation of the Borrower's Obligations under the Environmental Indemnity.

(d)     Notwithstanding the foregoing, non-recourse nature of the Loan as set forth in Section 10.20(a) above SHALL BECOME NULL AND VOID and shall be of no further force and effect in the event of (i) the occurrence of an Event of Default under Section 9.01(l) or 9.01(m) hereof, (ii) the occurrence of an Event of Default under Section 9.01(s) hereof, or (iii) a Default under Section 23 of the Security Instrument.

(e)     Nothing herein shall be deemed to be a waiver of any right which the Lender may have under Section 506(a), 506(b), 1111(b) or any other provisions of the Bankruptcy Code to file a claim for the full amount of the Obligations or to require that all collateral shall continue to secure all of the Obligations in accordance with the Loan Documents.

**Section 10.21. Intentionally Omitted.**

**Section 10.22. Servicing.**  The Borrower acknowledges and agrees that the Lender may from time-to-time retain the Servicer or one or more other servicers or other agents to service the Loan, administer the Loan and the Loan Documents, monitor compliance with the requirements

for disbursement of Loan proceeds, and perform and exercise rights, remedies and obligations and issue any or all consents and approvals of the Lender under the Loan Documents, including, without limitation, delivery of notices, Disbursement Requests and other communications for and on behalf of the Lender, in each case as and to the extent and subject to (i) the terms of the Servicing Agreement and (ii) such modifications of such delegation to the Servicer as the Lender may make from time-to-time in accordance with Section 3.04 of the Servicing Agreement. The Borrower, at the Lender's request, shall execute and deliver such agreements as the Lender reasonably may require from time-to-time to confirm such servicing relationship.

**Section 10.23. Waiver of Automatic Stay.** THE BORROWER HEREBY AGREES THAT, IN CONSIDERATION OF THE LENDER'S AGREEMENT TO MAKE THE LOAN AND IN RECOGNITION THAT THE FOLLOWING COVENANT IS A MATERIAL INDUCEMENT FOR THE LENDER TO MAKE THE LOAN, IN THE EVENT THAT THE BORROWER SHALL (a) FILE WITH ANY BANKRUPTCY COURT OF COMPETENT JURISDICTION OR BE THE SUBJECT OF ANY PETITION UNDER ANY SECTION OR CHAPTER OF TITLE 11 OF THE UNITED STATES CODE, AS AMENDED (THE "BANKRUPTCY CODE"), OR SIMILAR LAW OR STATUTE; (b) BE THE SUBJECT OF ANY ORDER FOR RELIEF ISSUED UNDER THE BANKRUPTCY CODE OR SIMILAR LAW OR STATUTE; (c) FILE OR BE THE SUBJECT OF ANY PETITION SEEKING ANY REORGANIZATION, ARRANGEMENT, COMPOSITION, READJUSTMENT, LIQUIDATION, DISSOLUTION, OR SIMILAR RELIEF UNDER ANY PRESENT OR FUTURE FEDERAL OR STATE ACT OR LAW RELATING TO BANKRUPTCY, INSOLVENCY OR OTHER RELIEF FOR DEBTORS; (d) HAVE SOUGHT OR CONSENTED TO OR ACQUIESCED IN THE APPOINTMENT OF ANY TRUSTEE, RECEIVER, CONSERVATOR OR LIQUIDATOR; OR (e) BE THE SUBJECT OF AN ORDER, JUDGMENT OR DECREE ENTERED BY ANY COURT OF COMPETENT JURISDICTION APPROVING A PETITION FILED AGAINST THE BORROWER FOR ANY REORGANIZATION, ARRANGEMENT, COMPOSITION, READJUSTMENT, LIQUIDATION, DISSOLUTION OR SIMILAR RELIEF UNDER ANY PRESENT OR FUTURE FEDERAL OR STATE ACT OR LAW RELATING TO BANKRUPTCY, INSOLVENCY OR RELIEF FOR DEBTORS, THEN, TO THE EXTENT PERMITTED BY APPLICABLE LAW AND SUBJECT TO COURT APPROVAL, THE LENDER SHALL THEREUPON BE ENTITLED, AND THE BORROWER HEREBY IRREVOCABLY CONSENTS TO, AND WILL NOT CONTEST, AND AGREES TO STIPULATE TO, RELIEF FROM ANY AUTOMATIC STAY OR OTHER INJUNCTION IMPOSED BY SECTION 362 OF THE BANKRUPTCY CODE OR SIMILAR LAW OR STATUTE (INCLUDING, WITHOUT LIMITATION, RELIEF FROM ANY EXCLUSIVE PERIOD SET FORTH IN SECTION 1121 OF THE BANKRUPTCY CODE) OR OTHERWISE, ON OR AGAINST THE EXERCISE OF THE RIGHTS AND REMEDIES OTHERWISE AVAILABLE TO THE LENDER AS PROVIDED IN THE LOAN DOCUMENTS, AND AS OTHERWISE PROVIDED BY LAW, AND THE BORROWER HEREBY IRREVOCABLY WAIVES ITS RIGHTS TO OBJECT TO SUCH RELIEF.

**Section 10.24. Waiver of Jury Trial.** EACH OF THE BORROWER AND THE LENDER (a) COVENANTS AND AGREES NOT TO ELECT A TRIAL BY JURY WITH RESPECT TO ANY AND ALL ISSUES PRESENTED IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY ANY OF THE PARTIES HERETO

AGAINST THE OTHER OR ITS SUCCESSORS WITH RESPECT TO ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, THE RELATIONSHIP BETWEEN THE PARTIES AS THE BORROWER AND THE LENDER, THE BORROWER'S USE OR OCCUPANCY OF THE MORTGAGED PROPERTY, AND/OR ANY CLAIM FOR INJURY OR DAMAGE, OR ANY EMERGENCY OR STATUTORY REMEDY THAT IS TRIABLE OF RIGHT BY A JURY; AND (b) WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO SUCH ISSUES TO THE EXTENT THAT ANY SUCH RIGHT EXISTS NOW OR IN THE FUTURE. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS SEPARATELY GIVEN BY EACH PARTY, KNOWINGLY, VOLUNTARILY AND INTENTIONALLY GIVEN WITH THE BENEFIT OF COMPETENT LEGAL COUNSEL AND IS AN ESSENTIAL ASPECT OF THEIR BARGAIN.

**Section 10.25. Additional Financing.**

(a)     Except as expressly provided in this Section, Borrower shall not incur any Indebtedness, secured or unsecured, direct or contingent (including guaranteeing any obligation), other than (w) the Indebtedness and the obligations under the Government Agreements, the Liquidity Facility Agreement, or other Liquidity Facility approved by the Lender, the Liquidity Facility Reimbursement Agreement or any similar instrument relating to any other Liquidity Facility approved by the Lender and the documents evidencing or securing any Additional Permitted Indebtedness (as defined below), (x) trade payables incurred in the ordinary course of its business which are paid within 60 days after the due date thereof, and leases for equipment (provided that the aggregate amount payable under all such equipment leases may not exceed $250,000 (increased on each anniversary of this Agreement in proportion to the increase in CPI over the prior 12 month period) in any 12 month period), (y) real estate taxes and (z) Indebtedness (from a lending source that is not an Affiliate of the Borrower) subordinate to the Obligations if (i) the Lender is satisfied the subordinate Indebtedness is subordinate to the Obligations, is not prohibited by or inconsistent with any Government Agreement or any other agreement with the Government, the subordinate lender cannot take any action that would materially adversely affect the Lender and the subordinate lender and the Lender enter into an intercreditor agreement confirming the foregoing; or (ii) if (i) does not apply, the Lender consents (which consent shall not be unreasonably withheld) to the subordinate Indebtedness. The Borrower may incur additional Indebtedness on a pari passu basis with the Loan ("Additional Permitted Indebtedness"), but only upon the satisfaction of the following terms and conditions (in each case in form and substance reasonably acceptable to, or as reasonably determined by, Capmark Capital):

(i)     The Borrower shall give the Lender and Capmark Capital written notice that the Borrower desires to obtain Additional Permitted Indebtedness, which notice shall set forth a description in reasonable detail of the amount, term, purpose, collateral and credit enhancement the Borrower proposes for such Additional Permitted Indebtedness;

(ii)     No Default or Event of Default shall exist on the date of Lender's and Capmark Capital's receipt of the notice in clause (i) or on the proposed funding date of the Additional Permitted Indebtedness;

(iii)     Intentionally Omitted;

(iv)     The Additional Permitted Indebtedness shall mature no later than the fifth year prior to expiration of the term of the Ground Lease and shall fully amortize by its maturity date;

(v)     The DSC Ratio for the 18 month period immediately prior to the proposed funding date of the Additional Permitted Indebtedness shall have been not less than: 1.20:1.00; provided that for purposes of calculating the DSC Ratio for this Section 10.25(a)(v) with respect to Additional Permitted Indebtedness to be funded prior to delivery of the Completion Date Certificate: Operating Income shall be determined by dividing the actual Operating Income during such 18 month period by the average number of units during such period Occupied or Available for Immediate Occupancy, and multiplying the quotient thereof by the End State Unit Count;

(vi)     The projected DSC Ratio from the date of the funding of the Additional Permitted Indebtedness through the scheduled final maturity date of the Loan and all Additional Permitted Indebtedness (whichever is later) shall not during any twelve month period of time be less than 1.20:1.00;

(vii)     The proposed non-economic material terms of the Additional Permitted Indebtedness (including any credit enhancement and the fees payable to the Lender, the Servicer and any issuer of credit enhancement for the Loan or any interest therein) shall be not materially less favorable to the holder of the Additional Permitted Indebtedness and such other parties than were the terms of the Loan for the holder of the Loan and such other parties as of the date of the funding of the Loan; provided, however, that the Additional Permitted Indebtedness may have a term shorter than the term of the Loan and may vary in other non-material ways from the Loan;

(viii)     Capmark Capital shall have received and approved (such approval not to be unreasonably withheld) such amendments to the Loan Documents, title endorsements, opinions of counsel, intercreditor agreements, certificates of insurance, due diligence materials and other conditions and documents as Capmark Capital may reasonably require in connection with such Additional Permitted Indebtedness and not inconsistent herewith;

(ix)     The Additional Permitted Indebtedness shall be secured by a Lien on the Mortgaged Property (and any additional real or personal property to be financed or improved with proceeds of the Additional Permitted Indebtedness), on a pari passu basis with the Lien of the Security Instrument and the other Loan Documents, and the Loan and the Additional Permitted Indebtedness shall be payable on a pari passu basis;

(x)     Capmark Capital and the Lender shall have received an opinion of counsel recognized in the federal income taxation of interests in loans such as the

Loan and the Additional Permitted Indebtedness, which counsel is reasonably acceptable and which opinion is reasonably acceptable in form and substance to Capmark Capital to the effect that (i) the Additional Permitted Indebtedness will not cause the Loan to fail to be characterized as debt for federal income tax purposes, (ii) the Borrower will continue to be characterized as a partnership for federal income purposes, and (iii) the Additional Permitted Indebtedness will not adversely affect the federal income tax status of the Lender or any Lender Assignee; and

(xi)   The Government shall have consented to the Additional Permitted Indebtedness.

