# EXHIBIT 6

# SERVICING AND LOCKBOX AGREEMENT

by and among

## FORT LEE COMMONWEALTH COMMUNITIES, LLC,
as Borrower

## CAPMARK CAPITAL INC.,
as the Lender

and

## CAPMARK FINANCE INC.,
as the Servicer

Dated as of August 31, 2007

4851-4057-8049.7
Fort Lee Servicing and Lockbox Agreement

**TABLE OF CONTENTS**

**Page**

ARTICLE I
DEFINITIONS AND USE OF PHRASES

Section 1.01.    Definitions ................................................................................................ 2
Section 1.02.    Rules of Construction ............................................................................. 8

ARTICLE II
REPRESENTATIONS, WARRANTIES AND COVENANTS

Section 2.01.    Representations and Warranties of the Borrower ..................... 9
Section 2.02.    Representations and Warranties of the Lender ........................... 11
Section 2.03.    Representations and Warranties of the Servicer ........................ 11

ARTICLE III
SERVICING

Section 3.01.    Appointment of the Servicer ............................................................. 11
Section 3.02.    Servicing Standards ............................................................................... 12
Section 3.03.    Servicing Duties ..................................................................................... 12
Section 3.04.    Limitation on the Servicer's Power ................................................. 15
Section 3.05.    Fidelity Bond; Errors and Omissions Insurance ......................... 15
Section 3.06.    No Advances by the Servicer .............................................................. 16
Section 3.07.    Compensation of the Servicer ........................................................... 16
Section 3.08.    Actions by Servicer as Agent of the Lender ................................. 16

ARTICLE IV
ESTABLISHMENT OF ACCOUNTS

Section 4.01.    Creation of Accounts ............................................................................ 17
Section 4.02.    Construction Account ........................................................................... 19
Section 4.03.    Capitalized Interest Account .............................................................. 21
Section 4.04.    Revenue Account .................................................................................... 21
Section 4.05.    Incentive Management Fee Account ............................................... 25
Section 4.06.    Tax and Insurance Account ................................................................ 26
Section 4.07.    Capital Repair/Replacement Account ............................................. 26
Section 4.08.    Operating Reserve Account ................................................................ 27
Section 4.09.    Loan Reserve Accounts ........................................................................ 27
Section 4.10.    Lender Accounts ..................................................................................... 28
Section 4.11.    Utility Cost Reserve Account ............................................................ 30
Section 4.12.    Tenant Security Deposit Account ..................................................... 30
Section 4.13.    Investment of Funds Held by the Servicer ................................... 31
Section 4.14.    Credit to Revenue Account ................................................................ 32
Section 4.15.    Uncollectible Drafts .............................................................................. 32
Section 4.16.    Reserve Account Contract ................................................................... 33

Section 4.17.    Prepayments ............................................................................................... 35

## ARTICLE V
## COVENANTS OF THE BORROWER

Section 5.01.    Lease Payments To Be Paid to the Servicer ................................................. 35
Section 5.02.    Appointment of the Servicer as Attorney-in-Fact........................................ 35
Section 5.03.    Borrower To Provide Access to Property and Books ................................... 36
Section 5.04.    Borrower To Provide Information ................................................................ 36
Section 5.05.    Borrower Remains Liable ............................................................................ 36
Section 5.06.    Operating Budget ........................................................................................ 36

## ARTICLE VI
## PLEDGE OF ACCOUNTS

Section 6.01.    Security for Obligations .............................................................................. 36
Section 6.02.    Financing Statement; Further Assurances ................................................... 37
Section 6.03.    Termination of Agreement........................................................................... 37
Section 6.04.    Transfers and Other Liens............................................................................ 38
Section 6.05.    Control ........................................................................................................ 38

## ARTICLE VII
## SERVICER DEFAULTS AND REMEDIES

Section 7.01.    Servicer Default Defined ............................................................................ 38
Section 7.02.    Remedies for Servicer Defaults ................................................................... 39
Section 7.03.    Limitations on Servicer Liability ................................................................ 39
Section 7.04.    No Effect on Other Remedies ...................................................................... 41

## ARTICLE VIII
## BORROWER DEFAULTS AND REMEDIES

Section 8.01.    Event of Default Defined ............................................................................ 41
Section 8.02.    Remedy on Default ..................................................................................... 41
Section 8.03.    Rights on Default........................................................................................ 42
Section 8.04.    Waiver by the Borrower............................................................................... 42

## ARTICLE IX
## OTHER PROVISIONS AFFECTING THE SERVICER

Section 9.01.    Duties .......................................................................................................... 42
Section 9.02.    Indemnity .................................................................................................... 42
Section 9.03.    Merger or Consolidation ............................................................................. 43
Section 9.04.    Resignation by the Servicer ........................................................................ 43
Section 9.05.    Removal of the Servicer .............................................................................. 43
Section 9.06.    Successor Servicer ...................................................................................... 44
Section 9.07.    Further Cooperation .................................................................................... 44
Section 9.08.    Servicer to Provide Access to Books........................................................... 44

ARTICLE X
MISCELLANEOUS

| | | |
|---|---|---|
| Section 10.01. | Notices | 45 |
| Section 10.02. | Amendment | 46 |
| Section 10.03. | Remedies Cumulative | 46 |
| Section 10.04. | Waivers | 46 |
| Section 10.05. | Beneficiaries, Successors and Assigns | 47 |
| Section 10.06. | Entire Agreement | 47 |
| Section 10.07. | Severability | 47 |
| Section 10.08. | Execution in Counterparts | 47 |
| Section 10.09. | Captions | 47 |
| Section 10.10. | Governing Law | 47 |
| Section 10.11. | Effective Date and Term | 47 |
| Section 10.12. | No Mortgagee in Possession; No Joint Venture | 47 |
| Section 10.13. | Conflicts between this Agreement and the Loan Documents | 48 |
| Section 10.14. | Interpleader | 48 |
| Section 10.15. | Nonrecourse | 48 |
| Section 10.16. | Assignment by Lender | 48 |

## SERVICING AND LOCKBOX AGREEMENT

**THIS SERVICING AND LOCKBOX AGREEMENT**, dated as of August 31, 2007, is by and among **FORT LEE COMMONWEALTH COMMUNITIES, LLC**, a Delaware limited liability company, as Borrower, **CAPMARK CAPITAL INC.**, a Colorado corporation, as Lender and **CAPMARK FINANCE INC.**, as Servicer, a California corporation.

W I T N E S S E T H :

WHEREAS, capitalized terms used in these Recitals are used with the meanings set forth in Article I hereof; and

WHEREAS, in response to a Request for Qualification issued by the Government, the Borrower has been selected by the Government to plan, design, develop, redevelop, finance, refinance, construct, renovate, replace, own, operate, maintain and manage a residential housing development to provide affordable housing primarily for use by military personnel and their families assigned to Fort Lee Army Base, Virginia; and

WHEREAS, the Borrower is leasing the land for the Project pursuant to the terms and provisions of the Ground Lease; and

WHEREAS, the Government has transferred to the Borrower an ownership interest in certain improvements now located on the Land; and

WHEREAS, pursuant to the terms and provisions of the Loan Agreement by and between the Borrower and the Lender, the Lender has agreed to make the Loan to the Borrower in the principal amount of $126,348,000; and

WHEREAS, the Borrower will demolish, or cause to be demolished, certain Improvements, rehabilitate certain Improvements, or cause certain Improvements to be rehabilitated, and construct, or cause to be constructed, certain Improvements on the Land; and

WHEREAS, to evidence the Loan, the Borrower has executed and delivered the Series A Note in the face amount of $121,131,000 and the Series B Note in the face amount of $5,217,000; and

WHEREAS, to secure the Obligations (as defined in the Loan Agreement), the Borrower has executed and delivered the Security Instrument covering the Mortgaged Property; and

WHEREAS, as between the Borrower and the Government, the operation of the Premises is governed by the terms and conditions of the Government Agreements; and

WHEREAS, in order to fulfill its obligations under the Ground Lease, the other Government Agreements and the Loan Documents, the Borrower has agreed that certain amounts will be deposited into and withdrawn from the Accounts pursuant to the Loan Documents and this Agreement;

NOW, THEREFORE, in consideration of the covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

**ARTICLE I**

**DEFINITIONS AND USE OF PHRASES**

**Section 1.01.   Definitions.**  Unless defined in this Agreement, capitalized terms used and not defined herein shall have the meanings ascribed to them in the Loan Agreement.  As used herein, the following terms shall have the following meanings:

"*Account*" means any of the Accounts and Subaccounts established pursuant to Section 4.01 hereof but expressly excluding the Reinvestment Account as defined in the Operating Agreement.

"*Agreement*" means this Servicing and Lockbox Agreement dated as of August 31, 2007, by and among the Borrower, the Lender and the Servicer, as such agreement may be amended, supplemented or otherwise modified from time to time pursuant to the terms hereof.

"*Borrower*" means Fort Lee Commonwealth Communities, LLC, a Delaware limited liability company, and its successors and assigns.

"*Borrower Equity Subaccount*" means the Subaccount by that name of the Construction Account established pursuant to Section 4.01 hereof and further described in Section 4.02 hereof.

"*Borrower Standing Instructions*" means the disbursement instructions delivered by Borrower to Servicer from time to time and identified as such by the Borrower, pursuant to which, in the absence of any contrary instruction by the Borrower, amounts disbursable to the Borrower pursuant to the terms of this Agreement shall be disbursed.

"*Capitalized Interest Account*" means the Account by that name established pursuant to Section 4.01 hereof and further described in Section 4.03 hereof.

"*Capital Repair/Replacement Account*" means the Account by that name established pursuant to Section 4.01 hereof and further described in Section 4.07 hereof.

"*Capital Repair/Replacement Amount*" means an amount equal to 1/12 of $250 (increased on September 1, 2008 and on each September 1, thereafter in proportion to the percentage increase, if any, in the average basic allowance for housing for all pay grades payable by the Government for accompanied personnel applicable to the Premises from September 1 of the previous year) multiplied by the number of units occupied or available for immediate occupancy at the Property as identified to the Servicer in the most recent Progress Certificate approved by the Construction Consultant.

"*Capmark Capital*" is defined in the Loan Agreement.

"*Collateral*" has the meaning set forth in Section 6.01(a) hereof.

"*Completion Date*" means the date of Completion of the Project as set forth in the Completion Date Certificate.

"*Construction Account*" means the Account by that name established pursuant to Section 4.01 hereof and further described in Section 4.02 hereof.

"*Debt Service Payment Date*" means each date upon which a payment of principal and/or interest is scheduled to be made pursuant to the terms of the applicable Note.

"*Deferred Developer's Fee*" is defined in the Development Agreement (defined in the Loan Agreement").

"*Designated Member*" means the Department of the Army acting in its capacity as a member of the Borrower, pursuant to the Borrower's Operating Agreement.

"*Eligible Account*" means a separate and identifiable trust account segregated from all other funds held by the holding institution that is an account or accounts maintained with a federal or state-chartered depository institution or trust company that is an Eligible Institution. An Eligible Account will not be evidenced by a certificate of deposit, passbook or other instrument.

"*Eligible Institution*" means (a) a depository institution or trust company whose (i) commercial paper, short-term unsecured debt obligations or other short-term deposits are rated "P-1" or higher by Moody's or "A-1+" or higher by S&P if the deposits are to be held in the account for less than 30 days, or (ii) long-term unsecured debt obligations are rated "Aa2" or higher by Moody's or "AA" (or its equivalent) or higher by S&P if the deposits are to be held in the account 30 days or more; (b) the trust department of a federal or state-chartered depository institution or trust company acting in its fiduciary capacity which, in the case of a state-chartered depository institution or trust company is subject to regulations substantially similar to 12 C.F.R. § 9.10(b), having in either case a combined capital and surplus of at least $100,000,000 and subject to supervision or examination by federal or state authority, as applicable; or (c) Escrow Bank USA, its successor or assigns.

"*Event of Default*" has the meaning set forth in Section 8.01 hereof.

"*Event of Default Notice and Direction*" has the meaning set forth in Section 8.03 hereof.

"*Excess Loan Proceeds Subaccount*" means the Subaccount by that name of the Construction Account established pursuant to Section 4.01 hereof and further described in Section 4.02 hereof.

"*Fiscal Year*" means the twelve month period ending December 31 of each year.

"*Government*" is defined in the Loan Agreement.

"*Government Funds Subaccount*" means the Subaccount by that name of the Construction Account established pursuant to Section 4.01 hereof and further described in Section 4.02 hereof.

"*Ground Lease*" is defined in the Loan Agreement.

"*Incentive Management Fee Account*" means the Account by that name established pursuant to Section 4.01 hereof and further described in Section 4.05 hereof.

"*Lender*" is defined in the Loan Agreement.

"*Lender Standing Instructions*" means disbursement instructions delivered to Servicer from time-to-time and identified as such by the Lender, pursuant to which, in the absence of contrary instructions by the Lender, amounts disbursable to or on behalf of the Lender shall be disbursed (as the same may be modified or replaced by the Lender from time-to-time).

"*Liquidity Facility*" is defined in the Loan Agreement.

"*Liquidity Facility Agreements*" means, collectively, the Series A Liquidity Facility Agreement and the Series B Liquidity Facility Agreement.

"*Liquidity Facility Provider*" is defined in the Loan Agreement.

"*Liquidity Facility Reimbursement Agreement*" is defined in the Loan Agreement.

"*Loan*" is defined in the Loan Agreement.

"*Loan Agreement*" means the Loan Agreement dated as of the date hereof between the Borrower and the Lender, as it may be amended, supplemented, modified and restated from time-to-time in accordance with its terms.

"*Loan Closing Statement*" means a statement executed by the Lender and the Borrower at the Closing of the Loan and delivered to the Servicer identifying, among other things, the amounts then being deposited into various of the Accounts, a copy of which is attached hereto as Schedule 5.

"*Loan Documents*" is defined in the Loan Agreement.

"*Loan Proceeds Subaccount*" means the Subaccount by that name of the Construction Account established pursuant to Section 4.01 hereof and further described in Section 4.02 hereof.

"*Moody's*" means Moody's Investors Service, its successors and assigns, and, if such corporation shall no longer perform the functions of a securities rating agency, "Moody's" shall be deemed to refer to any other nationally recognized securities rating agency designated by the Borrower and reasonably approved by the Lender.

"*Mortgaged Property*" means, collectively, the "Mortgaged Property" as defined in the Security Instrument.

"*Net Loan Interest*" means that portion of the interest payable on the Notes on any Debt Service Payment Date (comprised of the scheduled interest payable on the Series A Note as set forth on the amortization schedule attached as Schedule 2 hereto and the scheduled interest

payable on the Series B Note as set forth on the amortization schedule attached as Schedule 3) equal to (i) the total interest payment on such date, less (ii) the Servicer's Regular Monthly Fee payable in such month in accordance with Section 3.07 hereof.

"*Net Operating Income Subaccount*" means the Subaccount by that name of the Construction Account established pursuant to Section 4.01 hereof and further described in Section 4.02(e) hereof.