(b)   Upon receipt of the Borrower's written request for Additional Permitted Indebtedness together with reasonable evidence that each of the conditions set forth in Section 10.25(a) are or will be satisfied as of the date of the funding of such Additional Permitted Indebtedness, Capmark Capital shall have the sole and exclusive right, for a period of 90 days thereafter, to negotiate with the Borrower, the terms and conditions of such Additional Permitted Indebtedness which period shall commence upon receipt of Capmark Capital's notice described in Section 10.25(a)(i) (provided no Event of Default has then occurred and is continuing). If on or before the expiration of such 90 day period, Capmark Capital has (i) issued to the Borrower, Capmark Capital's written commitment to provide Additional Permitted Indebtedness on the terms described in Section 10.25(a) (and such other terms as the parties may agree to or that Capmark Capital reasonably requires and are not inconsistent with the terms of Section 10.25(a)) and (ii) delivered to the Borrower reasonable evidence of Capmark Capital's ability to close and fund the Additional Permitted Indebtedness, Capmark Capital shall have the sole and exclusive right to provide the Additional Permitted Indebtedness and the parties shall diligently proceed to the closing and funding of the same consistent with such written commitment of Capmark Capital. If Capmark Capital fails to satisfy the conditions in clause (i) or clause (ii) above, then Capmark Capital shall provide its consent to the Borrower obtaining from a third party Additional Permitted Indebtedness satisfying the conditions set forth in Section 10.25. Nothing in this Section 10.25 shall be deemed to constitute a waiver or modification of any prohibition in the Loan Documents against further encumbrance of the Mortgaged Property or the incurrence of additional Indebtedness by the Borrower

(c)   This Section 10.25 shall not be amended without the prior written consent of Capmark Capital.

(d)   Anything contained in the Loan Documents to the contrary notwithstanding, none of the rights of Capmark Capital described in this Section 10.25 shall be deemed Lender's Rights.

(e)   The Lender shall execute such instruments or documents to or with respect to the Loan Documents, and take such other actions, as Capmark Capital shall request:

(i)     To the extent necessary to facilitate the issuance of Additional Permitted Indebtedness (as determined by Capmark Capital in good faith), to amend or consent to the amendment of the Loan and any of the Loan Documents, the Government Agreements, the Liquidity Facility documents, the Borrower's Operating Agreement and any other document, agreement or instrument relating to any of the foregoing (the "Subject Documents").

(ii)    To the extent necessary to facilitate the issuance of Additional Permitted Indebtedness (as determined by Capmark Capital in good faith), to arrange for or consent to the attachment of additional liens on, and grant of additional security interests in, the Mortgaged Property consistent with this Section 10.25.

(iii)   To prevent any amendment to any of the Subject Documents or the attachment of any additional liens on, or the grant of additional security interests in, the Mortgaged Property that Capmark Capital determines in good faith may (1) reduce the value of the its rights under this Section 10.25 or (2) impede or interfere with the exercise of its rights, or the performance of its obligations, with respect to this Section 10.25.

(iv)    Notwithstanding the foregoing, without the prior written consent of the Lender, the Lender shall not be required to execute any document, or take any action, at the direction of Capmark Capital, that would:

(A)    reduce the interest rate payable with respect to the Notes;

(B)    reduce the principal payable on the Loan;

(C)    change the terms on which the Loan may be prepaid;

(D)    change any date on which any amount payable on the Loan is due;

(E)    terminate any Lien granted pursuant to the Loan Documents;

(F)    modify or supplement the terms or coverage of any insurance policy or other credit enhancement insuring the Loan; or

(G)    modify the provisions of this Section 10.25(e)(iv).

(f)     This Section 10.25 shall not be amended without the written consent of Capmark Capital.

**Section 10.26. Deemed Approval, Consent and Acceptance.**  With regard to the Construction Budget, the Construction Contract, the Builder or any Trade Contract, to the extent that the Lender's approval, consent or acceptance thereof is required by the terms of this agreement or any other Loan Document, so long as no Event of Default has occurred and is

continuing, the Lender shall not withhold its consent or disapproval to any such action for more than 30 days after request for such approval, consent or acceptance thereof has been made by the Borrower, accompanied by a detailed description of the request for which approval, consent or acceptance is sought, provided that the Borrower submits such request for the Lender's approval, consent or acceptance in an envelope labeled "Priority" and delivered to the Lender by Overnight delivery or otherwise in accordance with the provisions of the applicable Loan Document and which request shall state at the top of the first page in bold lettering "**THE LENDER'S RESPONSE IS REQUIRED WITHIN THIRTY DAYS AFTER RECEIPT OF THIS NOTICE PURSUANT TO THE TERMS OF A LOAN AGREEMENT BETWEEN THE BORROWER AND THE LENDER.**" In the event that the Lender does not either approve, consent to or accept such request or disapprove such request (such disapproval stating the reasons for such disapproval) within thirty days after receipt of such request, the Construction Contract, the Builder or the Trade Contract which was the subject of said request shall be deemed approved, consented to or accepted by the Lender.

[END OF DOCUMENT TEXT]

IN WITNESS WHEREOF, the Lender and the Borrower have executed this Agreement as of the day and year first above written.

LENDER:

**CAPMARK CAPITAL INC.**, a Colorado corporation

By _____
Dan J. Ray, Managing Director

[FORT LEE—LOAN AGREEMENT]

**FORT LEE COMMONWEALTH COMMUNITIES, LLC**, a Delaware limited liability company

By: **Fort Lee Family Housing, LLC**, a Delaware limited liability company, Managing Member

By: **Hunt ELP, Ltd.**, a Texas limited partnership, Member

By: **HB GP, LLC**, a Nevada limited liability company, Managing General Partner

By: _____
Robin Vaughn, Senior Vice President

By: **Falcon Properties MH LLC**, a Pennsylvania limited liability company, Member

By: _____
Sinclair S. Cooper, Sole Member

By: **Pinnacle Fort Lee LLC**, a Washington limited liability company, Member

By: _____
M. Scott Orrantia, Managing Director

[FORT LEE—LOAN AGREEMENT]

## SCHEDULE 1

## LEGAL DESCRIPTION OF LAND AND PARCELS

**Legal Description**
**PARCEL A**
Fort Lee, Virginia

PARCEL A
ALL THAT CERTAIN LOT, PIECE OR PARCEL OF LAND, BELONGING, LYING, SITUATE IN
FORT LEE MILITARY RESERVATION, AND BEING IN PRINCE GEORGE COUNTY, VIRGINIA,
KNOWN AND DESIGNATED AS PARCEL-A, BEARINGS AND DISTANCES REPRESENT
ACTUAL MONUMENTATION FOUND OR SET IN FIELD JULY, 2007, AND BEING MORE
PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT A CORPS OF ENGINEERS DISK STAMPED "GPS LEE 008AZ" SET IN
CONCRETE INSIDE THE BOUNDARY OF FORT LEE MILITARY RESERVATION, AND WITH
THE FOLLOWING COORDINATES, NAD 83, U.S SURVEY FEET, N 3611084 51, E
11821649.05, THENCE SOUTH 74 DEGREES 36 MINUTES 38 SECONDS EAST A DISTANCE
OF 598.38 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP STAMPED "A-28", SAID ROD
LYING ON THE NORTH SIDE OF BATTLE DRIVE AND BEING THE **TRUE POINT AND PLACE
OF BEGINNING,** THENCE SOUTH 65 DEGREES 58 MINUTES 48 SECONDS EAST A
DISTANCE OF 170.37 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH
19 DEGREES 02 MINUTES 21 SECONDS EAST A DISTANCE OF 350.63 FEET TO A FOUND
ROD WITH 2" ALUMINUM CAP, THENCE NORTH 15 DEGREES 23 MINUTES 42 SECONDS
WEST A DISTANCE OF 104.98 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE
NORTH 21 DEGREES 18 MINUTES 44 SECONDS EAST A DISTANCE OF 98 16 FEET TO A
FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 52 DEGREES 24 MINUTES 43
SECONDS EAST A DISTANCE OF 89.09 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP,
THENCE NORTH 86 DEGREES 32 MINUTES 13 SECONDS EAST A DISTANCE OF 66.39
FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 76 DEGREES 01
MINUTES 30 SECONDS EAST A DISTANCE OF 177.01 FEET TO A FOUND ROD WITH 2"
ALUMINUM CAP, THENCE NORTH 51 DEGREES 41 MINUTES 47 SECONDS EAST A
DISTANCE OF 58.26 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 12
DEGREES 08 MINUTES 37 SECONDS WEST A DISTANCE OF 102 79 FEET TO A FOUND
ROD WITH 2" ALUMINUM CAP, THENCE NORTH 35 DEGREES 57 MINUTES 58 SECONDS
WEST A DISTANCE OF 139.23 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE
NORTH 03 DEGREES 36 MINUTES 32 SECONDS WEST A DISTANCE OF 81 84 FEET TO A
FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 30 DEGREES 52 MINUTES 26
SECONDS EAST A DISTANCE OF 218.11 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP,
THENCE NORTH 26 DEGREES 39 MINUTES 03 SECONDS WEST A DISTANCE OF 151 97
FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 49 DEGREES 45
MINUTES 30 SECONDS EAST A DISTANCE OF 59 77 FEET TO A FOUND ROD WITH 2"
ALUMINUM CAP, THENCE SOUTH 68 DEGREES 30 MINUTES 35 SECONDS EAST A
DISTANCE OF 299 24 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH
69 DEGREES 45 MINUTES 47 SECONDS EAST A DISTANCE OF 142 14 FEET TO A FOUND
ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 58 DEGREES 24 MINUTES 20 SECONDS
EAST A DISTANCE OF 203.77 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE
SOUTH 72 DEGREES 28 MINUTES 36 SECONDS EAST A DISTANCE OF 151.49 FEET TO A
FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 01 DEGREES 32 MINUTES 49
SECONDS EAST A DISTANCE OF 301.69 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP,
THENCE SOUTH 35 DEGREES 49 MINUTES 45 SECONDS WEST A DISTANCE OF 63.50
FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 05 DEGREES 48
MINUTES 07 SECONDS WEST A DISTANCE OF 393 27 FEET TO A FOUND ROD WITH 2"
ALUMINUM CAP, SAID ROD LYING ON THE NORTH EDGE OF YORKTOWN DRIVE, THENCE
ALONG THE NORTH EDGE OF YORKTOWN DRIVE SOUTH 83 DEGREES 08 MINUTES 33
SECONDS EAST A DISTANCE OF 154.32 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP,