"*Note*" and "*Notes*" means, individually and collectively, the Series A Note and the Series B Note.

"*Operating Reserve Account*" means the Account by that name established pursuant to Section 4.01 hereof and further described in Section 4.08 hereof.

"*Permitted Investments*" means any investment set forth below which matures (or is redeemable at the option of the Servicer or is marketable prior to maturity) at such time or times as to enable disbursements to be made from the Account in which such investment is held in accordance with the terms of this Agreement:

(a)     cash (insured at all times by the Federal Deposit Insurance Corporation or otherwise collateralized with obligations described in clause (b) of this definition);

(b)     direct obligations of (including obligations issued or held in book-entry form on the books of) the Department of the Treasury of the United States of America;

(c)     obligations of any of the following federal agencies which obligations represent the full faith and credit of the United States of America, including:

—Export-Import Bank

—Farm Credit System Financial Assistance Corporation

—Rural Economic Community Development Administration (formerly the Farmers Home Administration)

—General Services Administration

—U.S. Maritime Administration

—Small Business Administration

—Government National Mortgage Association ("GNMA")

—U.S. Department of Housing & Urban Development

—Federal Housing Administration

—Federal Financing Bank;

    (d)    direct obligations of any of the following federal agencies which obligations are not fully guaranteed by the full faith and credit of the United States of America:

—Senior debt obligations rated "Aaa" by Moody's and "AAA" by S&P issued by the Federal National Mortgage Association ("Fannie Mae") or Federal Home Loan Mortgage Corporation ("Freddie Mac")

—Obligations of the Resolution Funding Corporation ("REFCORP")

—Senior debt obligations of the Federal Home Loan Bank System

—Senior debt obligations of other government sponsored agencies approved by the Lender;

    (e)    U.S. dollar denominated deposit accounts, federal funds and bankers' acceptances with domestic commercial banks which have a rating on their short term certificates of deposit on the date of purchase of "A-1" or "A-1+" by S&P and "P-1" by Moody's and maturing no more than 360 days after the date of purchase (Ratings on holding companies are not considered as the rating of the bank.);

    (f)    commercial paper which is rated at the time of purchase in the single highest classification, "A-1+" by S&P and "P-1" by Moody's and which matures not more than 270 days after the date of purchase;

    (g)    investments in a money market fund rated "AAAm" or "AAAm-G" or better by S&P;

    (h)    pre-refunded municipal obligations defined as follows: any bonds or other obligations of any state of the United States of America or of any agency, instrumentality or local governmental unit of any such state which are not callable at the option of the obligor prior to maturity or as to which irrevocable instructions have been given by the obligor to call on the date specified in the notice; and

    (i)    which are rated, based on an irrevocable escrow account or fund (the "escrow"), in the highest rating category of S&P and Moody's or any successors thereto; or

    (ii)    (A) which are fully secured as to principal and interest and redemption premium, if any, by an escrow consisting only of cash or obligations described in paragraph (b) of this definition, which escrow may be applied only to the payment of such principal of and interest and redemption premium, if any, on such bonds or other obligations on the maturity date or dates thereof or the specified redemption date or dates pursuant to such irrevocable instructions, as appropriate, and (B) which escrow is sufficient, as verified by a nationally recognized independent certified public accountant, to pay principal of and interest and redemption premium, if any, on the bonds or other obligations

described in this paragraph on the maturity date or dates specified in the irrevocable instructions referred to above, as appropriate;

(i)     general obligations of states with a rating of at least "A2/A" or higher by both Moody's and S&P;

(j)     an investment agreement approved by the Lender in writing with a provider approved by the Lender in writing;

(k)     any guaranteed investment contract approved in writing by the Lender; and

(l)     other forms of investments (including repurchase agreements) approved in writing by the Lender.

"*Prepayment Account*" means the Account by that name established pursuant to Section 4.01 hereof and further described in Section 4.17 hereof.

"*Reserve Account Contract*" has the meaning set forth in Section 4.16(a) hereof.

"*Revenue Account*" means the Account by that name established pursuant to Section 4.01 hereof and further described in Section 4.04 hereof.

"*Revenue Account Monthly Disbursement Date*" means the Business Day of each calendar month, which is two Business Days preceding the Debt Service Payment Date during such month.

"*S&P*" means Standard & Poor's Ratings Services, a Division of The McGraw-Hill Companies, its successors and assigns, and, if Standard & Poor's Ratings Services, a Division of The McGraw-Hill Companies, shall no longer perform the functions of a securities rating agency, "S&P" shall be deemed to refer to any other nationally recognized securities rating agency designated by the Borrower and reasonably approved by the Lender.

"*Security Instrument*" means the "Security Instrument" as defined in the Loan Agreement.

"*Series A Lender Account*" means the Account by that name established pursuant to Section 4.01 hereof and further described in Section 4.10(a) hereof.

"*Series B Lender Account*" means the Account by that name established pursuant to Section 4.01 hereof and further described in Section 4.10(b) hereof.

"*Series A Liquidity Facility Agreement*" is defined in the Loan Agreement.

"*Series B Liquidity Facility Agreement*" is defined in the Loan Agreement.

"*Series A Maximum Annual Debt Service*" means at any time the maximum regularly scheduled payments of principal, if any, and interest to become due with respect to the Series A

Note, during any 12 calendar month period during the remaining term of the Series A Note subsequent to the date of determination, assuming the absence of any Event of Default, as reasonably determined by the Servicer based on the information set forth in the Schedules as attached hereto as Schedule 1 and 2, and in accordance with Section 3.09 hereof.

"*Series B Maximum Annual Debt Service*" means at any time the maximum regularly scheduled payments of principal, if any, and interest to become due with respect to the Series B Note, during any 12 calendar month period during the remaining term of the Series B Note subsequent to the date of determination, assuming the absence of any Event of Default, as reasonably determined by the Servicer based on the information set forth in the Schedules as attached hereto as Schedule 3, and in accordance with Section 3.09 hereof.

"*Series A Note*" is defined in the Loan Agreement.

"*Series B Note*" is defined in the Loan Agreement.

"*Series A Reserve Account*" means the Account by that name established pursuant to Section 4.01 hereof and further described in Section 4.09(a) hereof.

"*Series B Reserve Account*" means the Account by that name established pursuant to Section 4.01 hereof and further described in Section 4.09(b) hereof.

"*Servicer*" means Capmark Finance Inc., a California corporation, and any successor servicer designated pursuant to Article IX hereof.

"*Servicer Parties*" has the meaning set forth in Section 7.03(a) hereof.

"*Servicer's Expenses*," "*Servicer's Fees*," "*Servicer's Fees and Expense*," "*Servicer's Prepayment Fee*," and "*Servicer's Regular Monthly Fee*" are defined in Section 3.07 hereof.

"*Subaccount*" means any of the subaccounts of an Account established pursuant to Section 4.01 hereof.

"*Tax and Insurance Account*" means the Account by that name established pursuant to Section 4.01 hereof and further described in Section 4.06 hereof.

"*Tenant Security Deposit Account*" means the Account by that name established pursuant to Section 4.01 hereof and further described in Section 4.12 hereof.

"*Utility Cost Reserve Account*" means the Account by that name established pursuant to Section 4.01 hereof and further described in Section 4.11 hereof.

**Section 1.02. Rules of Construction.**

(a)     The singular form of any word used herein, including the terms defined in Section 1.01 hereof, shall include the plural, and vice versa, unless the context otherwise requires.  The use herein of a pronoun of any gender shall include correlative words of the other genders.

(b)     All references herein to "Articles," "Sections" and other subdivisions hereof are to the corresponding Articles, Sections or subdivisions of this Agreement; and the words "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or subdivision hereof.

(c)     The headings or titles of the several Articles and Sections hereof, and any table of contents appended to copies hereof, shall be solely for convenience of reference and shall not limit or otherwise affect the meaning, construction or effect of this Agreement or describe the scope or intent of any provisions hereof.

(d)     All accounting terms not otherwise defined herein have the meanings assigned to them in accordance with applicable generally accepted accounting principles as in effect from time to time.

(e)     Every "request," "order," "demand," "application," "appointment," "notice," "statement," "certificate," "consent" or similar action hereunder by any party shall, unless the form thereof is specifically provided, be in writing signed by a duly authorized representative of such party with a duly authorized signature.

(f)     The parties hereto acknowledge that each such party and their respective counsel have participated in the drafting and revision of this Agreement. Accordingly, the parties agree that any rule of construction that disfavors the drafting party shall not apply in the interpretation of this Agreement or any amendment or supplement or exhibit hereto or thereto.

## ARTICLE II

## REPRESENTATIONS, WARRANTIES AND COVENANTS

**Section 2.01. Representations and Warranties of the Borrower.** The Borrower represents and warrants to the Lender and the Servicer as of the Closing Date and as of each Disbursement Date (except with respect to those statements that refer to a specific other date) that the following statements are true and correct in all material respects:

(a)     the Borrower is a limited liability company duly formed and existing under and pursuant to the laws of its state of formation and is in good standing in such jurisdiction and is qualified to do business in every other state in which the nature of its business requires such qualification except where the failure to be so qualified is not reasonably expected to result in a material adverse effect on Borrower;

(b)     the Borrower has duly authorized the execution and delivery by Borrower of this Agreement and this Agreement constitutes a legal, valid and binding obligation of Borrower, enforceable against Borrower in accordance with its terms, subject to bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer, fraudulent conveyance and other similar laws affecting the rights of creditors generally and general equitable principles (regardless of whether enforcement is sought in a proceeding in equity or at law);

(c)     the Borrower has complied in all material respects with the provisions of federal and state law that are prerequisite to the consummation by Borrower of, and has all necessary limited liability company, power and authority to consummate, all obligations imposed on it described in this Agreement;

(d)     none of the execution and delivery of this Agreement by the Borrower, the consummation of the transactions contemplated hereby by Borrower, nor the fulfillment of or compliance with the terms and conditions of this Agreement by Borrower, will (i) violate in any material respect any law, ordinance, statute or other legal requirement, or any indenture, agreement or other instrument to which it is now a party or by which it or any of its properties or assets is bound; (ii) be in conflict with, result in a breach of or constitute a default (with due notice or the passage of time or both) under any such indenture, agreement or other instrument or any license, law, ordinance, statute or other legal requirement applicable to either Borrower or the Mortgaged Property, in any material respect; or (iii) except as provided herein or in the other Loan Documents, result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever upon any of Borrower's property or assets;

(e)     no litigation or proceeding is pending with respect to which the Borrower has been served with process or, to the knowledge of the Borrower, threatened against the Borrower.  Borrower is not presently in default under any material agreement, contract, document, instrument or commitment to which Borrower is a party or to which it or any of its property is subject;

(f)     there (i) are no contemplated, pending or, to the knowledge of the Borrower, threatened insolvency, bankruptcy, relief, dissolution, liquidation, reorganization or similar proceedings whether voluntary or involuntary, affecting the Borrower; and (ii) has been no assertion or exercise of jurisdiction over it by any court empowered to exercise bankruptcy powers;

(g)     no event has occurred and no condition exists with respect to the Borrower, the Ground Lease, the other Government Agreements, the Project, this Agreement, any of the other Loan Documents or to the knowledge of the Borrower, the Mortgaged Property that would render any of the representations or warranties made by it herein untrue or misleading in any material respect (including by omission) or that would constitute a material default by the Borrower in the performance of its Obligations hereunder, under any of the other Loan Documents, the Ground Lease, or a material breach by the Borrower of any of its covenants herein, in any of the other Loan Documents, or the Ground Lease, or the other Government Agreements; and

(h)     no authorization, consent, approval, order, registration, declaration or withholding of objection on the part of or filing of or with any Governmental Authority or any other Person not already obtained or made or that will be obtained at the appropriate time is required for the execution and delivery or approval, as the case may be, by the Borrower of this Agreement, or the performance of the terms and provisions of this Agreement by the Borrower.

**Section 2.02.  Representations and Warranties of the Lender**.   Lender hereby represents and warrants that:

(a)    it is a corporation duly organized, validly existing and in good standing under the laws of the State of Colorado and is in good standing and qualified to do business in, and is in compliance with, the laws of each state in which the Mortgaged Property is located, to the extent necessary for the performance of its obligations under this Agreement;

(b)    it has duly authorized the execution and delivery of this Agreement and this Agreement constitutes a legal, valid and binding obligation of Lender, enforceable against Lender in accordance with its terms, subject to bankruptcy, insolvency, reorganization, moratorium and other similar laws affecting the rights of creditors generally and general equitable principles; and

(c)    it has all necessary power and authority to enter into and consummate the transactions described in this Agreement.

**Section 2.03.  Representations and Warranties of the Servicer**.  The Servicer hereby represents and warrants that:

(a)    the Servicer is a corporation duly organized, validly existing and in good standing under the laws of the State of California and is in good standing and qualified to do business and in, and is in compliance with the laws of each state in which the Mortgaged Property is located, to the extent necessary for the performance of its obligations under this Agreement;

(b)    the Servicer has duly authorized the execution and delivery of this Agreement and this Agreement constitutes a legal, valid and binding obligation of the Servicer, enforceable against the Servicer in accordance with its terms, subject to bankruptcy, insolvency, reorganization, moratorium and other similar laws affecting the rights of creditors generally, and general equitable principles; and

(c)    the Servicer has the full power and authority to enter into and consummate all transactions contemplated by this Agreement.

## ARTICLE III

## SERVICING

**Section 3.01.  Appointment of the Servicer**.  The Servicer is hereby appointed by the Lender as the Lender's agent to service the Loan, and the Lender hereby appoints, designates and authorizes the Servicer to take such action on the Lender's behalf and to exercise such powers and perform such duties as are expressly delegated to the Servicer by the terms of this Agreement or as are specifically allocated to the Servicer in the Loan Documents. The Servicer hereby accepts such appointment and agrees to act as the Lender's agent to service the Loan, to take such action on the Lender's behalf and to exercise such powers and perform such duties. The Borrower hereby acknowledges such appointment.

**Section 3.02. Servicing Standards.** The Servicer shall service the Loan and shall perform all duties and acts incident to the servicing of the Loan that are described in this Article, all in accordance with applicable law, the terms of this Agreement and the other Loan Documents with the same care, skill and diligence that it services loans held for its own account or third parties, whichever is higher (the "**Servicing Standard**"), all subject to an in accordance with the provisions of this Agreement.

**Section 3.03. Servicing Duties.** During the term of this Agreement, the Servicer shall perform the following duties, and, with the prior written consent of the Lender, may engage agents to perform any of such duties on its behalf:

(a)     Use efforts consistent with the Servicing Standard to collect all Operating Income and other amounts from the Borrower on or before the date on which the remittance thereof to the Servicer is due pursuant to the terms of this Agreement.

(b)     Establish, hold and maintain the Accounts and deposit, disburse and apply the amounts held in the Accounts in accordance with Article IV hereof and other applicable provisions of this Agreement and the other Loan Documents.