THENCE SOUTH 76 DEGREES 17 MINUTES 13 SECONDS EAST A DISTANCE OF 91.53 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 21 DEGREES 46 MINUTES 16 SECONDS EAST A DISTANCE OF 728.68 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 54 DEGREES 26 MINUTES 33 SECONDS EAST A DISTANCE OF 132.98 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 89 DEGREES 03 MINUTES 39 SECONDS EAST A DISTANCE OF 484.10 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 20 DEGREES 42 MINUTES 34 SECONDS EAST A DISTANCE OF 164.65 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 43 DEGREES 26 MINUTES 57 SECONDS EAST A DISTANCE OF 140.24 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 47 DEGREES 20 MINUTES 24 SECONDS EAST A DISTANCE OF 170.58 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE *SOUTH 86 DEGREES* 35 MINUTES 14 SECONDS EAST A DISTANCE OF 185.92 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, SAID ROD LYING ON THE WEST EDGE OF SISISKY BOULEVARD, THENCE ALONG THE EDGE OF PAVEMENT OF SISISKY BOULEVARD SOUTH 06 DEGREES 34 MINUTES 39 SECONDS WEST A DISTANCE OF 86.72 FEET TO A POINT, THENCE SOUTH 07 DEGREES 08 MINUTES 25 SECONDS WEST A DISTANCE OF 65.79 FEET TO A POINT, THENCE SOUTH 07 DEGREES 53 MINUTES 52 SECONDS WEST A DISTANCE OF 120.95 FEET TO A POINT, THENCE SOUTH 08 DEGREES 57 MINUTES 41 SECONDS WEST A DISTANCE OF 66.97 FEET TO A POINT, THENCE SOUTH 10 DEGREES 02 MINUTES 06 SECONDS WEST A DISTANCE OF 130.62 FEET, THENCE SOUTH 13 DEGREES 06 MINUTES 34 SECONDS WEST A DISTANCE OF 173.49 FEET TO A POINT, THENCE SOUTH 08 DEGREES 07 MINUTES 43 SECONDS WEST A DISTANCE OF 90.77 FEET TO A POINT, THENCE SOUTH 15 DEGREES 20 MINUTES 50 SECONDS WEST A DISTANCE OF 306.77 FEET TO A POINT, THENCE SOUTH 16 DEGREES 55 MINUTES 22 SECONDS WEST A DISTANCE OF 159.79 FEET TO A POINT, THENCE SOUTH 19 DEGREES 05 MINUTES 50 SECONDS WEST A DISTANCE OF 179.27 FEET TO A POINT, THENCE SOUTH 19 DEGREES 56 MINUTES 46 SECONDS WEST A DISTANCE OF 241.14 FEET TO A POINT, THENCE SOUTH 22 DEGREES 27 MINUTES 51 SECONDS WEST A DISTANCE OF 117.89 FEET TO A POINT, THENCE SOUTH 24 DEGREES 27 MINUTES 51 SECONDS WEST A DISTANCE OF 217.23 FEET TO A POINT, THENCE SOUTH 25 DEGREES 31 MINUTES 34 SECONDS WEST A DISTANCE OF 103.70 FEET TO A POINT, THENCE SOUTH 26 DEGREES 39 MINUTES 06 SECONDS WEST A DISTANCE OF 200.96 FEET TO A POINT, THENCE SOUTH 28 DEGREES 01 MINUTES 29 SECONDS WEST A DISTANCE OF 161.89 FEET TO A POINT, THENCE SOUTH 29 DEGREES 12 MINUTES 22 SECONDS WEST A DISTANCE OF 257.23 FEET TO A POINT, THENCE SOUTH 30 DEGREES 01 MINUTES 37 SECONDS WEST A DISTANCE OF 155.52 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, SAID ROD LYING ON THE NORTH SIDE OF BATTLE DRIVE, THENCE SOUTH 34 DEGREES 17 MINUTES 58 SECONDS WEST A DISTANCE OF 59.80 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, SAID ROD LYING ON THE SOUTH SIDE OF BATTLE DRIVE, THENCE ALONG THE WEST EDGE OF SISISKY BOULEVARD SOUTH 29 DEGREES 09 MINUTES 48 SECONDS WEST A DISTANCE OF 219.23 FEET TO A POINT, THENCE SOUTH 28 DEGREES 28 MINUTES 37 SECONDS WEST A DISTANCE OF 65.86 FEET TO A POINT, THENCE *SOUTH 24 DEGREES 34 MINUTES 41 SECONDS WEST A DISTANCE OF 47.08* FEET TO A POINT, THENCE SOUTH 16 DEGREES 18 MINUTES 32 SECONDS WEST A DISTANCE OF 33.74 FEET TO A POINT, THENCE SOUTH 07 DEGREES 26 MINUTES 47 SECONDS WEST A DISTANCE OF 49.29 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE LEAVING THE WEST EDGE OF SISISKY BOULEVARD SOUTH 79 DEGREES 46 MINUTES 10 SECONDS WEST A DISTANCE OF 145.30 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 46 DEGREES 57 MINUTES 11 SECONDS WEST A DISTANCE OF 95.91 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 55 DEGREES 23 MINUTES 11 SECONDS WEST A DISTANCE OF 116.63 FEET TO A SET ROD, THENCE NORTH 64 DEGREES 16 MINUTES 26 SECONDS WEST A DISTANCE OF 301.28 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 66 DEGREES 46 MINUTES 06 SECONDS WEST A DISTANCE OF 363.03 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 47 DEGREES 20 MINUTES 24 SECONDS WEST A DISTANCE OF 131.84 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH

44 DEGREES 00 MINUTES 10 SECONDS EAST A DISTANCE OF 109.52 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 38 DEGREES 11 MINUTES 37 SECONDS WEST A DISTANCE OF 242.26 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 57 DEGREES 50 MINUTES 24 SECONDS WEST A DISTANCE OF 33.04 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, SAID ROD LYING ON THE EAST EDGE OF YORKTOWN DRIVE, THENCE ALONG SAID EAST EDGE OF YORKTOWN DRIVE SOUTH 38 DEGREES 35 MINUTES 37 SECONDS WEST A DISTANCE OF 355.96 FEET TO A POINT, THENCE SOUTH 36 DEGREES 02 MINUTES 54 SECONDS WEST A DISTANCE OF 40.93 FEET TO A POINT, THENCE SOUTH 33 DEGREES 45 MINUTES 18 SECONDS WEST A DISTANCE OF 46 61 FEET TO A POINT, THENCE SOUTH 31 DEGREES 24 MINUTES 30 SECONDS WEST A DISTANCE OF 31.91 FEET TO A POINT, THENCE SOUTH 29 DEGREES 56 MINUTES 20 SECONDS WEST A DISTANCE OF 28.74 FEET TO A POINT, THENCE SOUTH 27 DEGREES 48 MINUTES 42 SECONDS WEST A DISTANCE OF 35.98 FEET TO A POINT, THENCE SOUTH 25 DEGREES 57 MINUTES 11 SECONDS WEST A DISTANCE OF 64.31 FEET TO A POINT, THENCE SOUTH 27 DEGREES 26 MINUTES 35 SECONDS WEST A DISTANCE OF 256.18 FEET TO A FOUND MAG NAIL, SAID NAIL LYING ON THE EAST EDGE OF YORKTOWN DRIVE AND THE NORTH EDGE OF C AVENUE, THENCE NORTH 59 DEGREES 31 MINUTES 47 SECONDS WEST A DISTANCE OF 22 65 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, SAID ROD LYING ON THE WEST EDGE OF YORKTOWN DRIVE AND THE NORTH EDGE OF C AVENUE, THENCE ALONG THE NORTH EDGE OF C AVENUE NORTH 69 DEGREES 26 MINUTES 03 SECONDS WEST A DISTANCE OF 276.06 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 59 DEGREES 45 MINUTES 14 SECONDS WEST A DISTANCE OF 78.53 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE LEAVING THE NORTH EDGE OF C AVENUE NORTH 09 DEGREES 33 MINUTES 23 SECONDS WEST A DISTANCE OF 134 05 FEET TO A SET ROD, THENCE NORTH 21 DEGREES 34 MINUTES 10 SECONDS WEST A DISTANCE OF 175.15 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 22 DEGREES 56 MINUTES 52 SECONDS WEST A DISTANCE OF 94.11 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 30 DEGREES 01 MINUTES 05 SECONDS WEST A DISTANCE OF 123.85 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 12 DEGREES 20 MINUTES 13 SECONDS WEST A DISTANCE OF 108.86 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 20 DEGREES 05 MINUTES 16 SECONDS EAST A DISTANCE OF 100 12 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 41 DEGREES 20 MINUTES 34 SECONDS EAST A DISTANCE OF 111 75 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 16 DEGREES 00 MINUTES 14 SECONDS WEST A DISTANCE OF 178.55 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 25 DEGREES 00 MINUTES 07 SECONDS EAST A DISTANCE OF 135.59 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 35 DEGREES 21 MINUTES 28 SECONDS EAST A DISTANCE OF 215.39 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 31 DEGREES 11 MINUTES 20 SECONDS EAST A DISTANCE OF 282 47 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 04 DEGREES 28 MINUTES 32 SECONDS EAST A DISTANCE OF 350.74 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, SAID ROD LYING ON THE SOUTH EDGE OF BATTLE DRIVE, THENCE NORTH 26 DEGREES 46 MINUTES 43 SECONDS E A DISTANCE OF 30.55 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, SAID ROD LYING ON THE NORTH EDGE OF BATTLE DRIVE, THENCE NORTH 29 DEGREES 53 MINUTES 39 SECONDS EAST A DISTANCE OF 18.24 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, SAID ROD BEING THE **TRUE POINT AND PLACE OF BEGINNING**, AND CONTAINING 144 898 ACRES AND 6,311,771 SQUARE FEET MORE OR LESS.

LEGAL DESCRIPTIONS FORT LEE PARCEL "PARCEL-A" LESS & EXCEPTS:

LESS & EXCEPT 1: (PARCEL-K)

COMMENCING AT A CORPS OF ENGINEERS DISK STAMPED "GPS LEE 008AZ" SET IN CONCRETE INSIDE THE BOUNDARY OF FORT LEE MILITARY RESERVATION, AND WITH

THE FOLLOWING COORDINATES, NAD 83, U.S. SURVEY FEET, N 3611084.51, E 11821649.06, THENCE SOUTH 62 DEGREES 28 MINUTES 47 SECONDS EAST A DISTANCE OF 1743.03 FEET TO A POINT, SAID POINT BEING THE **TRUE POINT AND PLACE OF BEGINNING.** THENCE SOUTH 37 DEGREES 39 MINUTES 14 SECONDS EAST A DISTANCE OF 9.33 FEET TO A POINT, THENCE SOUTH 09 DEGREES 51 MINUTES 11 SECONDS EAST A DISTANCE OF 12.64 FEET TO A POINT, THENCE SOUTH 19 DEGREES 50 MINUTES 28 SECONDS WEST A DISTANCE OF 10.95 FEET TO A POINT, THENCE SOUTH 33 DEGREES 52 MINUTES 20 SECONDS WEST A DISTANCE OF 130.05 FEET TO A POINT, THENCE SOUTH 65 DEGREES 24 MINUTES 23 SECONDS WEST A DISTANCE OF 12.80 FEET TO A POINT, THENCE NORTH 74 DEGREES 51 MINUTES 04 SECONDS WEST A DISTANCE OF 12.61 FEET TO A POINT, THENCE NORTH 57 DEGREES 01 MINUTES 27 *SECONDS WEST A DISTANCE OF 476.44 FEET TO A POINT,* THENCE NORTH 33 DEGREES 35 MINUTES 36 SECONDS EAST A DISTANCE OF 262.64 FEET TO A POINT, THENCE SOUTH 54 DEGREES 28 MINUTES 52 SECONDS EAST A DISTANCE OF 65.70 FEET A POINT, THENCE SOUTH 45 DEGREES 34 MINUTES 28 SECONDS EAST A DISTANCE OF 58.51 FEET TO A POINT, THENCE SOUTH 37 DEGREES 02 MINUTES 05 SECONDS EAST A DISTANCE OF 77.06 FEET TO A POINT, THENCE SOUTH 37 DEGREES 14 MINUTES 56 SECONDS EAST A DISTANCE OF 75.53 FEET TO A POINT, THENCE SOUTH 43 DEGREES 25 MINUTES 44 SECONDS EAST A DISTANCE OF 74.59 FEET TO A POINT, THENCE SOUTH 50 DEGREES 25 MINUTES 32 SECONDS EAST A DISTANCE OF 67.68 FEET TO A POINT, THENCE SOUTH 54 DEGREES 22 MINUTES 48 SECONDS EAST A DISTANCE OF 68.50 FEET TO A POINT, SAID POINT BEING THE **TRUE POINT AND PLACE OF BEGINNING,** AND CONTAINING 2.384 ACRES AND 103,847 SQUARE FEET MORE OR LESS