(c)     Use efforts consistent with the Servicing Standard to require the Borrower to perform its obligations under the Loan Documents.

(d)     Keep a complete and accurate account of the proceeds of the Loan and other amounts received, disbursed or applied by the Servicer and of the balances in and deposits to, investments of and disbursements from the Accounts.

(e)     Notify the Lender in writing in the event the Borrower fails to make any remittance of Operating Income on or before the date when due hereunder.

(f)     Segregate and maintain the proceeds of the Loan and other amounts received by the Servicer hereunder and under the other Loan Documents from the funds of the Servicer and any other Person.

(g)     Provide to the Lender and the Borrower monthly by facsimile, or other electronic means, a statement of the Loan setting forth the outstanding principal balance after recordation of the current month's financial activity, including an itemization of principal, interest and any other amounts paid thereon; any delinquency in payments under the Loan Documents; any deposits to, disbursements from, investments of and balance in each of the Accounts, in each case through and including the Revenue Account Monthly Disbursement Date for such month, and the DSC Ratio for each of the last full calendar month, the last full three calendar month, the last full six calendar month, the last full 12 calendar month and the last full 24 calendar month periods occurring prior to the date of such statement. The Servicer shall deliver such statement on or before the 15th Business Day of each month. In computing the DSC Ratio, the Servicer shall be entitled to rely on (A) the actual amounts deposited in the Revenue Account pursuant to Section 4.04(a) hereof in determining Operating Income, (B) the amounts actually deposited by it into the Tax and Insurance Account and the Capital Repair/Replacement Account, (C) the actual Operating Expenses, (D) the amortization

schedule for the Series A Note, attached as Schedule 2 hereto and the amortization schedule for the Series B Note attached hereto as Schedule 3, and (E) written notices delivered by the Borrower in determining the principal and interest due on other Indebtedness, if any, to the extent permitted by the Loan Documents. The parties hereto agree that the computation of the DSC Ratio by the Servicer using the assumptions set forth in the preceding sentence shall be for informational purposes only and shall not be binding on the parties, the parties being bound only by a computation of the DSC Ratio made in accordance with the definition of that term set forth in the Loan Agreement.

(h)     Monitor all UCC financing statements and file all UCC continuation statements for the UCC-1 Financing Statements filed with respect to the Mortgaged Property in connection with the Closing of the Loan or as are otherwise necessary to avoid a lapse in any security interests on the Mortgaged Property granted to the Lender under the Loan Documents.

(i)     Provide the Lender and the Borrower with a certification annually, or more frequently if reasonably requested by the Lender or the Borrower, stating that all proceeds of the Loan and other amounts collected by the Servicer have been properly applied in accordance with the provisions of this Agreement and the Loan Documents.

(j)     Deliver to the Lender copies of any annual, quarterly or other financial statements or reports regarding the Borrower received by the Servicer from the Borrower.

(k)     Provide the Lender within 31 days after the end of each calendar year, with a Form 1099 (or any applicable successor form) for the Loan.

(l)     Use efforts consistent with the Servicing Standard to ensure that at all times during the term of this Agreement, the Borrower maintains the insurance required to be obtained by the Borrower by the Loan Documents.

(m)     Subject to the terms of the Loan Documents, inspect the Mortgaged Property as may be required by the Lender and render to the Lender a written report of each such inspection.

(n)     As soon as such information comes to its attention, promptly notify the Lender and the Borrower of any material change in the condition of the Mortgaged Property, any lack of repair to or other deterioration or waste suffered or committed with respect to the Mortgaged Property, any sale or transfer by the Borrower or any other Person of any interest in the Mortgaged Property, the Borrower, any Member (other than the Government), the Manager or Indemnitor or any abandonment of the Mortgaged Property, or any Default by the Government, the Borrower or Indemnitor under the Loan Documents or the Ground Lease, and recommend to the Lender such action as the Servicer deems necessary or appropriate.

(o)     Promptly (and in any event within five days) furnish the Lender and the Borrower with copies (i) of any notices relating to the Loan, the obligations of the Borrower under the Loan Documents or the Mortgaged Property received by the Servicer from the Government or the Borrower, any correspondence between the Servicer and the

Borrower, or the Servicer and the Government relating to the Loan, the Loan Documents, the Mortgaged Property, the Ground Lease, any other Government Agreement or any other matter relating to the Loan, the Loan Documents, the obligations of the Borrower under the Loan Documents or the Mortgaged Property (including any Disbursement Request); and (ii) any audits or reports prepared with respect to the Mortgaged Property.

(p)     Furnish the Lender and the Borrower such other information relating to the Loan, the Mortgaged Property or the Servicer's activities pursuant to this Agreement as the Lender or the Borrower may from time-to-time reasonably request.

(q)     Keep proper books of accounts and records with respect to the Loan, this Agreement and the performance of its obligations hereunder, which books and records shall be available for inspection by the Lender and the Borrower at all reasonable times during normal business hours.   Such accounts and records shall be maintained in accordance with generally accepted accounting principles consistently applied.

(r)     Comply with all applicable federal, state and local laws, rules and regulations relating to its rights and obligations under this Agreement.

(s)     Notify the Lender and the Borrower in writing on the date of any drawing (including a draw on an applicable Reserve Account Contract), or replenishment of any amount from the Loan Reserve Account pursuant to Section 4.09 hereof, including the amount so drawn or replenished.

(t)     Until the Lender notifies it to the contrary, receive and review all Disbursement Requests, Borrower Standing Instructions, Lender Standing Instructions, certificates, reports, Operating Budgets, Progress Certificates, Resolution Plans and other instruments and documents the Borrower and the Construction Consultant are required to submit to the Lender pursuant to the Loan Documents and take such action on behalf of the Lender with respect to the same (including approving Disbursement Requests) as is commercially reasonable, in the best interest of the Lender, and consistent with the rights, remedies and obligations of the Lender under the Loan Documents.

(u)     Notify the Lender and the Borrower in writing on or before the fifth Business Day preceding the next Revenue Account Monthly Disbursement Date if the Servicer has determined that as of such Business Day, there will be insufficient amounts in the Revenue Account to fund, in accordance with the terms of this Agreement, the amounts required to be disbursed on such Revenue Account Monthly Disbursement Date pursuant to Sections 4.04(b)(i) through (xvi) hereof.

(v)     Deliver such notices and take such other action with respect to the Liquidity Facility and any other credit enhancement for the Loan now existing or hereafter established as required by the Liquidity Facility Agreement or as otherwise requested by Lender from time-to-time.

(w)     Commencing September 1, 2009 and on the last day of each calendar quarter thereafter, determine on behalf of the Lender (i) the aggregate amount of Eligible Funds and (ii) the portion thereof remaining in the Excess Loan Proceeds Subaccount.

Notify the Lender and the Borrower when the Servicer has received a Disbursement Request for funds from the Construction Account that, if funded, would cause the sum of the balance of the Excess Loan Proceeds Subaccount to be less than (i) $621,000 less (ii) the aggregate amount of Eligible Funds. The Servicer shall not fund such Disbursement Request until such Disbursement Request is approved in writing by the Lender.

(x)     Enforce the rights of Lender in Permitted Investments, as and when directed by Lender.

**Section 3.04. Limitation on the Servicer's Power.**   Except as expressly provided herein, the Servicer shall not accept any instructions or direction from any party other than the Lender with respect to the disbursement of any amounts in any Account.  For purposes of greater clarity, the Servicer hereby acknowledges that it shall have no greater rights with respect to servicing the Loan than set forth in this Agreement and the Loan Documents, it being expressly acknowledged by the Servicer that, unless the Servicer is instructed otherwise by the Lender, it shall have no right, without the prior written consent of the Lender, to (i) send to the Borrower or the Government any notice of default, accelerate the Loan or the other obligations of the Borrower under the Loan Documents or otherwise exercise any rights or remedies of the Lender against the Borrower or the Government; (ii) initiate any litigation or other proceeding against the Borrower or the Government relating to, and as provided in, the Loan Documents, the Ground Lease or the Mortgaged Property on behalf of the Lender; (iii) accept any notice or service of process on behalf of the Lender; or (iv) amend, modify, supplement or otherwise waive, excuse, condone, release or otherwise discharge or vary any of the terms of the Ground Lease, any Construction Document or Loan Document or consent to any postponement, delay or other deviation from strict compliance by the Borrower or the Government, as applicable, with any provision of the Ground Lease, any other Government Agreement, any Construction Document or any Loan Document.  Except for the Servicer's duties under Sections 3.03(b), (d), (f), (g), (i), (q), (s) and (u), Section 3.09, and Article IV hereof (and without limiting the Lender's other rights under this Agreement), the Lender may at any time, by written notice to the Servicer and the Borrower, modify any of the duties of the Servicer under this Agreement or any or all of the Loan Documents, provided that the Lender may not increase the Servicer's duties without the Servicer's consent.  The Borrower shall be bound by any such modification upon receipt of written notice thereof from the Lender and thereafter, to the extent the Servicer is relieved of any duty, any reference in any Loan Documents to the Servicer specifically relating to such duty shall mean and be deemed a reference to the applicable Lender instead.  The Servicer shall have no right of set-off against amounts in any Account.

**Section 3.05. Fidelity Bond; Errors and Omissions Insurance.**  The Servicer agrees to keep in force at all times, at no cost to the Lender or the Borrower throughout the term of this Agreement, a blanket fidelity bond and an errors and omissions insurance policy covering its officers and employees and other persons acting on behalf of the Servicer in connection with its activities under this Agreement.  The amount of coverage shall be at least equal to the coverage that would be required by Fannie Mae or Freddie Mac with respect to the Servicer if the Servicer were servicing and administering mortgage loans for Fannie Mae or Freddie Mac.  Coverage of the Servicer under a policy or bond obtained by an Affiliate of the Servicer and providing the coverage of the Servicer required by this Section shall satisfy the requirements of this Section.  The Servicer agrees to deliver to the Lender and the Borrower certificates of insurance

evidencing such fidelity bond and errors and omissions insurance at Closing and thereafter at its request.

**Section 3.06.  No Advances by the Servicer.**  The Servicer shall have no obligation to disburse to the Lender principal or interest payments or any other amounts payable by the Borrower under the Loan Documents unless and until amounts are available for such purpose in an Account in accordance with the terms of this Agreement.

**Section 3.07.  Compensation of the Servicer.**  As compensation for the performance of its obligations under this Agreement, the Servicer shall be entitled to:

> (a)  a fee, payable solely from each monthly payment of interest on the Loan payable monthly at the time interest on the Loan is payable, in an amount equal to the principal amount of the Loan outstanding from time-to-time times: (i) 0.05% per annum (the "Servicer's Regular Monthly Fee");

> (b)  reimbursement of its reasonable third party and out-of-pocket expenses (the "Servicer's Expenses") incurred by the Servicer in connection with the performance of its obligations under this Agreement and all other amounts (without duplication) payable by the Borrower to the Servicer pursuant to Section 10.12 of the Loan Agreement; and

> (c)  if a Prepayment Amount (as defined in each of the Notes, respectively), is payable under a Note, an additional fee (the "Servicer's Prepayment Fee") payable solely from the proceeds of such Prepayment Amount in an amount equal to (i) the amount of the Prepayment Amount, less the outstanding principal balance of such Note as of the date of such prepayment, multiplied by (ii) a fraction, the numerator of which is .05 and the denominator of which is (A) with respect to the Series A Note, the interest rate set forth in the first paragraph of the Series A Note, and (B) with respect to the Series B Note, the interest rate set forth in the first paragraph of the Series B Note.

The Servicer's Regular Monthly Fee and the Servicer's Prepayment Fee, collectively, are referred to as the "Servicer's Fees."  The Servicer's Fees and the Servicer's Expenses, collectively, are referred to as the "Servicer's Fees and Expenses."

**Section 3.08.  Actions by Servicer as Agent of the Lender.**  Whenever in the Loan Documents or this Agreement the Servicer is authorized or directed to take an action as agent of a Lender, the Borrower shall be entitled to rely on any action of the Servicer pursuant to such authorization or direction as being authorized by such Lender to the same extent as if taken by such Lender directly.

## ARTICLE IV

## ESTABLISHMENT OF ACCOUNTS

**Section 4.01. Creation of Accounts.**

(a)     As of the date hereof the Servicer has established the following Accounts as Eligible Accounts, which Accounts (other than the Lender Account) shall each be in the name of the Borrower, shall reflect a first priority security interest in favor of the Lender, and shall be under the exclusive control of the Servicer, as agent for the Lender (the Lender Account shall be in the name of the Lender):

(i)     Accounts initially funded from Loan proceeds and equity contributions from the Borrower:

(A)     Capitalized Interest Account;

(B)     Construction Account, which will be divided into the Government Funds Subaccount, the Borrower Equity Subaccount, the Loan Proceeds Subaccount, the Net Operating Income Subaccount and the Excess Loan Proceeds Subaccount (provided, only the Loan Proceeds Subaccount and the Excess Loan Proceeds Subaccount will be funded with Loan proceeds);

(C)     Series A Reserve Account;

(D)     Series B Reserve Account;

(E)     Operating Reserve Account; and

(F)     Utility Cost Reserve Account.

(ii)     Accounts funded from Operating Income, tenant deposits, if any, certain earnings thereon and other amounts:

(A)     Incentive Management Fee Account;

(B)     Revenue Account;

(C)     Tax and Insurance Account;

(D)     Capital Repair/Replacement Account;

(E)     Series A Reserve Account;

(F)     Series B Reserve Account;

(G)     Operating Reserve Account;

(H)     Utility Cost Reserve Account;

(I)     Series A Lender Account;

(J)     Series B Lender Account;

(K)     Prepayment Account; and

(L)     Tenant Security Deposit Account.

(b)     If this Agreement terminates prior to the expiration or termination of the Ground Lease, any funds in any of the Accounts shall be deposited into accounts held by a lockbox agent pursuant to a lockbox agreement, both of which are approved in writing by the Borrower and, if the Loan then is outstanding, the Lender.

(c)     Amounts on deposit in the Accounts may be disbursed only by the Servicer as provided in this Agreement.

(d)     Disbursements hereunder shall be made by the Servicer so that they are received by the party entitled thereto no later than 2:00 p.m. (Chicago, Illinois time) on the applicable date of disbursement.

(e)     The parties hereto expressly agree that the Permitted Investments held in the Accounts shall be owned by the Borrower and shall not be deemed assets of the Lender for Federal income tax purposes.