LESS & EXCEPT 2: (PARCEL-L)

COMMENCING AT A FOUND ROD WITH 2" ALUMINUM CAP STAMPED "A-23", AND WITH THE FOLLOWING COORDINATES, NAD 83, U.S. SURVEY FEET, N 3610115.65, E 11821904.83, THENCE SOUTH 76 DEGREES 13 MINUTES 05 SECONDS EAST A DISTANCE OF 609.64 FEET TO A POINT, SAID POINT BEING THE **TRUE POINT AND PLACE OF BEGINNING, THENCE** NORTH 25 DEGREES 14 MINUTES 27 SECONDS WEST A DISTANCE OF 329.34 FEET TO A POINT, THENCE NORTH 33 DEGREES 24 MINUTES 31 SECONDS EAST A DISTANCE OF 154.24 FEET TO A POINT, THENCE SOUTH 56 DEGREES 57 MINUTES 05 SECONDS EAST A DISTANCE OF 713.64 FEET TO A POINT, THENCE NORTH 31 DEGREES 45 MINUTES 21 SECONDS EAST A DISTANCE OF 110.97 FEET TO A POINT, THENCE SOUTH 48 DEGREES 00 MINUTES 02 SECONDS EAST A DISTANCE OF 164.05 FEET TO A POINT, THENCE SOUTH 47 DEGREES 08 MINUTES 18 SECONDS WEST A DISTANCE OF 104.47 FEET TO A POINT, THENCE SOUTH 51 DEGREES 30 MINUTES 44 SECONDS WEST A DISTANCE OF 256.48 FEET TO A POINT, THENCE NORTH 64 DEGREES 54 MINUTES 49 SECONDS WEST A DISTANCE OF 492.07 FEET TO A POINT, SAID POINT BEING THE **TRUE POINT AND PLACE OF BEGINNING,** AND CONTAINING *5.416 ACRES AND 235,921 SQUARE FEET MORE OR LESS*

LESS & EXCEPT 3: (PARCEL-M)

COMMENCING AT A FOUND ROD WITH 2" ALUMINUM CAP STAMPED "A-21", AND WITH THE FOLLOWING COORDINATES, NAD 83, U.S. SURVEY FEET, N 3609821.13, E 11821896.75, THENCE SOUTH 62 DEGREES 56 MINUTES 15 SECONDS EAST A DISTANCE OF 438.21 FEET TO A POINT, SAID POINT BEING THE **TRUE POINT AND PLACE OF BEGINNING, THENCE** NORTH 31 DEGREES 03 MINUTES 13 SECONDS EAST A DISTANCE OF 406.98 FEET TO A POINT, THENCE SOUTH 64 DEGREES 54 MINUTES 49 SECONDS EAST A DISTANCE OF 492.07 FEET TO A POINT, THENCE SOUTH 33 DEGREES 23 MINUTES 27 SECONDS WEST A DISTANCE OF 192.00 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 57 DEGREES 50 MINUTES 32 SECONDS WEST A DISTANCE OF 33.04 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 38

DEGREES 35 MINUTES 37 SECONDS WEST A DISTANCE OF 93.20 FEET TO A POINT, THENCE NORTH 80 DEGREES 44 MINUTES 57 SECONDS WEST A DISTANCE OF 469 94 FEET TO A POINT, SAID POINT BEING THE **TRUE POINT AND PLACE OF BEGINNING**, AND CONTAINING 3.656 ACRES AND 159,255 SQUARE FEET MORE OR LESS

LESS & EXCEPT 4:  (PARCEL-N)

COMMENCING AT A FOUND ROD WITH 2" ALUMINUM CAP STAMPED "N-02", AND WITH THE FOLLOWING COORDINATES, NAD 83, U.S  SURVEY FEET, N 3609342.96, E 11821910.46, SAID ROD BEING THE **TRUE POINT AND PLACE OF BEGINNING**, THENCE NORTH 53 DEGREES 28 MINUTES 24 SECONDS EAST A DISTANCE OF 468.49 FEET TO A POINT, THENCE SOUTH 80 DEGREES 44 MINUTES 57 SECONDS EAST A DISTANCE OF 469.94 FEET TO A POINT, THENCE SOUTH 38 DEGREES 35 MINUTES 37 SECONDS WEST A DISTANCE OF 262.76 FEET TO A POINT, THENCE SOUTH 36 DEGREES 02 MINUTES 54 SECONDS WEST A DISTANCE OF 40 93 FEET TO A POINT, THENCE SOUTH 33 DEGREES 45 MINUTES 18 SECONDS WEST A DISTANCE OF 46.61 FEET TO A POINT, THENCE SOUTH 31 DEGREES 24 MINUTES 30 SECONDS WEST A DISTANCE OF 31.91 FEET TO A POINT, THENCE SOUTH 29 DEGREES 56 MINUTES 20 SECONDS WEST A DISTANCE OF 28.74 FEET TO A POINT, THENCE SOUTH 27 DEGREES 48 MINUTES 42 SECONDS WEST A DISTANCE OF 35 98 FEET TO A POINT, THENCE SOUTH 25 DEGREES 57 MINUTES 11 SECONDS WEST A DISTANCE OF 64 31 FEET TO A POINT, THENCE SOUTH 27 DEGREES 26 MINUTES 35 SECONDS WEST A DISTANCE OF 256.18 FEET TO A FOUND MAG NAIL, THENCE NORTH 59 DEGREES 31 MINUTES 47 SECONDS WEST A DISTANCE OF 22.65 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP,  THENCE NORTH 69 DEGREES 26 MINUTES 03 SECONDS WEST A DISTANCE OF 276.06 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 59 DEGREES 45 MINUTES 14 SECONDS WEST A DISTANCE OF 78.53 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE 09 DEGREES 33 MINUTES 23 SECONDS WEST A DISTANCE OF 134 05 FEET TO A SET ROD, THENCE NORTH 21 DEGREES 34 MINUTES 10 SECONDS WEST A DISTANCE OF 175.15 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, SAID ROD BEING THE **TRUE POINT AND PLACE OF BEGINNING**, AND CONTAINING 7 771 ACRES AND 338,505 SQUARE FEET MORE OR LESS

LESS & EXCEPT 5:  (BATTLE DRIVE)

COMMENCING AT A FOUND ROD WITH 2" ALUMINUM CAP STAMPED "A-01.1", AND WITH THE FOLLOWING COORDINATES, NAD 83, U.S. SURVEY FEET, N 3609549.31, E 11824129 03, SAID ROD BEING THE **TRUE POINT AND PLACE OF BEGINNING, THENCE SOUTH 34 DEGREES 17 MINUTES 58 SECONDS WEST A DISTANCE OF 59.80 FEET TO A ROD FOUND WITH 2" ALUMINUM CAP STAMPED "A-01.2"** AND WITH THE FOLLOWING COORDINATES. NAD 83, U.S. SURVEY FEET, N 3609499 92, E 11824095.33 THENCE, FROM BACK OF CURB TO BACK OF CURB, NORTHWESTERLY FOLLOWING BATTLE DRIVE FOR A DISTANCE OF 2406 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP STAMPED "A-26" AND WITH THE FOLLOWING COORDINATES, NAD 83, U.S. SURVEY FEET, N 3610882.63, E 11822203.12, **THENCE NORTH 26 DEGREES 46 MINUTES 43 SECONDS EAST A DISTANCE OF 30.55 FEET TO A ROD FOUND WITH 2" ALUMINUM CAP STAMPED "A-27"** AND WITH THE FOLLOWING COORDINATES, NAD 83, U S. SURVEY FEET, N 3610909.90, E 11822216.89 AND CONTAINING 1 691 ACRES AND 73,660 SQUARE FEET MORE OR LESS  )

THE TOTAL AREA FOR PARCEL-A MINUS ALL LESS & EXCEPTS IS 123 98 ACRES AND 5,400,569 SQUARE FEET

**Legal Description**
**PARCEL B**
**Fort Lee, Virginia**

PARCEL B (Occupied)
ALL THAT CERTAIN LOT, PIECE OR PARCEL OF LAND, BELONGING, LYING, SITUATE IN
FORT LEE MILITARY RESERVATION, AND BEING IN PRINCE GEORGE COUNTY, VIRGINIA,
KNOWN AND DESIGNATED AS PARCEL-B, AS SHOWN ON THE SURVEY ENTITLED, "PLAT
OF FAMILY HOUSING PARCEL-B ALSO KNOWN AS MADISON PARK & MONROE MANOR,
FORT LEE, VIRGINIA" (UNITED STATES ARMY) KNOWN AS "PARCEL-B" FORT LEE,
VIRGINIA, DATED: SEPTEMBER, 2006, AND BEING MORE PARTICULARLY DESCRIBED AS
FOLLOWS:

COMMENCING AT A FOUND CORPS OF ENGINEERS DISK STAMPED "GPS LEE 016" SET
IN CONCRETE INSIDE THE BOUNDARY OF FORT LEE MILITARY RESERVATION, AND
WITH THE FOLLOWING COORDINATES  NAD 83, U.S. SURVEY FEET. N 3608404.77, E
11829788.37, THENCE SOUTH 72 DEGREES 49 MINUTES 52 SECONDS WEST A DISTANCE
OF 1741 20 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP STAMPED "B-40", SAID ROD
LYING ON THE NORTH SIDE OF A AVENUE AND BEING THE **TRUE POINT AND PLACE OF
BEGINNING,** THENCE ALONG THE NORTH SIDE OF A AVENUE SOUTH 73 DEGREES 24
MINUTES 22 SECONDS WEST A DISTANCE OF 667.19 FEET TO A FOUND ROD WITH 2"
ALUMINUM CAP, THENCE LEAVING A AVENUE NORTH 14 DEGREES 44 MINUTES 01
SECONDS WEST A DISTANCE OF 145 76 FEET TO A FOUND ROD WITH 2" ALUMINUM
CAP, THENCE NORTH 68 DEGREES 31 MINUTES 08 EAST A DISTANCE OF 246.67 FEET
TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 44 DEGREES 20 MINUTES
23 SECONDS EAST A DISTANCE OF 161 77 FEET TO A FOUND ROD WITH 2" ALUMINUM
CAP, THENCE NORTH 69 DEGREES 46 MINUTES 55 SECONDS EAST A DISTANCE OF
202.31 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 13 DEGREES
44 MINUTES 00 SECONDS WEST A DISTANCE OF 271.44 FEET TO A FOUND ROD WITH 2"
ALUMINUM CAP, THENCE SOUTH 81 DEGREES 30 MINUTES 01 SECONDS WEST A
DISTANCE OF 647 70 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH
61 DEGREES 07 MINUTES 35 SECONDS WEST A DISTANCE OF 182 34 FEET TO A FOUND
ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 72 DEGREES 26 MINUTES 45 SECONDS
WEST A DISTANCE OF 592.50 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE
SOUTH 73 DEGREES 40 MINUTES 00 SECONDS WEST A DISTANCE OF 450.69 FEET TO A
FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 74 DEGREES 41 MINUTES 30
SECONDS WEST A DISTANCE OF 654.36 FEET TO A FOUND ROD WITH 2" ALUMINUM
CAP, THENCE NORTH 79 DEGREES 26 MINUTES 47 SECONDS WEST A DISTANCE OF
167.74 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 21 DEGREES
04 MINUTES 11 SECONDS WEST A DISTANCE OF 72.48 FEET TO A FOUND ROD WITH 2"
ALUMINUM CAP, THENCE NORTH 17 DEGREES 00 MINUTES 07 SECONDS WEST A
DISTANCE OF 40.46 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 05
DEGREES 27 MINUTES 37 SECONDS WEST A DISTANCE OF 128 01 FEET TO A FOUND
ROD WITH 2" ALUMINUM CAP, THENCE NORTH 02 DEGREES 36 MINUTES 33 SECONDS
WEST A DISTANCE OF 168.29 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE
NORTH 00 DEGREES 45 MINUTES 44 SECONDS WEST A DISTANCE OF 298.16 FEET TO A
FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 06 DEGREES 43 MINUTES 08
SECONDS EAST A DISTANCE OF 134.80 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP,
THENCE NORTH 14 DEGREES 09 MINUTES 26 SECONDS EAST A DISTANCE OF 364 71
FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 09 DEGREES 32
MINUTES 22 SECONDS EAST A DISTANCE OF 89.02 FEET TO A FOUND ROD WITH  2"
ALUMINUM CAP, THENCE NORTH 17 DEGREES 11 MINUTES 37 SECONDS EAST A
DISTANCE OF 310.32 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, SAID ROD LYING