(f)     Except as otherwise provided below, earnings attributable to the investment of funds in the Accounts and Subaccounts thereof (A) shall be retained therein until the first Revenue Account Monthly Disbursement Date of each calendar quarter and (B) immediately before applying funds in the Revenue Account on the first Revenue Account Monthly Disbursement Date of each calendar quarter, the Servicer shall transfer earnings attributable to the investment of funds in the Account and Subaccounts thereof to the Revenue Account, except that:

(i)     Earnings attributable to the investment of funds in any Account or Subaccount thereof in which the balance is less (or, if such earnings were transferred would be less), than the amount required to be on deposit therein hereunder shall be retained in that Account or Subaccount;

(ii)    Earnings attributable to the investment of funds in the Subaccounts of the Construction Account and the Utility Cost Reserve Account shall be retained therein;

(iii)   Earnings attributable to the investment of funds in the Capital Repair/Replacement Account shall be retained therein;

(iv)    Earnings attributable to the investment of funds in the Capitalized Interest Account shall be retained therein; and

(v)     Earnings attributable to the investment of funds in the Excess Loan Proceeds Subaccount shall be transferred to the Loan Proceeds Subaccount.

**Section 4.02.  Construction Account.**

(a)     *Construction Account.*

(i)     *Deposits.*  The Construction Account shall be funded through deposits made to the Government Funds Subaccount, the Borrower Equity Subaccount, the Loan Proceeds Subaccount, the Excess Loan Proceeds Subaccount and the Net Operating Income Subaccount, as described in Section 4.02(b), (c) and (d) below.

(ii)     *Disbursements.*  Disbursements from the Construction Account shall be made only (A) to pay Project Costs and only upon delivery to the Servicer of a Disbursement Request executed by the Borrower and approval of such Disbursement Request by the Servicer, on behalf of the Lender, in accordance with, and subject to, the Loan Documents; (B) at the direction of the Lender pursuant to Section 3.07 of the Loan Agreement, from the Excess Loan Proceeds Subaccount (to the extent of amounts on deposit therein which are not Eligible Funds) to prepay a portion of the principal balance of the Series B Note in accordance with written instructions delivered by the Lender; and (C) without further instruction to the Servicer to the extent funds from the Revenue Account and the Capitalized Interest Account (to the extent available pursuant to Section 4.03(b) hereof), in that order, are insufficient to pay amounts required to be deposited to the Lender Account on any Revenue Account Monthly Disbursement Date pursuant to Section 4.04(b)(iv) hereof.  Disbursements for Project Costs made from the Construction Account shall be funded *first*, from the Net Operating Income Subaccount; *second*, from the Government Funds Subaccount; *third*, from the Borrower Equity Subaccount; *fourth*, from the Loan Proceeds Subaccount; and *fifth*, from any Eligible Funds on deposit in the Excess Loan Proceeds Subaccount, in each case to the extent of available funds therein. Subject to any delays incurred by the Servicer in liquidating Permitted Investments, disbursements from the Construction Account shall be made within eight Business Days after the Servicer's receipt of a completed Disbursement Request executed by the Borrower (together with all attachments thereto required by the Loan Documents), subject to satisfaction of the applicable requirements of Article III of the Loan Agreement.

(b)     *Government Funds Subaccounts.*

(i)     *Deposits.*  Within 90 days after the closing of the Loan, the Borrower shall cause to be deposited into the Government Funds Subaccount an amount equal to the amount identified on the Loan Closing Statement as the "Government Equity."

(ii) *Disbursements.* The Servicer shall (A) disburse amounts from the Government Funds Subaccount as necessary to fund disbursements from the Construction Account pursuant to Section 4.02(a)(ii) hereof, and (B) disburse and deposit into the Revenue Account all amounts then on deposit in the Government Funds Subaccount upon delivery to the Servicer of the Completion Date Certificate.

(c) *Borrower Equity Subaccount.*

(i) *Deposits.* Upon the closing of the Loan, the Borrower shall deliver the Equity Guaranty. In addition, on or before the dates required under the Borrower's Operating Agreement for contribution by the Borrower's managing member of equity to the Borrower, the Borrower shall cause to be deposited into the Borrower Equity Subaccount an amount from its own funds equal to each such contribution by the Borrower's managing member.

(ii) *Disbursements.* The Servicer shall (A) disburse amounts from the Borrower Equity Subaccount as necessary to fund disbursements from the Construction Account pursuant to Section 4.02(a)(ii) hereof, and (B) disburse and deposit into the Revenue Account all amounts then on deposit in the Borrower Equity Subaccount upon delivery to the Servicer of the Completion Date Certificate.

(d) *Loan Proceeds Subaccount.*

(i) *Deposits.* Upon the Closing of the Loan, a portion of the Loan shall be deposited into the Loan Proceeds Subaccount in an amount equal to the amounts identified on the Loan Closing Statement as the "Loan Proceeds Deposit."

(ii) *Disbursements.* The Servicer shall (A) disburse amounts from the Loan Proceeds Subaccount as necessary to fund disbursements from the Construction Account pursuant to Section 4.02(a)(ii) hereof, and (B) disburse and deposit into the Revenue Account all amounts then on deposit in the Loan Proceeds Subaccount upon delivery to the Servicer of the Completion Date Certificate.

(e) *Net Operating Income Subaccount.*

(i) *Deposits.* The Servicer shall deposit into the Net Operating Income Subaccount the amounts disbursed from the Revenue Account pursuant to Section 4.04(b)(xvi)(A) hereof.

(ii) *Disbursements.* The Servicer shall (A) disburse amounts from the Net Operating Income Subaccount to fund disbursements from the Construction Account pursuant to Section 4.02(a)(ii) hereof, and (B) disburse into the Revenue Account all amounts then on deposit in the Net Operating Income Subaccount upon delivery to the Servicer of the Completion Date Certificate.

(f)     *Excess Loan Proceeds Subaccount.*

(i)     *Deposits.* Upon the Closing of the Loan, a portion of the Loan shall be deposited into the Excess Loan Proceeds Subaccount in an amount equal to the amounts identified on the Loan Closing Statement as the "Excess Loan Proceeds Deposit."

(ii)     *Disbursements.* The Servicer shall (A) disburse amounts from Eligible Funds on deposit in the Excess Loan Proceeds Subaccount as necessary to fund disbursements from the Construction Account pursuant to Section 4.02(a)(ii) hereof, and (B) disburse and deposit into the Series A Lender Account or Series B Lender Account, as directed by Lender, all amounts then on deposit in the Loan Proceeds Subaccount required to be deposited in the Series A Lender Account or the Series B Lender Account pursuant to Sections 3.07 and 3.08 of the Loan Agreement.

**Section 4.03. Capitalized Interest Account.**

(a)     *Deposits.* Upon the funding of the Loan, a portion of the Loan shall be deposited into the Capitalized Interest Account in an amount equal to the amount identified on the Loan Closing Statement as the "Capitalized Interest Deposit."

(b)     *Disbursements.*

(i)     Commencing on the Revenue Account Monthly Disbursement Date occurring in October, 2007 and on each Revenue Account Monthly Disbursement Date thereafter until the depletion of all amounts in the Capitalized Interest Account, the Servicer shall disburse from the Capitalized Interest Account (without the need for a Disbursement Request or other instruction) an amount equal to the amount identified on Schedule 1 attached hereto for such date for application toward a portion of the total amount to be deposited to the Series A Lender Account or Series B Lender Account, as applicable, on such date pursuant to Section 4.04(b)(iv) or Section 4.04(b)(v), as applicable, hereof. Earnings attributable to the investment of funds in the Capitalized Interest Account shall be retained therein.

(ii)     Upon depletion of all amounts in the Capitalized Interest Account, the Servicer shall close such Account.

**Section 4.04. Revenue Account.**

(a)     *Deposits.*

(i)     The Borrower, within two Business Days after its receipt thereof, shall remit or cause to be remitted to the Eligible Institution(s) at which the Accounts are maintained all Operating Income (except (A) as otherwise provided in this Agreement with respect to investment earnings on any Account; (B) any amounts constituting a Prepayment Amount, which shall be deposited to the

Prepayment Account and administered pursuant to Section 4.16 hereof; and (C) any amounts on deposit in account numbers 223002408597 and 223002408607 held at Bank of America received by the Borrower for deposit to the Revenue Account. The Borrower shall instruct the Manager to remit or cause to be remitted to the Eligible Institution(s) at which the Accounts are maintained, within two Business Days after Manager's receipt thereof, all Operating Income received by Manager for deposit to the Revenue Account. The Servicer shall deliver to the Eligible Institution(s) at which the Accounts are maintained for deposit into the Revenue Account all Operating Income when received by the Servicer.

(ii)     The Servicer shall deposit into the Revenue Account all Account balances (or portions thereof) and investment earnings thereon as and when required by this Agreement.

(iii)     The Servicer shall deposit into the Revenue Account all other moneys received by it that are accompanied by directions of the Borrower, the Borrower and/or the Lender, as applicable, that such moneys are to be deposited into the Revenue Account.

(b)     *Disbursements When No Event of Default Notice and Direction Is In Effect.* Unless the Servicer has received an Event of Default Notice and Direction, on each Revenue Account Monthly Disbursement Date, all moneys in the Revenue Account shall be paid, transferred, or retained in the Revenue Account by the Servicer in the following order of priority:

(i)     To the Borrower in accordance with the Borrower Standing Instructions, an amount equal to Operating Expenses (including base/property management fees, but excluding any asset management fees and costs of taxes, insurance and capital repair and replacement, which costs are to be paid from the Tax and Insurance Account or the Capital Repair/Replacement Account, as applicable, any incentive fee payable to the Manager, any fee payable to the Asset Manager, or any other Operating Expense payable from another Account pursuant to the terms of the Servicing Agreement) for the current month to the extent set forth on the Operating Budget, which amount shall be used by the Borrower solely to pay such Operating Expenses.

(ii)     To the Tax and Insurance Account, 1/12 of the annual budgeted amount for real estate taxes and insurance set forth on the Operating Budget.

(iii)     To the Capital Repair/Replacement Account, the Capital Repair/Replacement Amount, plus, unless directed for deposit to the Series A Lender Account pursuant to clause (iv) below, all proceeds of insurance or condemnation awards or damage awards.

(iv)     To the Series A Lender Account an amount equal to the monthly installment of principal, if any, and interest due during the month of such

Revenue Account Monthly Disbursement Date on the Series A Note as set forth on the amortization schedule attached hereto as Schedule 3, less that portion of such sum payable from the Capitalized Interest Account pursuant to this Agreement.

(v)     To the Series B Lender Account an amount equal to the monthly installment of principal, if any, and interest due during the month of such Revenue Account Monthly Disbursement Date on the Series B Note as set forth on the amortization schedule attached hereto as Schedule 3, less that portion of such sum payable from the Capitalized Interest Account pursuant to this Agreement.

(vi)     If the Liquidity Facility Provider has made advances under the Series A Liquidity Facility Agreement which have not been reimbursed by the applicable reimbursement date in accordance with Section 2.1(a) of the Liquidity Facility Reimbursement Agreement, to the Liquidity Facility Provider (pursuant to its written instructions delivered to the Servicer) an amount equal to the sum of all amounts then due and payable to the Liquidity Facility Provider pursuant to Section 2.1(a) of the Liquidity Facility Reimbursement Agreement.

(vii)     If the Liquidity Facility Provider has made advances under the Series B Liquidity Facility Agreement which have not been reimbursed by the applicable reimbursement date in accordance with Section 2.1(a) of the Liquidity Facility Reimbursement Agreement, to the Liquidity Facility Provider (pursuant to its written instructions delivered to the Servicer) an amount equal to the sum of all amounts then due and payable to the Liquidity Facility Provider pursuant to Section 2.1(a) of the Liquidity Facility Reimbursement Agreement.

(viii)     To the Borrower in accordance with written instructions delivered to the Servicer by the Borrower, an amount equal to any excess Operating Expenses for the current month not paid with amounts disbursed to Borrower pursuant to clause (i) above.

(ix)     To the Lender pursuant to a Lender Standing Instruction, an amount equal to (1) all proceeds of insurance and condemnation awards or damage awards deposited into the Revenue Account which the Lender has elected and is entitled pursuant to the Security Instrument to apply toward the Obligations to the extent the Servicer and the Borrower have been advised of the same in writing by the Lender, plus (2) all other amounts payable to or on behalf of the Lender by the Borrower pursuant to the Loan Documents (including, without limitation, Section 10.12 of the Loan Agreement).

(x)     To the Servicer (pursuant to written instructions delivered to the Servicer), all accrued and unpaid Servicer's Expenses and all other amounts due and payable to the Servicer by the Borrower pursuant to the Loan Documents.

(xi)     To the Series A Reserve Account, the amount necessary, if any, to increase the balance in the Series A Reserve Account (after taking into account all withdrawals, if any, therefrom with respect to the preceding month) to an amount equal to the Maximum Annual Debt Service on the Series A Note; provided, that unless and until the Lender or the Servicer has notified the Borrower and the Servicer that the Series A Liquidity Facility Agreement is no longer in full force and effect, no funds shall be deposited to the Series A Reserve Account pursuant to this clause (x).

(xii)    To the Series B Reserve Account, the amount necessary, if any, to increase the balance in the Series B Reserve Account (after taking into account all withdrawals, if any, therefrom with respect to the preceding month) to an amount equal to the Maximum Annual Debt Service on the Series B Note; provided, that unless and until the Lender or the Servicer has notified the Borrower and the Servicer that the Series B Liquidity Facility Agreement is no longer in full force and effect, no funds shall be deposited to the Series B Reserve Account pursuant to this clause (xi).

(xiii)   To the Tax and Insurance Account and the Capital Repair/Replacement Account, as applicable, an amount equal to any expired Reserve Account Contract previously delivered with respect to such Account, as applicable, to the extent that it was either (x) not drawn on in full prior to its expiration, or (y) not replaced with a replacement Reserve Account Contract or immediately available funds, in each case in accordance with the Servicing Agreement.

(xiv)    To the Incentive Management Fee Account, an amount equal to 2% of the Net Rental Revenue (as defined in, and pursuant to, the Property Management Agreement).

(xv)     To the Asset Manager, an amount equal to the monthly fee payable to the Asset Manager pursuant to the Asset Management Agreement.

(xvi)    From and After December 10, 2011, to the Developer, an amount equal to any Deferred Developer's Fee plus any interest thereon pursuant to the Developer Agreement.

(xvii)   To the Operating Reserve Account, the amount necessary, if any, to increase the balance in the Operating Reserve Account (after taking into account all withdrawals therefrom with respect to the preceding month) to an amount equal to the average monthly budgeted Operating Expenses set forth on the current approved Operating Budget.

(xviii)  To the Utility Cost Reserve Account, the amount necessary, if any, to increase the balance in the Utility Cost Reserve Account (after taking into account all withdrawals therefrom with respect to the preceding month) to an

amount equal to 1/12 of the annual budgeted utility cost amount as set forth on the current approved Operating Budget.

(xix)   The remaining amount, (A) prior to delivery of the Completion Date Certificate, to the Net Operating Income Subaccount, and (B) on and after delivery of the Completion Date Certificate, for the benefit of and to the Borrower in accordance with Borrower Standing Instructions; provided, the Servicer will pay directly to the Reinvestment Account (as defined in the Operating Agreement), to the extent the Servicer has received written instructions from the Designated Member, that portion of such amount that pursuant to the Borrower's Operating Agreement is to be deposited into the Reinvestment Account.