ON THE SOUTH EDGE OF BATTLE DRIVE, THENCE ALONG THE SOUTH EDGE OF BATTLE DRIVE NORTH 76 DEGREES 11 MINUTES 37 SECONDS EAST A DISTANCE OF 116.04 FEET TO A FOUND MAG NAIL, THENCE NORTH 88 DEGREES 03 MINUTES 08 SECONDS EAST A DISTANCE OF 19.26 FEET TO A FOUND MAG NAIL, THENCE NORTH 78 DEGREES 15 MINUTES 41 SECONDS EAST A DISTANCE OF 58.69 FEET TO A TO A FOUND ROD WITH 2" ALUMINUM CAP, SAID ROD LYING ON THE SOUTH EDGE OF BATTLE DRIVE AND THE EASTERN EDGE OF YORKTOWN DRIVE, THENCE NORTH 03 DEGREES 36 MINUTES 30 SECONDS WEST A DISTANCE OF 52.37 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, SAID ROD LYING ON THE EASTERN EDGE OF YORKTOWN DRIVE, THENCE ALONG SAID YORKTOWN DRIVE NORTH 25 DEGREES 46 MINUTES 06 SECONDS WEST A DISTANCE OF 12 95 FEET TO A FOUND MAG NAIL, THENCE NORTH 02 DEGREES 51 MINUTES 23 SECONDS WEST A DISTANCE OF 381.24 FEET TO A FOUND BRIDGE NAIL, THENCE NORTH 08 DEGREES 46 MINUTES 18 SECONDS WEST A DISTANCE OF 50 29 FEET TO A FOUND BRIDGE NAIL, THENCE NORTH 11 DEGREES 45 MINUTES 53 SECONDS WEST A DISTANCE OF 62.65 FEET TO A BRIDGE NAIL FOUND, THENCE NORTH 17 DEGREES 00 MINUTES 22 SECONDS WEST A DISTANCE OF 48.75 FEET TO A FOUND BRIDGE NAIL, THENCE NORTH 21 DEGREES 08 MINUTES 26 SECONDS WEST A DISTANCE OF 40 66 FEET TO A FOUND BRIDGE NAIL, THENCE NORTH 24 DEGREES 48 MINUTES 05 SECONDS WEST A DISTANCE OF 36 97 FEET TO A FOUND BRIDGE NAIL, THENCE NORTH 29 DEGREES 12 MINUTES 27 SECONDS WEST A DISTANCE OF 56 37 FEET TO A FOUND BRIDGE NAIL, THENCE NORTH 33 DEGREES 48 MINUTES 50 SECONDS WEST A DISTANCE OF 46.26 FEET TO A FOUND BRIDGE NAIL, THENCE NORTH 23 DEGREES 19 MINUTES 13 SECONDS WEST A DISTANCE OF 53.39 FEET TO A FOUND BRIDGE NAIL, THENCE NORTH 41 DEGREES 52 MINUTES 59 SECONDS WEST A DISTANCE OF 59 13 FEET TO A FOUND BRIDGE NAIL, THENCE NORTH 44 DEGREES 41 MINUTES 00 SECONDS WEST A DISTANCE OF 57.14 FEET TO A FOUND BRIDGE NAIL, THENCE NORTH 50 DEGREES 04 MINUTES 24 SECONDS WEST A DISTANCE OF 33.59 FEET TO A SET ROD, THENCE NORTH 50 DEGREES 11 MINUTES 32 SECONDS WEST A DISTANCE OF 73.11 FEET TO A SET ROD, THENCE NORTH 52 DEGREES 24 MINUTES 47 SECONDS WEST A DISTANCE OF 57 99 FEET, THENCE NORTH 54 DEGREES 18 MINUTES 14 SECONDS WEST A DISTANCE OF 71.99 FEET TO A ROD SET, THENCE NORTH 59 DEGREES 06 MINUTES 43 SECONDS WEST A DISTANCE OF 79 84 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, SAID ROD LYING ON THE NORTH EDGE OF YORKTOWN DRIVE, THENCE ALONG SAID YORKTOWN DRIVE NORTH 63 DEGREES 25 MINUTES 53 SECONDS WEST A DISTANCE OF 60.17 FEET TO A FOUND BRIDGE NAIL, THENCE NORTH 65 DEGREES 39 MINUTES 26 SECONDS WEST A DISTANCE OF 61.02 FEET TO A FOUND BRIDGE NAIL, THENCE NORTH 68 DEGREES 51 MINUTES 34 SECONDS WEST A DISTANCE OF 45.82 FEET TO A FOUND BRIDGE NAIL, THENCE NORTH 72 DEGREES 11 MINUTES 10 SECONDS WEST A DISTANCE OF 63 31 FEET TO A FOUND BRIDGE NAIL, THENCE NORTH 74 DEGREES 28 MINUTES 29 SECONDS WEST A DISTANCE OF 57 92 FEET TO A FOUND BRIDGE NAIL, THENCE NORTH 79 DEGREES 10 MINUTES 16 SECONDS WEST A DISTANCE OF 146.95 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 53 DEGREES 19 MINUTES 02 SECONDS WEST A DISTANCE OF 18.30 FEET TO A FOUND BRIDGE NAIL, THENCE NORTH 35 DEGREES 47 MINUTES 16 SECONDS WEST A DISTANCE OF 11.40 FEET TO A FOUND BRIDGE NAIL, SAID NAIL LYING ON THE NORTH EDGE OF YORKTOWN DRIVE AND THE EAST EDGE OF SARATOGA DRIVE, THENCE ALONG THE EAST EDGE OF SARATOGA DRIVE NORTH 17 DEGREES 20 MINUTES 59 SECONDS WEST A DISTANCE OF 17.53 FEET TO A FOUND BRIDGE NAIL, THENCE NORTH 04 DEGREES 23 MINUTES 27 SECONDS EAST A DISTANCE OF 26 29 FEET TO A FOUND BRIDGE NAIL, THENCE NORTH 12 DEGREES 02 MINUTES 42 SECONDS EAST A DISTANCE OF 24.86 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 21 DEGREES 21 MINUTES 22 SECONDS EAST A DISTANCE OF 127 88 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 19 DEGREES 08 MINUTES 54 SECONDS EAST A DISTANCE OF 210 68 FEET TO A FOUND MAG NAIL, THENCE NORTH 17 DEGREES 36 MINUTES 34 SECONDS EAST A DISTANCE OF 101 11 FEET TO A FOUND MAG NAIL, THENCE NORTH 06 DEGREES 26 MINUTES 18

SECONDS EAST A DISTANCE OF 165.18 FEET TO A FOUND MAG NAIL, THENCE NORTH 15 DEGREES 32 MINUTES 12 SECONDS EAST A DISTANCE OF 104.41 FEET TO A FOUND MAG NAIL, THENCE NORTH 14 DEGREES 28 MINUTES 05 SECONDS EAST A DISTANCE OF 94.09 FEET TO A FOUND MAG NAIL, THENCE NORTH 13 DEGREES 10 MINUTES 33 SECONDS EAST A DISTANCE OF 104.03 FEET TO A FOUND BRIDGE NAIL, THENCE NORTH 11 DEGREES 37 MINUTES 25 SECONDS EAST A DISTANCE OF 183.62 FEET TO A FOUND MAG NAIL, THENCE NORTH 10 DEGREES 55 MINUTES 33 SECONDS EAST A DISTANCE OF 102.79 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE LEAVING SAID EAST EDGE OF SARATOGA DRIVE SOUTH 81 DEGREES 34 MINUTES 01 SECONDS EAST A DISTANCE OF 142.09 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 69 DEGREES 10 MINUTES 14 SECONDS EAST A DISTANCE OF 193.19 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 65 DEGREES 48 MINUTES 13 SECONDS EAST A DISTANCE OF 84.51 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 86 DEGREES 46 MINUTES 53 MINUTES EAST A DISTANCE OF 301.63 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 60 DEGREES 05 MINUTES 31 SECONDS EAST A DISTANCE OF 163.21 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 13 DEGREES 41 MINUTES 41 SECONDS WEST A DISTANCE OF 155.07 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 39 DEGREES 35 MINUTES 42 SECONDS EAST A DISTANCE OF 91.43 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 56 DEGREES 48 MINUTES 46 SECONDS EAST A DISTANCE OF 132.90 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 35 DEGREES 01 MINUTES 54 SECONDS EAST A DISTANCE OF 73.14 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 01 DEGREES 51 MINUTES 50 SECONDS EAST A DISTANCE OF 96.58 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 04 DEGREES 12 MINUTES 47 SECONDS WEST A DISTANCE OF 180.72 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 13 DEGREES 04 MINUTES 26 SECONDS EAST A DISTANCE OF 95.14 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 77 DEGREES 57 MINUTES 30 SECONDS EAST A DISTANCE OF 216.78 FEET TO A SET ROD, THENCE SOUTH 10 DEGREES 30 MINUTES 42 SECONDS EAST A DISTANCE OF 37.91 FEET TO A SET ROD, THENCE SOUTH 76 DEGREES 50 MINUTES 48 SECONDS WEST A DISTANCE OF 221.30 FEET TO A SET ROD, THENCE SOUTH 04 DEGREES 02 MINUTES 03 SECONDS EAST A DISTANCE OF 217.40 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 32 DEGREES 25 MINUTES 33 SECONDS EAST A DISTANCE OF 119.85 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 42 DEGREES 20 MINUTES 19 SECONDS EAST A DISTANCE OF 194.93 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 55 DEGREES 47 MINUTES 07 SECONDS EAST A DISTANCE OF 74.42 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 87 DEGREES 11 MINUTES 51 SECONDS EAST A DISTANCE OF 99.02 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 56 DEGREES 46 MINUTES 09 SECONDS EAST A DISTANCE OF 182.46 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 02 DEGREES 40 MINUTES 21 SECONDS EAST A DISTANCE OF 95.54 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 38 DEGREES 28 MINUTES 12 SECONDS EAST A DISTANCE OF 118.59 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 17 DEGREES 24 MINUTES 07 SECONDS EAST A DISTANCE OF 104.45 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 20 DEGREES 55 MINUTES 38 SECONDS WEST A DISTANCE OF 77.24 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 63 DEGREES 36 MINUTES 21 SECONDS EAST A DISTANCE OF 107.62 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 25 DEGREES 29 MINUTES 38 SECONDS EAST A DISTANCE OF 149.27 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, SAID ROD LYING ON THE NORTH EDGE OF BATTLE DRIVE, THENCE ALONG SAID BATTLE DRIVE NORTH 58 DEGREES 06 MINUTES 53 SECONDS EAST A DISTANCE OF 227.85 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE LEAVING SAID BATTLE DRIVE NORTH 23 DEGREES 09 MINUTES 18 SECONDS WEST A DISTANCE OF 90.77 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 59 DEGREES 52 MINUTES 53 SECONDS WEST A DISTANCE OF 80.96 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE

NORTH 21 DEGREES 46 MINUTES 53 SECONDS WEST A DISTANCE OF 361.92 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 10 DEGREES 03 MINUTES 13 SECONDS EAST A DISTANCE OF 38.31 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 33 DEGREES 23 MINUTES 39 SECONDS WEST A DISTANCE OF 80.35 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 27 DEGREES 24 MINUTES 52 SECONDS WEST A DISTANCE OF 134.51 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 41 DEGREES 50 MINUTES 37 SECONDS EAST A DISTANCE OF 113 96 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 89 DEGREES 21 MINUTES 52 SECONDS EAST A DISTANCE OF 34.00 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 57 DEGREES 58 MINUTES 09 SECONDS EAST A DISTANCE OF 110.05 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 40 DEGREES 42 MINUTES 54 SECONDS EAST A DISTANCE OF 43 27 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 70 DEGREES 45 MINUTES 38 SECONDS EAST A DISTANCE OF 150.64 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 81 DEGREES 19 MINUTES 38 SECONDS EAST A DISTANCE OF 127 33 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 32 DEGREES 09 MINUTES 07 SECONDS EAST A DISTANCE OF 99.73 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 09 DEGREES 37 MINUTES 25 SECONDS EAST A DISTANCE OF 89.55 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 29 DEGREES 39 MINUTES 01 SECONDS WEST A DISTANCE OF 207 47 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 84 DEGREES 54 MINUTES 59 SECONDS WEST A DISTANCE OF 88.90 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 63 DEGREES 20 MINUTES 38 SECONDS WEST A DISTANCE OF 83.85 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 60 DEGREES 05 MINUTES 13 SECONDS WEST A DISTANCE OF 97.41 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 88 DEGREES 03 MINUTES 06 SECONDS WEST A DISTANCE OF 104 11 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 74 DEGREES 03 MINUTES 15 SECONDS WEST A DISTANCE OF 157 28 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 55 DEGREES 57 MINUTES 07 SECONDS WEST A DISTANCE OF 144 61 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 19 DEGREES 41 MINUTES 35 SECONDS WEST A DISTANCE OF 154.70 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 02 DEGREES 09 MINUTES 22 SECONDS EAST A DISTANCE OF 84.15 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 05 DEGREES 45 MINUTES 58 SECONDS WEST A DISTANCE OF 187.12 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 72 DEGREES 32 MINUTES 35 SECONDS EAST A DISTANCE OF 253.63 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 07 DEGREES 05 MINUTES 10 SECONDS WEST A DISTANCE OF 145 99 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 57 DEGREES 23 MINUTES 05 SECONDS EAST A DISTANCE OF 58 82 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 49 DEGREES 53 MINUTES 19 SECONDS EAST A DISTANCE OF 368 68 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 69 DEGREES 50 MINUTES 17 SECONDS EAST A DISTANCE OF 62 28 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 72 DEGREES 28 MINUTES 44 SECONDS EAST A DISTANCE OF 119.16 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 89 DEGREES 01 MINUTES 30 SECONDS EAST A DISTANCE OF 219 89 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 69 DEGREES 08 SECONDS EAST A DISTANCE OF 136.74 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 48 DEGREES 03 MINUTES 21 SECONDS EAST A DISTANCE OF 86.86 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 03 DEGREES 46 MINUTES 25 SECONDS EAST A DISTANCE OF 81 59 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 46 DEGREES 12 MINUTES 33 SECONDS EAST A DISTANCE OF 127.39 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 08 DEGREES 46 MINUTES 49 SECONDS EAST A DISTANCE OF 78.08 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 34 DEGREES 02 MINUTES 21 SECONDS WEST A DISTANCE OF 104.92 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 86 DEGREES 55 MINUTES 27 SECONDS WEST A DISTANCE OF 178 42 FEET TO A

FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 77 DEGREES 03 MINUTES 23 SECONDS WEST A DISTANCE OF 122.76 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 40 DEGREES 47 MINUTES 05 SECONDS WEST A DISTANCE OF 108.87 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 74 DEGREES 26 MINUTES 16 SECONDS WEST A DISTANCE OF 52.93 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 53 DEGREES 00 MINUTES 32 SECONDS WEST A DISTANCE OF 99.63 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 76 DEGREES 57 MINUTES 37 SECONDS WEST A DISTANCE OF 69.48 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 43 DEGREES 32 MINUTES 26 SECONDS WEST A DISTANCE OF 122.81 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 56 DEGREES 07 MINUTES 37 SECONDS WEST A DISTANCE OF 80.66 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 59 DEGREES 50 MINUTES 20 SECONDS EAST A DISTANCE OF 445.64 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 67 DEGREES 50 MINUTES 53 SECONDS EAST A DISTANCE OF 233.09 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 60 DEGREES 33 MINUTES 48 SECONDS EAST A DISTANCE OF 176.18 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 86 DEGREES 51 MINUTES 19 SECONDS EAST A DISTANCE OF 97.89 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 31 DEGREES 14 MINUTES 15 SECONDS EAST A DISTANCE OF 134.40 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 67 DEGREES 24 MINUTES 45 SECONDS EAST A DISTANCE OF 39.73 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 49 DEGREES 30 MINUTES 26 SECONDS EAST A DISTANCE OF 129.25 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, SOUTH 36 DEGREES 22 MINUTES 23 SECONDS EAST A DISTANCE OF 846.46 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 22 DEGREES 31 MINUTES 44 SECONDS EAST A DISTANCE OF 255.31 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 12 DEGREES 09 MINUTES 49 SECONDS EAST A DISTANCE OF 229.08 FEET TO A SET 2" ALUMINUM CAP, THENCE SOUTH 56 DEGREES 44 MINUTES 31 SECONDS WEST A DISTANCE OF 119.59 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 57 DEGREES 33 MINUTES 45 SECONDS WEST A DISTANCE OF 56.91 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 87 DEGREES 13 MINUTES 31 SECONDS WEST A DISTANCE OF 100.04 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 51 DEGREES 58 MINUTES 51 SECONDS WEST A DISTANCE OF 132.99 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 74 DEGREES 18 MINUTES 45 SECONDS WEST A DISTANCE OF 36.04 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 51 DEGREES 13 MINUTES 33 SECONDS WEST A DISTANCE OF 46.48 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 24 DEGREES 12 MINUTES 41 SECONDS WEST A DISTANCE OF 126.33 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 76 DEGREES 33 MINUTES 16 SECONDS WEST A DISTANCE OF 118.92 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 55 DEGREES 46 MINUTES 58 SECONDS WEST A DISTANCE OF 49.42 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 24 DEGREES 56 MINUTES 19 SECONDS WEST A DISTANCE OF 153.46 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 05 DEGREES 22 MINUTES 40 SECONDS EAST A DISTANCE OF 34.74 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 30 DEGREES 44 MINUTES 31 SECONDS EAST A DISTANCE OF 70.00 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 76 DEGREES 07 MINUTES 33 SECONDS EAST A DISTANCE OF 74.53 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 69 DEGREES 35 MINUTES 34 SECONDS EAST A DISTANCE OF 308.90 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 15 DEGREES 58 MINUTES 21 SECONDS WEST A DISTANCE OF 282.12 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 86 DEGREES 06 MINUTES 56 SECONDS WEST A DISTANCE OF 321.83 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 12 DEGREES 49 MINUTES 54 SECONDS WEST A DISTANCE OF 211.21 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 28 DEGREES 05 MINUTES 18 SECONDS WEST A DISTANCE OF 237.09 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 40 DEGREES 04 MINUTES 03 SECONDS EAST A DISTANCE OF

266.28 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 79 DEGREES 45 MINUTES 16 SECONDS EAST A DISTANCE OF 450.44 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 13 DEGREES 32 MINUTES 59 SECONDS WEST A DISTANCE OF 323.43 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 28 DEGREES 58 MINUTES 14 SECONDS EAST A DISTANCE OF 579.66 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 15 DEGREES 00 MINUTES 03 SECONDS WEST A DISTANCE OF 152.05 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 50 DEGREES 21 MINUTES 50 SECONDS EAST A DISTANCE OF 144.75 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 15 DEGREES 11 MINUTES 10 SECONDS EAST A DISTANCE OF 790.09 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 57 DEGREES 22 MINUTES 48 SECONDS WEST A DISTANCE OF 147.13 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 22 DEGREES 23 MINUTES 33 SECONDS WEST A DISTANCE OF 169.50 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 03 DEGREES 45 MINUTES 02 SECONDS WEST A DISTANCE OF 145.14 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 22 DEGREES 40 MINUTES 16 SECONDS EAST A DISTANCE OF 221.46 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 71 DEGREES 43 MINUTES 04 SECONDS WEST A DISTANCE OF 347.60 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 07 DEGREES 23 MINUTES 17 SECONDS WEST A DISTANCE OF 238.51 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 39 DEGREES 03 MINUTES 50 SECONDS WEST A DISTANCE OF 339.05 FEET TO A SET 2" ALUMINUM CAP, THENCE SOUTH 00 DEGREES 02 MINUTES 54 SECONDS EAST A DISTANCE OF 413.26 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 15 DEGREES 00 MINUTES 34 SECONDS WEST A DISTANCE OF 106.88 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 04 DEGREES 59 MINUTES 25 SECONDS EAST A DISTANCE OF 203.35 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 20 DEGREES 34 MINUTES 17 SECONDS WEST A DISTANCE OF 195.04 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, SAID ROD BEING THE **TRUE POINT AND PLACE OF BEGINNING**, AND CONTAINING 242.619 ACRES AND 10,568,501 SQUARE FEET MORE OR LESS