In the event that on any Revenue Account Monthly Disbursement Date there are insufficient funds in the Revenue Account to make the full amount of any payment or deposit required to be made on such date pursuant to any of clauses (i) through (xvi) above, to the extent such deficiency remains as of the next Revenue Account Monthly Disbursement Date, such deficiency shall be added to the amounts to be deposited or paid under such clause as of such subsequent Revenue Account Monthly Disbursement Date.

(c)   *Disbursements When An Event of Default Notice and Direction Is In Effect*. After delivery of an Event of Default Notice and Direction and until (i) all Events of Default thereunder have been cured (or waived) and the Lender has delivered to the Servicer and the Borrower a termination of such Event of Default Notice and Direction, or (ii) the Loan is accelerated (unless such acceleration is rescinded in accordance with the Loan Agreement and the other Loan Documents), on each Revenue Account Monthly Disbursement Date, the Servicer shall withdraw from the Revenue Account and disburse the following amounts in the following priority:

To the Borrower, the Servicer, the Liquidity Facility Provider or the Lender, as applicable, the amounts that otherwise would have been disbursed pursuant to Section 4.04(b)(i) through (xvi) hereof, for the purposes and otherwise in accordance with the terms of such Sections, respectively; provided, that if the Completion Date Certificate has been delivered to the Servicer, amounts in the Revenue Account otherwise disbursable pursuant to Section 4.04(b)(xvi)(B) hereof shall remain on deposit in the Revenue Account.

**Section 4.05. Incentive Management Fee Account.**

(a)   *Deposits*. The Servicer shall deposit into the Incentive Management Fee Account the amounts required to be deposited therein from the Revenue Account pursuant to Section 4.04(b)(xiii) hereof.

(b)   *Disbursements*.

(i)   Intentionally Omitted.

(ii)   Disbursements from the Incentive Management Fee Account shall be made following each calendar quarter pursuant to the written instructions of

the Borrower so long as the Designated Member has previously advised the Servicer in writing that the conditions for disbursement of the amount specified in such instructions of the Borrower have been met and confirming the amount of the Incentive Management Fee to be disbursed for such period.

(iii)    Immediately prior to the sixth Revenue Account Monthly Disbursement Date following the end of each Fiscal Year, if the Servicer shall not have received written instructions from the Borrower (approved by the Designated Member as provided in Section 4.05(b)(ii) hereof) to disburse any amounts deposited to the Incentive Management Fee Account during the previous fiscal year, the Servicer shall disburse all such amounts into the Revenue Account.

**Section 4.06.  Tax and Insurance Account.**

(a)    *Deposits.*  The Servicer shall deposit into the Tax and Insurance Account the amounts required to be deposited therein from the Revenue Account as required pursuant to Sections 4.04(b)(ii) and 4.04(b)(xii) hereof.

(b)    *Disbursements.*

(i)    Immediately    prior    to    each    Revenue    Account    Monthly Disbursement Date, the Servicer shall disburse into the Revenue Account any amount on deposit in the Tax and Insurance Account in excess of the aggregate of the amounts required to have been deposited therein pursuant to Section 4.04(b)(ii) hereof on all preceding Revenue Account Monthly Disbursement Dates in the then current Fiscal Year.

(ii)    Disbursements from the Tax and Insurance Account shall be made (A) subject to the terms of the Loan Agreement, pursuant to a Disbursement Request to pay the cost of insurance premiums and real estate taxes, if any, applicable to the Mortgaged Property as and when due, or (B) to the Revenue Account, pursuant to a written direction of the Borrower delivered to the Lender and the Servicer, upon delivery to the Servicer of a Reserve Account Contract having a face amount equal to the amount of the proposed disbursement then requested by the Borrower.

**Section 4.07.  Capital Repair/Replacement Account.**

(a)    *Deposits.*  The Servicer shall deposit into the Capital Repair/Replacement Account the amounts required to be deposited therein from the Revenue Account pursuant to Sections 4.04(b)(iii) and hereof.

(b)    *Disbursements.*  Disbursements from the Capital Repair/Replacement Account shall be made (A) subject to the terms of the Loan Agreement, pursuant to a Disbursement Request, which request shall be consistent with the Operating Budget or otherwise approved by the Designated Member, or (B) to the Revenue Account, pursuant to a written direction of the Borrower delivered to the Lender and the Servicer, upon

delivery to the Servicer of a Reserve Account Contract having a face amount equal to the amount of the proposed disbursement then requested by the Borrower.

**Section 4.08.  Operating Reserve Account.**

    (a)    *Deposits.*

        (i)    Upon the funding of the Loan, a portion of the Loan in an amount equal to the amount identified on the Loan Closing Statement as the "Operating Reserve Deposit" shall be deposited into the Operating Reserve Account.

        (ii)    The Servicer shall deposit into the Operating Reserve Account the amounts required to be deposited therein from the Revenue Account pursuant to Section 4.04(b)(xiv) hereof.

    (b)    *Disbursements.*

        (i)    Intentionally Omitted.

        (ii)    Disbursements from the Operating Reserve Account shall be made (A) pursuant to a Disbursement Request to pay for unexpected or extraordinary Operating Expenses not paid pursuant to Sections 4.04(b)(i) or 4.04(b)(vii), or (B) to the Revenue Account, pursuant to a written direction of the Borrower delivered to the Lender and the Servicer, upon delivery to the Servicer of a Reserve Account Contract having a face amount equal to the amount of the proposed disbursement then requested by the Borrower.

**Section 4.09.  Loan Reserve Accounts.**

    (a)    *Series A Reserve Account.*

        (i)    *Deposits.*  The Servicer shall deposit into the Series A Reserve Account the amounts required to be deposited therein from the Revenue Account pursuant to Sections 4.04(b)(x) and 4.04(c) hereof.

        (ii)    *Disbursements.*

            (A)    Immediately prior to the first Revenue Account Monthly Disbursement Date in each calendar year, the Servicer shall disburse into the Revenue Account any amount on deposit in the Series A Reserve Account in excess of the then current Series A Maximum Annual Debt Service.

            (B)    Subject to Section 4.09(a)(ii)(C), disbursements from the Series A Reserve Account shall be made by the Servicer (without the need for further direction) on any Revenue Account Monthly Disbursement Date to pay amounts payable pursuant to Section 4.04(b)(iv) hereof on such date to the extent amounts in or available from the Revenue Account,

the Capitalized Interest Account, the Construction Account and the Series A Liquidity Facility, in that order, pursuant to the terms of this Agreement are not sufficient to pay such amounts.

(C)     The Servicer shall disburse amounts from the Series A Reserve Account to the Revenue Account, pursuant to a written direction from the Borrower delivered to the Lender and the Servicer, upon delivery to the Servicer of a Reserve Account Contract having a face amount at least equal to the amount of the proposed disbursement then requested by the Borrower.

(b)     *Series B Reserve Account.*

(i)     *Deposits.* The Servicer shall deposit into the Series B Reserve Account the amounts required to be deposited therein from the Revenue Account pursuant to Sections 4.04(b)(xi) and 4.04(c) hereof.

(ii)     *Disbursements.*

(A)     Immediately prior to the first Revenue Account Monthly Disbursement Date in each calendar year, the Servicer shall disburse into the Revenue Account any amount on deposit in the Series B Reserve Account in excess of the then current Series B Maximum Annual Debt Service.

(B)     Subject to Section 4.09(b)(ii)(C), disbursements from the Series B Reserve Account shall be made by the Servicer (without the need for further direction) on any Revenue Account Monthly Disbursement Date to pay amounts payable pursuant to Section 4.04(b)(vi) hereof on such date to the extent amounts in or available from the Revenue Account, the Capitalized Interest Account, the Construction Account and the Series B Liquidity Facility, in that order, pursuant to the terms of this Agreement are not sufficient to pay such amounts.

(C)     The Servicer shall disburse amounts from the Series B Reserve Account to the Revenue Account, pursuant to a written direction from the Borrower delivered to the Lender and the Servicer, upon delivery to the Servicer of a Reserve Account Contract having a face amount at least equal to the amount of the proposed disbursement then requested by the Borrower.

**Section 4.10.  Lender Accounts.**

(a)     *Series A Lender Account.*

(i)     *Deposits.* The Servicer shall deposit into the Series A Lender Account (i) the amounts required to be deposited into the Series A Lender Account (A) from the Capitalized Interest Account or the Revenue Account

pursuant to Section 4.04(b)(iv) hereof and (B) from the Series A Reserve Account pursuant to Section 4.09(a)(ii) hereof; (ii) funds from such of the Accounts as may be directed by the Lender pursuant to Section 8.03 hereof; and (iii) amounts paid to the Lender representing an Advance under the Series A Liquidity Facility.

(ii)     *Disbursements.*  From monies on deposit in the Series A Lender Account as of each Revenue Account Monthly Disbursement Date, the Servicer shall disburse from the Series A Lender Account, (i) on the immediately following Debt Service Payment Date, to the Servicer (pursuant to its instructions), all accrued and unpaid Servicer's Regular Monthly Fees; (ii) on the immediately following Debt Service Payment Date, to the Lender, pursuant to the Lender Standing Instructions, the monthly installment of principal, if any, and Net Loan Interest due during the month of such Debt Service Payment Date on the Series A Note as set forth on the amortization schedule for the Series A Note attached hereto as Schedule 2.  If the amount on deposit in the Series A Lender Account as of any Revenue Account Monthly Disbursement Date (after the application of Section 4.04(b) as of such date) is less than the sum of the amounts described in clauses (i), (ii) and (iii) of this Section 4.10(a)(ii), the Servicer shall disburse such amounts as are on deposit in the Lender Account on the dates specified in clauses (i), (ii) and (iii) to the Servicer and the Lender pro rata.  Any amount remaining in the Series A Lender Account on such Debt Service Payment Date shall be disbursed to the Revenue Account.

(b)     ***Series B Lender Account.***

(i)     *Deposits.*  The Servicer shall deposit into the Series B Lender Account (i) the amounts required to be deposited into the Series B Lender Account (A) from the Capitalized Interest Account or the Revenue Account pursuant to Section 4.04(b)(vi) hereof and (B) from the Series B Reserve Account pursuant to Section 4.09(b)(ii) hereof; (ii) funds from such of the Accounts as may be directed by the Lender pursuant to Section 8.03 hereof; and (iii) amounts paid to the Lender representing an Advance under the Series B Liquidity Facility.

(ii)     *Disbursements.*  From monies on deposit in the Series B Lender Account as of each Revenue Account Monthly Disbursement Date, the Servicer shall disburse from the Series B Lender Account, on a *pari passu* basis, (i) on the immediately following Debt Service Payment Date, to the Servicer (pursuant to its instructions), all accrued and unpaid Servicer's Regular Monthly Fees; (ii) on the immediately following Debt Service Payment Date, to the Lender, pursuant to the Lender Standing Instructions, the sum of: (A) the monthly installment of principal, if any, and Net Loan Interest due during the month of such Debt Service Payment Date on the Series B Note as set forth on the amortization schedule for the Series B Note attached hereto as Schedule 3.  If the amount on deposit in the Series B Lender Account as of any Revenue Account Monthly Disbursement Date (after the application of Section 4.04(b) as of such date) is less than the sum of the amounts described in clauses (i) and (ii) of this Section 4.10(b)(ii), the Servicer shall disburse such amounts as are on deposit in the Series B Lender Account on

the dates specified in clauses (i) and (ii) to the Servicer and the Lender pro rata. Any amount remaining in the Series B Lender Account on such Debt Service Payment Date shall be disbursed to the Revenue Account.

**Section 4.11.  Utility Cost Reserve Account.**

(a)    *Deposits.*

(i)    Upon the funding of the Loan, a portion of the Loan in an amount equal to the amount identified on the Loan Closing Statement as the "Utility Reserve Deposit" shall be deposited into the Utility Cost Reserve Account.

(ii)    The Servicer shall deposit into the Utility Cost Reserve Account the amounts required to be deposited therein from the Revenue Account pursuant to Section 4.04(b)(xv) hereof.

(b)    *Disbursements.*

(i)    Disbursements from the Utility Cost Reserve Account shall be made pursuant to a Disbursement Request approved in writing by the Designated Member to pay extraordinary costs of utility service to the Premises not paid for with money disbursed pursuant to Sections 4.04(b)(i) and 4.08 hereof, or (B) to the Revenue Account, pursuant to a written direction of the Borrower delivered to the Lender and the Servicer, upon delivery to the Servicer of a Reserve Account contract having a face amount equal to the amount of the proposed disbursement then requested by the Borrower.

(ii)    Upon the Borrower's certification to the Servicer, approved in writing by the Designated Member, that all residential rental units in the Project are individually metered for utilities, the Servicer shall disburse into the Revenue Account all amounts remaining on deposit in the Utility Cost Reserve Account, and such Account, together with any obligation to make deposits thereto, shall terminate.

**Section 4.12.  Tenant Security Deposit Account.**

(a)    *Deposits.*

(i)    On the date hereof, the Government shall transfer any funds representing security deposits from Tenants residing at the Project as of such date into the Tenant Security Deposit Account.

(ii)    Borrower shall cause any security deposit received from a Tenant to be deposited promptly into the Tenant Security Deposit Account.

(b)    *Disbursements.*  Withdrawals from the Tenant Security Deposit Account shall be made pursuant to a Disbursement Request which includes a certification from the Borrower certifying (i) the accuracy and completeness of the information included in the

Disbursement Request, and (ii) that the disbursement proceeds will be used by the Borrower either (A) to reimburse the Borrower for moneys used to return tenant security deposits during the immediately preceding calendar month or (B) to cure defaults under tenant leases. Disbursements from the Tenant Security Deposit Account shall not be made more frequently than twice per calendar month or more frequently than every two weeks. The Tenant Security Deposit Account shall be held and maintained in accordance with all Applicable Laws for the benefit of the Tenants whose security deposits are being held therein.

### Section 4.13.  Investment of Funds Held by the Servicer.

(a)     The moneys initially deposited into the Capitalized Interest Account and the Loan Proceeds Subaccount will initially be invested pursuant to separate investment agreements selected by Capmark Capital in its individual capacity that are approved by the Borrower.  The Borrower hereby directs the Servicer to enter into each such investment agreement and agrees that it will not provide the Servicer with other or conflicting investment directions regarding the moneys held in the account or subaccounts invested in any such investment agreement so long as the related investment agreement is in effect.  All other moneys held as part of any Account (other than the Tenant Security Deposit Account), including any moneys drawn from, or available upon termination of, the initial investment described in the first sentence of this Section, shall be invested by the Servicer at the direction of the Borrower (or, if an Event of Default Notice and Direction is in effect, the Lender) in Permitted Investments.  The Tenant Security Deposit Account shall be a non-interest bearing account unless the Borrower otherwise directs the Servicer in writing and certifies that holding such moneys in such interest-bearing account will be in compliance with all Applicable Laws.  The Servicer shall be authorized to withdraw funds from and provide directions to the provider of any investment agreement or similar investment unless and until the Lender notifies the provider not to honor withdrawal requests or directions from the Servicer.  The Servicer shall, subject to Section 4.13(c) hereof, sell and reduce to cash a sufficient amount of the investments held in any Account in order to permit the cash balance therein to be sufficient to make any disbursement when required to be made therefrom.  Except as otherwise provided herein, investments shall be valued at the lower of cost plus accrued interest or market value plus accrued interest, as of the date of determination.  Fees and costs incurred by the Servicer in connection with investments shall be included in the Servicer's Expenses.  The Borrower shall select Permitted Investments with maturity dates two Business Days prior to the anticipated disbursement of the applicable funds hereunder or, with respect to a Permitted Investment payable on demand, the Servicer shall demand payment thereof two Business Days prior to the anticipated disbursement of the applicable funds hereunder.  Thereafter, the proceeds of such Permitted Investments shall be held uninvested.  Absent a default thereof, no such Permitted Investment shall be sold prior to its maturity.