### Legal Description
### PARCEL C
**Fort Lee, Virginia**

PARCEL C (OCCUPIED)
ALL THAT CERTAIN LOT, PIECE OR PARCEL OF LAND, BELONGING, LYING, SITUATE IN
FORT LEE MILITARY RESERVATION, AND BEING IN PRINCE GEORGE COUNTY, VIRGINIA,
KNOWN AND DESIGNATED AS PARCEL-C, BEARINGS AND DISTANCES REPRESENT
ACTUAL MONUMENTATION FOUND IN FIELD JULY, 2007, AND BEING MORE
PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT A FOUND CORPS OF ENGINEERS DISK STAMPED "GPS LEE 002" SET
IN CONCRETE INSIDE THE BOUNDARY OF FORT LEE MILITARY RESERVATION, AND
WITH THE FOLLOWING COORDINATES, NAD 83, U.S. SURVEY FEET, N 3615916 01, E
11818949.68, THENCE SOUTH 56 DEGREES 23 MINUTES 27 SECONDS WEST A DISTANCE
OF 662.98 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP STAMPED "C-06", SAID ROD
LYING ON THE WEST RIGHT OF WAY LINE OF STATE ROUTE 36 (OAKLAWN BOULEVARD)
AND BEING THE **TRUE POINT AND PLACE OF BEGINNING,** THENCE ALONG THE WEST
RIGHT OF WAY LINE OF STATE ROUTE 36 SOUTH 49 DEGREES 24 MINUTES 52
SECONDS WEST A DISTANCE OF 121.04 FEET TO A FOUND ROD WITH 2" ALUMINUM
CAP, THENCE SOUTH 49 DEGREES 18 MINUTES 18 SECONDS WEST A DISTANCE OF
80.68 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 49 DEGREES 26
MINUTES 49 SECONDS WEST A DISTANCE OF 1209.20 FEET TO A FOUND ROD WITH 2"
ALUMINUM CAP, THENCE SOUTH 49 DEGREES 24 MINUTES 45 SECONDS WEST A
DISTANCE OF 82.22 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE LEAVING
SAID RIGHT OF WAY LINE OF STATE ROUTE 36 NORTH 39 DEGREES 36 MINUTES 19
SECONDS WEST A DISTANCE OF 119.63 FEET TO A FOUND ROD WITH 2" ALUMINUM
CAP,  SAID ROD LYING ON THE EDGE OF THE CURB ON THE WEST SIDE OF JACKSON
CIRCLE, THENCE SOUTH 44 DEGREES 59 MINUTES 59 SECONDS WEST A DISTANCE OF
170.47 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 48 DEGREES
48 MINUTES 13 SECONDS WEST A DISTANCE OF 424.68 FEET TO A FOUND ROD WITH 2"
ALUMINUM CAP, THENCE NORTH 76 DEGREES 58 MINUTES 16 SECONDS WEST A
DISTANCE OF 31.03 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 45
DEGREES 26 MINUTES 56 SECONDS WEST A DISTANCE OF 168.60 FEET TO A FOUND
ROD WITH 2" ALUMINUM CAP, THENCE NORTH 59 DEGREES 07 MINUTES 16 SECONDS
WEST A DISTANCE OF 77.72 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE
NORTH 37 DEGREES 43 MINUTES 38 SECONDS WEST A DISTANCE OF 88.05 FEET TO A
FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 17 DEGREES 00 MINUTES 31
SECONDS WEST A DISTANCE OF 49.84 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP,
THENCE NORTH 22 DEGREES 09 MINUTES 01 SECONDS WEST A DISTANCE OF 54 55
FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 04 DEGREES 15
MINUTES 22 SECONDS EAST A DISTANCE OF 40.19 FEET TO A FOUND ROD WITH 2"
ALUMINUM CAP, THENCE NORTH 20 DEGREES 40 MINUTES 03 SECONDS EAST A
DISTANCE OF 58.05 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 55
DEGREES 32 MINUTES 30 SECONDS EAST A DISTANCE OF 28.28 FEET TO A FOUND ROD
WITH 2" ALUMINUM CAP, THENCE NORTH 25 DEGREES 19 MINUTES 37 SECONDS WEST
A DISTANCE OF 23.18 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH
21 DEGREES 42 MINUTES 14 SECONDS EAST A DISTANCE OF 140 96 FEET TO A FOUND
ROD WITH 2" ALUMINUM CAP, THENCE NORTH 37 DEGREES 34 MINUTES 09 SECONDS
EAST A DISTANCE OF 80.48 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE
NORTH 43 DEGREES 47 MINUTES 37 SECONDS EAST A DISTANCE OF 551 42 FEET TO A
FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 49 DEGREES 33 MINUTES 35
SECONDS EAST A DISTANCE OF 284 42 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP,

THENCE NORTH 56 DEGREES 14 MINUTES 13 SECONDS EAST A DISTANCE OF 140.76 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 59 DEGREES 47 MINUTES 48 SECONDS EAST A DISTANCE OF 282.21 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 75 DEGREES 18 MINUTES 37 SECONDS EAST A DISTANCE OF 109.49 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 72 DEGREES 11 MINUTES 38 SECONDS EAST A DISTANCE OF 109.13 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 29 DEGREES 45 MINUTES 16 SECONDS EAST A DISTANCE OF 119.42 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 68 DEGREES 30 MINUTES 21 SECONDS EAST A DISTANCE OF 63.01 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 85 DEGREES 22 MINUTES 47 SECONDS EAST A DISTANCE OF 84.16 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 57 DEGREES 59 MINUTES 02 SECONDS EAST A DISTANCE OF 69.82 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 20 DEGREES 58 MINUTES 40 SECONDS EAST A DISTANCE OF 162.40 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 01 DEGREES 48 MINUTES 08 SECONDS EAST A DISTANCE OF 32.04 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 29 DEGREES 32 MINUTES 38 SECONDS EAST A DISTANCE OF 619.03 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 12 DEGREES 25 MINUTES 21 SECONDS EAST A DISTANCE OF 18.09 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 40 DEGREES 33 MINUTES 01 SECONDS EAST A DISTANCE OF 31.73 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, SAID ROD BEING THE **TRUE POINT AND PLACE OF BEGINNING**, AND CONTAINING 46.591 ACRES AND 2,029,512 SQUARE FEET MORE OR LESS.

# PARCEL D
## Fort Lee, Virginia

PARCEL D (OCCUPIED)
ALL THAT CERTAIN LOT, PIECE OR PARCEL OF LAND, BELONGING, LYING, SITUATE IN
FORT LEE MILITARY RESERVATION, AND BEING IN PRINCE GEORGE COUNTY, VIRGINIA,
KNOWN AND DESIGNATED AS PARCEL-D, BEARINGS AND DISTANCES REPRESENT
ACTUAL MONUMENTATION FOUND IN FIELD JULY, 2007, AND BEING MORE
PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT A FOUND CORPS OF ENGINEERS DISK STAMPED "GPS LEE 016AZ"
SET IN CONCRETE INSIDE THE BOUNDARY OF FORT LEE MILITARY RESERVATION, AND
WITH THE FOLLOWING COORDINATES, NAD 83, U.S. SURVEY FEET, N 3607298.25, E
11826261.72, THENCE NORTH 73 DEGREES 12 MINUTES 02 SECONDS EAST A DISTANCE
OF 1246 12 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP STAMPED "D-15", SAID ROD
LYING ON THE SOUTH SIDE OF A AVENUE AND BEING THE **TRUE POINT AND PLACE OF
BEGINNING,** THENCE ALONG THE SOUTH SIDE OF A AVENUE NORTH 73 DEGREES 26
MINUTES 19 SECONDS EAST A DISTANCE OF 690 68 FEET TO A FOUND ROD WITH 2"
ALUMINUM CAP, THENCE LEAVING A AVENUE SOUTH 07 DEGREES 17 MINUTES 50
SECONDS EAST A DISTANCE OF 120.87 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP,
THENCE SOUTH 14 DEGREES 12 MINUTES 34 EAST A DISTANCE OF 83.55 FEET TO A
FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 30 DEGREES 51 MINUTES 51
SECONDS EAST A DISTANCE OF 75.97 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP,
THENCE SOUTH 00 DEGREES 12 MINUTES 31 SECONDS EAST A DISTANCE OF 279.30
FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 09 DEGREES 35
MINUTES 38 SECONDS WEST A DISTANCE OF 59.73 FEET TO A FOUND ROD WITH 2"
ALUMINUM CAP, THENCE NORTH 88 DEGREES 35 MINUTES 50 SECONDS WEST A
DISTANCE OF 176 83 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH
27 DEGREES 35 MINUTES 23 SECONDS EAST A DISTANCE OF 35 36 FEET TO A FOUND
ROD WITH 2" ALUMINUM CAP, THENCE NORTH 05 DEGREES 38 MINUTES 25 SECONDS
EAST A DISTANCE OF 107 57 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE
NORTH 28 DEGREES 00 MINUTES 47 SECONDS WEST A DISTANCE OF 131.28 FEET TO A
FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 89 DEGREES 22 MINUTES 48
SECONDS WEST A DISTANCE OF 118.68 FEET TO A FOUND ROD WITH 2" ALUMINUM
CAP, THENCE SOUTH 53 DEGREES 15 MINUTES 17 SECONDS WEST A DISTANCE OF
91.00 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 21 DEGREES 24
MINUTES 49 SECONDS WEST A DISTANCE OF 88.82 FEET TO A FOUND ROD WITH 2"
ALUMINUM CAP, THENCE 78 DEGREES 43 MINUTES 33 SECONDS WEST A DISTANCE OF
327 54 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 04 DEGREES
43 MINUTES 24 SECONDS EAST A DISTANCE OF 349 88 FEET TO A FOUND ROD WITH 2"
ALUMINUM CAP, SAID ROD BEING THE **TRUE POINT AND PLACE OF BEGINNING,** AND
CONTAINING 6 422 ACRES AND 279,737 SQUARE FEET MORE OR LESS.

**Legal Description**
**PARCEL E**
**Fort Lee, Virginia**

PARCEL E (OCCUPIED)
ALL THAT CERTAIN LOT, PIECE OR PARCEL OF LAND, BELONGING, LYING, SITUATE IN
FORT LEE MILITARY RESERVATION, AND BEING IN PRINCE GEORGE COUNTY, VIRGINIA,
KNOWN AND DESIGNATED AS PARCEL-E, BEARINGS AND DISTANCES REPRESENT
ACTUAL MONUMENTATION FOUND IN FIELD JULY, 2007, AND BEING MORE
PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT A FOUND CORPS OF ENGINEERS DISK STAMPED "GPS LEE 016" SET
IN CONCRETE INSIDE THE BOUNDARY OF FORT LEE MILITARY RESERVATION, AND
WITH THE FOLLOWING COORDINATES, NAD 83, U.S. SURVEY FEET, N 360804 77, E
11829788.37, THENCE SOUTH 84 DEGREES 36 MINUTES 43 SECONDS EAST A DISTANCE
OF 504.58 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP STAMPED "E-02", SAID ROD
LYING ON THE NORTH SIDE OF A AVENUE 130 FEET FROM THE CENTERLINE OF SAID A
AVENUE AND BEING THE **TRUE POINT AND PLACE OF BEGINNING,** THENCE ALONG THE
NORTH SIDE OF A AVENUE SOUTH 73 DEGREES 25 MINUTES 50 SECONDS WEST A
DISTANCE OF 736.58 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH
16 DEGREES 36 MINUTES 24 SECONDS EAST A DISTANCE OF 113.42 FEET TO A FOUND
MAG NAIL IN THE ASPHALT OF A AVENUE, THENCE SOUTH 79 DEGREES 30 MINUTES 13
WEST A DISTANCE OF 199.74 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE
LEAVING A AVENUE NORTH 8 DEGREES 36 MINUTES 49 SECONDS EAST A DISTANCE OF
321 47 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 26 DEGREES
43 MINUTES 12 SECONDS WEST A DISTANCE OF 69.74 FEET TO A FOUND ROD WITH 2"
ALUMINUM CAP, THENCE NORTH 0 DEGREES 45 MINUTES 59 SECONDS WEST A
DISTANCE OF 241.66 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH
46 DEGREES 49 MINUTES 57 SECONDS EAST A DISTANCE OF 193 46 FEET TO A FOUND
ROD WITH 2" ALUMINUM CAP, THENCE NORTH 19 DEGREES 33 MINUTES 54 SECONDS
EAST A DISTANCE OF 276.82 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE
NORTH 41 DEGREES 08 MINUTES 54 SECONDS EAST A DISTANCE OF 114 50 FEET TO A
FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 59 DEGREES 04 MINUTES 46
SECONDS EAST A DISTANCE OF 204.47 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP,
THENCE NORTH 40 DEGREES 34 MINUTES 48 SECONDS EAST A DISTANCE OF 186.39
FEET, THENCE SOUTH 14 DEGREES 10 MINUTES 09 SECONDS EAST A DISTANCE OF
1023.83 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, SAID ROD BEING THE TRUE
**POINT AND PLACE OF BEGINNING,** AND CONTAINING 14 860 ACRES AND 647,269
SQUARE FEET MORE OR LESS.