(b)     The Permitted Investments purchased shall be held by the Servicer and shall be deemed at all times to be part of the Account or combination of Accounts from which funds were invested in the Permitted Investments.

(c)     The Servicer shall use efforts consistent with the Servicing Standard to sell at the best price obtainable, or present for redemption, any Permitted Investments purchased by it as an investment whenever it shall be necessary to provide money to meet any payment from the applicable Account.

(d)     Money in any Account may be pooled for the purpose of making investments.  Any purchase of Permitted Investments may be made by or through the Servicer or any of its affiliates.

(e)     Notwithstanding the foregoing, the Servicer shall not be responsible or liable for any losses on investments made by it hereunder or for keeping all Accounts held by it fully invested at all times, its only responsibility being to comply with this Agreement and the investment instructions of the Lender or the Borrower, as applicable, pursuant to this Agreement in a non-negligent manner.

**Section 4.14.  Credit to Revenue Account.**

(a)     Credit and collections of the money deposited to the Revenue Account shall be subject to the applicable Eligible Institution's standard collection and credit procedure for similar deposits received by such Eligible Institution.  Without limiting the generality of the foregoing, (i) the Servicer will accept for deposit items payable to or endorsed in favor of the Borrower (or a reasonable variation of the Borrower's name); (ii) all undated checks will be dated as of the date of receipt and processed as described above; (iii) where written and numeric amounts differ, a check shall be processed for the written amount; (iv) checks which do not bear the drawer's signature shall be marked or stamped "refer to maker" and processed; (v) checks with alterations will be processed and such alterations shall be ignored; and (vi) checks drawn on foreign currency will be processed in accordance with the Servicer's normal procedure for such checks.

(b)     The Borrower hereby agrees to indemnify and hold the Servicer harmless against any loss, Servicer's Expenses, claims, interest expense or suit suffered by the Servicer and arising out of or in connection with its receiving, processing or depositing of checks, drafts or other payment items pursuant to this Agreement, other than such arising out of the Servicer's gross negligence or willful misconduct.

(c)     If a payment item is received that is made payable to, or is endorsed to, a payee other than as stated above, the Borrower shall fully and completely cooperate with the Servicer without delay in causing the Operating Income represented by the item to be credited to the Revenue Account.

(d)     The Servicer will maintain a record (microfilm or otherwise) of all checks and other negotiable items received by it in collecting the contents of the Revenue Account to facilitate reconstruction of a deposit should the need arise and the request be made.

**Section 4.15.  Uncollectible Drafts.**  The Servicer will direct the applicable Eligible Institution to re-deposit one time any item deposited by or on behalf of the Borrower in the Revenue Account or the Tenant Security Deposit Account, as applicable, that is returned for

insufficient or uncollected funds. If such item is returned unpaid a second time or if such amount is otherwise uncollectible by the Servicer ("Uncollectible Draft"), including without limitation by any "stop payment order" having been applied to such draft, the Servicer may debit the Revenue Account or the Tenant Security Deposit Account, as applicable, as an Operating Expense for (i) any Servicer's Expenses incurred by the Servicer in connection with its deposit or collection attempts, and (ii) the amount represented by such Uncollectible Draft if such amount has actually been paid by the Servicer prior to the Servicer's collection thereof (together, "Costs of Uncollectible Drafts"); provided, however, that amounts in the Revenue Account will first be applied to reimburse the Servicer for amounts contemplated by the foregoing clause (ii). If amounts in the Revenue Account are insufficient to fully reimburse the Servicer for the Costs of Uncollectible Drafts, the Borrower agrees to pay such deficiency to the Servicer.

**Section 4.16.  Reserve Account Contract.**

(a)    As used herein, the term "Reserve Account Contract" means a surety bond, insurance policy, letter of credit, investment agreement, investment contract or similar instrument which provides for payment on demand, in form and substance reasonably satisfactory to the Servicer, naming the Servicer, as agent of the Lender, as beneficiary, which can be drawn upon in Chicago, Illinois (until delivery of the Completion Date Certificate and thereafter Philadelphia, Pennsylvania) and which otherwise complies with the provisions of this Section 4.16.  Any Reserve Account Contract delivered under this Section 4.16 must be issued by an obligor licensed to do business in Illinois (until delivery of the Completion Date Certificate and thereafter Pennsylvania), whose obligations under the Reserve Account Contract are (i) rated at least "AA" by S&P or "Aa2" by Moody's and (ii) not on a credit watch for a downgrading below such ratings.  If at any time any issuer of a Reserve Account Contract shall no longer have such required debt rating, the Borrower shall, at its option, within 10 Business Days after notice from the Lender or the Servicer, either cause a replacement Reserve Account Contract to be issued by an issuer licensed to do business in Illinois (until delivery of the Completion Date Certificate and thereafter Pennsylvania) which has such required debt rating or replace such Reserve Account Contract with immediately available funds in the requisite amount (provided that the failure to do either of such acts shall not, in and of itself constitute an Event of Default).  Each Reserve Account Contract shall be irrevocable, shall be in effect for an initial period of not less than one year, and shall provide that the same shall be automatically renewed for successive periods of at least one year, without any action whatsoever on the part of the Lender or the Servicer.  The issuer of a Reserve Account Contract shall have the right to elect not to renew such Reserve Account Contract only on written notice to the Lender and the Servicer given not less than 30 days prior to the then current expiration date thereof.  However, the privilege of the issuer to elect not to renew such Reserve Account Contract shall not diminish the obligation of the Borrower to maintain such Reserve Account Contract in accordance with the terms of this Agreement or to deposit immediately available funds in the requisite amount.  In addition, each Reserve Account Contract shall expressly provide by its terms that (A) the Servicer, as agent of the Lender, shall have the right to draw down an amount up to the face amount of the Reserve Account Contract (and in multiple partial draws) at any time upon presentation to the issuer thereof of the original of such Reserve Account Contract and the Servicer's certified statement that the Servicer is entitled to

draw such amount under the provisions of this Agreement (and without any other condition or qualification as to any such draw), and (B) the issuer will honor such draw request by the Servicer immediately upon such presentation and without inquiry as to the accuracy of the statement and regardless of whether the Borrower or other account party contests the draw.

(b)     The Borrower may deliver to the Servicer on behalf of the Lender, a Reserve Account Contract in lieu of all or a portion of the amounts on deposit in the Tax and Insurance Account, the Operating Reserve Account, the Utility Cost Reserve Account, the Capital Repair/Replacement Account, the Series A Reserve Account and/or the Series B Reserve Account pursuant to Sections 4.06, 4.07, 4.08, 4.09 and 4.11 hereof, as applicable.

(c)     If the issuer of a Reserve Account Contract notifies the Servicer that it will not renew any then current Reserve Account Contract it has issued, the Servicer will accept a replacement thereof (to be in effect not later than 10 days prior to the expiration of the then expiring Reserve Account Contract), upon the terms and conditions required by this Section 4.16. If as of the 10th day prior to the expiration of a Reserve Account Contract, such Reserve Account Contract has not been renewed or replaced and the Borrower, at its option, has not delivered to the Servicer cash or immediately available funds in an amount equal to the face amount of such Reserve Account Contract for deposit into the Operating Reserve Account, the Utility Cost Reserve Account, the Tax and Insurance Account, the Capital Repair/Replacement Account, the Series A Reserve Account or the Series B Reserve Account, as applicable, then on the next succeeding Business Day the Servicer shall (immediately and without the need for further direction from the Lender and regardless of any contest or protest by the Borrower) draw on such existing Reserve Account Contract prior to its expiration and the proceeds therefrom shall be deposited by the Servicer to the Operating Reserve Account, the Utility Cost Reserve Account, the Tax and Insurance Account, the Capital Repair/Replacement Account, the Series A Reserve Account or the Series B Reserve Account, as applicable.

(d)     The Servicer shall (immediately and without the need for further direction from the Lender and regardless of any contest or protest by the Borrower) draw upon any Reserve Account Contract (i) to the extent there are insufficient moneys in the Account for which such Reserve Account Contract was delivered (after all other money and proceeds from Permitted Investments on deposit therein have been exhausted) to fund any disbursement required from such Account pursuant to this Agreement; (ii) in the full face amount thereof, if it is not extended or replaced as provided in Section 4.16(c) hereof at least 10 days prior to its expiration (or upon the expiration of the 10-day period described in Section 4.16(a), if not replaced within such period, in the case of the issuer failing to maintain a required debt rating); or (iii) if and to the extent the Servicer is directed by the Lender to make such draw pursuant to an Event of Default Notice and Direction delivered under Section 8.03. The proceeds of any draw by the Servicer under any Reserve Account Contract pursuant to this Section 4.16(d) shall be deposited into the Account for which such Reserve Account Contract was delivered.

**Section 4.17. Prepayments.** The Borrower shall deposit or cause to be deposited into the Prepayment Account all Prepayment Amounts under the Notes as and when due under the Loan Documents. On each date on which a Prepayment Amount is so deposited, the Servicer shall disburse from the Prepayment Account the full amount of such Prepayment Amount to the following Persons in the following amounts on a pari passu basis:

      (a)    to the Lender, pursuant to the Lender Standing Instructions delivered by the Lender to the Servicer, the full Prepayment Amount due with respect to the Notes minus the amount of the applicable Servicer's Prepayment Fee; and

      (b)    to the Servicer, the aggregate Servicer's Prepayment Fee.

# ARTICLE V
## COVENANTS OF THE BORROWER

**Section 5.01. Lease Payments To Be Paid to the Servicer.** The Borrower shall (i) instruct the Government (or its agent) or, to the extent a tenant is paying such amounts directly (other than partial month payments), each such tenant of units within the Property to remit all payments payable by such Person to the Borrower (whether paid by check or electronic transfer) directly to the Revenue Account pursuant to Section 4.04 hereof and (ii) instruct the Manager to deposit all Operating Income received by it to the Revenue Account pursuant to Section 4.04 hereof and all Tenant Security deposits received by it to the Tenant Security Deposit Account pursuant to Section 4.12 hereof.

**Section 5.02. Appointment of the Servicer as Attorney-in-Fact.** The Borrower hereby irrevocably constitutes and appoints the Servicer, on behalf of the Lender, as the Borrower's true and lawful attorney-in-fact, with full power of substitution:

      (a)    after the occurrence and during the continuance of an Event of Default, to execute, acknowledge and deliver any instruments and to exercise and enforce in any commercially reasonable manner every right, power, remedy, option and privilege of the Borrower with respect to the Collateral;

      (b)    to receive the Operating Income with the full power to endorse the name of the Borrower upon any notes, checks, acceptances, drafts, money orders in any commercially reasonable manner instruments and documents relating to the Operating Income and to effect in any commercially reasonable manner the deposit and collection thereof, subject to the terms of this Agreement and applicable law; and

      (c)    after the occurrence and during the continuance of an Event of Default, to do any and all things necessary to take such action in the name and on behalf of the Borrower to carry out the intent of this Agreement or which the Servicer or the Lender deems necessary to more fully vest in the Servicer, as agent for the Lender, the rights and remedies provided for herein,

in the name, place and stead of the Borrower. The Borrower agrees that neither the Servicer nor any of its agents, designees or attorneys in fact shall be liable for any acts or omissions or for any error or judgment or mistake of fact or law in respect of the exercise of this power of attorney,

except for the negligence or willful misconduct of the Servicer or its employees or agents. This power of attorney is irrevocable and coupled with an interest.

**Section 5.03. Borrower To Provide Access to Property and Books.** Upon reasonable prior written notice, each Lender, the Servicer and their agents and representatives shall be provided such reasonable access to the Premises and the books and records maintained with respect to the Mortgaged Property and the activities of the Borrower by the Borrower (such access to be during business hours and to be upon reasonable advance written notice) as shall be reasonably necessary to permit the Lender, the Servicer and such agents and representatives to take all necessary action to ensure the compliance by the Borrower with the terms and conditions of this Agreement.

**Section 5.04. Borrower To Provide Information.** The Borrower shall comply with all reasonable requests for information by the Lender, the Servicer or their agents or representatives from time to time.

**Section 5.05. Borrower Remains Liable.** The Lender nor the Servicer shall, by reason of this Agreement, have any obligation or liability under the Leases or any Government Agreement, nor shall the Lender or the Servicer be obligated to perform any of the obligations or duties of the Borrower thereunder, all of which shall remain the sole obligations of the Borrower; provided, the foregoing shall not limit or modify the obligations of the Lender or the Servicer under the Loan Documents.

**Section 5.06. Operating Budget.** The Borrower shall deliver a copy of each Operating Budget, when available (together with written approval thereof executed by the Servicer on behalf of the Lender to the extent that a Lender's approval thereof is required pursuant to the terms of the Loan Documents) to the Servicer, whereupon such Operating Budget shall be the "Operating Budget" for all purposes of this Agreement and shall replace and supersede any previous "Operating Budget" used hereunder.

## ARTICLE VI

## PLEDGE OF ACCOUNTS

**Section 6.01. Security for Obligations.**

(a)     To secure the full and punctual payment and performance of all obligations of the Borrower under the Loan Documents now or hereafter existing with respect to the Loan, whether for principal, interest, fees, expenses or otherwise, the Borrower hereby grants to the Lender a first priority continuing security interest in and to the right, title and interest of the Borrower, whether now owned or existing or hereafter acquired or arising, and regardless of where located, in the following (collectively referred to herein as the "Collateral"):

(i)     the Accounts and all cash, checks, drafts, certificates and instruments, if any, from time to time deposited or held in such Accounts including, without limitation, all deposits or wire transfers made to such Accounts;

(ii)     any and all amounts invested in Permitted Investments in such Accounts;

(iii)    all interest, dividends, cash, instruments and other property from time to time received, receivable or otherwise payable in respect of, or in exchange for, any or all of the foregoing; and

(iv)    to the extent not covered by clauses (i), (ii) or (iii) above, all "proceeds" (as defined under the UCC) of any or all of the foregoing.