## Legal Description
## PARCEL F
### Fort Lee, Virginia

PARCEL F (OCCUPIED)
ALL THAT CERTAIN LOT, PIECE OR PARCEL OF LAND, BELONGING, LYING, SITUATE IN FORT LEE MILITARY RESERVATION, AND BEING IN PRINCE GEORGE COUNTY, VIRGINIA, KNOWN AND DESIGNATED AS PARCEL-E, BEARINGS AND DISTANCES REPRESENT ACTUAL MONUMENTATION FOUND IN FIELD JULY, 2007, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT A FOUND CORPS OF ENGINEERS DISK STAMPED "GPS LEE 016" SET IN CONCRETE INSIDE THE BOUNDARY OF FORT LEE MILITARY RESERVATION, AND WITH THE FOLLOWING COORDINATES, NAD 83, U.S. SURVEY FEET, N 360804.77, E 11829788.37, THENCE SOUTH 53 DEGREES 01 MINUTES 53 SECONDS WEST A DISTANCE OF 467.36 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP STAMPED "F-11", SAID ROD LYING ON THE SOUTH SIDE OF A AVENUE AND BEING THE TRUE POINT AND PLACE OF BEGINNING, THENCE LEAVING THE SOUTH SIDE OF A AVENUE SOUTH 65 DEGREES 02 MINUTES 58 SECONDS EAST A DISTANCE OF 302.89 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE SOUTH 32 DEGREES 09 MINUTES 02 SECONDS WEST A DISTANCE OF 1017.78 FEET TO A SET ROD, THENCE SOUTH 47 DEGREES 14 MINUTES 35 WEST A DISTANCE OF 294.00 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 46 DEGREES 15 MINUTES 27 SECONDS WEST A DISTANCE OF 100.67 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 06 DEGREES 17 MINUTES 29 SECONDS WEST A DISTANCE OF 170.80 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 41 DEGREES 50 MINUTES 43 SECONDS WEST A DISTANCE OF 115.06 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 83 DEGREES 16 MINUTES 45 SECONDS WEST A DISTANCE OF 276.32 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 05 DEGREES 39 MINUTES 42 SECONDS WEST A DISTANCE OF 372.00 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 40 DEGREES 50 MINUTES 09 SECONDS WEST A DISTANCE OF 125.04 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 03 DEGREES 32 MINUTES 04 SECONDS WEST A DISTANCE OF 172.06 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, SAID ROD LYING ON THE SOUTH SIDE OF A AVENUE, THENCE ALONG SAID A AVENUE NORTH 73 DEGREES 19 MINUTES 43 SECONDS EAST A DISTANCE OF 271.58 FEET, THENCE SOUTH 16 DEGREES 33 MINUTES 16 SECONDS EAST A DISTANCE OF 114.35 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, THENCE NORTH 73 DEGREES 28 MINUTES 00 SECONDS EAST A DISTANCE OF 793.54 FEET TO A FOUND ROD WITH 2" ALUMINUM CAP, SAID ROD BEING THE TRUE POINT AND PLACE OF BEGINNING, AND CONTAINING 19.573 ACRES AND 852,617 SQUARE FEET MORE OR LESS.

**SCHEDULE 2**

**CONSTRUCTION BUDGET**

Fort Lee RCI
Phase I

## Construction Phase I

| | Unit Cost | Quantity | | Total |
|---|---|---|---|---|
| **Site Work / Infrastructure** | | | | |
| Site work / Infrastructure / New Urbanism | 28 500 | 124 | | 3 534 000 |
| **Site Work / Infrastructure** | 28,500 | 124 | | 3,534,000 |
| **New Construction** | | | | |
| New Construction | 134 000 | 124 | | 16 616 000 |
| **New Construction** | 134,000 | 124 | | 16,616,000 |
| **Major Renovation - Duplex to Single Family** | | | | |
| Monroe Manor Duplex Units | - | - | | - |
| **Total Major Renovation** | - | - | | - |
| **Major Renovation - 3rd Bedroom Addition** | | | | |
| Jackson Circle 2-Bedroom Units | - | - | | - |
| **Total Major Renovation** | - | - | | - |
| **Major Renovation - Enduring Units** | | | | |
| Monroe Manor and Jefferson Terrace Units | - | - | | - |
| **Total Major Renovation** | - | - | | - |
| **Medium Renovation** | | | | |
| Medium Renovation | - | - | | - |
| **Total Medium Renovation** | - | - | | - |
| **Minor Renovation** | | | | |
| Minor Renovation | - | - | | - |
| **Total Minor Renovation** | - | - | | - |
| **No Work (Meters Only)** | | | | |
| Meters | 750 | 862 | | 646 500 |
| **Total Meters** | 750 | 862 | | 646,500 |
| **Demolition** | | | | |
| Demolition / Abatement | 15.500 | 148 | | 2 294 000 |
| **Total Demolition** | 15.500 | 148 | | 2,294,000 |
| **Ancillary** | | | | |
| Ancillary Facilities | | | | |
| Customer Service Center | | | 250 000 | 250 000 |
| Swimming Pool / Splash Park (2) | | | 245 000 | 245 000 |
| Cabana | | | 50 000 | 50 000 |
| Picnic Shelter / Tot Lots (3) | | | 195 000 | 195 000 |
| Multi-purpose courts | | | 50 000 | 50 000 |
| Jog / Bike Path | | | 70 000 | 70 000 |
| Renovate Existing Community Centers | | | 80 000 | 80 000 |
| **Total Ancillary** | | | 940,000 | 940,000 |
| **Other** | Per Month | Mos | | |
| General Conditions, Construction months | 135 000 | 18 | | 2 430 000 |
| Outside Surveying/Geotech | | | | 75 000 |
| Sub Bonds | | | | 20 000 |
| Asbestos/Demolition surveys | | | | 29 000 |
| **Subtotal Hard Costs Before Escalation Allowance** | | | | 26,584,500 |
| Contingency | | | | 350,000 |
| **TOTAL HARD COSTS** | | | | 26,934,500 |
| **Soft Cost** | Basis | % | | |
| A&E'S Fees | | | | 4 900 000 |
| Bonds and Insurance | | | | 391 400 |
| Oversight Architect | | | | 36 000 |
| Design-Builder Overhead | 32 261 900 | 2.50% | | 806 600 |
| Design-Builder Fee Base | 32 261 900 | 3.00% | | 967 800 |
| Design-Builder Fee, Incentive | 32,261,900 | 1.75% | | 584,800 |
| **TOTAL SOFT COSTS** | | | | 7,686,500 |
| **TOTAL COST** | | | | 34,801,000 |

8/30/2007

## SCHEDULE 3

## MEMBERS IN THE BORROWER

Fort Lee Family Housing, LLC
FLIM, Inc.

# SCHEDULE 4

## CONSTRUCTION SCHEDULE





**EXHIBIT A**

**DISBURSEMENT REQUEST**

_____, 20__

Capmark Capital Inc.
c/o Capmark Finance Inc.
100 South Wacker Drive, Suite 400
Chicago, Illinois 60606
Attn: Construction Lending

Re:    $_____ Loan ("Loan") from Capmark Capital Inc., a Colorado corporation ("Lender"), to Fort Lee Commonwealth Communities, LLC, a Delaware limited liability company ("Borrower")

Gentlemen:

Unless otherwise defined herein, capitalized terms used herein shall have the same meanings assigned to such terms in the Loan Agreement dated as of August 31, 2007 between the Lender and the Borrower (the "Loan Agreement").

The Borrower desires to obtain a disbursement of $_____ (the "Disbursement") of the amounts now available in the Account or Accounts identified on the Disbursement Schedule attached hereto on _____, 20__ (the "Disbursement Date"), as further described in the Disbursement Schedule. Pursuant to the Loan Agreement and as a condition to such disbursement, the Borrower hereby represents and certifies the following to the Lender and the Servicer:

1.    No Event of Default has occurred and is continuing. No Event of Default will occur as a result of the Disbursement. To the best of the Borrower's knowledge, after due inquiry and investigation, no Default has occurred and no Default will occur as a result of the Disbursement, except: _____.

2.    All of Borrower's representations and warranties set forth in the Loan Documents are true and correct in all material respects as of the Disbursement Date as if made on the Disbursement Date.

3.    Borrower has no defenses to or offsets against the payment of any amounts due to Lender under or in connection with the Loan, or defenses against the performance of any of Borrower's obligations under the Loan Documents.

4.    No other Disbursement has been requested for the calendar month in which the Disbursement Date occurs.

5.    Neither the New Improvements, to the extent then constructed or rehabilitated, nor the Mortgaged Property (exclusive of any Demolished Units or [_____] not rehabilitated)

have been damaged, destroyed, condemned or, to the knowledge of Borrower, threatened with condemnation in any material respect.

6.      The Security Instrument constitutes a valid Lien on the Mortgaged Property for the full amount of the Loan outstanding as of the Disbursement Date, free and clear of all Liens except for Permitted Exceptions and such other Liens as may have been approved in writing by the Lender.

7.      Subject to the security interests created by the Security Instrument and other Permitted Exceptions, all Tangible Personal Property acquired to date has been purchased so that fee title thereto has vested in Borrower and has been paid for in full.

8.      The Improvements contain _____ residential units occupied or available for immediate occupancy in compliance in all material respects with all Legal Requirements.

9.      If any portion of the Disbursement is requested from the Capital Repair/Replacement Account, the Borrower has incurred all of the expenses described on the attached Disbursement Schedule relating to disbursements from the Capital Repair/Replacement Account.

10.     The Borrower shall use the proceeds of the Disbursement solely for the payment of the amounts described on the attached Disbursement Schedule to the payees described on the attached Disbursement Schedule.

11.     The Project Costs and other costs as detailed on the attached Disbursement Schedule are duly and adequately supported by valid invoices delivered to the Borrower by the applicable payee and maintained in the Borrower's records.

12.     With respect to amounts described on the attached Disbursement Schedule to be paid for from the Construction Account or the Capital Repair/Replacement Account, the Borrower has obtained fully executed and valid lien waivers (conditioned only upon receipt of payment) from each applicable payee described on the attached Disbursement Schedule who has or may have lien rights against the Mortgaged Property (for any portion thereof) with respect to the work and/or materials to be paid for with such amounts.

13.     The individual executing this Disbursement Request on behalf of the Borrower is thoroughly familiar with the facts and circumstances concerning the Mortgaged Property and the information set forth on the attached Disbursement Schedule and is duly authorized on behalf of the Borrower to execute this Disbursement Request.

14.     The attached Disbursement Schedule is a true and complete statement of all contracts, payments, balances and other information set forth therein.

_____

By _____
Name _____
Title _____

## DISBURSEMENT SCHEDULE

| Name and Address of Payee | Account from which Disbursement is Requested | *Date of Trade Contract with this Payee/ Description of Work | *Adjusted Total Contract Price for this Payee, including Extras and Credit | *Total Amount Previously Paid Under this Payee's Trade Contract | Amount of This Payment | *Balance to Become Due under Applicable Trade Contract | *Amount of Existing Retainage For This Payee/ Disbursement Date(s) Retained | *Amount Retained from this Payment as Additional Retainage For This Payee | *Budget Line Relating to This Disbursement |
|---|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
| Total |  |  |  |  |  |  |  |  |  |

*Columns apply only to disbursement from Construction Account and Capital Repair/Replacement Account