(b)     The Servicer acknowledges that this Agreement constitutes notice, in accordance with Sections 9-104 and 9-106 of the UCC, of the Lender's security interest in the Collateral and does hereby consent thereto.  The Lender hereby appoints the Servicer as the Lender's agent and pledgee-in-possession for the Accounts and all funds, receipts, deposits and investments contained therein, and the Servicer hereby accepts such appointment and agrees to be bound by the terms of this Agreement.  The Borrower hereby agrees to such appointment and further agrees that the Servicer, on behalf of the Lender, shall be entitled to exercise, upon the written instructions of the Lender (subject to the Security Instrument), any and all rights and remedies which the Lender (subject to the Security Instrument) may have under the Loan Documents or under applicable law with respect to the Accounts and all funds, receipts, deposits and investments contained therein.

(c)     Notwithstanding anything to the contrary in any Loan Document, the Lender shall not have any lien on, and no lien shall attach to, the Reinvestment Account (as defined in the Operating Agreement).

**Section 6.02. Financing Statement; Further Assurances.**  Simultaneously herewith, the Borrower shall deliver to the Lender for filing a financing statement or statements in connection with the Collateral in the form reasonably required by the Lender to properly perfect their respective security interest therein.  The Borrower agrees that at any time and from time to time, at the expense of the Borrower, the Borrower will promptly execute, if applicable, and deliver all further control agreements, instruments and documents, and take all further action, that is necessary and that the Servicer or the Lender, or assignee thereof or successor thereto, reasonably requests, in order to perfect and protect any security interest granted or purported to be granted hereby (including, without limitation, any security interest in and to any Permitted Investments) or to enable the Lender (subject to the Security Instrument), or the Servicer on behalf of the Lender (subject to the Security Instrument), to exercise and enforce the Lender's rights and remedies hereunder with respect to any Collateral.

**Section 6.03. Termination of Agreement.**  This Agreement shall create a continuing security interest in the Collateral and shall remain in full force and effect until payment and performance in full of the obligations of the Borrower in accordance with the Loan Documents, unless sooner terminated as provided herein.  Upon payment and performance in full of the obligations of the Borrower under the Loan Documents, this Agreement shall terminate and the Borrower shall be entitled to the return, at its expense, of such of the Collateral as shall not have been sold or otherwise applied pursuant to the terms hereof, and the Servicer and/or the Lender

shall execute such instruments and documents as may be reasonably requested by the Borrower to evidence such termination and the release of the Lien hereof. The Lender shall duly notify the Servicer in the event this Agreement is terminated pursuant to the terms of this Section 6.03.

**Section 6.04. Transfers and Other Liens.** The Borrower agrees that it will not (a) sell or otherwise dispose of any of the Collateral or (b) create or permit to exist any Lien upon or with respect to all or any of the Collateral, except for the Liens granted to the Lender under this Agreement or as otherwise permitted or required by the terms of any Loan Document.

**Section 6.05. Control.** The Servicer hereby acknowledges that, to the extent that it holds, or a third party holds on its behalf, physical possession of or "control" (as defined in the UCC) over the Accounts or the Collateral or any other Mortgaged Property (as defined in the Security Instrument) pursuant to the Loan Documents, such possession or control is for the benefit of the Lender solely to the extent required to perfect Lender's security interest in such Collateral and Mortgaged Property. Nothing in the preceding sentence shall be construed to impose any duty on the Servicer (or any third party acting on its behalf) with respect to such Collateral or Mortgaged Property or provide the Lender with any rights with respect to such Collateral and Mortgaged Property beyond those specified in this Agreement, the Security Instrument, and the other Loan Documents.

**ARTICLE VII**

**SERVICER DEFAULTS AND REMEDIES**

**Section 7.01. Servicer Default Defined.** For the purpose of this Agreement, each of the following events is hereby defined as, and is declared to be, a "Servicer Default":

(a)    failure by the Servicer to disburse any moneys on the date and in the manner required by Article IV hereof;

(b)    default in the performance or observance of any of the other duties, obligations, covenants or agreements of the Servicer hereunder (other than as set forth in subsection (a) of this Section) which continues for 30 days following written notice of such default to the Servicer from the Lender or the Borrower; *provided, however,* that if such default is not reasonably susceptible to cure within such 30 day period but the Servicer has commenced action to cure such default within such 30 day period, the Servicer shall not be in default so long as it diligently prosecutes such cure to completion within a reasonable time thereafter, but in no event beyond 120 days after the date of such notice;

(c)    a case or proceeding is commenced against the Servicer (i) seeking a decree or order in respect of the Servicer under any applicable federal, state or foreign bankruptcy, or other similar law; (ii) seeking the appointment of a custodian, receiver, liquidator, assignee, trustee or sequestrator (or similar official) for the Servicer or of any substantial part of such Person's assets; or (iii) seeking the winding-up or liquidation of

the affairs of the Servicer and any such case or proceeding remains undismissed, unstayed, unbonded or undischarged for a period of 60 days;

      (d)     the Servicer (i) files a petition seeking relief under any applicable federal, state or foreign bankruptcy, or other similar law; (ii) consents to the institution of proceedings thereunder or to the filing of any such petition or to the appointment of or taking possession by a custodian, receiver, liquidator, assignee, trustee or sequestrator (or similar official) of the Servicer or of any substantial part of such Person's assets; (iii) makes a general assignment for the benefit of its creditors; (iv) takes any corporate action to authorize any of the foregoing; or (v) admits in writing its inability to, or shall be generally unable to, pay its debts as such debts as such debts become due; or

      (e)     the Servicer shall, in any manner (voluntarily, by operation of law or otherwise) assign, hypothecate, pledge, transfer, permit or suffer the creation of a Lien on or security interest in, or shall accept instructions from any Person other than the Lender with respect to this Agreement (except the Borrower to the extent expressly provided under this Agreement), the Accounts, the amounts held in any Account or any right or interest therein or any rights of the Lender hereunder.

**Section 7.02. Remedies for Servicer Defaults.**  Upon the occurrence and during the continuance of a Servicer Default hereunder:

      (a)     the Lender may, and at the request of the Borrower, shall remove the Servicer in accordance with Section 9.05 hereof; provided that in connection with any such removal of the Servicer by the Lender pursuant to this Section 7.02 (and notwithstanding the requirements of Section 9.05 hereof), the Lender shall have the right to immediately appoint a Person to act as Servicer hereunder on an interim basis until such time as a successor Servicer, reasonably acceptable to the Borrower and the Lender, has been appointed in accordance with Section 9.05; and

      (b)     regardless of whether the Servicer has been removed in accordance with Section 9.05 hereof but subject to Section 7.03 hereof, the Lender and/or the Borrower may take whatever action at law or in equity may appear necessary or desirable to enforce any provision of this Agreement and for any damages suffered as a result of such Servicer Default and may offset any Servicer's Fees and Expenses otherwise due to the removed Servicer against such damages.

**Section 7.03. Limitations on Servicer Liability.**

      (a)     The Servicer shall be liable under this Agreement only to the extent of the obligations specifically imposed upon the Servicer herein.  Neither the Servicer nor any of the directors, officers, employees or agents of the Servicer shall be under any liability to any Person for any action taken, or for refraining from the taking of any action, in good faith pursuant to this Agreement or for errors of judgment; *provided, however,* that this provision shall not protect the Servicer, any director, officer, employee or agent of the Servicer (collectively, the "Servicer Parties") against any breach of warranties or representations made herein or any liability which would otherwise be imposed by reason

of the Servicer's (i) negligence with respect to wiring, transferring or accounting, or making any payment with respect to any moneys or investments; (ii) willful misfeasance, bad faith or gross negligence in the performance of the Servicer's duties; or (iii) reckless disregard of the Servicer's obligations and duties hereunder.

(b)     The Servicer and any Servicer Party may rely in good faith on any document of any kind prima facie properly executed and submitted by or on behalf of the Borrower or the Lender respecting any matters arising hereunder.

(c)     The Servicer may rely and act upon the opinion or advice of any qualified attorneys (which opinion or advice shall be memorialized in writing and which attorney or attorneys may be the attorney or attorneys for the Lender or the Servicer) and the opinion of such counsel shall be full and complete authorization and protection in respect of any action taken or suffered by it hereunder and in good faith in accordance therewith. The Servicer shall not be responsible for any loss or damage resulting from any action or nonaction in good faith in reliance upon such opinion or advice. The Servicer shall not be responsible for any acts required to be performed by any Person other than the Servicer. Neither the Lender nor the Servicer shall have any liability for any loss resulting from the investment of funds in Permitted Investments made in accordance with the terms and conditions of this Agreement.

(d)     The Servicer assumes no responsibility for the correctness of, nor makes any representations as to the validity or sufficiency of, this Agreement nor shall it incur any responsibility in respect of its validity or sufficiency, other than in connection with the duties or obligations herein assigned to or imposed upon it.

(e)     The Servicer shall not withhold unreasonably its consent, approval, or action to any reasonable request of the Lender or the Borrower.

(f)     Subject to the terms of subsection (g) below, the Servicer shall be entitled to rely upon a Disbursement Request signed by an authorized officer or agent of the Lender (or, pursuant to this Agreement, the Servicer on behalf of the Lender) and/or the Borrower, as required by the applicable provisions of this Agreement, as sufficient evidence of the facts therein contained.

(g)     The Servicer shall not be required to take notice or be deemed to have notice of any Event of Default hereunder, or acceleration of the Loan under the Loan Documents, unless the Servicer shall be specifically notified in writing of such Event of Default or acceleration of a Loan by the applicable Lender, and, in the absence of such notice so delivered, the Servicer may conclusively assume there is no Event of Default or Loan acceleration except as aforesaid; provided, however, that if the deposits to the Revenue Account are materially different than the projected deposits contained in the Operating Budget, the Servicer shall have a duty to inquire as to the discrepancy.

(h)     Neither the Servicer nor any of the Servicer Parties shall be under any obligation to appear in, prosecute or defend any legal or administrative action, proceeding, hearing or examination that is not directly related to the Servicer's duties

under this Agreement. If any such action, proceeding, hearing or examination directly related to the Servicer's duties under this Agreement is undertaken, the legal expenses and costs thereof and any liability resulting therefrom shall be deemed to be part of the Servicer's Fees and Expenses for which the Servicer shall be entitled to be reimbursed pursuant to the terms hereof unless the Servicer is liable for the action on which it is based under subsection (a) of this Section, in which case the Servicer shall have no right to reimbursement or payment from the Operating Income, the Accounts, the Borrower or the Lender with respect thereto.

**Section 7.04. No Effect on Other Remedies.** Except as otherwise provided in Section 7.03 hereof, nothing contained herein shall in any way prohibit any party from exercising any rights and remedies available to it hereunder, under any of the other Loan Documents or by operation of law.

## ARTICLE VIII

### BORROWER DEFAULTS AND REMEDIES

**Section 8.01. Event of Default Defined.** For the purpose of this Agreement, an "Event of Default" as defined under the Loan Agreement and each of the following events are hereby defined as an "Event of Default":

(a)     failure of the Borrower, the members of the Borrower or the Manager to deposit or cause to be deposited any Operating Income or Loan proceeds with the Servicer as and when required by this Agreement; provided, however, an Event of Default shall not be deemed to have occurred hereunder to the extent that (i) Borrower is prevented from performing its obligations under this Agreement solely due to delays incurred by the Servicer in liquidating Permitted Investments or a Force Majeure Delay; or (ii) Servicer fails to distribute any funds otherwise available for distribution as required by this Agreement;

(b)     default in the performance or observance of any other Obligations by the Borrower to be kept, observed, and performed under this Agreement and continuation of such default for a period of 30 days after written notice thereof by the Lender or the Servicer; and

(c)     any representation made by the Borrower hereunder shall prove to have been false or misleading in any material respect when made by such party.

Notice of the occurrence of an Event of Default hereunder shall be immediately provided by the Servicer or the Lender to each other party to this Agreement.

**Section 8.02. Remedy on Default.** Upon the happening and continuance of an Event of Default hereunder, Lender may proceed to protect and enforce its rights hereunder by such of the following remedies as the Lender shall elect in its sole discretion (subject to the Security Instrument):

(a)    by suit, action or proceeding at law or in equity, to enforce the deposit of Operating Income to the Revenue Account; and

(b)    take whatever action at law or in equity or allowed under this Agreement as may appear necessary to enforce any covenant, obligation or agreement of the Borrower hereunder and the other Loan Documents.

**Section 8.03.  Rights on Default.**  Subject to Section 9.02 of the Loan Agreement, upon the occurrence and during the continuance of an Event of Default under the Loan Documents, the Lender may notify the Servicer in writing (with a copy thereof delivered to the Borrower), of such Event of Default (each notice an "Event of Default Notice and Direction"), whereupon, to the extent provided in such Event of Default Notice and Direction (as the same may be supplemented and modified) (i) the Borrower shall not have any further right to disbursements from the Accounts other than for payment of Operating Expenses (including property management fees, but excluding any asset management fee) pursuant to Section 4.04(c) hereof; and (ii) the Lender may (A) direct the Servicer to liquidate and transfer any amounts then invested in Permitted Investments to the Accounts or reinvest such amounts in other Permitted Investments as the Lender may reasonably determine is necessary to perfect or protect any security interest granted or purported to be granted hereby or to enable the Servicer, as agent for the Lender, or the Lender to exercise and enforce the Lender' rights and remedies hereunder with respect to any Collateral (subject to the Security Instrument); (B) charge, set-off and otherwise apply any funds in the Accounts to any Obligations in such order of priority as the Lender may determine in its sole discretion (subject to Section 43(j) of the Security Instrument); (C) exercise any and all rights and remedies available to it under this Agreement and/or as a secured party under the UCC; and (D) demand, collect, take possession of, receipt for, settle, compromise, adjust, sue for, foreclose or realize upon the Collateral (or any portion thereof) as the Lender may determine in its sole discretion (subject to the Security Instrument).

**Section 8.04.  Waiver by the Borrower.**  The Borrower hereby expressly waives, to the fullest extent permitted by law, presentment, demand, protest or any notice of any kind (except to the extent expressly provided for herein) in connection with this Agreement or the Collateral. The Borrower acknowledges and agrees that 10 days' prior written notice of the time and place of any public sale of the Collateral or any other intended disposition thereof shall be reasonable and sufficient notice to  the Borrower within the meaning of the UCC.

## ARTICLE IX

## OTHER PROVISIONS AFFECTING THE SERVICER

**Section 9.01.  Duties.**  The Servicer hereby accepts the trusts imposed upon it by this Agreement, and agrees to perform said trusts, but only upon and subject to the terms and conditions of this Agreement.

**Section 9.02.  Indemnity.**  The Servicer shall not be under any obligation or duty to perform any act that would involve it in expense or liability or to institute or defend any suit in respect hereof, or to advance any of its own monies. The Borrower shall indemnify and hold the Servicer, the Lender, Capmark Capital and their respective employees and officers harmless

from and against any loss, reasonable out-of-pocket cost or damage (including, without limitation, reasonable out-of-pocket attorneys' fees and disbursements, and reasonable out-of-pocket costs and expenses of defending against any claim or liability in connection with the Mortgaged Property, the Project, the Operating Income and any Account or Subaccount) incurred by the Servicer, Capmark Capital or the Lender arising out of or in connection with this Agreement, except to the extent that such loss or damage results from the Lender's or Capmark Capital's, as applicable, gross negligence or willful misconduct or the acts or omissions of the Servicer described in clauses (i) through (iii) of Section 7.03(a) hereof, or as a result of Servicer's breach of this Agreement.

**Section 9.03. Merger or Consolidation.** Any company or national banking association into which the Servicer may be merged or converted or with which it may be consolidated, or any company or national banking association resulting from any merger, conversion or consolidation to which it shall be a party or any company or national banking association to which the Servicer may sell or transfer all or substantially all of its business (provided any such company or national banking association shall be a company organized under the laws of any state of the United States or a national banking association and shall be eligible to perform all of the duties imposed upon it by this Agreement) shall be the successor hereunder to the Servicer without the execution or filing of any paper or the performance of any further act. The Servicer shall notify all other parties to this Agreement of any such merger, conversion or consolidation within five Business Days of its occurrence.

**Section 9.04. Resignation by the Servicer.** The Servicer shall have the right to resign as the Servicer hereunder upon 30 days' prior written notice to the Borrower and the Lender, and in the event of such resignation, the Lender shall appoint a successor Servicer with the consent of the Borrower, which consent shall not be unreasonably withheld. No such resignation by the Servicer shall become effective until a successor Servicer shall have accepted such appointment and executed an instrument by which it shall have assumed all of the rights and obligations of the Servicer hereunder. If no such successor Servicer is appointed within 30 days after receipt of the resigning Servicer's notice of resignation, the resigning Servicer may petition a court for the appointment of a successor Servicer. The resigning Servicer shall be entitled to the payment of all of Servicer's Fees and Expenses owed to it pursuant to Section 9.05 hereof up to the effective date of its resignation.

**Section 9.05. Removal of the Servicer.**

(a)     Capmark Capital, with the consent of the Borrower, which consent shall not be unreasonably withheld (provided, if an Event of Default has occurred and is continuing, the Borrower's consent shall not be required) (i) may remove the Servicer at any time, and shall remove the Servicer if at any time the Servicer shall cease to be eligible in accordance with the provisions of this Agreement, or shall become incapable of acting, or shall be adjudged a bankrupt or insolvent, or a receiver of the Servicer or its property shall be appointed, or any public officer shall take control or charge of the Servicer or of its property or affairs for the purposes of rehabilitation, conservation, or liquidation, in each case giving written notice of such removal to the Servicer and the Borrower; and (ii) thereupon shall appoint a successor Servicer by an instrument in writing; provided, however, that if the Servicer is the holder of a Loan, the Servicer shall

not be removed unless the Servicer is in default hereunder; and provided further that during the occurrence and continuance of a Servicer Default references to Capmark Capital in this Section 9.05(a) shall be deemed references to the Lender.

(b)     Any removal of the Servicer and appointment of a successor Servicer shall become effective upon acceptance of appointment by the successor Servicer under this Agreement. The Servicer being removed shall be entitled to the payment of all of its Servicer's Fees and Expenses owed to it up to the date of its termination. Promptly upon such acceptance, the Servicer shall give notice thereof to the Borrower and the Lender. Subject to the Lender' rights under Section 7.02(a) hereof, if no successor Servicer shall have been appointed and have accepted appointment within 45 days of giving notice of removal, the Servicer, Capmark Capital or the Lender (if a Servicer Default has occurred and is continuing) may petition any court of competent jurisdiction for the appointment of a successor Servicer, and such court may thereupon, after such notice (if any) as it may deem proper, appoint such successor Servicer.

(c)     Anything contained in this Agreement to the contrary notwithstanding, none of the rights of Capmark Capital described in this Section 9.05 and in Sections 4.13, 9.02 and 10.02 of this Agreement shall be deemed to be Lender's Rights.

(d)     Capmark Capital shall be deemed a third-party beneficiary with respect to this Section 9.05.

**Section 9.06. Successor Servicer**. Every successor Servicer appointed hereunder shall execute, acknowledge and deliver to its predecessor and also to the Borrower and the Lender an instrument in writing accepting such appointment hereunder, and thereupon such successor, without any further act, deed, or conveyance, shall become fully vested with all the estates, properties, rights, powers, trusts, duties and obligations of its predecessor; but such predecessor shall, nevertheless, execute and deliver an instrument transferring to such successor Servicer all the estates, properties, rights, powers and trusts of such predecessor hereunder.

**Section 9.07. Further Cooperation**. In connection with any resignation or termination of the Servicer (i) the resigning or terminated Servicer shall, at the sole cost of the Borrower (unless such costs are the responsibility of the Servicer pursuant to Section 7.02 hereof and provided the Borrower shall be responsible for any commercially reasonable increase in the Servicer Regular Monthly Fee resulting therefrom, which increase, if any shall be payable from funds in the Revenue Account at the same level as the Servicer's Regular Monthly Fee), (A) duly assign, transfer and deliver to the successor Servicer this Agreement and all cash and Permitted Investments held by it hereunder; (B) execute such assignments of financing statements and other instruments as may be necessary to give effect to such succession; and (C) take such other actions as may be reasonably required by the Borrower or the successor Servicer in connection with the foregoing; and (ii) the successor Servicer shall establish or continue the Accounts for purposes of this Agreement upon the succession of such Servicer.

**Section 9.08. Servicer to Provide Access to Books**. The Borrower and the Lender and their agents and representatives shall be provided such access to the books and records maintained by the Servicer hereunder (such access to be during business hours and to be upon

reasonable advance notice) as shall be reasonably necessary to permit the Borrower, the Lender and their agents and representatives to take all necessary action to ensure the compliance by the Servicer with the terms and conditions of this Agreement.

## ARTICLE X

## MISCELLANEOUS

**Section 10.01. Notices.** All notices, consents, approvals and requests required or permitted hereunder shall be given in writing and shall be effective for all purposes (a) if hand delivered, upon receipt; (b) if sent by (i) certified or registered United States mail, postage prepaid, return receipt requested, upon receipt or refusal of delivery or (ii) expedited prepaid reputable overnight delivery service, either commercial or United States Postal Service, the next Business Day after delivery to such service; or (c) sent by telecopier and receipt of a machine-generated confirmation of successful transmission (provided, notices of Event of Default and Event of Default Notice and Direction shall not be effectively delivered by telecopier), addressed as follows (or at such other address and Person as shall be designated from time to time by any party hereto, as the case may be, in a written notice to the other parties hereto in the manner provided for in this Section):

| | |
|---|---|
| If intended for Capmark Capital: | Capmark Capital Inc.<br>1801 California Street, Suite 3900<br>Denver, CO 80202<br>Attention: Dan Ray<br>Facsimile: (303) 296-6804 |
| If intended for the Lender: | Capmark Capital Inc.<br>1801 California Street, Suite 3900<br>Denver, CO 80202<br>Attention: Dan Ray<br>Facsimile: (303) 296-6804 |
| with copies to: | Servicer |
| If to Servicer: | Capmark Finance Inc.<br>100 South Wacker Drive, Suite 400<br>Chicago, IL 60606<br>Attention: Construction Lending<br>Facsimile: (312) 845-8623 |
| If to Borrower: | Fort Lee Commonwealth Communities, LLC<br>4401 North Mesa<br>El Paso, TX 79902-1107<br>Attention: James C. Hunt<br>Facsimile: (915) 533-1172 |

with a copy to:                     Pinnacle Fort Lee LLC
                                    18500 Von Karman
                                    Suite 540
                                    Irvine, CA  92612
                                    Attention:  M. Scott Orrantia
                                    Facsimile:  (949) 224-2943

with a copy to:                     Falcon Properties MH, LLC
                                    506 Mockingbird Way
                                    Warrington, PA  18976
                                    Attention:  Sinclair Cooper
                                    Facsimile:  (215) 491-4750

**Section 10.02. Amendment**.  No amendment to this Agreement shall be binding upon any party hereto until such amendment is reduced to writing and executed by the Lender, the Servicer and the Borrower.  In addition, no amendment shall be made to Section 4.04(b) hereof to the extent such amendment would affect the amount, or the priority of payment, of any obligation payable to the Servicer under this Agreement without the prior written consent of Capmark Capital.

**Section 10.03. Remedies Cumulative**.   The rights and remedies provided in this Agreement and the Loan Documents are cumulative and may be exercised by the party entitled thereto independently or concurrently, and are not exclusive of any other right or remedy that is or may be provided at law or in equity.  No failure to exercise or delay in exercising any right or remedy hereunder or under the other Loan Documents shall impair or prohibit the exercise of any such rights or remedies in the future or be deemed to constitute a waiver or limitation of any such right or remedy or acquiescence therein.  Every right and remedy granted hereunder or by law may be exercised at any time and from time to time, and as often as the party entitled thereto may deem it expedient.  Any and all of the Lender's rights with respect to the Lien and security interest granted hereunder shall continue unimpaired, and Borrower shall be and remain obligated in accordance with the terms hereof, notwithstanding (a) any proceeding of Borrower under any bankruptcy, insolvency or reorganization laws or statutes of any state or the federal government; (b) the release or substitution of Collateral at any time, or of any rights or interests therein; or (c) any delay, extension of time, renewal, compromise or other indulgence granted by a Lender in the event of any default, with respect to the Collateral or otherwise hereunder. Nothing contained herein shall in any way prohibit the Lender or the Servicer from exercising any remedy available to it either under the other Loan Documents or by operation of law or equity.

**Section 10.04. Waivers**.

(a)      In the event any covenant, agreement or condition contained in this Agreement shall be breached by a party and thereafter waived by another party, such waiver shall not bind any party which has not waived the breach and shall be limited to the particular breach so waived and shall not be deemed to waive any other breach hereunder nor be a waiver of the same breach on a future occasion and shall be effective only for the purpose for which given.

(b)      No waiver of any term or condition of this Agreement, whether by delay, omission or otherwise, shall be effective unless in writing and signed by the party sought to be charged.

**Section 10.05.  Beneficiaries, Successors and Assigns**.  The Borrower may not assign or transfer any right, duty or remedy of the Borrower under this Agreement to any other Person without the prior written consent of the Lender.  The Lender may pledge, assign and transfer its right, title and interest in this Agreement, the Accounts and the Collateral and may appoint any Person, as such Person's authorized agent to exercise any and all of such Person's rights and remedies under this Agreement in each case without the further consent of any other Person (provided that the appointment of any Person as the Servicer shall be governed by the applicable terms of this Agreement and the Loan Documents).  Promptly after request from the Lender, the Servicer will acknowledge, in writing, such pledge, assignment, transfer, or appointment, which acknowledgment shall, if requested by the Lender, acknowledge that the applicable pledgee, assignee, transferee or appointee is vested with all right, title and interest of such Person in this Agreement, the Accounts and the Collateral.  The Servicer, at the Lender's request, shall change the name of each Account to the name of any such pledgee, transferee, assignee or appointee, as secured party (showing the Borrower as beneficial owner).

**Section 10.06.  Entire Agreement**.   This Agreement, together with the other Loan Documents, constitutes the entire and final agreement between the parties with respect to the subject matter hereof.

**Section 10.07.  Severability**.  If any clause, provision or section of this Agreement shall be ruled invalid or unenforceable by any court of competent jurisdiction, the invalidity or unenforceability of such clause, provision or section shall not affect any of the remaining clauses, provisions or sections.

**Section 10.08.  Execution in Counterparts**.   This Agreement may be executed in several counterparts, each of which shall be an original and all of which shall constitute but one and the same instrument.

**Section 10.09.  Captions**.   All captions in this Agreement are included herein for convenience of reference only and shall not constitute part of this Agreement for any other purpose.

**Section 10.10.  Governing Law**.  This Agreement shall be governed by and interpreted in accordance with the internal laws of the Commonwealth of Virginia without regard to conflicts of laws principles.

**Section 10.11.  Effective Date and Term**.  The provisions of this Agreement shall be effective on and as of the date of this Agreement and shall continue until this Agreement is terminated.

**Section 10.12.  No Mortgagee in Possession; No Joint Venture**.  The Borrower agrees that the Lender is not a mortgagee in possession with respect to the Mortgaged Property or the Land and that this Agreement does not create any obligation on the part of the Lender to manage or operate the Mortgaged Property.   The relationship among each Lender and the Borrower is

that of creditor and debtor and not that of partners or joint venturers. The Borrower agrees that the Lender shall have no fiduciary obligations or trust obligations with respect to managing or operating the Mortgaged Property.

**Section 10.13. Conflicts between this Agreement and the Loan Documents.** If the provisions of this Agreement conflict with the provisions of the Loan Documents, the provisions of the Loan Documents shall control.

**Section 10.14. Interpleader.** If the Servicer, at any time in good faith is in doubt as to the action it should take under this Agreement, it shall have the right to commence an interpleader action in any United States district court in the Commonwealth of Virginia or any other court of proper jurisdiction and to take no further action except in accordance with joint instructions from the Borrower and Lender or in accordance with the order of the court in such action.

**Section 10.15. Nonrecourse.** The terms of Section 10.20 of each of the Loan Agreement (captioned "Nonrecourse") are hereby incorporated into this Agreement by this reference.

**Section 10.16. Assignment by Lender.** The Borrower and the Servicer acknowledge and agree that the Lender may assign its Lender's Rights to one or more Lender Assignees (as defined in the Loan Agreement) and designate other Persons as the "Lender" as and to the extent set forth in Section 10.02 of the Loan Agreement, the terms and provisions of which are hereby incorporated as if set forth herein in full. The Servicer hereby consents to any such assignment to any Lender Assignee, agrees to recognize any such "Lender" as and to the extent set forth in Section 10.02 of the Loan Agreement and acknowledges and agrees that, to the extent of any such assignment, each Lender Assignee is explicitly recognized as an intended third-party beneficiary under this Agreement and all representations and warranties of the Servicer under this Agreement.

[END OF DOCUMENT TEXT]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the date set forth above.

**FORT LEE COMMONWEALTH COMMUNITIES, LLC**, a Delaware limited liability company

By: **Fort Lee Family Housing, LLC**, a Delaware limited liability company, Managing Member

By: **Hunt ELP, Ltd.**, a Texas limited partnership, Member

By: **HB GP, LLC**, a Nevada limited liability company, Managing General Partner

By: _____
Robin Vaughn, Senior Vice President

By: **Falcon Properties MH LLC**, a Pennsylvania limited liability company, Member

By: _____
Sinclair S. Cooper, Sole Member

By: **Pinnacle Fort Lee LLC**, a Washington limited liability company, Member

By: _____
M. Scott Orrantia, Managing Director

**LENDER:**

**CAPMARK CAPITAL INC.,** a Colorado
corporation

By _____

Dan J. Ray, Managing Director

**SERVICER:**

**CAPMARK FINANCE INC.**, a California
corporation

By _____
      Todd Paradis, Senior Vice President